## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| In re:<br><br>FREEDOM INDUSTRIES, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 14-20017 (RGP) |

## EMERGENCY MOTION FOR INTERIM AND FINAL ORDER AUTHORIZING DEBTOR-IN-POSSESSION FINANCING

Freedom Industries, Inc. ("Debtor" or "Borrower"), as a debtor and debtor in possession, hereby submits this emergency motion (the "Motion")[1] for entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A, and a final order (the "Final Order"), pursuant to sections 105, 361, 362(a), 364(c)(1), 364(c)(2), and 364(c)(3) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code) and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  In support of this Motion, the Debtor respectfully represents as follows:

## CONCISE STATEMENT UNDER BANKRUPTCY RULE 4001

1. By this Motion, the Debtor seeks entry of the Interim Order and at a final hearing, the Final Order seeking, *inter alia*, the following:

   a. authority for the Debtor to obtain post-petition credit from WV Funding LLC "Lender") disbursed in installment advances from time to time, up to an aggregate principal amount outstanding not to exceed $4,000,000 on an interim basis and Five Million Dollars $5,000,000 at any time (the "Maximum Commitment Amount"), and including, without limitation, principal, interest, fees, expenses, and other costs of Lender in accordance with the terms and conditions set forth in the Debtor-in-Possession Credit

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DIP Agreement.

      Agreement (the "<u>DIP Agreement</u>")[2] and all related documents (collectively, the "<u>DIP Facility</u>");

  b. authority for the Debtor to execute, deliver and perform under the DIP Facility and the Loan Documents on account of the DIP Facility and granting or perfecting liens or security interests by the Debtor in favor of Lender on account of the DIP Facility, as same now exists or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all of the documents currently executed or to be executed in connection therewith or related thereto;

  c. approval of the terms and conditions of the DIP Facility and Loan Documents as so executed and delivered;

  d. modification of the automatic stay of section 362 of the Bankruptcy Code (the "<u>Automatic Stay</u>") to the extent provided herein; and

  e. granting of liens and super priority administrative claims to Lender as adequate protection to Lender in respect of the DIP Facility.

**A. Terms of the DIP Facility**

 2. The significant terms of the DIP Agreement are as follows:

  a. <u>Borrower</u>:  Freedom Industries, Inc., a West Virginia Corporation

  b. <u>Guarantor</u>:  None.

  c. <u>Lender</u>:  WV Funding LLC, a West Virginia Limited Liability Company

  d. <u>Purpose; Uses</u>:  Provide additional liquidity to the Debtor in order to allow it to continue to operate as a going concern.  The proceeds of the DIP Facility may be used by the Debtor to fund the costs and expenses of Lender, and the general corporate and working capital requirements of the Debtor as outlined in the Budget (defined below).

---

[2] A copy of the DIP Agreement is attached hereto as <u>Exhibit B</u> and incorporated herein by reference.  The terms and conditions of the DIP Agreement set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such.  For a complete description of the terms and conditions of the DIP Agreement, reference should be made to the DIP Agreement and the proposed Interim Order.  The summary herein is qualified in its entirety by reference to such documents and parties are strongly encouraged to read the operative documents.  In the event of a conflict or inconsistency between the Motion and the operative documents, the operative documents shall control in all respects.

e. Commitment: A term loan facility disbursed in installment advances from time to time, up to an aggregate principal amount of $4,000,000 on an interim basis and $5,000,000 on a final basis, and including, without limitation, principal, interest, fees, expenses, and other costs of Lender in accordance with the terms and conditions set forth in the DIP Facility and DIP Agreement.

