**EXHIBIT "B" TO DIP MOTION**

**DIP AGREEMENT**

**EXECUTION VERSION**

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Effective as of JANUARY ___, 2014

among

FREEDOM INDUSTRIES, INC.
Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, as Borrower,

and

WV FUNDING LLC, as Lender

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS ................................................................................. 1

    1.1    Defined Terms .................................................................................. 1

    1.2    Other Definitional Provisions .......................................................... 5

    1.3    Payment Terms; References to Money .............................................. 6

ARTICLE II        AMOUNT AND TERMS OF REVOLVING LOANS ................. 6

    2.1    Loan Commitments............................................................................ 6

    2.2    Note ................................................................................................... 7

    2.3    Procedure for Installment Loans and Payments................................ 7

    2.4    Permanent Reduction of Loan Commitment ..................................... 7

    2.5    Interest Rates and Payment Dates..................................................... 7

    2.6    Computation of Interest .................................................................... 8

    2.7    Prepayments...................................................................................... 8

    2.8    Use of Proceeds................................................................................. 8

    2.9    Priority and Security ......................................................................... 8

    2.10    Payment of Obligations..................................................................... 9

    2.11    No Discharge, Survival of Claims .................................................... 9

ARTICLE III        REPRESENTATIONS AND WARRANTIES............................ 9

    3.1    No Legal Bar ..................................................................................... 9

    3.2    No Default.......................................................................................... ..10

    3.3    Purpose of Loans............................................................................... 10

    3.4    Accuracy and Completeness of Information...................................... 10

    3.5    The Orders ......................................................................................... 10

    3.6    Liens and Claims of Lender .............................................................. 10

    3.7    Reorganization Matters ..................................................................... 10

ARTICLE IV        CONDITIONS PRECEDENT ................................................... 11

    4.1    Conditions ......................................................................................... 11

    4.2    Conditions to Draws Upon Entry of the Interim Order .................... 11

    4.3    Conditions to Additional Draws Upon Entry of the Final Order...................12

ARTICLE V        NEGATIVE COVENANTS ....................................................... 13

# TABLE OF CONTENTS

(continued)

**Page**

| | | | |
|---|---|---|---|
| 5.1 | Limitation on Indebtedness | | 13 |
| 5.2 | Limitation on Liens or Claims | | 13 |
| 5.3 | Limitation on Sale of Assets | | 13 |
| 5.4 | Limitations on Employee Inceptives, Bonuses or Other Retention Payments | | 13 |
| 5.5 | Limitations on use of Term Loan Proceeds | | 13 |
| 5.6 | Disrepair or Impairment of Assets | | 14 |
| 5.7 | Failure to Comply with Laws | | 14 |
| ARTICLE VI | TERMINATION | | 14 |
| 6.1 | Termination | | 14 |
| 6.2 | Survival of Obligations Upon Termination of Financing Arrangements | | 14 |
| ARTICLE VII | EVENTS OF DEFAULT; RIGHTS AND REMEDIES | | 14 |
| 7.1 | Events of Default | | 14 |
| 7.2 | Remedies | | 16 |
| ARTICLE VIII | MISCELLANEOUS | | 17 |
| 8.1 | Amendments and Waivers | | 17 |
| 8.2 | No Waiver; Cumulative Remedies | | 17 |
| 8.3 | Survival of Representations and Warranties | | 17 |
| 8.4 | Successors and Assigns; Participations and Assignments | | 17 |
| 8.5 | Counterparts | | 17 |
| 8.6 | Severability | | 18 |
| 8.7 | Governing Law | | 18 |
| 8.8 | Submission to Jurisdiction; Waivers | | 18 |
| 8.9 | No Waiver | | 18 |

THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT ("Agreement"), effective as of January ___, 2014, by and between FREEDOM INDUSTRIES, INC. ("Borrower"), debtor and a debtor-in-possession in a case pending under Chapter 11 of Title 11 of the Bankruptcy Code pending in the United States Bankruptcy Court for the Southern District of West Virginia (the "Chapter 11 Case"), and WV FUNDING LLC, a West Virginia Limited Liability Company. ("Lender").

