IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

In Re:

**FREEDOM INDUSTRIES, INC.,**

Debtor

Case No. 2:14-bk-20017
Chapter 11

## OBJECTION OF WEST VIRGINIA-AMERICAN WATER COMPANY TO DEBTOR'S FIRST DAY MOTIONS

West Virginia-American Water Company ("WVAWC"), by counsel, hereby objects to certain of the first day motions filed by Freedom Industries, Inc. ("Freedom" of "Debtor") filed on January 17, 2014. Specifically, WVAWC objects to the *Emergency Motion For Interim And Final Order Authorizing Debtor-In-Possession Financing* ("DIP Financing Motion"); *Motion For Entry Of An Order Authorizing The Payment Of Pre-Petition Wages, Benefits And Employment Taxes* ("Wage Motion"); *Debtor's Motion For Entry Of An Order Authorizing The Debtor To Pay 503(b)(9) Claims* ("503(b)(9) Motion"); *Debtor's Motion For Entry Of An Order Authorizing The Debtor To Continue Using Its Existing Cash Management System, Bank Accounts, And Business Forms* ("Cash Management Motion"); *Motion For Entry Of An Order Authorizing The Debtor To Pay Certain Pre-Petition Taxes And Fees* ("Tax Motion"); and *Motion To Authorize Payment Of Certain Essential Trade Vendors' Prepetition Obligations Pursuant To 11 U.S.C. § 105(a) And 363(b) And Bankruptcy Rule 6003* ("Preferred Vendor Motion"). In support of its objection, WVAWC states as follows:

{C2775283.1}

**PRELIMINARY STATEMENT**

The release of 4-methylcyclohexane methanol from Freedom's Etowah River Terminal ("Freedom spill" or "spill") and the resulting damages, both to WVAWC directly because of the Freedom spill and to WVAWC indirectly from the twenty-three (23) lawsuits filed against WVAWC as a result of the spill, make WVAWC by far the largest single creditor in this bankruptcy case. Without disclosing the amount and nature of the Debtor's current assets including cash, receivables, and investments; without providing any information about the current state of the Debtor's finances or business; without providing a single balance sheet or financial statement; without disclosing the true relationship between the Debtor and the proposed DIP lender; without providing any information about the Debtor's insurance or lack thereof for the millions of dollars in claims filed against it; and without disclosing the cash and other financial transactions of the Debtor, including payments by the Debtor since the occurrence of the spill, Freedom seeks to stampede this Court into irrevocable and improvident actions which will likely result in the selective dismemberment of the Debtor's business to the permanent and immeasurable detriment of its creditors.

In the DIP financing motion, the Debtor represents that "the terms and conditions of the DIP facility were negotiated by the parties in good faith and at arms-length . . ." [Motion at p. 15] but, upon information and belief, the DIP lender is owned by or relates to the parent of the Debtor. This fact is undisclosed in the Debtor's pleadings. The terms of the DIP facility would provide the lender with a lien on all of the Debtor's assets, a superpriority claim, and the ability to foreclose selectively on the assets and take away the most valuable assets from the Debtor's estate, leaving behind only the toxic facilities and huge damage claims caused by the Freedom spill.

The DIP Financing Motion smells of collusion between the Debtor and its parent in a "loan to own" scheme whereby the Debtor proposes to obtain irrevocable liens a mere one-half business day following the petition date. The payments sought to be authorized in the first day motions would permit the Debtor, improperly and irrevocably, to pay numerous pre-petition claims which would guarantee the use of as much of the debtor-in-possession financing as possible and solidify the "loan to own" scheme.

WVAWC respectfully submits that the Debtor's first day motions should, with certain exceptions for non-officer-employees, be denied pending an opportunity for creditors to investigate the Debtor and the Debtor's finances and transactions prior to irrevocable actions on its first day motions.

## BACKGROUND

1. Freedom filed its voluntary petition under Chapter 11 on January 17, 2014 (the "Petition Date") and continues to manage and operate its business as a debtor-in-possession.

2. No trustee has been appointed for the Debtor.

3. No Creditors Committee has been appointed to protect the interests of the unsecured creditors.

4. On the Petition Date, the Debtor also filed its first day motions and, as requested therein, the Court has granted an expedited hearing on the first day motions on Tuesday, January 21, 2014, at 1:30 p.m. The order was issued following the close of business on January 17, 2014 and, because of the legal holiday on Monday, January 20, 2014, the notice given is effectively only one half a business day.

5. On information and belief, Freedom is in the business of producing, packaging, and selling specialty chemicals.

6. Freedom owns a "tank farm" which, together with certain barge loading and unloading facilities nearby, may also be referred to or known as Etowah River Terminal, at which it stores chemicals. The tank farm is situated on the Elk River approximately 1.5 miles up river from WVAWC's Charleston water treatment plant.

