# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| **FREEDOM INDUSTRIES, INC.** | ) | Case No. 2:14-bk-20017 |
| | ) | |
| Debtor. | ) | Related to Docket Nos. 304 and 307 |
| | ) | |

### MEMORANDUM IN SUPPORT OF EXPEDITED MOTION FOR ENTRY OF ORDER APPROVING SALE OF THE ASSETS OF THE POCA BLENDING BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS

The debtor and debtor-in-possession ("Freedom" or the "Debtor") in the above-captioned case, by and through its undersigned counsel, hereby files this Memorandum ("Memorandum") in Support of the Expedited Motion for Entry of an Order Approving the Sale of the Assets of the Poca Blending Business (as defined below) Free and Clear of All Liens, Claims, Encumbrances and Interests (the "Motion"),[1] and in support thereof, respectfully states as follows:

### JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested in the Motion are 11 U.S.C. §§ 105(a), 363 and 365, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### BACKGROUND

4. On January 17, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

"Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of West Virginia (the "Court").

5. The Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6. The Debtor's bankruptcy filing was the result of an incident that occurred on January 9, 2014 involving one of Freedom's storage tanks located at its Charleston Facility (the "Incident"). Facts surrounding the Incident are subject to pending investigations by Freedom and various regulatory and other governmental authorities.[2] Due to the very public nature of the Incident and the significant media coverage, parties in Freedom's industry and potential purchasers have likely been aware of the possibility that the Debtor may eventually sell some or substantially all of its assets during this bankruptcy case.

7. On May 5, 2014, the Debtor filed the Motion seeking, *inter alia*, Court approval of the transaction contemplated by that certain Asset Purchase Agreement (the "Agreement") by and between the Debtor and Lexycon, LLC ("Lexycon"), pursuant to which Lexycon seeks to purchase and the Debtor intends to sell, transfer and convey all of its right, title and interest in certain assets, properties and rights associated with the Poca Blending Business (collectively, the "Purchased Assets") on an "as is-where is" basis [Docket No. 304]. A copy of the Agreement is attached to the Motion as Exhibit B. The factual basis for the Motion and certain background related to the Agreement are more fully described in the Declaration of Mark Welch (the "Welch Declaration"), Chief Restructuring Officer of the Debtor, which is attached to the Motion as Exhibit C.

---

[2] The facts and circumstances relating to the Incident as described herein are intended for explanatory purposes only and shall not prejudice the rights, claims, or defenses of any party in interest, including, without limitation, the rights of any purported holder of a claim arising from or related to the Incident, and correspondingly, all rights, claims, and defenses of the Debtor and other parties in interest are preserved.

8.  Also on May 5, 2014, the Debtor filed a Motion for an Expedited Hearing on the Sale of the Poca Blending Business [Docket No. 305], which requested a hearing date of May 13, 2014 at 1:30 p.m. to coincide with other Freedom matters previously scheduled for hearing.

9.  On May 7, 2014, the Court entered an Order Scheduling Preliminary Hearing on the Motion [Docket No. 307] (the "Order").  Pursuant to the Order, the Court scheduled a preliminary hearing to consider the matters raised by the Motion on May 13, 2014 at 1:30 p.m.

10.  In the Order, the Court appears to express concern regarding the Debtor's request for an expedited hearing on the Motion because it would occur prior to the 21 day timeframe set forth in Bankruptcy Rules 2002(a)(2) and 6004.

11.  The Debtor files this Memorandum in further support of an expedited hearing on the Motion and approval of the Motion.

## BASIS FOR RELIEF REQUESTED

12.  Bankruptcy Rule 6004(a) states that "[n]otice of a proposed use, sale, or lease of property . . . not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if applicable, in accordance with § 363(b)(2) of the Code.  FED. R. BANKR. P. 6004(a).

