**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| In re ) | Chapter 11 |
| ) | |
| **FREEDOM INDUSTRIES, INC.** ) | |
| ) | Case No. 14-20017-RGP |
| ) | |
| Debtor. ) | |
| ) | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO**
**11 U.S.C. § 1121(d) EXTENDING THE EXCLUSIVITY PERIODS DURING**
**WHICH ONLY THE DEBTOR MAY FILE AND SOLICIT APPROVAL**
**OF A CHAPTER 11 PLAN AND DISCLOSURE STATEMENT**

The debtor and debtor-in-possession in the above captioned case (the "Debtor") hereby files this motion (the "Motion")[1] for entry of an order ("Order") pursuant to 11 U.S.C. § 1121(d) extending the exclusivity periods during which only the Debtor may file and solicit approval of a chapter 11 plan and disclosure statement. In further support of this Motion, the Debtor respectfully represents as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this case and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are section 1121(d) of the Bankruptcy Code, Bankruptcy Rule 9006 (a) and (b) and Local Rule 9006-1.

**BACKGROUND**

3. On January 17, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

---

[1] The Debtor has discussed this Motion with counsel for the Committee (as defined below) and has been authorized to indicate that the Committee has no objection to the Motion.

1

4. The Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. Freedom's corporate office is located in Charleston, West Virginia, and as of the Petition Date it operated two production facilities located in (a) Nitro, West Virginia (the "Nitro Facility") and (b) Charleston, West Virginia (the "Charleston Facility")

6. The Debtor's bankruptcy filing was the result of an incident that occurred on January 9, 2014 involving one of Freedom's storage tanks located at its Charleston Facility (the "Incident"). Facts surrounding the Incident are subject to pending investigations by Freedom and various regulatory and other governmental authorities.[2]

7. On February 5, 2014, the Office of the United States Trustee for the Southern District of West Virginia (the "U.S. Trustee") filed the Notice of Appointment of Committee of Unsecured Creditors [Docket No. 117] (the "Committee").

8. As of the Petition Date, the Debtor intended to reorganize its business and affairs as a going concern enterprise. Shortly following the Petition Date, however, undersigned counsel suggested to the Debtor that circumstances did not reasonably appear to allow for a going concern reorganization, and management of the Debtor agreed with this assessment. Accordingly, the Debtor promptly changed its course of action and began preparations for and then implementation of an orderly wind down of its business and affairs.

9. Very soon after the Petition Date, it became readily apparent to undersigned counsel that the Debtor lacked crisis management in an extraordinarily difficult set of circumstances. Undersigned counsel, in the first week of February, 2014, began a process

---

[2] The facts and circumstances relating to the Incident as described herein are intended for explanatory purposes only and shall not prejudice the rights, claims, or defenses of any party in interest, including, without limitation, the rights of any purported holder of a claim arising from or related to the Incident, and correspondingly, all rights, claims, and defenses of the Debtor and other parties in interest are preserved.

where counsel endeavored to convince existing management of the Debtor, the Committee, the U.S. Trustee, and finally the Court that the involvement of a chief restructuring officer of the Debtor was essential to the preservation and maximization of the value of the bankruptcy estate. Unfortunately, this process took much longer than had been hoped, as the engagement of a chief restructuring officer was met with preliminary skepticism from both the U.S. Trustee and the Court.

10. On March 18, 2014, the Court entered the *Order Approving Application of the Debtor for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing the Appointment of Mark Welch of MorrisAnderson & Associates, Ltd. as Chief Restructuring Officer* [Docket No. 228] (the "CRO Order"). Pursuant to the CRO Order, Mark Welch (the "CRO") was appointed as Chief Restructuring Officer, effective as of March 18, 2014.

11. The CRO submits that the Debtor has made substantial progress towards proposing a confirmable chapter 11 plan, while ensuring that the Debtor's environmental responsibilities and other substantial obligations are fulfilled, and that a forty-five (45) day extension of the exclusivity periods is undeniably warranted.

