**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| In re ) | |
| ) | **Chapter 11** |
| **FREEDOM INDUSTRIES, INC.** ) | |
| ) | **Case No. 2:14-bk-20017** |
| **Debtor.** ) | |
| ) | |

**MOTION TO APPROVE SETTLEMENT AGREEMENT AND**
**INSURANCE BUY-BACK BETWEEN DEBTOR AND INSURER**

The debtor and debtor-in-possession in the above-captioned case ("Freedom" or the "Debtor") hereby files this motion (the "Motion") for entry of an order substantially in the form of Exhibit A hereto, pursuant to sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for approval of a settlement between the Debtor and its insurer AIG Specialty Insurance Company and affiliated parties (collectively, "AIG Specialty"), as more fully described herein and in the Settlement Agreement which settlement involves the buy-back of the excess policy issued by AIG Specialty to the Debtor and a partial release of the primary policy issued by AIG Specialty to the Debtor. In support of the Motion, the Debtor respectfully states as follows:

### I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue of this case and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019.

## SUMMARY OF RELIEF REQUESTED

4. Through the Motion, the Debtor seeks relief relating to the Debtor's insurer, AIG Specialty,[1] which provided coverage to the Debtor implicated by the Incident (as defined below). The Motion seeks: (i) approval of the Settlement Agreement, (ii) a partial release of AIG Specialty under the Primary Policy, (iii) the sale of the Excess Policy to AIG Specialty free and clear of all Interests, and (iv) the issuance of the Injunction for the benefit of AIG Specialty, all in consideration of AIG Specialty's payment of the Settlement Amount.[2] This Motion, if granted, represents one of the foundations of the chapter 11 plan of liquidation that the Debtor contemplates filing with this Court in the near future.

## II. BACKGROUND

5. On January 17, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6. The Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7. On February 5, 2014, the Office of the United States Trustee for the Southern District of West Virginia (the "U.S. Trustee") filed the Notice of Appointment of Committee of Unsecured Creditors [Docket No. 117] (the "Committee").

8. As the Court is aware, the Debtor's bankruptcy filing was the result of an incident that occurred on January 9, 2014 involving one of Freedom's storage tanks located at its

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the Settlement Agreement attached hereto and incorporated herein by reference as Exhibit B.

[2] The Settlement Amount is Three Million Dollars ($3,000,000) less amounts AIG Specialty has paid under the policies prior to approval of this Motion by the Bankruptcy Court pursuant to any order of the Bankruptcy Court including but not limited to that certain Order Approving Debtor's Motion to Authorize Retention of Experts Without Further Order of the Court and Payment of Certain Obligations Pursuant to the Debtor's Insurance Policies dated February 27, 2014 [Docket No. 186]. In accordance with the February 27, 2014 order, AIG Specialty has paid or will pay the invoices of AMEC Environment & Infrastructure in the aggregate sum of $90,827.26. Accordingly, the Settlement Amount to be received by the Debtor is estimated to total approximately $2,909,172.74.

Charleston facility (the "Incident"). Facts surrounding the Incident are subject to pending investigations by Freedom and various regulatory and other governmental authorities.[3]

9. Numerous lawsuits were filed against the Debtor as a result of the Incident, giving rise to various types of claims against the Debtor, including, but not limited to, claims of governmental agencies. A list of lawsuits pending against the Debtor as of the Petition Date is attached hereto and incorporated herein by reference as Exhibit C. Some creditors and claimants have already inquired about the nature and extent of the Debtor's insurance, including, without limitation, the Committee and certain counsel to parties having filed pre-Petition Date lawsuits against the Debtor.

10. On the date of the Incident, the Debtor maintained the following two (2) insurance policies (the "Policies") whose coverage was potentially implicated by the Incident: (a) a Commercial General Liability and Pollution Legal Liability policy defined in the Settlement Agreement as the Primary Policy) issued by AIG Specialty; and (b) a Commercial Excess policy (defined in the Settlement Agreement as the Excess Policy), also issued by AIG Specialty. The two policies provide coverage for, among other things, pollution legal liability. Copies of the Primary Policy and the Excess Policy are attached hereto and incorporated herein by reference as Exhibit D and Exhibit E, respectively.