f. Interest Rate: The DIP Facility and all amounts capitalized and added to the principal balance of the Term Loan) shall bear interest at equal to the JP Morgan prime rate in effect on the Interim Closing Date, plus two (2.00%) percent per annum. Notwithstanding the foregoing, in the event an Event of Default has occurred and is continuing, the DIP Facility shall bear interest at a rate equal to ten percent (10.00%) per annum from the date of occurrence of such Event of Default until date such Event of Default is cured or waived (after as well as before judgment). In addition, should any interest on the Loan or any other obligations payable not be paid when due (whether at the stated maturity, by acceleration or otherwise) such overdue amount shall bear interest (to the extent permitted by law in the case of interest on interest) at a rate equal to the rate set forth above plus two percent (2%) in each case, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

g. Prepayment: Voluntary pre-payments under the DIP Facility may be made at any time without penalty or premium unless such pre-payment is in connection with an asset sale or plan of reorganization not supported by Lender (in its sole discretion), in which case there shall be a pre-payment premium payable to Lender at the time of such voluntary pre-payment in the amount of ten percent (10.00%) of the DIP Facility.

h. Maturity Date: The earlier to occur of 180 days after the Petition Date (the "Final Maturity Date") or the Commitment Termination Date as defined in the DIP Agreement.

i. Priority and Security: The Lender shall be provided the following liens and administrative expense priority:

   i. *Superpriority Claim.* Pursuant to section 364(c)(1) of the Bankruptcy Code, and other than the Carve Out all of the obligations under the DIP Facility shall constitute allowed senior administrative expense claims against the Debtor with priority over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b)

3

and 507(b) of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, any successor trustee, or any creditor, in this case or any subsequent proceedings under the Bankruptcy Code (the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from and have recourse to all pre- and postpetition property of the Debtor and all proceeds thereof;

ii. *First Lien on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected first priority senior security interest in and lien upon all pre- and postpetition property of the Debtor, wherever located, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively, "Unencumbered Property"), including, without limitation, any and all [cash and cash collateral of the Debtor and any investment of such cash and cash collateral, any and all machinery, equipment, inventory, accounts, accounts receivable, any other right to payment whether arising before or after the Petition Date, contracts, and refunds of any nature, [insurance proceeds], contracts, properties, plants, machinery, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names,, as extracted collateral, other real property and fixtures thereon and/or improvements thereto, insurance premium refunds, security deposits, utility deposits, bonds and proceeds of same, motor vehicles, titled vehicles, rolling stock, leasehold interests in real and personal property, intellectual property rights and interests, and customer lists and proceeds of any and all foregoing whether acquired before or after the Petition Date, whether now owned and existing or hereafter acquired, created, or arising, and all products and proceeds thereof (including without limitation, claims of the Debtor against third parties for loss or damage to such property), and all accessions thereto, substitutions and replacements therefor, and wherever located, and all assets acquired by the Debtor post-petition (collectively, the "DIP Collateral");

iii. *Liens Junior to Certain Other Liens*. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and postpetition property of the Debtor, whether now existing or hereafter acquired, that is subject to valid, perfected, and

4

        unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code;

j.     <u>Budget</u>: Prior to the Petition Date, the Debtor delivered to the Lender a 13-week cash flow forecast and budget (as supplemented from time to time in accordance with the DIP Facility, the "<u>Budget</u>"), which reflects the Debtor's projection of all cash receipts and disbursements during such 13-week period, and which Budget is attached to the proposed Iterium DIP Order as <u>Exhibit 2</u> thereto . The Debtor is permitted Budget overage variances of only up to ten percent (10.00%) of the sum of total disbursements on a cumulative basis from the date of entry of the Interim Order to the particular week, beginning in week three of the Budget. The Budget may only be modified in writing with the prior written consent of the Lender, in its sole and absolute discretion, provided notice of such modification is filed of record with the Bankruptcy Court.

k.     <u>Covenants</u>: The DIP Agreement contains affirmative, negative, and financial reporting covenants customary for facilities of this nature, including, without limitation: (i) limitations on other indebtedness; (ii) limitations on mergers, acquisitions, asset dispositions, or sales outside the ordinary course of business without prior Lender consent; (iii) limitations on dividends other restricted payments; (v) limitations on investments (including joint ventures and partnerships) without the prior consent of Lender; (vi) limitations on formation of subsidiaries and issuances of equity interests without the prior consent of Lender; (vii) maintenance of existing properties; (viii) limitations on liens; (ix) compliance with laws, including environmental and ERISA; (xi) payment of taxes and other liabilities; (xii) use of proceeds of DIP Facility; and (xiii) delivery of Budget in form and substance satisfactory to Lender and compliance therewith.