RECITALS

WHEREAS, on January 17, 2014 (the "Petition Date"), the Borrower filed a voluntary petition for relief with the Bankruptcy Court (as defined in Section 1.1) initiating the Chapter 11 Case, and has continued in the possession of its assets and in the management of its business pursuant to Bankruptcy Code Sections 1107 and 1108;

WHEREAS, on January 21 , 2014 the Bankruptcy Court conducted a hearing on approval of the Debtor-In-Possession Financing to be evidenced by a Secured Promissory Note ("Note") and related  Loan Documents ("Loan'), and entered the Interim Agreed Order Authorizing Debtor-In-Possession Financing on January ____, 2014 ("Interim Order") ;

WHEREAS, the Interim Order scheduled a hearing before the Bankruptcy Court on February [__], 2014 for the purpose of approving the Loan on a final basis and entering the Final Order;

WHEREAS, this Agreement is being executed with and in contemplation of entry of the Final Order by the Bankruptcy Court;

WHEREAS, an immediate and on-going need exists for the Borrower to obtain additional funds in order to continue the operation of its business and manage its affairs as debtor-in-possession under Chapter 11 of the Bankruptcy Code and, accordingly, the Borrower has requested that the Lender extend post-petition financing to the Borrower;

WHEREAS, the Lender is willing to make the Loan as defined in Section 1.1 to the Borrower upon the terms and conditions set forth herein;

WHEREAS, all Exhibits hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together, shall constitute but a single agreement.

THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

ARTICLE I
DEFINITIONS

1.1    Defined Terms.

Capitalized terms used in the Loan Documents shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings and all Section references in the following definitions shall refer to Sections of the Agreement.

1

"Agreement" shall mean this Debtor-in-Possession Credit Agreement, as the same may from time to time be amended, modified or supplemented.

"Asset Sale" shall mean any disposition of Collateral or series of related dispositions of Collateral.

"Bankruptcy Code" shall mean 11 U.S.C. §§ 101, et seq. as amended.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of West Virginia.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Procedure for the Southern District of West Virginia, as either of the same may from time to time be in effect and applicable to the Chapter 11 Case.

"Borrower" shall mean and refer to FREEDOM INDUSTRIES, INC., the debtor and a debtor-in-possession.

"Budget" shall mean the 13-week cash flow forecast prepared by Borrower on a cash basis, and updated demonstrating actual income and expenses compared against Budget on a bi-weekly basis, all in form and substance satisfactory to the Lender.  A copy of the Budget shall be attached to the Interim Order.

"Business Day" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in West Virginia are authorized or required by law to close.

"Change of Control" shall mean the occurrence of any of the following:

(a)     the acquisition directly or indirectly by any Person (other than the Lender) or two or more Persons acting in concert of (i) beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act of 1934) of thirty-five percent (35%) of the outstanding Voting Securities of the Parent or (ii) the power (whether or not exercised) to elect a majority of the Parent's directors;

(b)     A Trustee or Examiner with expanded powers is appointed in Borrower's Chapter 11 Case; or

(c)     Borrower's Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code, or dismissed.

"Chapter 11 Case" shall have the meaning ascribed thereto in the Preamble.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Commitment Termination Date" shall mean the earliest of (a) the Maturity Date; (b) the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code of a

Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court; and (c) the acceleration of the Loan and the termination of the Loan Commitments in accordance with the terms hereof, including Section 7.2.

"Default" shall mean any of the events specified in Section 7.1, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Draw Request" shall mean written requests for draws of the Loan by Borrower which requests (i) shall not exceed one per every seven (7) day period; (ii) shall be no less than $50,000 per draw; (iii) shall not in the aggregate exceed $5,000,000 until such time as the Bankruptcy Court has entered the Final Order; (iv) shall not in the aggregate exceed the Maximum Commitment Amount; and (v) shall be for purposes and in amounts as contemplated by the Budget or the Loan Documents.

"Event of Default" shall have the meaning ascribed thereto in Section 7.1.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court which order shall be satisfactory in form and substance to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely field, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur indebtedness, and authorizes and approves in their entirety the Loan, Budget and Loan Documents.

"Fiscal Year" shall mean any of the annual accounting periods of the Borrower ending on December 31 of each year.

"Interest Payment Date" means the first Business Day of each month.

"Interim Closing Date" shall mean the date of funding by Lender of the First Draw Request, which date was January [21], 2014.

"Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Case on January [__], 2014, after notice and hearing in accordance with Bankruptcy Rule 4001(c)(1)(C)(3), and which authorized and approved the Loan, Budget, Loan Documents.

"IRS" shall mean the Internal Revenue Service, or any successor thereto.

"Lender" shall have the meaning ascribed thereto in the preamble.

"Lien" shall mean any mortgage, deed of trust, pledge, statutory deemed trust, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale

or other title retention agreement and any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC (other than the filing of any such financing statement which states therein that such filing is a precautionary filing only and is filed in connection with "true leases" only) or comparable law of any jurisdiction), (b) any arrangement or agreement which prohibits any loan party from creating any mortgage, pledge, hypothecation, deposit arrangement, encumbrance, lien, charge or other security interest, or from entering into any agreement or arrangement described in <u>clause (a)</u> of this definition or (c) the sale, assignment, pledge or transfer for security of any accounts, general intangibles or chattel paper of any loan party with or without recourse.