7. On January 9, 2014, an unknown quantity of 4-methylcyclohexane methanol ("MCHM") was released from one of Freedom's storage tanks into the Elk River. Upon information and belief, the MCHM dissolved into the waters of the Elk, which were drawn into the intake of the water treatment plant, thus contaminating water in the WVAWC system.

8. Upon information and belief, the required containment facilities at the Debtor's tank farm were poorly maintained and defective, a situation known to management of the facility.

9. On the same day, West Virginia Governor Earl Ray Tomblin declared a state of emergency and ordered residents and other customers of WVAWC not to use water from the WVAWC system except for sanitation and fire protection.

10. As a result of the state of emergency and the contamination of the WVAWC system by MCHM from the Debtor's storage tanks, many business customers of WVAWC were forced to close (pending restoration of full water service), many residents were advised to cease using water from WVAWC for any purpose other than fire suppression or sanitation, and some people visited doctors and hospital emergency rooms complaining of symptoms that they thought might have been caused by exposure to MCHM.

11. As a result of these events, to date approximately twenty-three (23) lawsuits have been filed against WVAWC in state and federal courts. Many of these suits allege a putative class. WVAWC therefore has large claims against the Debtor arising both from cross-claims it

{C2775283.1}

will assert against Freedom in such lawsuits and from separate damages suffered directly by WVAWC because of the release and the expense incurred by WVAWC in the enormous effort undertaken to protect against and correct, on behalf of itself and the customers and communities it serves, the situation caused by the Freedom spill. As a result of these damages, WVAWC has claims against the Debtor, both directly for expenses incurred by WVAWC in dealing with and correcting the water supply situation caused by the Freedom spill and indirectly through cross-claims it will make against Freedom in the lawsuits filed against WVAWC, rendering WVAWC the largest creditor by far in this bankruptcy case.

12. Because of the lack of a Creditors Committee at this time in this case, WVAWC is compelled to comment on and object to the Debtor's first day motions. The WVAWC objection to each of the first day motions is set forth below.

## DIP FINANCING MOTION

13. The Debtor seeks the authority of this Court to borrow from its parent without providing current financial information. It has provided no balance sheet, no income statement, and no information about payments by the Debtor pre-petition. While there is attached to the proposed order an "Interim DIP Budget," and the DIP budget does have a beginning accounts receivable number and a beginning cash balance, no other information about the current finances of the Debtor is provided anywhere.

14. Upon information and belief, the proposed DIP lender is related to the Debtor, but that is not disclosed in the DIP motion. Indeed, the DIP motion represents that the DIP agreement was negotiated in good faith and at arms length, which would be legally impossible if the DIP lender is an arm of the Debtor's parent.

5

15. The DIP agreement proposes that the DIP lender will have a first lien on unencumbered assets and a junior lien on encumbered assets, plus the usual priorities. The DIP agreement also proposes that this Court lift the automatic stay to permit the Debtor to foreclose upon default. Since the Debtor's parent or an affiliate of the Debtor's parent would hold the loan and the Debtor would be in control of whether the Debtor defaulted under the loan, the possibility of collusion exists.

16. The result of the proposed DIP facility could, in reality, be, and upon information and belief is, a "loan to own" facility with the result that Debtor's parent or its affiliate could end up foreclosing upon those parts of the business that it deems valuable, abandoning the rest, taking the going concern value from the Debtor, and leaving the Debtor and its many creditors "holding the bag."

17. Without financial information, it is difficult to know whether the Debtor has been under-capitalized or whether assets of the Debtor have been removed from the Company.

18. If the Debtor's parent wishes to preserve the going concern value of the Debtor, it should do what any parent is expected to do – contribute capital to Debtor, not loan it, pursuant to a scheme to cherry-pick the best assets and going concern value of Freedom.

19. WVAWC objects to the DIP Motion, except to the extent that money would be loaned on an unsecured basis for the payment of the wages and withholdings of employees who are not officers or former employees.

## WAGE MOTION

20. WVAWC objects to the breadth of the wage motion in that it would permit the Debtor to pay, in its discretion, potentially large pre-petition obligations before it has been determined whether the Debtor has the means and ability to continue its operations.

21.     WVAWC does not object to the payment of pre-petition wages and related payroll taxes for employees other than officers and former shareholders. Employees who are officers or former shareholders should not be paid their pre-petition wages until creditors have time to investigate the Debtor's affairs.

22.     To the extent required by the Debtor's finances, WVAWC does not object to borrowing by the Debtor on an administrative priority basis of sufficient funds to pay pre-petition wages and payroll taxes of employees other than officers and former shareholders.