13.  Bankruptcy Rule 2002(a)(2), requires a debtor to give at least 21 days' notice by mail of a proposed sale of property of the estate other than in the ordinary course of business, unless the court for "cause shown" shortens the time or directs another method of giving notice. FED. R. BANKR. P. 2002(a)(2).  Thus, this Court has express authority pursuant to Bankruptcy Rule 2002(a)(2) to reduce the notice period for the sale of the Debtor's property provided that "cause" is shown.

3

14. As described in the Motion and more fully set forth in the Welch Declaration, "cause" can be shown such that the Court should shorten the notice period pursuant to Bankruptcy Rule 2002(a)(2), and authorize and approve the transaction contemplated by the Motion.

15. Once the Debtor made the decision in mid-February that it was in the best interests of all parties for Freedom to wind down operations rather than reorganize as a going concern, Mark Welch was retained as the Debtor's Chief Restructuring Officer (the "CRO") [Docket No. 228]. The CRO promptly analyzed the Debtor's business and its assets in an effort to determine the best approach to maximize the value of the Debtor's bankruptcy estate. Initially, the CRO concluded that it was unlikely in the current environment that the assets comprising the Poca Blending Business could be sold to a turnkey operation. As such, the CRO conducted an analysis to determine the approximate cost of and best approach for a liquidation and decommissioning process. Based on this research, the CRO determined that the decommissioning process, after taking into account the value of assets of the Poca Blending Business that could be liquidated, would cost approximately $387,000. The CRO will be prepared to testify at the hearing on the Motion the efforts untaken by the CRO to reach this conclusion and the basis for this calculation.

16. Thus, when David Carson ("Mr. Carson"), the sole owner of Dcar, LLC and represents Lexycon as its chairman of the Board of Members, contacted the CRO in late March 2014 to initiate preliminary discussions for a potential transaction involving of the Poca Blending Business, it represented an unforeseen opportunity to avoid potentially significant costs and execution risk. Accordingly, the CRO took the opportunity to work with David Carson to negotiate the transaction ultimately reflected in this Motion.

17.     The Order reflects an apprehension about the involvement of Kevin Skiles ("Mr. Skiles"), the Debtor's former Vice President of Research and Technology, as President of Lexycon. The Court expresses this apparent apprehension in the Order through reference to "the possible advantage to insider interests". The CRO will be prepared to testify at the hearing on the Motion that during his negotiations for the sale contemplated by the Motion, the CRO negotiated the transaction with David Carson and addressed diligence matters with David Carson. The CRO was advised by David Carson during the course of negotiations that David Carson intended to involve Mr. Skiles and Mr. Farrell as part of the team responsible for post-acquisition operations of Lexycon. The CRO was not troubled by these disclosures, and in fact, the CRO expected as much given the nature of the Poca Blending Business and the fact that David Carson did not have deep connections with the primary customers of the Poca Blending Business. David Carson has obtained sworn affidavits from Mr. Skiles and Mr. Farrell attached to this Memorandum as Exhibits A and B, respectively.

18.     While David Carson and Lexycon began to perform their due diligence related to the Poca Blending Business, the CRO also met with two other parties that expressed a level of interest in potential transaction involving the Poca Blending Business – (i) Crown Products and (ii) Gulbrandsen Technologies ("Gulbrandsen"). Crown Products contemplated a transaction involving the eventual transition of the Poca Blending Business to it, however, neither the economics of the concept nor the risks to the bankruptcy estate inherent in the transaction structure made sense to the CRO. Crown performed limited due diligence and never provided the CRO a letter of intent. Gulbrandsen, on the other hand, quickly got up to speed on the transaction structure proposed by the CRO and made efforts to catch up to Lexycon in the diligence and transaction agreement negotiation process.

19. Negotiations with Lexycon and Gulbrandsen occurred in parallel throughout April, and did not linger due to a lack of diligent effort by any of the parties.