## RELIEF REQUESTED

12. Section 1121(b) of the Bankruptcy Code provides for an initial period of one hundred twenty days after the commencement of a chapter 11 case during which a debtor has the exclusive right to propose and file a plan. Section 1121(c)(3) of the Bankruptcy Code provides that if the debtor proposes and files a plan within the initial 120-day exclusive period, the debtor then has until one hundred eighty days after the commencement of the chapter 11 case to solicit and obtain acceptances of such plan

13.     Through this Motion, the Debtor respectfully requests an order pursuant to 11 U.S.C. § 1121(d) extending the exclusivity periods by forty-five (45) days during which only the Debtor may file and solicit approval of a chapter 11 plan and disclosure statement

## **BASIS FOR RELIEF**

14.     Pursuant to section 1121(d)(1) of the Bankruptcy Code, "on request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section." 11 U.S.C. § 1121(d)(1). Although the term "cause" is not defined by the Bankruptcy Code, the legislative history indicates that it is to be viewed flexibly "in order to allow the debtor to reach an agreement." *H.R. Rep. No. 595, 95th Cong., 1st Sess. 232 (1977)*; *see also* In re McLean Indus., Inc., 87 B.R. 830, 833 (Bankr. S.D.N.Y. 1987); In re Public Serv. Co. of N.H., 88 B.R. 521, 534 (Bankr. D.N.H. 1988) ("[T]he legislative intent . . . [is] to promote maximum flexibility."). To facilitate this legislative intent, a debtor should be given a reasonable opportunity to negotiate an acceptable plan with creditors and to prepare adequate financial and non-financial information concerning the ramifications of any proposed plan for disclosure to creditors. *See*, *e.g.*, McLean, 87 B.R. at 833-34; In re Texaco, Inc., 76 B.R. 322, 327 (Bankr. S.D.N.Y. 1987).

15.     The decision to extend a debtor's exclusive periods is committed to the bankruptcy court's sound discretion, guided by the facts and circumstances of each case. *See*, *e.g.*, First Am. Bank of N.Y. v. S.W. Gloves and Safety Equip., Inc., 64 B.R. 963, 965 (D. Del. 1986). Courts consider a variety of factors in determining whether "cause" exists to warrant an extension of the exclusive periods, including: (a) the size and complexity of the case; (b) the debtor's progress in resolving issues facing the estate; and (c) whether an extension of time will

4

harm the debtor's creditors. *See*, *e.g.*, In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409-10 (E.D.N.Y. 1989) (listing above-referenced factors); *see also* In re Dow Corning Corp., 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997) (*citing* In re Express One Int'l, Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996)). The existence of good faith progress and the need for additional time to continue such progress is a particularly significant factor in establishing cause for extending the exclusive periods under section 1121(d) of the Bankruptcy Code. *See* Express One Int'l, Inc., 194 B.R. at 101; In re Pine Run Trust, Inc., 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986).

16. In this case, the one hundred twenty day exclusivity period to file a plan of reorganization set forth in section 1121(b) expires on May 17, 2014, and the one hundred eighty day period to solicit acceptances of a plan originally expired on July 16, 2014. May 17, 2014 falls on a weekend and therefore, pursuant to Bankruptcy Rule 9006, the official deadline in which the Debtor has to file a Plan is May 19, 2014 (the "Plan Exclusivity Deadline") and the official deadline for the Debtor to solicit acceptances of the Plan is July 16, 2014 (the "Solicitation Deadline", and together with the Plan Exclusivity Deadline, the "Exclusivity Deadlines").

17. "Cause" exists to warrant extension of the Exclusivity Deadlines. Since his appointment just under sixty (60) days ago, the CRO has endeavored to ensure that the Debtor's bankruptcy is conducted in the best interests of all stakeholders involved in the case and has made substantial good faith progress towards submitting a confirmable liquidating plan.