11. Following the Incident, Freedom provided notice to AIG Specialty, which advised Freedom that it would provide a defense to Freedom pursuant to Coverage D-2 of the Primary Policy subject, however, to a reservation of rights. The combined limits of liability under both the Primary Policy and Excess Policy for Coverage D-2 applicable to the Incident are

---

[3] The facts and circumstances relating to the Incident as described herein are intended for explanatory purposes only and shall not prejudice the rights, claims, or defenses of any party in interest, including, without limitation, the rights of any purported holder of a claim arising from or related to the Incident, and correspondingly, all rights, claims, and defenses of the Debtor and other parties in interest are preserved.

$3,000,000, with a deductible of $25,000.  Under Coverage D-2, the payment of defense costs erodes the limits of liability.  The payment of emergency response costs that Freedom incurred within 72 hours of the commencement of the Incident would also erode the $3,000,000 limits of liability.

12.     The Excess Policy has additional coverages for crisis response and crisis management expenses, with separate and distinct limits of liability totaling $300,000.  Those additional coverages apply only to fees and expenses of a public relations or crisis management firm approved by AIG Specialty or certain other crisis management expenses that are pre-approved by AIG Specialty.  Following the Incident, Freedom retained a public relations firm, Abernathy MacGregor ("Abernathy").  The Abernathy invoices fall within the crisis response/crisis management limits of liability, but there are no other expenses incurred as of the date of this Motion by Freedom that are payable from the crisis response/crisis management limits.  The Debtor has no right to be directly paid any amounts under the crisis response and crisis management expense coverage.

13.     Various individuals have contacted the Debtor or AIG Specialty regarding Claims that would erode the policy limits, including law firms, consultants and other vendors that provided pre-petition services to Freedom and claimants that have filed civil lawsuits against Freedom arising from the Incident.  In addition, two officers and/or employees of Freedom, Gary Southern and Dennis Farrell, have requested that AIG Specialty provide them with a defense and/or indemnity under the Policies for certain lawsuits in which they have been named as defendants and/or for criminal investigations.  Because the claims against Freedom and other insureds greatly exceed the limits of the Policies, and because payment of defense costs and emergency response costs would erode the available policy limits, there is a significant risk that

the Policies could quickly be exhausted, leaving significant Claims against Freedom and other insureds unresolved.

14. Since the Petition Date, the Debtor has engaged in extensive discussions with AIG Specialty regarding the Policies and the proper disposition of the proceeds of the Policies. AIG Specialty and the Debtor disagree about the extent to which the Policies afford coverage for the varying Claims asserted against the Debtor and other insureds and the costs associated with the defense of those claims.

15. The Debtor has also conferred with the Committee regarding the Policies, their eroding limits and the extent of coverage. The Committee is in agreement with the approach to the Policies as set forth in the Motion.

16. In recognition of the fact that the competing Claims asserted against the Debtor as a result of the Incident, whether liquidated, unliquidated, contingent, or otherwise, are highly varied and would almost certainly exhaust the limits of the Policies; that Freedom has already incurred substantial defense costs and emergency response costs that would be payable under the terms of the Policies; that other potential insureds, including Gary Southern and Dennis Farrell, have been sued or may be sued as a result of the Incident and have or may request defense and indemnity under the Policies; that, without the oversight of the Bankruptcy Court, it is likely that the payment of defense and other costs will substantially and quickly erode the limits of the Policies; and that the Debtor's bankruptcy estate has limited resources and would be impacted by the erosion of the policy limits, the Debtor requested that AIG Specialty tender the limits of the Policies. AIG Specialty disputes the propriety of such a demand at this stage, as the substantial majority of the Claims asserted against the Debtor that relate to or arise from the Incident remain

disputed, contingent and unliquidated.  AIG Specialty has also reserved its rights as to certain coverage defenses that would potentially apply to Claims related to the Incident.