l.     <u>Representations and Warranties</u>: Article III of the DIP Agreement sets forth representations and warranties customary for facilities of this nature, including, without limitation: (i) corporate status, (ii) power and authority, (iii) enforceability and due execution and delivery of DIP Facility loan documents, (iv) no violation or conflicts with laws, contracts, or charter documents, (v) financial statements and undisclosed liabilities, (vi) true and complete disclosure, (vii) compliance with ERISA, environmental law, general statutes, etc., (viii) ownership of property, (ix) perfection of security interests to secure DIP Facility, (ix) existing indebtedness, (x) maintenance of insurance, (x) subordination, and (xi) final Bankruptcy Court approval.

m. Events of Default: The DIP Agreement contains usual and customary events of default for facilities of this type, which are set forth in Article VII of the DIP Agreement. Without limitation, the occurrence of any of the following shall constitute an event of default under the DIP Agreement: (a) any default, violation, or breach of any of the terms of the Interim Order or the Loan Documents by the Debtor upon five (5) days written notice from Lender; (b) the occurrence of the Maturity Date, termination, expiration, or non-renewal of the Interim Order or the DIP Facility as provided for in the Interim Order or the Loan Documents; (c) the non-payment by the Debtor of Principal, interest, or any fee or other amount due under the DIP Agreement after such amount becomes due and payable; (d) any representation or warranty made by the Debtor in the DIP Agreement or in any statement or certificate given after the Initial Closing Date by the Debtor in writing pursuant to any Loan Document or in connection with any Loan Document shall be false in any material respect on the date as of which made; (e) the Debtor shall breach or violate any covenant or agreement contained in the Loan Documents; (f) the conversion of the Debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; (g) the appointment of a trustee in the Debtor's chapter 11 case without the prior written consent of Lender; (h) the appointment of an examiner in the Debtor's chapter 11 case with expanded powers without the prior written consent of Lender; (i) the dismissal of the Debtor's chapter 11 case; (j) the entry of an order approving an Asset Sale or approving a Change in Control by virtue of a transfer or sale of the ownership interests of the Debtor without the prior written consent of the Lender; (k) the entry of any order reversing, revoking, staying, rescinding, or vacating this Interim Order without the express prior written consent of the Lender; (l) any security interest, lien, claim, or encumbrance, excluding Permitted Liens, shall be granted in any of the DIP Collateral which is *pari passu* with or senior to the claims of Lender granted herein, including any surcharge of the DIP Collateral pursuant to Bankruptcy Code sections 506(c), 552, or otherwise; (m) the Debtor shall attempt to vacate or modify the Interim Order over the objection of the Lender; (n) any challenge by the Debtor to the extent, validity, priority, or unavoidability of Lender's liens or security interest securing the DIP Facility; (o) the entry of an order granting relief from the Automatic Stay to the holder or holders of any security interest or lien in any DIP Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any assets of the Debtor; (p) any provision of the Loan Documents shall cease to be valid and binding on the Debtor, or the Debtor shall assert in any pleading filed with any court; and (q) any other Event of Default under the Loan Documents (any of the foregoing events of default, being referred to individually as an "Event of Default", or collectively, as "Events of Default").