"<u>Loans</u>" shall mean the Loan as funded by Lender in installments from time to time pursuant to written Draw Requests by Borrower.

"<u>Loan</u>" shall have the meaning ascribed thereto in <u>Section 2.1</u>, as such Loan may be increased by interest and fees to outside Persons incurred by Lender and relating to the Loan capitalized and added to the principal balance thereto pursuant to the terms of this Agreement.

"<u>Loan Commitment</u>" means Lender's commitment to make the Loan in installments to the Borrower as set forth herein.

"<u>Loan Documents</u>" shall mean the Agreement, the Note, the Interim Order and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrower in connection with the Agreement or the transactions contemplated hereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all exhibits thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such Agreement as the same may be in effect at any and all times such reference becomes operative.

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on (a) the business, operations, property, or condition (financial or otherwise) of the Borrower, (b) the ability of Borrower to fully and timely perform its Obligations or (c) the validity, priority or enforceability of this Agreement, the Note or any of the other Loan Documents, or the rights or remedies of the Lender hereunder or thereunder.

"<u>Maturity Date</u>" shall mean the earlier to occur of (a) one hundred eighty (180) from the date that Borrower files its Bankruptcy Case (the "Petition Date"), or the Commitment Termination Date as defined herein.

"<u>Maximum Commitment Amount</u>" shall mean Five Million ($5,000,000) Dollars.

"<u>Note</u>" shall mean the Secured Promissory Note dated January __, 2014 in the principal amount of Five Million Dollars ($5,000,000.00).

"<u>Obligations</u>" shall mean the unpaid principal of and interest on (including without limitation, interest accruing after the maturity of the Loan) the Note and under this Agreement, or any other document made, delivered or given in connection therewith or herewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, or expenses.

"Person" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Petition Date" shall have the meaning ascribed thereto in the Recitals.

"Permitted Lien" shall mean a Lien existing as of the Petition Date to which Lender consents will prime Lender in lien priority with respect to the DIP Collateral to which each respective holder's lien relates. The following shall be Permitted Liens: (i) UCC Financing Statement filed by PPG Industries on August 3, 2011 at No. 201138463140; (ii) Federal Tax Lien filed in Kanawha County, WV on August 2, 2010 in the amount of $320,199.24; and (iii) Federal Tax Lien filed in Kanawha County, WV in the amount of $2,075,623.71. [A1]

"Post-petition Financing Orders" shall collectively mean the Interim Order and the Final Order authorizing and approving this Agreement, the Loan Documents and the transactions contemplated thereunder.

"Pre-Payment Fee" shall mean ten percent (10%) of the Maximum Commitment Amount.

"Reorganization Plan" shall mean (i) a plan of reorganization filed by the Borrower and consented to by Lender; or (ii) a plan of reorganization or liquidation filed by Lender in the Chapter 11 Case.

"Requirement of Law" as to any Person shall mean the certificate of incorporation and bylaws or other organization or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other governmental authority, in each case, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Secured Promissory Note" shall have the meaning ascribed thereto in Section 2.2.

1.2   Other Definitional Provisions.

(a)   Unless otherwise specified therein, all terms defined in this Agreement shall have their respective defined meanings when used in the Note or other Loan Documents.

(b)   As used herein, in the Note or other Loan Documents made or delivered pursuant hereto, accounting terms relating to either Borrower and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under normal and customary use.

(c)   The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole, including all Exhibits, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in the Agreement or any such Exhibit.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(d)     Unless the context otherwise requires, each reference herein to any agreement, document or instrument (including the Loan Documents) shall be deemed a reference to such agreement, document or instrument as amended, restated, supplemented or otherwise modified from time to time.

(e)     The term "includes" and "including" shall not be construed to imply any limitation.

(f)     In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".  Periods of days referred to in this Agreement shall be counted in calendar days unless Business days are expressly prescribed.  Any period determined hereunder by reference to a month or months or year or years shall end on the day in the relevant calendar month in the relevant year, if applicable, immediately preceding the date numerically corresponding to the first day of such period, provided that if such period commences on the last day of a calendar moth (or on a day for which there is no numerically corresponding day in the calendar month during which such period is to end), such period shall, unless otherwise expressly required by the other provisions of this Agreement, end on the last day of the calendar month.

1.3     <u>Payment Terms; References to Money</u>.