### 503(b)(9) MOTION

23.     WVAWC objects to payment of 503(b)(9) claims at this early date, pending further investigation.

24.     The motion proposes that the Debtor be authorized to pay up to $730,000.00 in pre-petition claims in the Debtor's "sole discretion." To authorize the Debtor to send $730,000.00 out the door on one-half business days' notice, without investigation, is unwise, unjustified, and improvident.

### CASH MANAGEMENT MOTION

25.     WVAWC does not object, in general, to the relief requested in the Debtor's cash management motion, provided that such motion would not permit banks to honor pre-petition checks, drafts, wires, and ACH transfers.

26.     WVAWC requests that the Court stipulate in any order approving the Debtor's continued use of its cash management system that banks are not authorized to honor pre-petition checks, drafts, wires, and ACH transfers.

## TAX MOTION

27. WVAWC objects to the wholesale payment of taxes and fees on the basis that there is no urgency to authorize such payments and authorization would be premature.

28. To the extent such taxes are trust funds taxes, WVAWC does not object to their payment to the extent that sums to be paid were deposited into "trust fund" accounts pre-petition.

29. While ultimately the Debtor may be permitted to make tax payments, there is no justification for authorizing payment of pre-petition taxes on a one-half business day's notice.

## PREFERRED VENDOR MOTION

30. Until more is known and disclosed about the Debtor's business and finances, it is premature to authorize the payment of pre-petition trade vendors, and WVAWC objects to such payment at this time. The Debtor seeks the authority to pay up to an amount identified as $3,300,000.00 that it represents is owed to creditors it considers essential trade vendors. It also seeks to have banks honor pre-petition checks drawn in favor of their "essential trade vendors."

31. Under bankruptcy law, essential trade vendors have no higher priority than general unsecured creditors such as WVAWC. While at some point in this bankruptcy case it may be appropriate to authorize the Debtor to pay properly identified and approved essential trade vendors that it can afford to pay, it is premature to authorize such payments on one-half business day's notice.

32. Not until a Creditors Committee is formed and that committee and other creditors have the opportunity to investigate the Debtor's business would it be appropriate for Freedom to ask and this Court to authorize the preferential payment of pre-petition unsecured claims.

## CONCLUSION

On effectively one-half business day's notice, the Debtor is attempting to stampede the Court and its creditors to decisions and actions that will be impossible to rescind. The Debtor's motions are without candor and without information. Freedom is faced with large claims against it, and it has provided no information whatsoever about its applicable or potentially-applicable insurance coverage. Without such information, it is impossible to know whether the Debtor has any hope of reorganizing its business, which is and should be a predicate to the granting of relief sought by its first day motions. Until the Court and creditors are provided with answers, it is simply premature to grant the Debtor's first day motions other than to the extent necessary to authorize the payment of wages and payroll taxes for employees other than officers and former shareholders, to the extent the Debtor has funds available or to the extent funds are loaned to Debtor on only an administrative priority basis.

WHEREFORE, West Virginia-American Water Company respectfully requests that the Court enter an order denying the Debtor's first day motions except to the extent described in this Objection.

Respectfully submitted,

**WEST VIRGINIA-AMERICAN WATER COMPANY**

By Counsel

/s/ William F. Dobbs, Jr.
William F. Dobbs, Jr. (WV Bar No. 1027)
Ellen S. Cappellanti (WV Bar No. 627)
A. L. Emch (WV Bar No. 1125)
JACKSON KELLY PLLC
500 Lee Street, East; Suite 1600 (25301)
Post Office Box 553
Charleston, West Virginia  25322
Telephone:(304) 340-1000
Facsimile: (304) 340-1080
Email:     wdobbs@jacksonkelly.com
           aemch@jacksonkelly.com
           ecappellanti@jacksonkelly.com
*Counsel for West Virginia-American Water Company*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

In Re:

**FREEDOM INDUSTRIES, INC.,**

        Debtor

Case No. 2:14-bk-20017
Chapter 11

## CERTIFICATE OF SERVICE

    I, William F. Dobbs, Jr., counsel for West Virginia-American Water Company, does hereby certify that service of the foregoing **OBJECTION OF WEST VIRGINIA-AMERICAN WATER COMPANY TO DEBTOR'S FIRST DAY MOTIONS** was made by via ECF filing on this 19th day of January, 2014, as follows:

- Mark E. Freedlander     mfreedlander@mcguirewoods.com,
-     hhickman@mcguirewoods.com
- Stephen L. Thompson     sthompson@barth-thompson.com,
      office@barth-thompson.com; chris@barth-thompson.com
- United States Trustee     ustpregion04.ct.ecf@usdoj.gov

                           /s/ William F. Dobbs, Jr.
                           William F. Dobbs, Jr.