20. During this period, the CRO and Debtor's counsel kept counsel to the Official Committee of Unsecured Creditors (the "Committee") generally apprised of the contemplated transaction and the view of the CRO that any turnkey transaction was driven on the Debtor side by the opportunity for the bankruptcy estate to avoid substantial cots and execution risk attendant to liquidation of the Poca Blending Business. As negotiations for the sale of the Poca Blending Business progressed, a draft form of purchase agreement was shared with Committee counsel. The Agreement filed with the Motion reflects certain comments suggested by counsel to the Committee. In addition, the Office of the United States Trustee has received periodic updates regarding the potential sale of the Poca Blending Business, including a lengthy and detailed conference call that included the CRO, Debtor's counsel, Judy A. Robbins, United States Trustee for Region 7, and David Bissett, from the Office of the United States Trustee in Charleston. During this call, the CRO explained the negotiating process, explained costs and concerns attendant to an alternative liquidation of the Poca Blending Business, and answered questions of the U.S. Trustee, including inquiries based on reports of sale by media outlets. No logical conclusions can be reached other than that the CRO has been calculated and transparent in his approach regarding the disposition of the assets comprising the Poca Blending Business.

21. The expedited nature of this Motion does not result from efforts to create crisis by either the CRO or Lexycon, nor has Lexycon conducted negotiations in a manner that created delay. The necessity of a closing as soon as possible in May has been known to the CRO, Lexycon and Gulbrandsen since the CRO began discussions with each of these respective parties. Diligence has been efficiently performed by Lexycon and Gulbrandsen, and negotiations

of transaction documents have been commercial, arm's length negotiations. In the course of negotiating a purchase agreement with Lexycon initially insisted on a condition precedent that Lexycon could obtain third party pollution and liability insurance coverage for the Poca Blending Business. The CRO, having experienced his own difficulties in obtaining replacement coverage insurance for purposes not pertinent to the Motion, demanded that Lexycon remove this condition precedent from the purchase agreement. The CRO understands that Lexycon went to considerable lengths and incurred considerable costs in an effort to place insurance for the Poca Blending Business, but, to date, Lexycon has been unsuccessful in doing so. Notwithstanding the difficulties in placing insurance coverage for the assets contemplated to be acquired in the proposed transaction, Lexycon nevertheless agreed to remove the insurance contingency, and thus, the CRO was able to finalize negotiations of the terms and conditions of a purchase agreement as reflected in the Agreement attached to the Motion.

22.    The CRO believes that it is a reasonable requirement of a purchaser for the Poca Blending Business that the business maintain more or less ordinary course operations as a condition to closing. There is, however, a very narrow window that allows the CRO to satisfy this requirement. This is true because the time period from late March until mid-May represents a transitional period from the winter operations to summer operations of the Poca Blending Business. This period is far and away the slowest and least capital intensive time of year for the business. May begins the period in which the Poca Blending Business must incur several million dollars of material purchases in order to satisfy the summer dust treating requirements of the largest customers of the Poca Blending Business. A failure to ramp up material purchases in May means that the Poca Blending Business could not satisfy the volume demands for dust treatment materials in the summer months that follow. The CRO is certain that the failure by

the Poca Blending Business to begin building significant material inventory in May would cause the loss of major customers.

23. The Order suggests that these circumstances could be theoretically addressed by the Debtor through the issuance of preliminary purchase orders or negotiations with suppliers to protect seasonal business opportunities. There are several practical reasons why this approach is not workable. These practical implications are in some instances specific to Freedom and in others more industry driven. First and foremost, there are NO parties encountered by the CRO that are prepared to make ANY accommodations to Freedom. The taint to Freedom resulting from the Incident has been experienced by the CRO is unlike anything the CRO has ever experienced in his career as a consultant to distressed companies. The sellers of materials are not prepared to bear the risk associated with some form of contingent purchase orders, and instead, require cash in advance from Freedom. Further, there is a limited volume of materials available to satisfy customer requirements. Likewise, there are transportation restraints that mandate the timing of delivery of materials necessary for the summer dust treatment season. Also, as described in the Declaration, the CRO reached the conclusion that as part of Freedom, the Poca Blending Business cannot be profitable. Accordingly, retaining the staff necessary to gear up for the summer season of the Poca Blending Business, which the CRO sees as a money losing proposition for Freedom, cannot be justified.