18. First and foremost, the CRO stepped into a situation that can only be described as an absolute frenzy of media attention, regulatory pressures and a lack of internal controls, all in the context of a wholly unanticipated crisis. Notwithstanding these circumstances, the CRO has

been able to bring relative order to this chaos. The West Virginia Department of Environmental Protection ("WVDEP"), among other state and federal regulatory authorities, has intensely scrutinized the Debtor's, assets, records and remediation efforts.  The CRO regularly communicates with and actually meets WVDEP representatives in both a sit-down meeting and site walk-through every week.  The WVDEP and other regulatory authorities are fully apprised of developments relating to the Debtor's environmental remediation undertakings.  As it relates to environmental matters, the Debtor under control of the CRO has, among other things:

- Modified and refined the remediation plan to segment and secure waste water tanks, thereby avoiding more expensive water treatment obligations;

- Implemented a water diversion plan and accompanying water treatment system in a manner that has reduced water treatment costs by approximately fifty (50%) percent;

- Negotiated waste water removal arrangements that have reduced waste water removal costs by at least fifty (50%) percent;

- Removed approximately six hundred thousand (600,000) gallons of waste water since implementation of new processes at the end of the first week of April, 2014;

- Caused removal and treatment of ALL existing chemical materials from the Etowah site, and caused dismantling of all fiberglass and plastic tanks at the Etowah site;

- Coordinated and oversaw affected tank testing by the federal Chemical Safety Board, as well as coordination of additional testing and oversight by plaintiff and non-debtor defendant representatives;

- Implemented changes to environmental consultant participation at Etowah site, thereby reducing associated costs from approximately $30,000 per day to $10,000 per day as of approximately April 1, 2014;

- Implemented (subject to final approval by WVDEP) a self-monitoring and water treatment system that will allow for elimination of outside environmental consultant fees, and self-contained monitoring system going forward; and

- Established a competitive bid process involving 11 demolition firms for the completion of the demolition and decommissioning of the Etowah facility within the next 60 days (with final choice of demolition firm to be subject to Court approval).

19. Second, the Debtor under the control of the CRO diligently negotiated with two purchasers of the Debtor's operations at the Nitro Facility. Once he was appointed, the CRO promptly analyzed the Debtor's business and its assets in an effort to determine the best approach to maximize the value of the Debtor's bankruptcy estate. In the less than 60 days since appointment of the CRO, the Debtor has negotiated and presented to the Court a proposed turnkey transaction that: (i) will save approximately $400,000 in net dismantling and material costs; (ii) will eliminate all execution risks associated with decommissioning the Nitro Facility, which are substantial; (iii) will create $575,000 in proceeds for the benefit of the bankruptcy estate; and (iv) will result in the employment of up to approximately twenty (20) former employees of the Debtor once the proposed purchaser commences its ordinary course operations.

20. The Debtor under control of the CRO has also engaged in negotiations with the Debtor's primary insurer in an effort to obtain for the benefit of the bankruptcy estate, proceeds of available insurance coverage under applicable policies for claims allegedly arising out of or related to the Incident. At the time of the Incident, Freedom maintained two insurance policies whose coverage was potentially implicated by the Incident: (a) a Commercial General Liability and Pollution Legal Liability policy (the "Primary Policy") issued by AIG Specialty Insurance Company; and (b) a Commercial Excess policy (the "Excess Policy"), also issued by AIG Specialty Insurance Company. These negotiations are ongoing and have been slowed by the Debtor's inability, despite significant efforts by the CRO, to obtain replacement pollution and general liability coverage. The Debtor is nevertheless hopeful that the Debtor will be able to resolve issues with the Debtor's insurer and bring insurance policy proceeds into the bankruptcy estate within the proposed extended period of exclusivity.

21. Moreover, the Debtor under control of the CRO has continued to diligently winddown the Debtor's business operations, which has included collection of outstanding accounts receivable owed to the Debtor by its customers, managing the Debtor's remaining employees, and implementing a variety of other cost cutting measures. In the less than 60 days since the appointment of the CRO, the Debtor has been able to accomplish the following with respect to these matters:

- Reduced labor costs by approximately seventy (70%) percent, while maintaining sufficient operations at the Nitro Facility to allow for a turnkey sale (subject to Court approval which is pending);

- Eliminated approximately $2.0 million in post-petition accounts payable;

- Collected approximately $7.8 million in accounts receivable over a period of less than eight (8) weeks;

- Eliminated a variety of operating costs such as cell phones, sales expenses, uniform services, equipment rentals, and other operating expenses equaling as much as $40,000 per week; and

- Increased operating cash on hand from approximately $2.0 million as of the date of the CRO's appointment to approximately $5.5 million as of May 13, 2014.