17.  Notwithstanding the foregoing, AIG Specialty has advised the Debtor that it is prepared to compromise its position pursuant to the terms of the Settlement Agreement attached hereto as Exhibit B.  Key terms of the Settlement Agreement include:[4]

a. The Debtor will sell and AIG Specialty will purchase the Excess Policy (including any and all rights under the Excess Policy) free and clear of all Interests pursuant to section 363 of the Bankruptcy Code for $3,000,000 less any amounts AIG Specialty has paid under the Policies prior to the Approval Date pursuant to any order of the Bankruptcy Court, including but not limited to the February 27, 2014 *Order Approving Debtor's Motion to Authorize the Retention of Experts Without Further Order of the Court and Payment of Certain Obligations Pursuant to Debtor's Insurance Policies* [Dkt. No. 186] (the "Settlement Amount"), which amount represents the full remaining limits of liability available for both Policies under Coverage D-2 for the Incident.

b. In addition to payment of the Settlement Amount, AIG Specialty will pay the invoice submitted by Abernathy for public relations services rendered in connection with the Incident prior to the date of Freedom's chapter 11 petition.

c. The order approving the Settlement Agreement, including provisions relating to the Sale, will contain language (i) finding AIG Specialty is a good faith purchaser entitled to the protections of Bankruptcy Code Section 363(m), (ii) releasing AIG Specialty from any and all Claims arising from or relating to the Incident, and (iii) staying and permanently enjoining any party-in-interest from asserting claims against AIG Specialty in connection with the Incident and/or the Policies.

d. AIG Specialty will continue to insure Freedom under the Primary Policy for losses unrelated to the Incident up to an aggregate limit of $1,000,000, subject to the specific terms, conditions and exclusions of the Primary Policy.  The release of AIG Specialty under the Settlement Agreement will exclude this ongoing coverage.

e. The Settlement Agreement also provides that in the event that any Other Insurer obtains a judicial determination, settlement or binding arbitration award that it is entitled to obtain a sum certain against AIG Specialty as a result of a Claim for

---

[4] Below is a general description of the terms and conditions of settlement between the Debtor and AIG Specialty.  A complete description of the terms and conditions of settlement are set forth in the Settlement Agreement attached hereto and incorporated herein by reference as Exhibit B.  In the event of a conflict between terms and conditions of settlement with AIG Specialty as summarized in this Motion and the Settlement Agreement, the terms and conditions of the Settlement Agreement shall control.

contribution, subrogation, indemnification or other similar Claim against AIG Specialty for AIG Specialty's alleged share or equitable share, or to enforce subrogation rights with respect to the defense and/or indemnity obligations of AIG Specialty for any Claims released pursuant to the Settlement Agreement, Freedom shall voluntarily reduce its judgment or Claim against or settlement with such Other Insurer(s) to the extent necessary to eliminate such contribution, subrogation or indemnification Claims against AIG Specialty.

f.  Subject to the above terms, AIG will waive any and all right to receive any distribution from the bankruptcy estate for claims relating to the Incident and/or the Policies.

### III.  RELIEF SOUGHT

18. By this Motion, the Debtor seeks authorization to effectuate the Settlement Agreement with AIG Specialty by selling the Excess Policy to AIG Specialty in consideration for payment of the Settlement Amount of $3,000,000, less any amounts paid by AIG Specialty under the Policies prior to the Approval Date pursuant to an order[5] of the Bankruptcy Court, which amount represents the combined limits of liability of the Policies applicable to the claims, losses and expenses arising from the Incident.  As part of the Settlement Agreement, AIG Specialty will receive a release from the Debtor, its bankruptcy estate and all other parties-in-interest of any and all Claims against AIG Specialty that arise from or relate to the Incident or that arise from or relate to the Excess Policy.  AIG will continue to insure Freedom under the Primary Policy for covered losses unrelated to the Incident up to an aggregate limit of $1,000,000. In connection with the Sale, the Debtor intends to hold the Settlement Amount in a segregated account, while preserving the rights of all parties-in-interest in and to the Settlement Amount.

---

[5] Such orders include, the February 27, 2014 *Order Approving Debtor's Motion to Authorize the Retention of Experts Without Further Order of the Court and Payment of Certain Obligations Pursuant to Debtor's Insurance Policies* [Dkt. No. 186], which authorized AIG Specialty to pay fees and costs of certain experts from the limits of the Policies without the need for further court order.  AIG Specialty advises that it has received three invoices from one of the experts retained pursuant to that order in the aggregate amount of $90,827.26.