    n.    <u>Remedies</u>:  Article VII of the DIP Agreement sets forth each of the Remedies available to Lender under the DIP Agreement, which include, *inter alia*, that upon the occurrence of any Event of Default that remains uncured by the Debtor within five (5) days after the Debtor's receipt of written notice of such Event of Default from Lender: (a) Lender may declare all or any part of the DIP Facility immediately to be accelerated and due and payable for all purposes, rights, and remedies, (b) Lender's obligations in connection with the DIP Facility shall immediately terminate, and (c) with the exception of funding the Carve Out, any and all obligations of Lender under the Interim Order shall terminate. Notwithstanding anything to the contrary, Lender shall have no obligation to make any advances under the DIP Facility unless all terms and conditions of the DIP Agreement are satisfied at the time of such advance, including, but not limited to, those conditions precedent contained in the DIP Agreement.  Furthermore, (i) upon the occurrence of any Event of Default that remains uncured by the Debtor within five (5) days after the Debtor's receipt of written notice of such Event of Default from Lender, and (ii) upon entry of an order granting Lender relief from the Automatic Stay (if and to the extent necessary), then Lender shall be entitled to pursue all rights and remedies in accordance with applicable law in connection with the DIP Facility.  Upon the occurrence of any Event of Default, Lender shall be entitled to seek, on an expedited basis, relief from the Automatic Stay.  Finally, upon the occurrence of any Event of Default that remains uncured by the Debtor within five (5) days after the Debtor's receipt of written notice of such Event of Default from Lender, Lender shall not be obligated to, but may, in its sole and absolute discretion, continue to advance funds to the Debtor, and all such advance(s) shall not constitute a waiver, limitation, or modification of Lender's rights and remedies pursuant to the Loan Documents and under applicable law and shall be granted all of the protections granted to Lender under the Interim Order in connection with the DIP Facility.

    o.    <u>Lender's Fees and Expenses</u>: During this chapter 11 case, all reasonable fees, costs, and expenses, including attorneys' fees and expenses, that are incurred by the Lender (prior to or following the Petition Date) as a result of the Debtor's chapter 11 case in connection with the DIP Facility, including, but not limited to, fees and costs associated with documenting, enforcing, and collecting on the DIP Facility ("<u>Lender Costs</u>"), shall be paid by the Debtor out of the DIP Facility advances on a monthly basis.  In order to facilitate tracking of Lender's Costs by the Debtor, counsel for the Lender will provide from time to time (but not less than once each month with respect to the prior month) the amount of its fees and expenses so paid under this paragraph to counsel for the Debtor and the United States Trustee.  Such payment shall not constitute satisfaction of any fees of such

7

        professionals other than those actually paid. Any reasonable fees and expenses of Lender that are paid pursuant to the foregoing Lender Costs procedure shall be deemed allowed without further Order of this Court, unless the Debtor or United States Trustee objects to such Lender Costs based on reasonableness within twenty (20) days of the payment of same.

    p.    <u>Indemnification</u>: The Debtor will indemnify Lender and its directors, officers, employees, attorneys, and other advisors and affiliates for any loss, claim, damage, or liability arising out of or relating to the DIP Facility, or the use of proceeds thereof in accordance with customary indemnification provisions (including no indemnification for gross negligence or willful misconduct of the Lender as determined by a court of competent jurisdiction in a final and non-appealable decision).

    q.    <u>Surcharge Protection</u>: No costs or expenses of administration or other costs or expenses of the Debtor or its bankruptcy estate that may be incurred in this chapter 11 case, or other proceedings or matters related thereto, shall be charged against Lender or Lender's DIP Collateral pursuant to Bankruptcy Code sections 506(c), 552, or otherwise.

## JURISDICTION AND VENUE

3. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this case and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief requested herein are sections 105 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001.

## BACKGROUND

**(i).   The Bankruptcy Case**

5. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

6. The Debtor continues to manage and operate its business as a debtor in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.

7. No trustee or examiner has been appointed in this chapter 11 case, and no committees have yet been appointed or designated.

**(ii). The Debtor**

8. Freedom is engaged principally in the business of producing specialty chemicals for the mining, steel and cement industries. It is a leading supplier of freeze conditioning agents, dust control palliatives, flotation reagents, water treatment polymers and other specialty chemicals.

9. Freedom, whose corporate office is located in Charleston, West Virginia, operates two production facilities located in (a) Nitro, West Virginia (the "Nitro Facility") and (b) Charleston, West Virginia (the "Charleston Facility").

10. The Nitro Facility (a/k/a Poca Blending) operates four emulsion lines, two FCA Blenders, and one specialty chemical reactor. The Nitro Facility has a fully staffed laboratory for quality assurance and research. Finished goods are distributed via truck and rail.