Except as expressly set forth herein to the contrary, (a) all payments made by the Borrower shall be made in Dollars in respect of principal and interest on the Loan, and (b) to the extent not otherwise indicated, all amounts of money referenced herein shall mean and be references to amounts of money denominated in Dollars.

ARTICLE II
AMOUNT AND TERMS OF REVOLVING LOANS

2.1     <u>Loan Commitments</u>.

Subject to the terms and conditions hereof (including without limitation the conditions precedent set forth in <u>ARTICLE IV</u> hereof), Lender agrees to make the Loan funded in multiple draws pursuant to Draw Requests to Borrower from time to time until the Commitment Termination Date in an aggregate principal amount at any one time outstanding not to exceed the Maximum Commitment Amount; provided that Lender shall not fund any Draw Request under the Loan if:

(a)     After giving effect thereto, the sum of the outstanding aggregate principal amount of the Loan would exceed the Maximum Commitment Amount; or

(b)     An Event of Default has occurred in this Agreement and is not cured during the applicable period for cure, if any.

2.2     Secured Promissory Note.

The Loan made by Lender is evidenced by a secured promissory note of the Borrower made to the order of Lender effective as of January 21, 2014 (the "Note"), with appropriate insertions as to date and principal amount, payable to the order of Lender and in a principal amount equal to the Maximum Commitment Amount.

2.3     Procedure for Installment Loans and Payments.

(a)     The Borrower may borrow under the Loan Commitment until the Commitment Termination Date on any Business Day pursuant to a Draw Request.  Lender will make the amount of the draw on the Loan available to the account of the Borrower within two Business Days (i.e., twenty-four (24) hours following Lender's receipt of a Draw Request).[A2]

(b)     The Loan (including all interest, costs and fees capitalized and added to the principal balance of the Loan) shall be paid in full on the Commitment Termination Date, pursuant to the terms herein.  Lender's obligation to make the Loan shall terminate at the close of business on the Business Day immediately preceding the Maturity Date, unless sooner terminated in accordance with the terms hereof.

2.4     Permanent Reduction of Loan Commitment.

The Borrower shall have the right, upon not less than five (5) Business Days' notice, to terminate the Loan Commitment or, from time to time, to reduce permanently the amount of the Loan Commitment in whole, but not in part.  Such reduction of the Loan Commitment shall be accompanied by payment in full of all outstanding principal and accrued interest thereon, to and including the date of such prepayment, together with any additional amounts owing and any outstanding fees and expenses due and owing.  In the event that a prepayment results from or is in connection with an Asset Sale or plan of reorganization (or liquidation) not acceptable to Lender in its sole and absolute discretion, then the Obligations under the Loan shall also include the Pre-Payment Fee.

2.5     Interest Rates and Payment Dates.

(a)     The Loan (and all amounts capitalized and added to the principal balance of the Loan) shall bear interest at a rate equal to the  JP Morgan Prime Rate in effect on the Interim Closing Date, plus two (2%) percent per annum.

(b)     Notwithstanding the foregoing, in the event an Event of Default has occurred and is continuing, the Loan shall bear interest at a rate *per annum* of ten percent (10%) from the date of occurrence of such Event of Default until date such Event of Default is cured or waived (after as well as before judgment).   In addition, should any interest on the Loan or any other obligations payable hereunder not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest (to the extent permitted by law in the case of interest on interest) at a rate *per annum* equal to the rate set forth above plus two percent (2%) in each case, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

(c)    Accrued interest on the Loan will be capitalized and added to the outstanding principal balance of the Loan as of each Interest Payment Date.  Amounts representing interest which are capitalized and added to the outstanding principal balance of the Term Loan, shall thereafter bear interest in accordance with this Section and otherwise be treated as the Loan for all purposes of this Agreement.  Interest accruing pursuant to Section 2.5(b) shall be payable from time to time on demand.

2.6    Computation of Interest.

(a)    Interest shall be calculated for the actual number of days elapsed on the basis of a hypothetical year of 360 days.

(b)    Each determination of an interest rate pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lender in the absence of manifest error.

2.7    Prepayments.

(a)    Optional Prepayments.  Borrower may, at any time and from time to time, prepay the Loan, in whole or in part, without premium or penalty, unless such pre-payment results from an Asset Sale to which Lender does not consent or a plan of reorganization to which the Lender does not consent, and in either such instance, a Pre-Payment Penalty shall become part of the Obligations and immediately due and payable by Borrower to Lender, upon irrevocable written notice on a Business day to the Lender at least twenty-four (24) hours prior to the date of prepayment, in each case specifying the date and amount of prepayment.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with any amounts payable, accrued interest to such date on the amount prepaid and any outstanding fees and expenses then due and owing, including the Pre-Payment Fee.  No amount of the Loan, once repaid, may be re-borrowed.