24. The West Virginia Department of Environmental Protection ("WVDEP") is also a driver to the timing of the proposed transaction. As reflected in the Declaration, promptly following the Incident, the Poca Blending Business became subject to intense scrutiny from WVDEP, which notified Freedom of certain environmental matters as reflected in the corresponding schedule to the Agreement. WVDEP has applied significant pressure on the CRO

8

to either promptly decommission the Nitro facility of the Poca Blending Business, or sell it, if possible, to a party with appropriate capitalization to address the concerns expressed by WVDEP. The CRO meets with the WVDEP every week and has kept the WVDEP fully apprised of developments relating to the Poca Business. The CRO believes that it is only as a result of these regular updates and the fact that the CRO is, subject to approval by this Court, on the verge of closing on a turnkey transaction for the sale of the Poca Blending Business that WVDEP has not been more activist with respect to the Poca Blending Business.

25. The CRO believes that if a turnkey transaction within the timeframe proposed by Freedom were to fall through for any reason, WVDEP would mandate the immediate decommissioning of the Poca Blending Business. The CRO believes that this requirement would adversely impact timing of the CRO's implementation of the decommissioning plan for the Etowah facility. This is true in the view of the CRO due to (i) the limited number of parties willing to participate in the decommissioning of Freedom's facilities, (ii) constraints on transportation resources necessary for disposal in the decommissioning process, and (iii) a severe limitation on waste disposal enterprises willing or able to accept materials from Freedom. .

26. The CRO has analyzed the costs of the Debtor purchasing the materials directly, but the slim profit margins that can be obtained through their sale makes it a poor use of estate assets to take such action. Furthermore, there is certainly a risk that the sale of the Poca Blending Business to either Lexycon or Gulbrandsen never occurs, and then the Debtor would be saddled with a significant amount of these materials for a business that cannot be profitable under Freedom's current constraints. Taking into account these risks, the CRO does not believe that it is prudent for the Debtor to purchase the materials and, therefore, time is of the essence in completing the rapid sale of the Poca Blending Business.

27.     As described above, Bankruptcy Rule 2002(a)(2) requires 21 days' notice of a sale outside the ordinary course of business, unless the court for "cause shown" shortens the time. FED. R. BANKR. P. 2002(a)(2). Courts in several instances have found that such "cause" exists depending on the facts of each case. In In re Vanguard Oil & Service Co., 88 B.R. 576, 579 (E.D.N.Y. 1988), a judgment creditor appealed a bankruptcy court order permitting the sale of real property under section 363 of the Bankruptcy Code on the basis that the sale purportedly violated the creditor's due process rights allegedly resulting from improper notice. 88 B.R. at 579. In that case, "due to the seasonal nature of the Debtor's business, [the purchaser] conditioned its offer upon immediate acceptance." Id. at 580. Recognizing the need for a quick sale, the bankruptcy court allowed the 363 sale to move forward without satisfying the 21 day notice requirement set forth in Bankruptcy Rule 2002(a)(2). Id.

28.     On appeal, the district court noted that "[a] delay in accepting [the purchaser's] offer arguably risked decreasing the value of all the assets involved in the Debtor's estate." Id. As such, the district court held that the bankruptcy court acted within its discretion in approving the sale. Id. In making this determination, the district court also looked to the Second Circuit's decision in Matter of General Insecticide Co., Inc. v. Bankrupt, 403 F.2d 629 (2d Cir. 1968), which held that "absence of notice to creditors of a private sale was not a sufficient ground for setting aside a bankruptcy sale." Vanguard Oil, 88 B.R. at 580. In General Insecticide, the court found that "if an advantageous sale would be lost or if the property to be sold would substantially depreciate in value during the notice period, the notice requirement for a private sale from a bankrupt estate could be dispensed with." Vanguard Oil, 88 B.R. at 580 (citing General Insecticide, 403 F.2d at 630). Lastly, the district court in Vanguard Oil, stated that the appellant failed to demonstrate how it was materially prejudiced, as it had notice of the sale and an

10

opportunity to contest the sale, yet it failed to do so. Id. For all of these reasons, the district court found the appellant's due process claim unpersuasive. Id.