22. The Debtor under control of the CRO also implemented a process to cause the removal of every lawsuit in which Freedom was a defendant arising out of the Incident to this Court and, shortly thereafter, sought withdrawal of those removed actions to the District Court. As set forth more fully in the Motion to Withdraw the Reference filed in the removed actions, the CRO submits that consolidation of those lawsuits in one jurisdiction – federal district court - is very important to allow the Debtor to manage the process of validating and estimating claims arising from the Incident.

23. The Debtor under control of the CRO has also met and conferred with a variety of parties in interest including but not limited to vendors, customers, plaintiff representatives and the Committee in an effort to address case administration and claims treatment. As a result of

these communications, the Debtor has developed an internal outline of the content of a plan of liquidation that the Debtor believes can be negotiated with the Committee such that the Debtor will be in a position to file a plan of liquidation jointly with the Committee within the proposed short extension of the Debtor's exclusive period.

24. As a result of these efforts, the CRO submits that the Debtor will be in position to file a plan of liquidation during proposed the forty-five (45) day extension of the Exclusivity Deadlines sought herein.

25. A short extension of the Exclusive Deadlines has been earned by the CRO and is warranted here because, among other things:

  a. The Debtor's case is complex, particularly with respect to the environmental, insurance, and claims processing issues, and certain substantial issues remain unresolved, including but not limited to the validity, amount, and priority of claims and the value of the Debtor's assets, including the value of insurance proceeds payable to the Debtor or its designee;

  b. The Debtor has made significant, good faith progress in resolving many of the issues facing the estate, including the environmental remediation, the ultimate disposition of the Debtor's assets through a liquidation of the Poca Blending Business, and negotiations regarding insurance proceeds;

  c. An extension of the Exclusive Deadlines will give the Debtor a reasonable opportunity to develop, negotiate, and ultimately confirm a consensual plan, without prejudicing any party in interest; and

  d. Creditors will not be harmed by the extension requested herein because all parties-in-interest are best served by the Debtor having sufficient time to formulate a confirmable plan and, in fact, the Committee has consented to the extension.

26. In summary, the CRO has made substantial progress towards submitting a confirmable plan of liquidation, has done so in a responsible manner designed to ensure that the Debtor complies with its environmental remediation obligations, and has worked diligently to resolve the Debtor's bankruptcy case such that creditors receive maximum value.

27. For those reasons, the Debtor respectfully submits that cause exists to extend the Exclusivity Deadlines and requests that the Court enter an order extending the Plan Exclusivity Deadline to July 3, 2014, and extending the Solicitation Deadline to August 30, 2014.

WHEREFORE, the Debtor, Freedom Industries, Inc., respectfully requests that this Court enter an Order (i) approving the Motion for cause shown, (ii) extending the deadline through which the Debtor has the exclusive authority to file a chapter 11 plan through and including July 3, 2014 and extending the deadline through which the Debtor has the exclusive authority to solicit acceptance of a plan through August 30, 2014, and (iii) granting such other relief as the Court deems just and proper.

Dated: <u>May 16, 2014</u>

Respectfully submitted,

**BARTH & THOMPSON**

Stephen L. Thompson (WV 3751)
J. Nicholas Barth (WV 255)
Barth & Thompson
P.O. Box 129
Charleston, West Virginia 25321
Telephone: (304) 342-7111
Facsimile: (304) 342-6215

and

**MCGUIREWOODS LLP**

/s/ Mark E. Freedlander
Mark E. Freedlander (PA 70593)
Jason P. Alter (PA 307596)
625 Liberty Avenue, 23rd Floor
Pittsburgh, PA 15222
Telephone: (412) 667-6000
Facsimile: (412) 667-6050

Attorneys for the Debtor and
Debtor-in-Possession