### A. The Settlement Agreement Should Be Approved Pursuant to Bankruptcy Rule 9019

19. Bankruptcy Rule 9019 provides that the Court "may approve a compromise and settlement." Fed. R. Bankr. P. 9019. Compromises are tools for expediting the administration of the case, reducing administrative costs and are favored in bankruptcy. See In re Bond, 1994 U.S. App. Lexis 1282, *9 - *13 (4th Cir. 1994) ("To minimize litigation and expedite the administration of a bankruptcy estate, 'compromises are favored in bankruptcy.'"); Fogel v. Zell, 221 F.3d 955, 960 (7th Cir. 2000); In re Martin, 91 F.3d 389, 393 (3d Cir. 1996). Various courts have endorsed the use of Bankruptcy Rule 9019. See, e.g., Bartel v. Bar Harbour Airways, Inc., ,196 B.R. 268 (S.D.N.Y. 1996); In re Foundation for New Era Philanthropy, 1996 Bankr. Lexis 1892 (Bankr. E.D. Pa. 1996); In re Miller, 148 B.R. 510, 516 (Bankr. N.D. Ill. 1992); In re Check Reporting Service, Inc., 137 B.R. 653 (Bankr. W.D. Mich. 1992); In re Patel, 43 B.R. 500, 504 (N.D. Ill. 1982).

20. The standard by which a court should evaluate a settlement are well established. In addition to considering the proposed terms of the settlement, the court should consider the following factors:

   a) the probability of success in litigation;

   b) the difficulty in collecting any judgment that may be obtained;

   c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attendant to it; and

   d) the interest of creditors and stockholders and a proper deference to their reasonable views of the settlement.

See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968); United States ex. Rel. Rahman v. Oncology Assoc., P.C., 269 B.R. 139, 152 (D. Md. 2001); In re Frye, 216 B.R. 166, 174 (E.D. Va. 1997).

21. The decision to approve a settlement or compromise is within the discretion of the court and is warranted where the settlement is found to be reasonable and fair in light of the particular circumstances of the case. See TMT Trailer Ferry, 390 U.S. at 424-25. The settlement need not be the best that the debtor could have achieved, but need only fall "within the reasonable range of litigation possibilities." In re Telesphere Communications, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994). In making its determination, a court should not substitute its own judgment for that of the debtor. In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986).

22. In the present matter, the proposed Settlement Agreement is properly approved by the Court because the Debtor and its bankruptcy estate are effectively receiving the full benefit of coverage provided under the Policies now rather than at the conclusion of a claims resolution process and a possible coverage action. The exact nature and extent of Claims asserted against the Debtor remain largely uncertain as the facts and circumstances surrounding the Incident are still being investigated and the Court is in the process of appointing a local claims administrator for purposes of identifying and qualifying Claims. Liquidating the Claims to a fixed amount could involve a protracted and potentially expensive process. Yet, the Debtor has negotiated a compromise with AIG Specialty that effectively provides for the immediate payment of the Insurance Policy limits irrespective of the outcome of litigation claims associated with the Incident. The Settlement Agreement further benefits the bankruptcy estate and parties-in-interest because it enables more effectively control and marshalling the proceeds of the Policies to maximize their value to the bankruptcy estate, to provide a mechanism for any insureds to seek and obtain payment of defense costs, and preventing conflicting or duplicative Claims from exhausting the Policies' limits before other claimants can be paid.

23. The proposed Settlement Agreement satisfies each of the factors for approval of settlements delineated in TMT Trailer Ferry:

a. While the probability of success in an action against AIG Specialty relating to coverage is largely uncertain at early stage because the prosecution of all Claims unrelated to defense costs have been stayed, the settlement memorialized in the Settlement Agreement eliminates the risk of a coverage action because the Debtor is essentially receiving the equivalent of the applicable limits of the Policies as a result of the Settlement Agreement. Such a result clearly falls within the range of results that might be obtained if these matters were litigated.

b. As for potential difficulties with respect to collection, the settlement memorialized in the Settlement Agreement eliminates the prospect for a coverage dispute with AIG Specialty.

c. The settlement memorialized in the Settlement Agreement eliminates the inconvenience and delay associated with an insurance claims process and the costs to the bankruptcy estate attendant thereto.

d. Finally, the settlement memorialized in the Settlement Agreement provides proper deference to the interests of creditors and claimants because the Settlement Amount will be segregated and held in escrow pending further order of the Court.

24. The Debtor, in its reasoned business judgment, has concluded that the Settlement Agreement, including the releases provided for the benefit of the Debtor and AIG Specialty thereunder, are in the best interest of the Debtor, its bankruptcy estate, creditors and other parties-in-interest.