11. The Charleston Facility (a/k/a Etowah River Terminal) is located on the Elk River and is accessible by barge and truck. The Charleston Facility is comprised of multiple large storage tanks and has significant storage capacity, as well as two computer controlled truck loading stations.

12. The current owner of equity in the Debtor has owned such equity for fewer than forty-five (45) days.

13. On December 6, 2013, the equity in Freedom was acquired by its current owner. The current owner of Freedom also acquired all of the membership interests in Etowah River Terminal, LLC, a West Virginia limited liability company ("Etowah LLC"). At the time of the acquisition, Poca Blending, LLC, a West Virginia limited liability company ("Poca LLC") and

9

Crete Technologies, LLC, a Delaware limited liability company ("Crete LLC") were wholly-owned subsidiaries of Freedom.

14.     On December 31, 2013, a corporate restructuring occurred pursuant to which Etowah LLC, Poca LLC and Crete LLC were merged with and into Freedom, with Freedom as the sole surviving entity following the merger.  Collectively, the entities that currently comprise Freedom had gross revenue in fiscal year 2012 of approximately $25.7 million and gross revenue in fiscal year 2013 of approximately $30.7 million.

**(iii)    Events Leading to the Filing of the Chapter 11 Case.**

15.     On or about January 9, 2014, an incident occurred involving one of Freedom's storage tanks located at the Charleston Facility (the "Incident").  Facts surrounding the Incident are subject to pending investigations by Freedom and various regulatory and other governmental authorities.[3]

16.     It is presently hypothesized that a local water line break adjacent to the Charleston Facility may have caused or contributed to the ground beneath a storage tank at the Charleston Facility to freeze in the extraordinary frigid temperatures in the days immediately preceding the Incident.  The Debtor and investigative authorities have taken note of the hole in the affected storage tank that appears to have come from an object piercing upwards through the base of the affected storage tank.  Investigations by multiple agencies are ongoing with full cooperation by the Debtor.

17.     It has been reported that the Incident involved the apparent release from one of Freedom's storage tanks of a substance referred to as methylcyclohexane methanol, a/k/a

---

[3] The facts and circumstances relating to the Incident as described herein are intended for explanatory purposes only and shall not prejudice the rights, claims or defenses of any party in interest, including, without limitation, the rights of any purported holder of a claim arising from or related to the Incident, and correspondingly, all rights, claims and defenses of the Debtor and other parties in interest are preserved.

Case 2:14-bk-20017    Doc 2    Filed 01/17/14    Entered 01/17/14 15:48:38    Desc Main
                            Document      Page 11 of 18

MCHM, into the Elk River. MCHM is used by customers of Freedom to treat coal and reduce the amount of ash during the coal preparation process. The water company was notified.

18.     MCHM is not a regulated substance, and accordingly, there are no published standards regarding acceptable concentrations of MCHM in water. To the best knowledge, information and belief of the Debtor, no aquatic life was harmed as a result of the Incident.

19.     On January 9, 2014, within hours following discovery of the Incident, West Virginia Governor Earl Ray Tomblin declared a state of emergency for nine (9) West Virginia counties stating that water supplied by the local water authority had been contaminated (the "Declaration").

20.     In response to the Declaration, county residents and businesses were encouraged to refrain from using water supplied by the local water company. The Debtor understands that as a result of the Incident and the corresponding Declaration, various businesses were temporarily closed. The Debtor understands that water service is in the process of being restored.

21.     As of January 16, 2014, approximately 20 lawsuits have been commenced against the Debtor and other parties in state and federal courts relating to the Incident.

22.     As a result of the substantial media coverage relating to the Incident, vendors and customers of the Debtor have made demands upon the Debtor that it cannot reasonably satisfy without additional liquidity. Many vendors have required cash-on-delivery or cash-in-advance for goods and services essential to the going concern operations of the Debtor. These modified credit requirements have proven to be disruptive to the Debtor's operations, and absent additional liquidity, the Debtor, its estate and creditors will suffer irreparable harm as the Debtor will have no choice but to liquidate. Likewise, the defense of the numerous suits filed against the Debtor will exhaust the Debtor's liquidity and the attention of its management absent the

automatic stay afforded by this filing.