2.8    Use of Proceeds.

Other than the reimbursement to Lender of all fees and expenses associated with the Loan or enforcement or collection thereof, the Borrower shall utilize the proceeds of the Loan solely to pay pre-petition and (as may be authorized by order of the Bankruptcy Court) post-petition expenses in accordance with the Budget.  Borrower shall not be permitted to use the proceeds of the Loans:  (i) to finance in any way, any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of Lender or its rights and remedies under this Agreement, the other Loan Documents, the Final Order; (ii) to finance the payment of, or application for authority to pay, any prepetition claim without the Lender's prior written consent and an order of the Bankruptcy Court; (iii) to make any distribution under a Reorganization Plan in the Chapter 11 Case; or (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of Lender.

2.9    Priority and Security.

Borrower hereby covenants, represents and warrants that, upon entry of the Interim Order, the Obligations of the Borrower hereunder and under the Loan Documents:  (i) pursuant

to section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed administrative expense claims in the Chapter 11 Case having priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a Lien on all property of Borrower's bankruptcy estate that is not subject to a Lien; (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, shall at all times be secured by a junior lien on all property of the Borrower's bankruptcy estate that is subject to a Permitted Lien.  Any Lien in existence as of the Petition Date that is not a Permitted Lien shall be subordinate in priority and right of payment to the Liens granted to Lender pursuant to the Loan Documents.

2.10    <u>Payment of Obligations</u>.

Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court. Alternatively, the Lender may, at its sole discretion, elect to credit bid its secured claims granted hereunder at any Asset Sale pursuant to section 363(k) and/or 1123(a)(5)(D) of the Bankruptcy Code, or convert the claims or a portion thereof granted hereunder to equity pursuant to section 1123(a)(5)(J) of the Bankruptcy Code in a Reorganization Plan.

2.11    <u>No Discharge, Survival of Claims</u>.

Borrower agrees that to the extent the Obligations hereunder are not satisfied in full, (i) its Obligations arising hereunder shall not be discharged by the entry of an order confirming a plan of reorganization or plan of liquidation (and the Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code hereby waives any such discharge); and (ii) the liens and claims granted to Lender pursuant to the Final Order shall not be affected in any manner by the entry of an order confirming any such plan of reorganization or plan of liquidation in the Chapter 11 Case.

ARTICLE III<br>REPRESENTATIONS AND WARRANTIES

To induce Lender to make the Loans, the Borrower makes the following representations and warranties to Lender with respect to Borrower, each and all of which shall survive the execution and delivery of this Agreement.

3.1    <u>No Legal Bar</u>.

Except for the effect of the filing of the Chapter 11 Case, the execution, delivery and performance of the Loan Documents to which Borrower is a party, the borrowings by Borrower hereunder and the use of the proceeds thereof (a) will not violate any Requirement of Law or Contractual Obligation of Borrower, (b) will not accelerate or result in the acceleration of any payment obligations of Borrower, and (c) will not result in, or require, the creation or imposition of any Lien on any of the respective properties or revenues of any Borrower pursuant to any such Requirement of Law or Contractual Obligation.

3.2     No Default.

Borrower is not in default under, or with respect to, any of its Contractual Obligations in any respect which could reasonably be expected to have a Material Adverse Effect.  Immediately after giving effect to this Agreement, no Default or Event of Default has occurred and is continuing.

3.3     Purpose of Loans.

The Borrower shall not use the proceeds of the Loan hereunder other than in accordance with this Agreement, the Budget, the Final Order or any other Loan Document.

3.4     Accuracy and Completeness of Information.

All information, reports and other papers and data with respect to the Borrower furnished to the Lender by or on behalf of Borrower, were, at the time furnished, complete and correct in all material respects, or have been subsequently supplemented by other information, reports or other papers or data, to the extent necessary to give the Lender a true and accurate knowledge of the subject matter in all material respects.  There is no fact known to Borrower that has, or could reasonably be expected to have, a Material Adverse Effect.

3.5     The Orders.

On the date of the making of any Draw Request under the Loan, the Final Order shall have been entered and shall not have been amended, stayed, vacated or rescinded without the Lender's consent.  Upon the maturity (whether by the acceleration or otherwise), the Obligations of the Borrower hereunder and under the other Loan Documents shall be entitled to immediate payment of such Obligations.  Lender shall have the right to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

3.6     Liens and Claims of Lender.

Upon the entry of the Interim Order and then the Final Order, the Liens shall be fully perfected without further action required by the Lender and the claims of the Lender shall be deemed allowed.