29. Similarly, in In re Eldercare, 390 B.R. 762 (Bankr. D. Conn. 2008), a bankruptcy court found that under the circumstances related to the sale of nursing facility assets, cause existed to reduce the 21 day notice required by Bankruptcy Rule 2002(a)(2) to two (2) days because (i) the debtor was in "financial extremis", (ii) the value of the debtors' assets was deteriorating, (iii) the debtors were unable to find a cash purchaser to bring into the auction process, and (iv) there was "no credible evidence to support a claim that additional notice might materially enhance the outcome for any case constituency." 390 B.R. at 769-70.

30. Finally, the Fourth Circuit in In re Patriot's Point Assocs., 1990 U.S. App. LEXIS 26964 (4th Cir. 1990), held that the district court did not abuse its discretion in shortening the notice requirements of Bankruptcy Rule 2002(a)(2) to ten (10) days by conducting an expedited hearing on the sale of certain assets under section 363 of the Bankruptcy Code where "the potential purchasers of the [assets] would not wait long." 1990 U.S. App. LEXIS 26964 at *24-25. The court noted that even if it were to find an abuse of discretion by the district court in shortening the notice time, "a rule requiring notice and opportunity to object is adequately complied with if an objecting party receives actual notice and is afforded an opportunity to raise its objection." Id. at 25 (citing In re Glinz, 66 B.R. 88, 91 (D.N.D. 1986)). Because the appealing party received actual notice of the hearing and objected to the sale, "any noncompliance with notice requirements was harmless error." Id.

31. In the instance of the Poca Blending Business, the proposed sale represents an economic swing to the bankruptcy estate of almost $1.0 million – from decommissioning expenditures on a net basis of approximately $400,000 to an asset sale of $575,000. The CRO

views risk and cost avoidance associated with decommissioning of the Nitro facility as justification alone for approval of an expedited sale. The CRO does not believe that any delay in the sale process for the prospect of a potentially higher offer can at all justify the risks that the bankruptcy estate would bear with such delay. Despite skepticism expressed in the Order, the CRO is certain that Freedom can demonstrate that cause exists for approval by the Court of the Motion on an expedited basis.

WHEREFORE, the Debtor, Freedom Industries, Inc., respectfully requests that this Court enter an Order (i) approving the Motion for cause shown, and (ii) granting such other relief as the Court deems just and proper.

Dated: May 12, 2014                                              Respectfully submitted,

**BARTH & THOMPSON**

Stephen L. Thompson (WV 3751)
J. Nicholas Barth (WV 255)
Barth & Thompson
P.O. Box 129
Charleston, West Virginia 25321
Telephone: (304) 342-7111
Facsimile: (304) 342-6215

and

**MCGUIREWOODS LLP**

/s/ Mark E. Freedlander
Mark E. Freedlander (PA 70593)
Jason P. Alter (PA 307596)
625 Liberty Avenue, 23rd Floor
Pittsburgh, PA  15222
Telephone: (412) 667-6000
Facsimile: (412) 667-6050

Attorneys for the Debtor and
Debtor-in-Possession

I have reviewed the content of this Memorandum in Support in detail and declare under the penalty of perjury that the content of this Memorandum in Support is true and correct to the best of my knowledge, information, and belief.

                                                /s/ Mark Welch
                                                Mark Welch
                                                Chief Restructuring Officer