**B.   The Sale of the Excess Policy to AIG Specialty Free and Clear of Claims and Interests Should Be Approved Pursuant to Section 363 of the Bankruptcy Code.**

25. Section 363(b) of the Bankruptcy Code provides that a debtor-in-possession may sell property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Courts have recognized that insurance policies are property of a debtor's estate, which may be sold with court approval under section 363 of the Bankruptcy Code. See, e.g., Estate of Lellock v. Prudential Ins. Co., 811 F.2d 186, 189 (3d Cir. 1987); MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93 (2d Cir.

1988) (Numerous courts have determined that a debtor's insurance policies are property of the estate; the bankruptcy court was therefore authorized to approve a settlement of the debtor's insurance coverage claims pursuant to the court's authority to approve the sale of the debtor's property); cf. In re Martin, 91 F.3d at 389, 394-95 (3d Cir. 1996) ("We agree . . . that the disposition by way of 'compromise' of a claim that is an asset of the estate is the equivalent of a sale of the intangible property represented by the claim . . . ."). Furthermore, based on the circumstances of this particular case and this particular Excess Policy, the bankruptcy estate has an equitable property interest in the proceeds of the Excess Policy, because conflicting Claims will likely consume the limits of the Excess Policy and defense costs can erode the limits of the Excess Policy. See A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1001-02 (4th Cir. 1986); Tringali v. Hathaway Mach. Co., Inc., 796 F.2d 553, 560 (1st Cir. 1986).

26. A debtor's sale of property outside the ordinary course of business should be approved if the debtor demonstrates a sound business justification for the proposed transaction. See Comm. of Equity Sec. Holders v. Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).

27. Where a settlement involves a "buy-back" of an insurance policy as is contemplated in the proposed Settlement Agreement, the proper test for approval under either Bankruptcy Rule 9019 or section 363(b) of the Bankruptcy Code is the business judgment standard. See, e.g., In re Johns-Manville Corp., 837 F.2d at 93; In re Dow Corning Corp., 198 B.R. 214, 222 n. 7 (Bankr. E.D. Mich. 1996).

28. The Debtor's decision to sell the Excess Policy back to AIG Specialty is based upon the Debtor's sound business judgment. The portion of the Settlement Amount allocated to the purchase of the Excess Policy ($2 million) is the equivalent of the limit of the Excess Policy applicable to claims or losses arising from the Incident. Those proceeds, along with the rest of

the Settlement Amount, will be preserved for the benefit of the Debtor, other insureds, the bankruptcy estate and creditors. Finally, the Sale as proposed minimizes the costs necessary to monetize the Excess Policy (because it avoids potentially protracted claims process and possible coverage actions).

29. Section 363(f) of the Bankruptcy Code provides that a debtor-in-possession may sell property "free and clear of any interest in such property of an entity other than the estate" if at least one of the several conditions enumerated in section 363(f) is satisfied. See 11 U.S.C. § 363(f)(1-5). Section 363(f) authorizes a sale free and clear of "interests," not just liens, and thus permits a sale of property free and clear of all claims and interests of any entity that "are derivative of the Debtor's rights in that property." See In re Dow Corning Corp., 198 B.R. at 244.

30. In the present matter, the Settlement Agreement satisfies the requirements of section 363(f) of the Bankruptcy Code. Section 363(f)(5) of the Bankruptcy Code provides that the debtor may sell free and clear of any entity's interest if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5). While the Debtor does not concede that any party-in-interest holds an "interest" in the Policies or their proceeds, to the extent that any party in interest were to claim an interest in the Policies or proceeds, such parties could be compelled to accept money in satisfaction of their interests. See In re WBQ P'ship, 189 B.R. 97, 106-07 (Bankr. E.D. Va. 1995). Moreover, any claim/interest arising from or related to the Incident is subject to a *bona fide* dispute at this time and therefore subject to divestment pursuant to section 363(f)(4). 11 U.S.C. § 363(f)(4).

31. Notably, any interests in the Policies or their proceeds will also be adequately protected in accordance with section 363(e) of the Bankruptcy Code because the Sale Proceeds

will be maintained by the Debtor, through its Chief Restructuring Officer, in a segregated account pending further order of the Court, which can address and resolve the rights of parties asserting claims or interests in the Policies or proceeds.