Accordingly, Freedom, in an exercise of its reasoned business judgment, determined that the most efficient and equitable way of addressing vendor and liquidity issues as well as the multitude of claims that have been or may be asserted against the Debtor was to seek protection under chapter 11 of the Bankruptcy Code.

### C.    The Debtor's Decision to Enter Into the DIP Facility

23.    The Debtor's current financial circumstances result from a single incident that occurred approximately one week ago.  The fallout from the Incident has created substantial liquidity problems.  The Debtor submits that under is current circumstances, it is unable to obtain credit allowable under sections 503(b)(1), 364(a), or 364(b) of the Bankruptcy Code.

24.    The Debtor has conferred with its counsel and financial advisor in determined that the terms and conditions of the DIP Facility are at, and in some instances below, market for distressed loans.  The Debtor determined in its business judgment that the DIP Facility provides the best and only reasonable opportunity to finance its case, as contemplated by section 364(c) of the Bankruptcy Code.  Accordingly, the Debtor decided, in the exercise of its sound business judgment, that the terms of the DIP Facility were the most favorable under the circumstances and best addressed the Debtor's working capital needs.

25.    The Debtor's entry into the DIP Facility will afford the Debtor valuable additional time to maintain its business as a viable going concern enterprise while maintaining its value going forward.  Therefore, the Debtor has determined that entry into the DIP Agreement is in the best interests of its estate, creditors, and all other parties in interest.

**BASIS FOR RELIEF REQUESTED**

26. If a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), then the Court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt (a) with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien. See 11 U.S.C. § 364(c).

27. Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

28. Bankruptcy Rule 4001(d) provides, in relevant part, that a motion (i) for obtaining credit, or (ii) for approval to modify or terminate the automatic stay, shall be served on any official creditors' committee, or, if as in the instant case where no committee has been elected or appointed, on the creditors included on the list filed under Bankruptcy Rule 1007(d), and on such other entities as the court may direct, Fed. R. Bankr. P. 4001(c)(1), (d)(1). The Rule further provides that objections to the relief sought may be filed within 14 days of the mailing of the notice of the motion and the time for filing objections thereto. See Fed. R. Bankr. P. 4001(d).

**A.     The DIP Facility Should Be Approved**

29.     Under the current circumstances faced by the Debtor, the Debtor determined that it was not possible to obtain postpetition financing on an unsecured basis or on a junior priority basis within the time periods that the Debtor's liquidity situation permitted. See In re The Rowe Cos., Case No. 06-11142 (Bankr. E.D. Va. Oct. 16, 2006) (authorizing credit on a super-priority basis); In re U.S. Airways, Inc., Case No. 04-13819 (Bankr. E.D. Va. Feb. 28, 2005) (same).

30.     The Debtor negotiated the DIP Agreement with the Lender in good faith, at arm's length with experienced counsel on each side, and pursuant to the Debtor's sound business judgment. Provided that this judgment does not run afoul of the provisions of and policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its business judgment. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor in possession financing necessary to sustain seasonal business); In re Ames Department Stores, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest").

31.     The financing under the DIP Agreement provides significant liquidity to the Debtor and thus will enable the Debtor, *inter alia*, to (a) minimize disruption to its business and ongoing operations, (b) enhance the value of the Debtor's estate for the benefit of all creditors and parties in interest and, (c) avoid immediate and irreparable harm to the Debtor, its creditors, its business, its employees, and its assets.

32. Such financing is the sole means of sustaining the Debtor's ongoing operations, thus preserving and enhancing the Debtor's going concern value. Indeed, without the financing provided by the DIP Facility, the Debtor will be unable to meet its direct operating expenses, will suffer irreparable harm, and its entire reorganization effort will be severely jeopardized.