3.7     Reorganization Matters.

(a)     The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for the hearing for the approval of the Interim Order and Final Order has been given.

(b)     After the entry of the Interim Order, and pursuant to and to the extent permitted in the Final Order, the Obligations will constitute allowed super-priority administrative expense claims in the Chapter 11 Case having priority over all other administrative priority claims against Borrower now existing or hereafter arising, of any kind whatsoever, and will be secured by Liens

on all property of the Borrower's bankruptcy estate (i) that are senior and first in priority on all property of the Debtor's bankruptcy estate now existing or hereinafter acquired, not subject to a Permitted Lien; (ii) that are junior in all property of the Borrower's bankruptcy estate now existing or hereinafter acquired that is subject to valid and properly perfected Permitted Liens in such property that existed as of the Petition Date.

(c)     The Final Order (with respect to the period on and after entry of the Final Order) is in full force and effect has not been reversed, stayed, modified or amended.

(d)     Subject to five (5) days prior written notice, notwithstanding the provisions of section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

## ARTICLE IV
## CONDITIONS PRECEDENT

4.1     <u>Conditions</u>.

[RESERVED]

4.2     <u>Conditions to Draws Upon Entry of the Interim Order</u>.

The obligation of the Lender to fund Draw Requests under the Loan as authorized in accordance with the Interim Order in an amount not to exceed $4,000,000 or to take, fulfill or perform any other action hereunder, until the following conditions have been satisfied or provided for in a manner satisfactory to the Lender, or waived in writing by the Lender.

(a)     <u>Loan Documents</u>.  The Lender shall receive this Agreement, the Note and all other Loan Documents, each other agreement, documents and instruments relating to the loan and other credit transactions contemplated by this Agreement, each duly executed where appropriate and in form and substance satisfactory to the Lender.  Borrower shall also submit the Budget and all other information requested by the Lender.

(b)     <u>No Material Adverse Effect</u>.  No Material Adverse Effect shall have occurred after the Petition Date with respect to Borrower, other than those which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Case.

(c)     <u>Iterim Order</u>.  In no later January 22, 2014, Lender shall have received a copy of the Interim Order, inter alia, approving the transactions contemplated hereby and finding that the Lender is extending credit to the Borrower in good faith within the meaning of Section 364(e) of the Bankruptcy Code.  Such Interim Order (i) shall be in form and substance satisfactory to Lender; (ii) shall have been entered upon an application of the Borrower reasonably satisfactory in form and substance to the Lender; (iii) shall be in full force and effect; and (iv) shall not has

11

been stayed, reversed, vacated or rescinded or, without the consent of the Lender, modified or amended in any respect and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of such loan nor the performance by the Borrower of any of its Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(d)    Litigation.  No litigation shall have been commenced or be pending which has not been stayed by the commencement of the Chapter 11 Case and which, if successful, would have a Material Adverse Effect on Borrower taken as a whole, its business or ability to repay the Loan or which would challenge this Agreement, Post-petition Financing Orders or the transaction contemplated thereby.

(e)    Board Approval. The board of directors of the Borrower has approved resolutions, in form and substance satisfactory to Lender (i) authorizing the filing of the Chapter 11 Case; and (ii) authorizing the Agreement and the transactions contemplated herein.

(f)    The Interim Order authorizes and approves the right and obligation of the Borrower to reimburse Lender for all out-of-pocket fees, costs and expenses (including legal fees and expenses) and other compensation contemplated hereunder.

4.3  Conditions to Additional Draws Upon Entry of the Final Order.

The obligation of the Lender to fund Draw Requests under the Loan as authorized in accordance with the Final Order in an amount not to exceed the Maximum Commitment Amount or to take, fulfill or perform any other action hereunder, until the following conditions have been satisfied or provided for in a  manner satisfactory to the Lender, or waived in writing by the Lender.

(a)    No Material Adverse Effect.  No Material Adverse Effect shall have occurred with respect to Borrower after the Petition Date, other than those which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Case.

(b)    Final Order.  In no later than twenty (20) days after entry by the Bankruptcy Court of the Interim Order, Lender shall have received a copy of the Final Order, *inter alia,* approving the transactions contemplated hereby and finding that the Lender is extending credit to the Borrower in good faith within the meaning of section 364(e) of the Bankruptcy Code.  Such Final Order (i) shall be in form and substance satisfactory to Lender; (ii) shall have been entered upon an application of the Borrower reasonably satisfactory in form and substance to the Lender; (iii) shall be in full force and effect; and (iv) shall not have been stayed, reversed, vacated or rescinded or, without the consent of the Lender, modified or amended in any respect and, if the Final Order is the subject of a pending appeal in any respect, neither the making of such Loans nor the performance by the Borrower of any of its Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(c)    Litigation.  No litigation shall have been commenced or be pending which has not been stayed by the commencement of the Chapter 11 Case and which, if successful, would have

a Material Adverse Effect on Borrower taken as a whole, its business or ability to repay the Loan or which would challenge this Agreement, Post-petition Financing Orders or the transaction contemplated thereby.