32. Finally, the Settlement Agreement, including the Sale contemplated thereunder, is a product of good faith, arms-length bargaining between the Debtor and AIG Specialty. The Settlement Agreement is being entered by the parties without fraud or collusion and with each party represented by counsel. The Debtor accordingly requests that the Court find that AIG Specialty is a good faith purchaser for value and is entitled to the protections afforded to such purchasers under section 363(m) of the Bankruptcy Code.

### C. A Permanent Injunction Should Be Issued Under Section 105(a) to Implement the Sale of the Subject Policies Free and Clear of Interests.

33. Coupled with the Court's power to authorize the sale of the Debtor's property free and clear of interests and the settlement of claims and controversies of the Debtor is its power to enjoin creditors of the Debtor or any other person from pursuing a purchaser of such property of the estate. Such an injunction frequently is "necessary and appropriate to give the 'free and clear' aspects of 363(f) meaning." See In re Dow Corning Corp., 198 B.R. at 245. Accordingly, this Court has the power under Sections 363 and 105(a) of the Bankruptcy Code to issue a permanent injunction to prohibit claims against a bankruptcy estate from being raised against a buyer of assets from that estate, such as AIG Specialty here, and to attach any such claims to the proceeds of the sale. See In re Johns-Manville Corp., 837 F.2d at 93-94; In re Dow Corning Corp., 198 B.R. at 245.

34. The Injunction is necessary and appropriate to protect the integrity of the sale and settlement contemplated by the Settlement Agreement. As reflected in the Settlement Agreement, without the protection of the Injunction, AIG Specialty will not consummate the

repurchase of the Excess Policy or undertake any other aspect of the Settlement Agreement, and Freedom will lose the benefit of the Settlement Amount. In addition, the holders of present and future Claims are adequately protected in that they will have the right to pursue such Claims against the Settlement Amount.

35. Accordingly, the Debtor respectfully submits that this Court should issue the Injunction to give effect to the sale of the Excess Policy to AIG Specialty free and clear of interests in accordance with the Settlement Agreement and to allow for settlement of matters relating to the Primary Policy in accordance with the Settlement Agreement.

## IV. NOTICE

36. Notice of this Motion will be given to: (i) the Office of the United States Trustee for the Southern District of West Virginia; (ii) the Internal Revenue Service, (iii) the Department of Justice; (iv) Counsel for the Official Committee of Unsecured Creditors, (v) the creditors matrix, (vi) those persons who have formally appeared in this Bankruptcy Case and requested service pursuant to Bankruptcy Rule 2002 and 6004, (vii) each person or entity known to the Debtor to have a Claim against it or the bankruptcy estate through the participation in the bankruptcy case, the filing of a lawsuit, or the filing of a proof of claim, (viii) any and all Persons known to Freedom entitled or allegedly entitled to insurance coverage under the Policies, including additional insureds (or Persons claiming to be additional insureds) and those Persons falling within a policy definition of "named insured"; (ix) any experts, consultants, law firms or other professionals or vendors that have provided services to Freedom and have or may assert a right to payment under the Policies; and (x) all other parties-in-interest pursuant to Bankruptcy Rules 2002 and 6004 and any other applicable local rules. Also, due to the scope and breadth of the waivers being sought in this Motion, the Debtor will publish notice of the Motion and the

hearing in local newspaper(s) with circulation in the following counties in West Virginia: Kanawha County, Boone County, Putnam County, Jackson County and Lincoln County.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtor respectfully requests that the Court enter the order substantially in the form attached hereto as <u>Exhibit A</u> (i) granting the Motion and (ii) granting such other relief as may be just and proper.

Dated: June 24, 2014

          Respectfully submitted,

          **BARTH & THOMPSON**

          Stephen L. Thompson (WV 3751)
          J. Nicholas Barth (WV 255)
          Barth & Thompson
          P.O. Box 129
          Charleston, West Virginia 25321
          Telephone: (304) 342-7111
          Facsimile: (304) 342-6215

          and

          /s/ Mark E. Freedlander
          **McGUIREWOODS LLP**
          Mark E. Freedlander (PA 70593)
          625 Liberty Avenue, 23rd Floor
          Pittsburgh, PA  15222
          Telephone: (412) 667-6000
          Facsimile: (412) 667-6050

          Attorneys for the Debtor and
          Debtor-in-Possession