33. The terms and conditions of the DIP Agreement are fair and reasonable, and were negotiated by the parties in good faith and at arm's length. Accordingly, the Lender should be accorded the benefits of Bankruptcy Code section 364(e) in respect of the DIP Agreement.

34. Based upon the foregoing, the Debtor respectfully requests that the Court approve the DIP Facility in accordance with the terms set forth in the Interim Order and the DIP Agreement.

**B.**     **The Terms of the DIP Facility are Fair, Reasonable, and Appropriate**

35. The proposed terms of the DIP Facility are fair, reasonable, and appropriate under the circumstances currently facing the Debtor. First and foremost, the Debtor has made a concerted, good faith effort to obtain credit on the most favorable terms that are available. The circumstances faced by the Debtor mean that lending to the Debtor has inherent risks and that the terms and conditions of the DIP Facility are fair and reasonable in comparison to the risk.

36. Against this backdrop, the Debtor carefully evaluated the proposed financing structure from the Lender, engaged in extensive negotiations with the Lender regarding the proposed terms, and eventually agreed to the Lender's proposal, as it was deemed best suited to the Debtor's needs. Moreover, the terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arm's length, and were instituted for the purpose of enabling the Debtor to meet ongoing operational expenses and to maximize the value of the Debtor's estate.

37. Accordingly, the various fees and expenses required to be paid by the Debtor to the Lender under the DIP Agreement are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. See, e.g., In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

38. Thus, the terms of the DIP Agreement are fair, reasonable, and adequate, and the Lender should be afforded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

C. **Modification of the Automatic Stay is Appropriate**

39. Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed Interim Order contemplates a modification of the automatic stay, to the extent applicable and necessary, to (i) entitle the Lender to exercise its rights and remedies in accordance with the DIP Facility and (ii) permit the Debtor to incur all liabilities and obligations required under the DIP Facility.

40. Provisions modifying the automatic stay are ordinary and standard features of postpetition debtor in possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. Accordingly, the Debtor respectfully requests that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and the DIP Facility.

E. **Interim Approval of the DIP Facility Should Be Granted**

41. Bankruptcy Rules 4001(b) and (c) provide that a final hearing to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service

of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable to the debtor's estate.

42. The Debtor requests that the Court schedule and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtor, from and after the entry of the Interim Order until the Final Hearing, to obtain credit under the terms of the DIP Facility. This relief will enable the Debtor to operate its business in a manner that will permit it to preserve value and avoid immediate harm and prejudice to its estate and all parties in interest, pending the Final Hearing.

## NOTICE

43. Notice of this Motion has been provided to: (a) the Office of the United States Trustee; (b) the attorney for Lender; (c) all creditors known to the Debtor who have or may assert liens against the Debtor's assets; (d) the United States Internal Revenue Service; (c )the twenty (20) largest liquidated unsecured creditors of the Debtor; and (d) those parties upon whom service must be effected under the Bankruptcy Rules or the Local Rules of the Southern District of West Virginia. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

## NO PRIOR REQUEST

44. No previous motion for the relief sought herein has been made to this or any other Court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtor, Freedom Industries, Inc., respectfully requests that this Court (i) enter the Interim Order granting the relief requested herein, (ii) schedule a Final Hearing, (iii) following the Final Hearing, enter the Final Order, and (iv) grant such other relief as is just and proper.

Dated: January 17, 2014

Respectfully submitted,

**BARTH & THOMPSON**

 /s/ Stephen L. Thompson_____
Stephen L. Thompson (WV 3751)
J. Nicholas Barth (WV 255)
Barth & Thompson
P.O. Box 129
Charleston, West Virginia 25321
Telephone: (304) 342-7111
Facsimile: (304) 342-6215

and

**McGUIREWOODS LLP**

Mark E. Freedlander (PA 70593)
Michael J. Roeschenthaler (PA 87647)
Scott E. Schuster (PA 203766)
Jason P. Alter (PA 307596)
625 Liberty Avenue, 23rd Floor
Pittsburgh, PA  15222
Telephone: (412) 667-6000
Facsimile: (412) 667-6050

Proposed Attorneys for the Debtor and
Debtor-in-Possession