(d)   The Final Order authorizes and approves the right and obligation of the Borrower to reimburse Lender for all out-of-pocket fees, costs and expenses (including legal fees and expenses) and other compensation contemplated hereunder in connection with, enforcement of and collection of the Loan in a manner acceptable in form and substance to Lender.

(e)   Borrower shall have remained in compliance with the Budget.

ARTICLE V
NEGATIVE COVENANTS

From the date hereof and for so long as the Loan Commitment remains in effect, the Note remains outstanding and unpaid or any Obligation is owing to the Lender hereunder, Borrower hereby agrees that it will not, (and will not apply, unless in connection with an amendment to the Agreement that has been approved in writing by the Lender.

5.1   Limitation on Indebtedness.

Create, incur, assume or permit to exist any Indebtedness, or enter into any agreement or binding commitment to create, incur, assume or suffer to exist any Indebtedness, except the Loan and the Obligations created under this Agreement.

5.2   Limitation on Liens or Claims.

Create, incur, assume or permit to exist (other than a Permitted Lien) any Lien on or with respect to any of its properties, assets or revenues (whether now owned or hereafter acquired), which is *pari passu* or senior to the Liens of the Lender, or incur claims that have priority *pari passu* with or senior to the claims granted to Lender hereunder.

5.3   Limitation on Sale of Assets.

Convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets (including, without limitation, any capital stock, receivables and fee or leasehold interests), outside the ordinary course of business, whether now owned or hereafter acquired, in each case, in one transaction or a series of transactions to any Person, except as otherwise approved in writing by the Lender prior to the consummation thereof.

5.4   Limitations on Employee Incentives, Bonuses or Other Retention Payments.

Grant, pay or seek Bankruptcy Court approval of any employee incentive program or payments, bonus or retention plans or payments without the prior written consent of the Lender.

5.5     <u>Limitations on Use of Loan Proceeds.</u>

Pay or incur obligations other than in the ordinary course of business or as otherwise provided for and delineated in the Budget without prior written consent of the Lender.

5.6     <u>Disrepair or Impairment of Assets.</u>

Allow any property or casualty insurance to lapse or expire, allow any utility service to be terminated, fail to maintain and repair any assets of the Borrower or incur any tax obligations without timely payment.

5.7     <u>Failure to Comply with Laws.</u>

Fail to comply with any law, regulation or requirement applicable to the Borrower.

ARTICLE VI
TERMINATION

6.1     <u>Termination</u>.

The financing arrangements contemplated hereby shall be in effect until the Commitment Termination Date, and the Loans and all other Obligations shall be automatically due and payable in full on such date.

6.2     <u>Survival of Obligations Upon Termination of Financing Arrangements</u>.

Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Borrower or the rights of Lender relating to any unpaid portion of the Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Commitment Termination Date.

Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon the Borrower, and all rights of Lender, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Commitment Termination Date.

ARTICLE VII
EVENTS OF DEFAULT; RIGHTS AND REMEDIES

7.1     <u>Events of Default</u>.

Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, and upon five (5) days written notice to Borrower and the U.S. Trustee, and subject to <u>Section 7.2</u>, the occurrence of any one or more of the

14

following events (regardless of the reason therefore) shall constitute an "Event of Default" hereunder:

(a)    (i)  Borrower shall fail to pay any Obligation or any other amount payable hereunder; or

(b)    One or more judgments or decrees shall be entered after the Petition Date against the Borrower involving in the aggregate a liability (to the extent not covered by third- party insurance as to which the insurer has acknowledged coverage) of $10,000 or more, net of insurance proceeds, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(c)    The occurrence of any additional "Event of Default" identified in the Interim Order (or, when applicable, analogous paragraph of the Final Order) not identified herein; or

(d)    The breach of any representation or warranty that has a Material Adverse Effect on the business or assets of the Borrower; or

(e)    The breach of any affirmative or negative covenant; or

(f)    Any event causing any interruption in Borrower's possession, occupancy or quiet enjoyment of any of Borrower's leasehold interests; or

(g)    The occurrence of any of the following in the Chapter 11 Case:

(i)    the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of any of the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

(ii)    the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of any of the Borrower (powers beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code);

(iii)    the entry of an order by a court of competent jurisdiction (1) reversing, staying, vacating or rescinding the Final Order, or otherwise ceases to be in full force and effect or (2) amending, supplementing or otherwise modifying the Interim Order or the Final Order without the written consent of the Lender or the filing of a motion for reconsideration in respect of the Loan Commitment, without Lender's consent;

(iv)    Borrower materially violates or breaches the Post-petition Financing Orders or files any pleadings seeking, joining in, or otherwise consenting to any material violation or breach of the Post-petition Financing Orders;

(v)    without prior written consent of Lender, the filing of a motion, taking of any action or the filing of any Reorganization Plan or disclosure statement attendant thereto by

the Borrower in the Chapter 11 Case:  (1) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (2) to grant any Lien upon or affecting any assets of the Borrower; or (3) any other action or actions adverse to Lender's rights and remedies hereunder;

(vi)    the entry of an order in the Chapter 11 Case granting any other super priority administrative claim or Lien equal or superior to that granted to the Lender;

(vii)    without prior written consent of Lender, the Final Order is not entered within twenty (20) days following entry of the Interim Order by the Bankruptcy Court; or

(viii)    the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement;

(ix)    the Bankruptcy Court shall enter an order or orders granting relief from or modifying the automatic stay applicable under section 362 of the Bankruptcy Code to permit one or more creditors to execute upon, enforce or perfect a lien on any assets of the Borrower;

(x)    the commencement of any suit against the Lender that would in any way reduce, set off, or subordinate the Obligations under this Agreement; if any such suit is commenced by any party other than the Borrower, and in the reasonable judgment of the Lender, such suit has a reasonable possibility of success, and if successful, would be reasonably likely to have a material adverse effect on (1) the Borrower or (2) Borrower's business or its ability to repay the Loan made under this Agreement;

(xi)    the payment of, or application for authority to pay, any prepetition claim without the Lender's prior written consent or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under this Agreement; or

(xii)    the failure of the Borrower to comply with the Budget.

7.2    Remedies.

Upon the occurrence and during the continuance of an Event of Default, and without further order of or application to the Bankruptcy Court, the Lender may upon five (5) days prior written notice to the Borrower (with a copy to the United States Trustee for the Southern District of West Virginia), take one or more of the following actions, at the same or different times:  (i) terminate forthwith the Loan Commitments; (ii) declare the Loan to be forthwith due and payable, whereupon the principal of such Loan, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and (iii) take any other action or exercise any and all other rights or remedies under the Loan Documents, and under applicable law available to the Lender.

ARTICLE VIII
MISCELLANEOUS

8.1     Amendments and Waivers.

Neither this Agreement, the Note or any other Loan Document, nor any terms hereof or thereof may be amended, restated, supplemented or modified except in writing signed by the parties hereto.

8.2     No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

8.3     Survival of Representations and Warranties.

All representations and warranties made hereunder, in any other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the Note and the making of the Loan hereunder.

8.4     Successors and Assigns; Participations and Assignments.

(a)     This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns, including any trustee appointed in this case.

(b)     Lender may, in accordance with applicable law, sell or assign its rights under this Agreement and any Obligations of Borrower hereunder.

(c)     The Borrower authorizes Lender to disclose to any assignee (each, a "Transferee") and any prospective Transferee, any and all financial information in Lender's possession concerning the Borrower which has been delivered to Lender, subject, however, to the same confidentiality requirements as exist between Borrower and Lender.

8.5     Counterparts.

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Lender.

8.6     <u>Severability</u>.

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.7     <u>Governing Law</u>.

THIS AGREEMENT AND THE REVOLVING NOTES AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE REVOLVING NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF WEST VIRGINIA WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF.

8.8     <u>Submission to Jurisdiction; Waivers</u>.   Borrower and Lender hereby irrevocably and unconditionally:

(a)     submit for themselves and their property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the jurisdiction of the Bankruptcy Court;

(b)     consent that any such action or proceeding may be brought in the Bankruptcy Court and waive any objection that they may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agree not to plead or claim the same;

(c)     agree that nothing contained herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(d)     waive, to the maximum extent not prohibited by law, any right they may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

8.9     <u>No Waiver</u>.

No failure on the part of Lender to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.   All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

IN WITNESS WHEREOF, the parties hereto has caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

FREEDOM INDUSTRIES, INC.. Borrower
and Debtor, Debtor-in-Possession


By: _____
Name: _____
Title: _____



WV FUNDING, LLC, Lender, a West Virginia
Limited Liability Company,

By:  Mountaineer Funding, LLC, a West Virginia
Limited Liability Company, Member

By: _____
Name: _____
Title: _____