## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| **In re** | ) | **Chapter 11** |
| | ) | |
| **FREEDOM INDUSTRIES, INC.** | ) | |
| | ) | **Case No. 14-20017-RGP** |
| | ) | |
| **Debtor.** | ) | |
| | ) | |

## SECOND MODIFIED AMENDED DISCLOSURE STATEMENT TO ACCOMPANY AMENDED PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY FREEDOM INDUSTRIES, INC. DATED AUGUST 7, 2015

**BARTH & THOMPSON**

Stephen L. Thompson (WV 3751)
J. Nicholas Barth (WV 255)
Barth & Thompson
P.O. Box 129
Charleston, West Virginia 25321
Telephone: (304) 342-7111
Facsimile: (304) 342-6215

and

**MCGUIREWOODS LLP**

Mark E. Freedlander (PA 70593)
625 Liberty Avenue, 23rd Floor
Pittsburgh, PA  15222
Telephone: (412) 667-6000
Facsimile: (412) 667-6050

Co-Counsel for the Debtor,
Freedom Industries, Inc.

## IMPORTANT NOTICE

This Disclosure Statement[1] and its related documents are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes to accept the Plan. No representations have been authorized by the Bankruptcy Court concerning the Debtor, its business operations or the value of its assets, except as explicitly set forth in this Disclosure Statement.

Unless specifically defined herein, please refer to the Plan (or, where indicated, certain motions filed with the Bankruptcy Court) for definitions of the capitalized terms used in this Disclosure Statement.

The Debtor reserves the right to file an amended Plan and Disclosure Statement from time to time. The Debtor urges you to read this Disclosure Statement carefully for a discussion of voting instructions, recovery information, classification of claims, the history of the Debtor and the Case and a summary and analysis of the Plan.

This Disclosure Statement contains only a summary of the Plan. This Disclosure Statement is not intended to replace a careful and detailed review of the Plan, only to aid and supplement such review. This Disclosure Statement is qualified in its entirety by reference to the Plan, and the exhibits attached thereto, if any, and the agreements and documents described therein. If there is a conflict between the Plan and this Disclosure Statement, the provisions of the Plan will govern. You are encouraged to review the full text of the Plan and to read carefully the entire Disclosure Statement, including all exhibits, before deciding how to vote with respect to the Plan.

Except as expressly otherwise indicated, the statements in this Disclosure Statement are made as of August 7, 2015, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any time after August 7, 2015. Any estimates of claims or interests in this Disclosure Statement may vary from the final amounts of claims or interests allowed by the Bankruptcy Court. In addition, the treatment of creditors under the Plan described herein is subject to change as such treatment continues to be negotiated.

YOU SHOULD NOT CONSTRUE THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. YOU SHOULD, THEREFORE, CONSULT WITH YOUR OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS IN CONNECTION WITH THE PLAN, THE SOLICITATION OF VOTES ON THE PLAN AND THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the First Modified Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by Freedom Industries, Inc. Dated August 7, 2015 (the "Plan").

# TABLE OF CONTENTS

**Page**

I.      OVERVIEW OF THE DISCLOSURE STATEMENT ...................................................1

II.     SUMMARY AND OVERVIEW OF THE PLAN...........................................................5

III.    PROJECTED DISTRIBUTIONS TO CREDITORS ....................................................6

IV.     BACKGROUND ...........................................................................................................7

    A.      Background of the Debtor.................................................................................7

    B.      Filing of Bankruptcy Petition..........................................................................8

    C.      Debtor's Attempt to Reorganize in Chapter 11 ...............................................8

    D.      General Case Information .................................................................................8

    E.      Other Material Activities During Chapter 11 Case.........................................10

    F.      Means for Implementation and Execution of the Plan....................................18

V.      EFFECTIVENESS OF THE PLAN .............................................................................20

    A.      Conditions Precedent to Effective Date .........................................................20

    B.      Satisfaction of Conditions...............................................................................21

    C.      Effect of Nonoccurrence of Conditions to Effective Date ..............................21

VI.     EFFECT OF CONFIRMATION ..................................................................................21

    A.      Vesting of Assets ............................................................................................21

    B.      Release of Assets ............................................................................................21

    C.      Binding Effect.................................................................................................21

    D.      Satisfaction of Claims and Termination of Interests.......................................21

    E.      Term of Injunctions or Stays...........................................................................22

    F.      Retention of Causes of Action ........................................................................22

    G.      Exculpation .....................................................................................................22

    H.      Debtor Release ................................................................................................22

    I.      Release By Other Releasing Parties................................................................22

    J.      Releases of Preference Actions Against Holders of General Unsecured Claims ............22

    K.      Limited Third Party Releases of Southern.......................................................22

    L.      Injunction .......................................................................................................23

    M.      Injunction Against Interference with Plan .......................................................23

    N.      Apportionment of Fault in Tort Lawsuits ........................................................23

VII.    ALTERNATIVES TO THE PLAN ..............................................................................24

    A.      Other Plans of Liquidation..............................................................................24

    B.      Liquidation Under Chapter 7 of the Bankruptcy Code ...................................24

i

# TABLE OF CONTENTS

(continued)

**Page**

| | | | |
|---|---|---|---|
| VIII. | | CONFIRMATION REQUIREMENTS | 25 |
| | A. | The Confirmation Hearing | 25 |
| | B. | Acceptances Necessary to Confirm the Plan | 26 |
| | C. | Best Interests of Creditors | 26 |
| | D. | Feasibility | 27 |
| | E. | Confirmation of the Plan | 28 |
| IX. | | CERTAIN RISK FACTORS TO BE CONSIDERED | 28 |
| | A. | Parties-In-Interest May Object to the Classification of Claims | 28 |
| | B. | The Debtor May Not Be Able to Secure Confirmation of the Plan | 28 |
| | C. | The Debtor, Committee and/or a Plan Administrator May Object to the Amount or Classification of Your Claim | 29 |
| | D. | Remediation Requirements | 29 |
| | E. | The Proposed Settlements May Not Be Approved | 29 |
| | F. | Payment of the Southern Contribution is Subject to Approval by the Office of the U.S. Attorney | 29 |
| X. | | WHERE YOU CAN OBTAIN MORE INFORMATION | 29 |
| XI. | | CONCLUSION AND RECOMMENDATION | 30 |

## EXHIBITS

Exhibit A --   Description of December 2013 Transactions, January 9, 2014 Chemical Spill, Clean-Up
Efforts, and Chemical Spill Lawsuits.

Exhibit B --   Second Modified Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy
Code Proposed by Freedom Industries, Inc. dated August 7, 2015

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re | ) | **Chapter 11** |
| | ) | |
| **FREEDOM INDUSTRIES, INC.** | ) | |
| | ) | **Case No. 14-20017-RGP** |
| | ) | |
| Debtor. | ) | |
| | ) | |

**SECOND MODIFIED AMENDED DISCLOSURE STATEMENT TO ACCOMPANY AMENDED PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY FREEDOM INDUSTRIES, INC. DATED AUGUST 7, 2015**

**I.      OVERVIEW OF THE DISCLOSURE STATEMENT**

**PURPOSE OF DISCLOSURE STATEMENT**

The debtor and debtor-in-possession in the above-captioned case, Freedom Industries, Inc. ("Freedom" or "Debtor"), prepared this First Modified Amended Disclosure Statement (the "Disclosure Statement") to accompany and in connection with its solicitation of acceptances of the Second Modified Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by Freedom Industries, Inc. dated August 7, 2015 (the "Plan"), filed in the Debtor's chapter 11 case under the Bankruptcy Code. [Upon order of the Bankruptcy Court entered [Month/Day], 2015, the Bankruptcy Court approved this Disclosure Statement and scheduled the Confirmation Hearing.]

A copy of the Plan is attached to this Disclosure Statement and incorporated into this Disclosure Statement by reference as Exhibit B. Unless otherwise specifically noted, all capitalized terms utilized herein shall have the meanings ascribed to such terms as set forth in the Plan.

You should read this Disclosure Statement and the Plan in their entirety before voting on the Plan. No statements or information concerning the Debtor, its affiliates or any other entity described in this Disclosure Statement or the Plan, particularly, but not limited to, the Debtor's profits, financial condition, assets or liabilities are authorized by the Debtor other than as set forth in this Disclosure Statement or Exhibits hereto.

The financial information set forth in this Disclosure Statement has not been audited by independent certified public accountants, nor has it necessarily been prepared in accordance with generally accepted accounting principles, except as specifically set forth herein. For that reason, and as a result of the complexity of the financial affairs of the Debtor (and its subsidiaries and/or affiliates, to the extent applicable), the Debtor is not able to represent and warrant that the information set forth in this Disclosure Statement is without any inaccuracy. To the extent possible, however, the information has been prepared from the Debtor's Schedules and other information available to the Debtor, and every reasonable effort has been made to ensure that all information in this Disclosure Statement has been fairly presented.

The Plan represents a heavily negotiated document that is supported by the Committee, Spill Claim Counsel and WVDEP. The Plan includes certain settlements that allow substantial funds to be

1

available to Freedom where absent the settlement, protracted litigation would be required before any further funds may be available to creditors of Freedom

<u>**PROCEDURAL INFORMATION**</u>

**Voting**

---

**Which Classes of Claims are Entitled to Vote on the Plan?**

Classes of Claims entitled to vote on the Plan are as follows:

- Claims in Classes 1, 2, 3, 4 and 5 are Impaired and entitled to vote on the Plan (each a "<u>Voting Class</u>" and together the "<u>Voting Classes</u>").

- Equity Interests in Class 6 will not receive a distribution under the Plan, are deemed to have rejected the Plan and will not be entitled to vote on the Plan.

---

Under the Bankruptcy Code, the Plan will be deemed accepted by an Impaired Class of Claims if the Debtor receives votes accepting the Plan representing at least:

- two-thirds of the total dollar amount of the allowed Claims in Classes that vote; and

- more than one-half of the total number of allowed Claims in the Class that cast a vote.

All properly completed ballots received by the Debtor on or before [Month/Day]**, 2015 at 5:00 p.m. (EDST)** (the "<u>Voting Deadline</u>"), will be counted in determining whether each Impaired Class entitled to vote on the Plan has accepted the Plan. Any ballots received after the Voting Deadline will not be counted. All ballots must contain an original signature to be counted. No ballots received by facsimile will be accepted.

---

**Voting on the Plan**

***When does the vote need to be received?*** The deadline for the receipt by the Debtor of properly completed ballots is [Month/Day], 2015 **at 5:00 p.m. (EDST)**.

***Which Classes may vote?*** Persons may vote to accept or reject the Plan only with respect to Allowed Claims that belong to a Class that is Impaired under the Plan and is not deemed to have rejected the Plan- i.e. Classes 1, 2, 3, 4 and 5.

***Which members of the Impaired Classes may vote?*** The *voting record* date for determining which members of Impaired Classes may vote on the Plan is [Month/Day]**, 2015**.Persons may vote on the Plan only with respect to Claims that were held on the voting record date.

***How do I vote on the Plan?*** For a vote to be counted, the Debtor must receive an original signed copy of the ballot form approved by the Bankruptcy Court. Faxed copies and votes sent on other forms will not be accepted.

***Who should I contact if I have questions or need a ballot?*** You may contact the Debtor at the address or phone number listed below.

---

This Disclosure Statement , the Plan, attachments thereto and documents filed by the Debtor or CRO in connection therewith are the only materials that you should use in determining how to vote on the Plan. The Debtor submits that approval of the Plan provides the greatest return to holders of Claims in the Voting Classes. The Debtor in preparing the Plan and Disclosure Statement, has consulted with the Committee. **The Plan reflects substantial input from the Committee and the Committee supports the Plan.**

---

**Voting Recommendations**

The Debtor submits that the Plan presents the best opportunity for holders of Claims to maximize their respective recoveries. **The Debtor and Committee encourages holders of Impaired Claims to vote to _accept_ the Plan.**

---

The ballots have been specifically designed for the purpose of soliciting votes on the Plan from each Class entitled to vote. If you hold Claims in more than one Class, you must use a separate ballot for voting with respect to each Class of Claims that you hold.

Please complete and sign your ballot and return it in the enclosed pre-addressed envelope to the office of the bankruptcy counsel to the Debtor. All correspondence in connection with voting on the Plan should be directed to the following address:

---

**By mail or overnight delivery:**
**McGuireWoods LLP**
**Attn: Susan Harding**
625 Liberty Avenue, 23rd Floor
Pittsburgh, PA 15212
(412) 667-6000

---

The Debtor will prepare and file with the Bankruptcy Court a certification of the results of the voting on the Plan on a Class-by-Class basis.

Additional copies of the ballots, this Disclosure Statement and the Plan are available upon request made to the Debtor at the address and telephone number above.

---

**Your Vote Is Important**

Your vote on the Plan is important because:

- Under the Bankruptcy Code, a chapter 11 plan can only be confirmed if certain majorities in dollar amount and number of claims (as described above) of each Voting Class under the plan vote to accept the plan, unless the "cram down" provisions of the Bankruptcy Code are used.

- Under the Bankruptcy Code, only the votes of those holders of claims or interests who actually submit votes on a plan are counted in determining whether the specified majorities of votes in favor of the plan have been received.

- If you are eligible to vote with respect to a Claim and do not deliver a properly completed ballot relating to that Claim by the Voting Deadline, you will be deemed to have abstained from voting with respect to that Claim and your eligibility to vote with respect to that Claim will _not_ be considered in determining the number and dollar amount of ballots needed

---

> to make up the specified majority of that Claim's Class for the purpose of approving the Plan.

All pleadings and other documents referred to in this Disclosure Statement as being on file with the Bankruptcy Court are available for inspection and review during normal business hours at the Office of the Clerk of the United States Bankruptcy Court for the Southern District of West Virginia, U.S. Bankruptcy Court Robert C. Byrd U.S. Courthouse 300 Virginia Street, Room 3200, Charleston, West Virginia 25301 or on-line at the Bankruptcy Court's website: http://www.wvsb.uscourts.gov.

**Confirmation Hearing**

The Bankruptcy Court will hold the Confirmation Hearing at the following time and place:

---

**Confirmation Hearing**

**Date and Time:** Commencing at _____ (_____ time), on [Month/Day], 2015.

**Place:** U.S. Bankruptcy Court Robert C. Byrd U.S. Courthouse 300 Virginia Street, Charleston, West Virginia 25301.

**Judge:** Ronald G. Pearson, United States Bankruptcy Judge, Southern District of West Virginia.

The Confirmation Hearing may be adjourned from time to time on announcement in the Bankruptcy Court on the scheduled date for the hearing. No further notice will be required to adjourn the hearing.

---

At the Confirmation Hearing, the Bankruptcy Court will:

- determine whether sufficient majorities in number and dollar amount, as applicable, from each Voting Class have delivered properly executed votes accepting the Plan to approve the Plan;

- hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be in writing and filed and served as required by the Bankruptcy Court under the order approving this Disclosure Statement. That order requires any objections to the confirmation of the Plan to be served so as to be received on or before 4:00 p.m. (EDST) on [Month/Day], **2015**, by (i) Counsel for the Debtor: MCGUIREWOODS LLP, 625 Liberty Avenue, 23rd Floor, Pittsburgh, PA 15222, Attn: Mark E. Freedlander, Esquire and BARTH & THOMPSON, P.O. Box 129, Charleston, West Virginia 25321, Attn: Stephen Thompson, Esquire, ; (ii) Counsel for the Committee: FROST BROWN TODD, LLC, 3300 Great American Tower, 301 East 4th Street, Cincinnati, OH 45202 Attn: Ronald Gold; and (iii) Office of the United States Trustee, 300 Virginia Street East, Room 2025, Charleston, WV 25301, Attn: David Bissett.

## II.    SUMMARY AND OVERVIEW OF THE PLAN

The following table briefly summarizes the classifications and treatment of Claims and Equity Interests under the Plan.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery | Impairment | Voting |
|---|---|---|---|---|---|
| N/A | Administrative Expense Claims | Paid in full, in cash | 100% | Unimpaired | No |
| N/A | Professional Fee Compensation and Reimbursement Claims | Paid pro rata cash upon approval plus future payments from certain potential recovery resources described in the Plan. | Initial Cash Est. of $1,195,983 | Impaired | No |
| N/A | U.S. Trustee Fees | All fees payable in the Case under 28 U.S.C. §1930, as agreed by the CRO or as determined by the Bankruptcy Court, will, if not previously paid by the Debtor, be paid in Cash on the Effective Date or as soon thereafter as is practicable by the Spill Claim Plan Administrator, and will continue to be paid by the Spill Claim Plan Administrator as required under 28 U.S.C. §1930 until such time as an order is entered by the Bankruptcy Court closing the Case. | 100% | Unimpaired | No |
| Class 1 | IRS Secured Claims | Principal and interest paid in full, in cash on Effective Date, and all penalties waived. | 100% | Impaired | Yes |
| Class 2 | Priority Tax Claims | Paid in full, in cash on Effective Date | 100% | Impaired | Yes |
| Class 3 | General Unsecured Claims | Initial distribution of $350,000 cash on Effective Date, plus future payments from certain potential recovery sources described in the Plan. | Initial Distribution Estimate of 5% | Impaired | Yes |
| Class 4 | Convenience Class Spill Claim | $500,000 paid in cash on Effective Date to Spill Claim Administrator for prompt distribution to timely filed spill claims of $3,000 or less. | Est. 44% | Impaired | Yes |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery | Impairment | Voting |
|-------|-------|-------|-------|-------|-------|
| **Class 5** | Spill Claims | Initial payment made in cash on Effective Date to Spill Claim Administrator who will determine with Spill Claim Oversight Committee how funds will be used or distributed, plus future payments from certain potential recovery sources described in the Plan. | Initial Cash Est. of $1,595,983 | Impaired | Yes |
| **Class 6** | Equity Interests | No Distribution or recovery of any nature. | 0% | Impaired | No (deemed to reject) |

## III.    PROJECTED DISTRIBUTION TO CREDITORS

The sources of funding for the Plan are (1) the proceeds of the Sale Escrow (now totaling approximately $2,720,000), (2) the proceeds of settlement with Gary Southern (totaling $300,000), and (3) the proceeds of the AIG Settlement ($3,180,490.87) made possible only as a result of the settlement with Gary Southern. Additionally, cash proceeds of the Chemstream Settlement, or $1,100,000 have been funded into the ERT Remediation Fund for uses exclusively as provided under the Chemstream Settlement. Absent the settlements proposed in the Plan, some form of resolution would need be reached with WVDEP both to assure the ability of the Debtor to sell the Etowah River Terminal, and more importantly, to satisfy the environmental obligations of the Debtor relating to the Etowah River Terminal. Proceeds of the Insurance Policies could not be obtained by the Estate without resolution of the Southern appeal of the AIG Approval Order, and even with resolution of the AIG Approval Order, the ability of the Debtor to use these funds to pay creditors would remain subject to the restrictions of the Clarification Order in the absence of resolution of matters with WVDEP. All other sources of cash would be subject to either recoveries from litigation or settlement thereof. The outcome of such litigation, cost of such litigation and timing of recoveries, if any, are among the factors contributing to the CRO's determination that the settlements contained in the Plan are in the best interests of the Debtor, its Estate and creditors.

Projected Sources of Funding as of Effective Date of Plan of Liquidation

| | |
|---|---|
| Proceeds of December 2013 Sale Escrow | $2,820,000 |
|     Less: Remediation Advance from Escrow | [$  100,000] |
| Gross AIG Settlement Proceeds | $3,199,318 |
|     Less:  Agreed Deduction for Emergency Services (per settlement) | [$   90,827] |
| Southern Cash Settlement Consideration to Estate | $   300,000 |
| | |
| Total Projected Funding for Plan on Effective Date | $6,128,491 |

Projected Uses of Funding as of Effective Date of Plan of Liquidation

| | |
|---|---|
| Additional Funds to ERT Remediation Fund | $1,400,000 |
| IRS Secured Claim (P&I) | $584,525 |
| Estimated Allowable 503(b)(9) | $450,000 |
| Priority Tax Claims | $    2,000 |
| General Unsecured Claim Effective Date Distribution | $350,000 |
| Convenience Spill Class Distribution | $500,000 |
| Fixed Plan Payments | $3,286,525 |
| | |
| Funds Remaining After Fixed Plan Payments | $2,841,966 |
|     Less Reimbursement for Plan-Related Expenses | [$50,000] |
| Funds Remaining for Class 5/Professional Fee Escrow Split | $2,791,966 |
| | |
| Effective Date Class 5 Spill Claim Administrator Distribution | $1,595,983 |
| Effective Date Professional Fee Escrow Distribution | $1,195,983 |

Note:  This summary does not reflect the $1.1 million cash component of the Chemstream Contribution provided for in the Chemstream Settlement, which amount has previously been paid into the ERT Remediation Fund.

SUBSTANTIAL EFFORT HAS BEEN MADE TO ENSURE THE ACCURACY OF THE ESTIMATED INFORMATION SUMMARIZED IN THIS TABLE.  NO ASSURANCES CAN BE GIVEN THAT THE ESTIMATED AMOUNT OF ALLOWED CLAIMS AND THE PROJECTED DISTRIBUTION WILL BE ACHIEVED.

## IV.    BACKGROUND

### A.    Background of the Debtor

#### General Background

Prior to the Petition Date, the Debtor was engaged principally in the business of producing specialty chemicals for the mining, steel, and cement industries.  The Debtor was a leading supplier of freeze conditioning agents, dust control palliatives, flotation reagents, water treatment polymers, and other specialty chemicals.

The Debtor's corporate office is located in Charleston, West Virginia, and as of the Petition Date it operated two production facilities located in (a) Nitro, West Virginia (the "Nitro Facility") and (b) Charleston, West Virginia (the "Etowah River Terminal").  On the Petition Date, the Debtor owned the

Etowah River Terminal and related real property and leased the Nitro Facility from an unaffiliated third party.

**A description of (i) pre-Petition Date transactions that resulted in the current structure of the Debtor, (ii) the January 9, 2014 chemical spill, (iii) investigation and clean-up measures, and (iv) chemical spill lawsuits is attached to this Disclosure Statement and incorporated herein at <u>Exhibit "A"</u>.**

### B.      Filing of Bankruptcy Petition

Freedom determined that the most efficient and equitable way to address the significant issues faced as a result of the Incident was the consolidation of as many issues and interests as possible through a chapter 11 bankruptcy process.  Bankruptcy Counsel was engaged shortly before the Petition Date, and preparations began for an orderly yet expedited bankruptcy filing.  On January 17, 2014, Debtor filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* in the Bankruptcy Court.

### C.      Debtor's Attempt to Reorganize in Chapter 11

The Debtor filed for bankruptcy protection with an initial intention to reorganize its business and affairs.  Accordingly, the first few weeks of the Debtor's bankruptcy proceeding involved actions in furtherance of that intention.  As discussed in more detail below, the Debtor believed that there were three critical pieces to its reorganization: 1) obtaining financing sufficient to both overcome the liquidity issues it was experiencing and fund ongoing environmental cleanup; 2) using appropriate bankruptcy mechanisms at its disposal to stabilize its relationships with vendors and customers during its "busy season" so that the Debtor could use its inventory to generate cash to fund a plan of reorganization; and 3) finding the most efficient and effective way to address the multitude of class action lawsuits filed against the Debtor as well as addressing other claims related to the Incident that were not embodied in the class action lawsuits.

### D.      General Case Information

#### 1.      Debtor's Professionals

McGuireWoods LLP represents the Debtor as lead bankruptcy counsel pursuant to an order entered by the Bankruptcy Court first on January 22, 2014 [Docket No. 54].  Following a request for reconsideration by the US Trustee [Docket No. 116], the Court entered an order [Docket. No. 122] amending the January 22, 2014 order to reflect that McGuireWoods, LLP was retained on an interim basis subject to the right of parties-in-interest to object thereto and setting February 21, 2014 as the deadline for parties to object to the Debtor's retention of McGuireWoods, LLP as counsel. There were no objections to retention of McGuireWoods, LLP as counsel.

Barth & Thompson is representing the Debtor as West Virginia bankruptcy counsel pursuant to an order entered by the Bankruptcy Court on January 22, 2014 [Docket No. 53].  The Court, *sua sponte*, entered an order [Docket. No. 122] amending the January 22, 2014 order to reflect that Barth & Thompson was retained on an interim basis subject to the right of parties-in-interest to object thereto and setting February 21, 2014 as the deadline for parties to object to the Debtor's retention of Barth & Thompson as counsel. There were no objections to retention of Barth & Thompson as counsel.

Babst, Calland, Clements & Zomnir, P.C. is representing the Debtor as special environmental counsel pursuant to an order entered by the Bankruptcy Court on March 4, 2014 [Docket No. 195].

Pietragallo Gordon Alfano Bosick & Raspanti LLP ("Pietragallo") is representing the Debtor as special litigation counsel pursuant to an order entered by the Bankruptcy Court on March 4, 2014 [Docket No. 194]. The primary responsibilities handled by the Pietragallo Firm in the Case have been (i) coordination with certain regulatory authorities in the course of their respective investigations of the Incident, (ii) leading matters relating to evidence preservation and review coordination, and (iii) leading matters relating to the pursuit of criminal matters by the Office of the U.S. Attorney against Freedom relating to the Incident.

Civil & Environmental Consultants, Inc. was acting as special environmental consultant to the Debtor pursuant to an order entered by the Bankruptcy Court on March 19, 2014 [Docket No. 230]. By order dated July 2, 2014 [Docket No. 454], ARCADIS US, Inc. was retained by the Debtor as replacement environmental consultant. The Debtor replaced CEC as a result of public pronouncement by the WVDEP criticizing CEC and calling for the Debtor to replace CEC following the mid-June, 2014 water overflow occurrence. ARCADIS is no longer serving as environmental consultant to the Debtor nor as the Debtor's licensed remediation specialist. On July 20, 2015, the Debtor filed an Expedited Motion for Approval Under 11 U.S.C. §§ 105 And 363 To Enter Into Agreement With And Compensate CORE Environmental Services, Inc. As Debtor's Licensed Remediation Specialist (the "CORE Motion") [Docket No. 845] and corresponding Motion to Expedite Hearing on the CORE Motion ("Motion to Expedite") [Docket No. 844]. On July 21, 2015, the Court entered a scheduling order [Docket No. 848] establishing July 28, 2015 as the date for a hearing on approval of the CORE Motion. The CORE Motion was approved by the Bankruptcy Court pursuant to order dated July 30, 2015 [Docket No. 857]. CORE Environmental Services, Inc. ("CORE") began its role as the Debtor's replacement licensed remediation specialist immediately following Court approval of the CORE Motion. ARCADIS asserts that its unpaid fees and expenses should be paid from proceeds of the ERT Remediation Fund. WVDEP challenges this assertion and the Debtor intends to do so as well. The Debtor intends for unpaid fees and expenses of ARCADIS to be treated in the same manner as all other Bankruptcy Court approved Professionals. The fees and expenses of ARCADIS, including that portion which remains unpaid, shall be subject to review and potential objection by parties in interest, including, without limitation, the Debtor unless acceptable accommodations are otherwise reached with ARCADIS.

2.     **Chief Restructuring Officer**

The wholly unexpected circumstances of Freedom resulting from the Incident combined with the added pressures and requirements of an emergency bankruptcy filing ultimately required the Debtor to retain an experienced crisis manager. Counsel to the Debtor urged senior management and the sole board member of the Debtor to retain a chief restructuring officer ("CRO") and specifically recommended Mark Welch of MorrisAnderson for this role. Once the sole director and senior management of the Debtor agreed to engage Mr. Welch as CRO, the Debtor then conducted discussions and negotiations with the Committee and US Trustee for the proposed appointment of Mark Welch as CRO. This process of negotiations with the Committee and US Trustee (particularly with the US Trustee), took approximately three (3) weeks to conclude. Following these negotiations, on March 4, 2014 the Debtor filed an Emergency Application to Retain Mark Welch as CRO [Docket No. 191]. The Bankruptcy Court conducted a hearing on the proposed retention of Mark Welch as CRO on March 18, 2014 and following an evidentiary hearing on the matter where Mark Welch was required to provide extensive testimony, an order was entered appointing Mark Welch as the CRO on this date. [Docket No. 228] In connection with the retention of Mark Welch as CRO, the Debtor agreed to and did withdraw its application to retain Mr. Welch's firm, MorrisAnderson & Associates, Ltd., as financial advisor to the Debtor (subject to payment for services rendered through the date of appointment of the CRO). Since March 18, 2014, the CRO has exercised decision making authority (subject to, in certain circumstances, prior approval by the sole director of the Debtor) and complete control over the Debtor, its assets, and wind down operations, including the fulfilment of environmental obligations.

3.       **The Official Committee of Unsecured Creditors and Professionals**

On February 5, 2014, the Office of the United States Trustee filed the Appointment of Committee of Unsecured Creditors appointing the following members of the Committee: (i) Larry Bostick, Archer Daniels Midland; (ii) Daniel K. Adkins, Hartman & Tyner, Inc.; (iii) Charles W. Lawler, Rogers Electrical Contracting Company, Inc.; (iv) Stephen Smith; and (v) Carolyn Mount, West Virginia American Water Company. Larry Bostick was appointed chair of the Committee. Mr. Bostick retired from Archer Daniels Midland during the course of this Case, and his replacement, Gary Barry, has assumed the role of Committee Chairperson.

The Committee is represented by Frost Brown Todd, LLC pursuant to an order entered by the Bankruptcy Court on March 4, 2014 [Docket No. 193]. The Debtor has worked closely and collaboratively with the Committee throughout the Case.

4.       **Compliance with Bankruptcy Code, Bankruptcy Rules, Local Court Rules and U.S. Trustee Deadlines**

On February 17, 2014, the Debtor filed its Statement of Financial Affairs, Schedules of Assets and Liabilities, and lists of Equity Security Holders, each as amended from time to time. On February 25, 2014, the Office of the United States Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "Meeting of Creditors"). The Debtor has filed all required monthly operating reports and paid all quarterly fees as and when due to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930.

**E.       Other Material Activities During Chapter 11 Case**

1.       **Site Access, Evidence Preservation and Plea Agreement**

On February 21, 2014, the Bankruptcy Court entered the Site Access and Evidence Preservation Order [Docket No. 149] pursuant to which the Court ordered, among other things, that (i) the Debtor provide certain litigation parties with notice of any changes made to the Remediation Plan; (ii) no tanks at the Etowah River Terminal could be moved, altered, or subjected to any destructive testing without a minimum of forty-eight (48) hours' notice; (iii) certain sampling results were to be provided by the Debtor to certain litigation parties; (iv) certain litigation parties were to be provided access to the Etowah River Terminal; and (v) the Debtor secure and maintain all documentary, electronic, and imagery evidence in its possession. This order resulted from significant negotiations among Pietragallo, McGuireWoods and counsel to a variety of parties in interest. The Debtor has fully complied with the Site Access and Evidence Preservation Order.

Pietragallo began working with the Debtor on January 10, 2014, the day after the Incident. As discussed above, officials from numerous federal and state agencies were present at the Etowah River Terminal in the days and weeks after the Incident, all of which made a variety of demands of the Debtor. During that period, Pietragallo primarily managed those demands and worked with the Debtor to address and comply with each to the greatest extent possible under the circumstances.

In mid-February 2014, the Federal Chemical Safety Board ("CSB") indicated an intention to remove certain tanks from the Etowah River Terminal, including Storage Tank Number 396 and take them off site, which would have directly impacted the Debtor's ability to preserve evidence for the benefit of the estate and other parties in interest. Pietragallo engaged in extensive negotiations with the CSB, which ultimately resulted in the CSB agreeing to allow the Debtor to retain possession of the tanks. Thereafter, representatives of Chemical Spill Claimants toured the Etowah River Terminal and

10

photographed and tested the affected areas on several occasions.  Over the course of the Case, extensive collaborative efforts have transpired where Pietragallo, in conjunction with the CRO, coordinated tank specimen, soil specimen, water specimen and other evidentiary sampling among other professionals and consultants to a substantial number of interested parties – all without the need for any intervention by the Bankruptcy Court.

Pietragallo additionally assisted the Debtor in responding to broad document requests from the United States Attorney's Office for the Southern District of West Virginia ("USAO") and the West Virginia Attorney General's Office.  A federal grand jury was convened and investigated the Debtor for criminal violations related to the Incident and has made numerous document requests.  Pietragallo in conjunction with McGuireWoods has overseen the production of approximately forty thousand (40,000) pages of documents to the grand jury plus also provided, following privilege review, extensive computer records of the Debtor.

Pietragallo in conjunction with lead bankruptcy counsel to the Debtor also engaged in extensive negotiations with the USAO regarding document production on a "rolling basis." This was vital to the Debtor's bankruptcy estate during the first months of the Case because, otherwise, the USAO almost certainly would have executed an immediate search warrant resulting in all of the Debtor's computers and records being seized.  With all of the Debtor's financial records electronically stored, seizure of the Debtor's computers would have precluded the CRO from timely pursuing and collecting the accounts receivable that were ultimately collected.  To date, those accounts receivable have brought in over seventeen million five hundred thousand ($17,500,000.00) Dollars to the Estate.  Since the Incident, the Debtor has cooperated with the United States Department of Justice, through the USAO in its investigation of Freedom and the Incident.  As a natural extension of this cooperation, the CRO, on behalf of the Debtor, upon advice of counsel, agreed with the USAO to consent to the filing of a three-count information incorporated by reference into a Plea Agreement that was filed with the United States District Court for the Southern District of West Virginia and docketed at Criminal Action No. 2:14-cv-00275.  The Debtor agreed to plead to three counts under Federal law, as follows: (1) a violation of 33 U.S.C. § 1319(c)(1)(A) and 1311 (i.e., negligent discharge of a pollutant); (2) a violation of 33 U.S.C. § 407 and 411 (i.e., unlawful discharge of a refuse matter); and (3) a violation of 33 U.S.C. § 1319(c)(2)(A), 1311 and 1318 (i.e., knowing violation of a permit condition).  As part of the Plea Agreement, the USAO agreed with the CRO on behalf of the Debtor that, among other things, the USAO would recommend to the District Court that the statutory minimum fine be assessed against the Debtor and that the USAO would not seek restitution from the Debtor given the pending chapter 11 proceedings of the Debtor and the manner in which Spill Claims are contemplated to be addressed in the Case.  In turn, the Debtor agreed, among other things, to cooperate with the USAO in its ongoing investigation of the Incident, thereby saving the Debtor the substantial costs of defending a lengthy criminal trial.  A hearing on approval of the Plea Agreement by the District Court was conducted on March 23, 2015.  At that time the Plea Agreement was accepted by the District Court, however, the District Court took under advisement the amount of the fine to be assessed against the Debtor.  The CRO, on behalf of the Debtor, continues to work with a probation officer assigned to the matter in order to allow the probation officer to report its financial findings to the District Court.  As of the date hereof, the amount of the criminal fine assessed against the Debtor has not been determined by the District Court.

2.      **Appointment of Claims Agent**

On March 5, 2014, the Bankruptcy Court entered the Administrative Order Directing Discussions as to the Management of Claims and Development of a Customized Claim Form For Use By "Elk River Spill" Claimants (Docket  No. 197) (the "Administrative Order").  Pursuant to the Administrative Order, the Bankruptcy Court instructed counsel to the Debtor, the Committee, representatives of the Chemical

Spill Claimants, the assistant US Trustee, and the Clerk of Court to confer and develop a simplified claims process and a customized claim form.

In response to the Administrative Order, the parties participated in numerous conference calls to discuss the retention of a qualified and experienced claims agent for purposes of developing an efficient and cost effective means of noticing and administering a claim process. The Debtor solicited and received proposals from five reputable claims agents. As a result of an interview process by the Debtor and the Committee that took into account pricing, service capabilities, and experience for each of the proposed claims agents, it was ultimately determined by the Debtor and Committee with consent of the US Trustee that Rust Consulting/Omni Bankruptcy ("Rust Omni") was the best candidate to serve as claims agent for this chapter 11 bankruptcy case.

On May 1, 2014, the Debtor filed a Motion for Entry of Order Authorizing the Retention and Employment of Rust Omni as Notice and Claims Agent ("Claims Agent Motion") [Docket No. 298]. The Bankruptcy Court conducted a hearing on the Claims Agent Motion on May 13, 2014. At that hearing, the Bankruptcy Court did not approve the Claims Agent Motion and took the matter under advisement.

On June 18, 2014, the Bankruptcy Court entered an order denying the Claims Agent Motion and appointing a local claims and noticing agent, James W. Lane, Jr. (the "Local Claims Agent"), of the law firm Flaherty Sensabaugh Bonasso PLLC. [Docket No. 419]. The Claims Agent has estimated that his fees will be approximately one hundred thirty five thousand dollars ($135,000.00). The Local Claims Agent, with input from and oversight by the Bankruptcy Court, established a process for notifying potentially affected parties of their right to file a proof of claim in the Case and the deadline by which such claims were required to be filed. This process included, but was not limited to multi-media notifications and town hall meetings conducted by the Local Claims Agent.

3.      **Claims Bar Date and Publication Notice Thereof**

The Bankruptcy Court originally set May 27, 2014 as the date by which to file proofs of claim against the Debtor (the "Original Bar Date"). The Committee filed a motion seeking to vacate the Original Bar Date [Docket No. 256], which the Bankruptcy Court granted on April 9, 2014 [Docket No. 262]. On June 17, 2014, the Bankruptcy Court entered an order setting August 1, 2014 as the new bar date (the "Extended Bar Date"). [Docket No. 415].

On June 18, 2014, the Local Claims Agent filed a Motion for Approval of Proposed Publication Notice of Claims Bar Date and Publication Schedule ("Motion for Notice Procedures") [Docket No. 421], which the Bankruptcy Court granted on June 18, 2014 (Doc. No. 422). Pursuant to the Motion for Notice Procedures, the Claims Agent published in several newspapers in general circulation in the Charleston, West Virginia and surrounding communities a notice of the Extended Bar Date and information on who may file and how to file a proof of claim for several weeks. As of the Extended Bar Date, the Local Claims Agent estimated that approximately 3828 Incident Related Claims totaling approximately One Hundred Seventy Six Million ($176,000,000) Dollars were filed. The Debtor notes that a very small number of the approximately 3828 claims timely filed comprise the majority in dollar amount of claims asserted. Many such claims appear to be contingent and/or unliquidated and may subsequently be disputed. As of the date hereof, the Debtor cannot reasonably estimate the allowable dollar amount or number of spill claims.

4.    **Sale of Poca Blending Business**

On May 5, 2014, the Debtor and Lexycon, LLC ("Lexycon") executed that certain Asset Purchase Agreement pursuant to which Lexycon agreed to purchase and the Debtor agreed to sell, transfer and convey all of its right, title and interest in certain assets, properties and rights associated with the Debtor's operations at the Nitro Facility on an "as is-where is" basis.  On May 16, 2014, the Court entered an order approving the Debtor's *Expedited Motion for Entry of Order Approving Sale of the Assets of the Poca Blending Business Free and Clear of all Liens, Claims, Encumbrances, and Interests* [Docket No. 342].  The sale of the Poca Blending Business closed on or about May 20, 2014, and the Debtor's estate received the sum of Five Hundred Seventy-Five Thousand ($575,000.00) Dollars.

The sale of the Nitro Facility provided two significant benefits to the Debtor's Estate.  The first component is the actual sale consideration received, which far exceeded the CRO's initial expectations.  The second benefit was the avoidance of risks and costs associated with the alternative to the Lexycon sale, which included decommissioning and liquidation of the Nitro Facility.  By the CRO's estimate at the time of approval of the sale of the Nitro Facility, on a net basis, after taking into account the liquidation value of assets comprising the Nitro Facility the transaction with Lexycon saved the Estate approximately One Million ($1,000,000) Dollars in demolition and remediation costs.  Also, unknown potential environmental obligations and limited resources available to actually decommission the facility made the Debtor's implementation of a demolition and remediation program subject to considerable execution risk and to potential costs of substantially higher amounts than the CRO's base estimates.  The CRO's experience with respect to demolition and remediation of the Etowah River Terminal, coupled with the CRO's understanding of substantial regulatory issues faced by Lexycon with respect to its post-closing ownership of the Nitro Facility led the CRO to conclude that all-in costs to the Estate had the CRO not sold the Nitro Facility easily could total several times the $1.0 million cost savings estimate of the CRO.

5.    **Settlement Agreement with AIG**

As of the date of the Incident, the Debtor maintained the following two insurance policies (the "Policies") where coverage was potentially implicated: (a) a Commercial General Liability and Pollution Legal Liability policy (the "Primary Policy") issued by AIG Specialty Co.  and affiliated parties ("AIG"); and (b) a Commercial Excess policy (the "Excess Policy, together with the Primary Policy, the "Insurance Policies"), also issued by AIG.  The two policies provide coverage for, among other things, pollution legal liability.  On the date of the Incident, AIG was notified by Freedom in writing of the Incident and a demand for coverage was made.  On January 10, 2014, AIG issued a reservation of rights letter but agreed, subject to reservation of rights, to accept the defense of Freedom under coverage D-2 of the Primary Policy.  The Insurance Policy limit with respect to the Incident under coverage D-2  is Three Million ($3,000,000) Dollars subject to a deductible of $25,000 and the costs of certain consulting fees paid by AIG, in accordance with order of the Court.  Additionally, under the Excess Policy there is certain crisis coverage up to a maximum amount of Three Hundred Thousand ($300,000) Dollars for certain specified costs approved by AIG, including a crisis response public relations firm.  There is no direct right of payment by Freedom with respect to this additional crisis coverage.  A public relations firm retained by Freedom immediately following the Incident was paid directly by AIG under the crisis coverage.

A variety of potential parties contacted the Debtor or AIG regarding claims that could have the effect of eroding policy limits.  These parties include law firms, consultants, vendors, certain former officers or employees and claimants that filed lawsuits against Freedom arising from the Incident.  Because the claims against Freedom and other insured parties greatly exceed the limits of the Insurance Policies, there is a significant risk that the Insurance Policies could be quickly exhausted.

13

The Debtor and AIG engaged in extensive discussions and negotiations regarding the Insurance Policies and the proper disposition of their proceeds. The Debtor and AIG disagree about the extent to which the Insurance Policies afford coverage for the varying claims asserted against the Debtor and other insured or allegedly insured parties and the costs associated with the defense of such claims. The Debtor also conferred with the Committee during the course of negotiations with AIG.

On June 24, 2014, the Debtor filed a Motion to Approve Settlement Agreement and Insurance Buy-Back Agreement Between Debtor and Insurer (the "AIG Settlement Motion") [Docket No. 432]. The AIG Settlement Motion seeks approval of a comprehensive settlement agreement that provides for, among other things, the following forms of relief:

(1)     A sale by the Debtor of the Excess Policy to AIG free and clear of any and all rights, claims or interests in and now to the Excess Policy in consideration of $2,909,172.24 which represents coverage limits under the Insurance Policies relating to the Incident less certain expert costs paid directly by AIG in accordance with order of the Bankruptcy Court dated February 27, 2014 [Docket No. 186];

(2)     The issuance of an injunctive order for the benefit of AIG and its affiliated entities staying and permanently enjoining any party-in-interest from asserting claims against AIG and its affiliated entities in connection with the Incident and/or the Insurance Policies; and

(3)     The continuation of insurance coverage for the benefit of Freedom under the Primary Policy for losses unrelated to the Incident up to an aggregate limit of $1,000,000 subject, however, to the terms, conditions and exclusions of the Primary Policy.

A hearing on the AIG Settlement Motion was conducted by the Bankruptcy Court on July 22, 2014. At the hearing, the Former Ds and Os argued against approval of the AIG Settlement Motion primarily on the basis that they are insured parties under the Insurance Policies and that coverage E-2 (which provides for costs of defense outside of coverage limits not coverage D-2 (which provides for costs of defense within coverage limits) is the appropriate coverage relating to the Incident. In response to the objections, the Debtor requested a period for settlement negotiations, after which, in the absence of consensual resolution, briefing would occur. On July 30, 2014, the Court entered an order [Docket No. 505] providing that in the event a settlement is not filed with the Court on or before August 1, 2014, briefing on issues relating to the AIG Settlement Motion will be required, with all briefing to be completed by August 15, 2014. On August 7, 2014 the Debtor filed a status report with the Bankruptcy Court [Docket No. 513] suggesting that progress is being made in negotiations relating to the AIG Settlement Motion, but that more time is required to finalize potential resolution. On August 8, 2014, the Bankruptcy Court entered an order [Docket No. 514] extending the briefing deadline until August 22, 2014 in the event that withdrawal of the objections to the AIG Settlement Motion does not occur on or before August 15, 2014. Extensive negotiations occurred among various parties in interest. These negotiations culminated in a revised settlement with AIG pursuant to which, among other things (i) AIG agreed to pay an additional $199,318.13 under the emergency response portion of the Insurance Policies, (ii) the Former Ds and Os agreed to withdraw their objections to the AIG Settlement Motion and waive any rights, claims or interests in or to the proceeds of the Insurance Policies, and (iii) certain third party class action litigants agreed not to asset or pursue litigation claims against the Former Ds and Os (collectively, along with other certain terms and conditions, the "Revised AIG Settlement"). The Revised AIG Settlement was memorialized in a Modified Settlement Agreement dated as of December 11, 2014 (the "Modified AIG Agreement"). The Modified AIG Agreement was filed with the Bankruptcy Court on December 12, 2014 [Docket No. 642] and linked to the AIG Settlement Motion.

14

Although not a participant in the underlying proceedings on approval of the AIG Settlement Motion, on December 19, 2014, Southern filed an objection (the "Southern Objection") [Docket No. 650] to the Modified AIG Agreement, arguing, *inter alia*, that the Bankruptcy Court does not have jurisdiction to enter injunctive relief provided for in the AIG Settlement Motion and the Revised AIG Settlement improperly stripped Southern of rights he alleged under the Insurance Policies.  In turn, the Debtor filed papers [Docket No. 669] responsive to the Southern Objection explaining the Debtor's position regarding the late filing of the Southern Objection and the lack of merit of points espoused in the Southern Objection.  The Court entered an order on March 19, 2015 (the "AIG Approval Order") [Docket No. 725] approving the Revised AIG Settlement and overruling the Southern Objection.  Although the AIG Settlement Motion and Modified AIG Agreement provided for proceeds of the Insurance Policies to be held in escrow by the CRO pending further order of the Bankruptcy Court or other court of competent jurisdiction, the AIG Approval Order entered by the Bankruptcy Court provided that $2.9 million of the proceeds of the Insurance Policies should be limited to the noticed terms of the AIG Settlement Motion and should be used only for the purpose of paying liabilities arising from or related to the Incident and any related costs of administering the payment of such liabilities.

On April 1, 2015, Southern filed a Notice of Appeal relating to the AIG Approval Order. [Docket No. 741]  The Debtor requested that AIG close on the Modified AIG Agreement over the appeal by Southern, but AIG declined to do so.  On April 2, 2015, the Debtor filed a Notice of Appeal relating to the AIG Approval Order.  [Docket No. 745]  The Southern and Debtor appeals of the AIG Approval Order have been transferred by the Clerk of the Bankruptcy Court to the U.S. District Court for the Southern District of West Virginia.  [Docket Nos. 750 and 768].  Also, on April 2, 2015, WVDEP filed a motion in the Bankruptcy Court (the "WVDEP Reconsideration Motion") requesting, *inter alia*, that the Bankruptcy Court reconsider its findings in the AIG Approval Order with respect to the entitlement of the holders of Spill Claims to proceeds of the Insurance Policies [Docket No. 744].  On April 3, 2015, in response to the WVDEP Reconsideration Motion, the Bankruptcy Court entered an order (the "Clarification Order") clarifying the AIG Approval Order.  [Docket No. 754].  The Clarification Order determined, *inter alia*, that WVDEP is entitled to priority status with respect to the Debtor's environmental obligations arising from the Incident.

Pursuant to the Chemstream Settlement, the Debtor was required to withdraw its appeal of the AIG Approval Order upon consummation of the Chemstream Settlement.  The Debtor contemplates that in the event the settlements incorporated into the Plan are approved in the context of confirmation of the Plan, the appeal of the AIG Approval Order by Southern will be resolved.

6.    **Investigation of Causes of Action and Proposed Settlements and Compromises**

The CRO has, in the course of this Case, reviewed substantial books and records of the Debtor. The CRO has been required to review the Debtor's books and records in connection with requests for information by a variety of regulatory authorities.    The CRO has likewise been involved in extensive document review in connection with the production of documents and information to the USAO in connection with two grand jury subpoenas for documents. Likewise, in connection with the Debtor's plea agreement with the USAO, the Debtor, through the CRO, as the Bankruptcy Court appointed fiduciary to the Estate, was required to execute an extensive stipulation of facts.  Prior to execution of this stipulation of facts on behalf of the Debtor, the CRO investigated and negotiated these stipulations to assure their accuracy.  In the course of serving the role of CRO, the CRO has also engaged in extensive dialogue with virtually every party in interest in this case and/or their respective counsel.  As a result of this extensive information gathering process in the course of serving the role of CRO, and based on extensive historical experience in a broad array bankruptcy related litigation, the CRO reached the conclusion that the most appropriate and expedient path forward to conclude this Case was to pursue settlements with as many

15

parties in interest as reasonably possible.  The CRO, with support from bankruptcy counsel, worked to construct a detailed outline for a plan of liquidation premised upon settlements with various parties in interest.  This term sheet was shared and discussed with various parties in interest, including, without limitation, the Committee.  In response to concerns expressed by the Committee regarding the fact that the Committee had not conducted its own independent investigation of potential Claims and Causes of Action, the CRO and bankruptcy counsel to the Debtor prepared a comprehensive analysis of hypothetical Claims and Causes of Action against certain potential defendants and likely defenses that would be asserted by potential defendants in response to these Causes of Action.  This analysis applied the CRO's knowledge of facts and circumstances of Freedom and the Incident to legal precedent as explained to the CRO by the Debtor's bankruptcy counsel.  This analysis was then shared by the Debtor with the Committee and an extensive discussion and question/answer session with the full Committee followed.  Thereafter, the Committee provided the Debtor a list of certain modifications and terms and conditions that the Committee required in connection with a plan of liquidation that the Committee would support.  The CRO accepted the Committee comments and conditions.  The Plan reflects the settlements proposed by the CRO on behalf of the Debtor in the plan outline as modified based on input from the Committee and certain negotiations with other parties in interest that followed.  The Debtor's analysis relating to litigation claims and justification for the settlements proposed under the Plan is below:

Summary of Key Settlements Under the Plan

| A. Former Ds and Os: | |
|---|---|
| • Benefit to Freedom 1: | Sale Escrow containing approximately $2.7 million paid to Freedom free and clear of claims and interests of the settling parties. |
| • Benefit to Freedom 2: | The Former Ds and Os will honor their existing agreement to withdraw objections to AIG Settlement and release all right to AIG proceeds.  The Former Ds and Os are additional insured parties under the AIG Policies. |
| • Consideration from Freedom: | Release of all potential Freedom litigation rights and claims against the Former Ds and Os (and all of their respective affiliated parties). |
| • Third Party Participation: | Chemstream required to release the Former Ds and Os. |
| • Execution Risks: | All represented interests of which the Debtor is aware support this settlement.  However, the settlement is subject to the Bankruptcy Court approval. |
| B. Southern Settlement: | |
| • Benefit to Freedom 1: | Southern to withdraw appeal of AIG settlement order and release rights to AIG proceeds, paving way for Freedom to receive AIG Settlement Proceeds without any claim of Southern, as an additional insured party under the AIG policies, against AIG Settlement Proceeds. |
| • Benefit to Freedom 2: | Southern to pay Freedom $300,000 of additional settlement consideration. |
| • Consideration from Freedom: | Release of all potential Freedom litigation rights and claims against Southern. |
| • Third Party Participation: | Good Plaintiffs and Bar 101 Plaintiffs to release Southern. Southern is required to pay the Good Plaintiffs $350,000 in consideration of their release. |
| • Execution Risk: | Settlement consideration to be paid by Southern will require U.S. Attorney support. All represented interests of which the Debtor is aware support this Settlement.  However, the Settlement is subject to Bankruptcy Court approval. |

16

Bankruptcy courts evaluate settlements based on a four factor test as follows: (i) the probability of success in litigation, (ii) the complexity of the litigation and the expense, inconvenience and delay attendant to such litigation, (iii) the difficulties in collection if successful in litigation, and (iv) the paramount interests of creditors.  In order for a bankruptcy court to approve a settlement, the settlement must satisfy the lowest threshold of reasonableness and not shock the conscience.  **A detailed analysis forming the basis for the proposed settlements under the Plan is being filed by the CRO under separate cover in support of the settlements proposed under the Plan.**

### 7.        Settlements and Compromises as the Foundation of the Plan.

The foundation of the Plan is a series of interdependent settlements and compromises involving numerous parties in interest in the Case.   These settlements and the Chemstream Settlement that was previously approved by order of the Bankruptcy Court provide the basis for funding of the Plan and allow for the negotiated distributions provided for under the Plan on the Effective Date.   Given the interdependence of the settlements and compromises embodied in the Plan, if any single settlement were not approved, the entirety of the Plan becomes non-feasible either as a result of the execution risks associated with the Plan and/or the inability of the Debtor to fund negotiated obligations under the Plan.

(a)        **Southern**.  The Estate owns potential Causes of Action against Southern.  These Causes of Action may include Claims for breach of duty, fraudulent conveyance, unjust enrichment and preferential transfers, among others.  The Debtor has evaluated these potential Causes of Action, potential defenses to the potential Causes of Action and collectability in the event that a hypothetical judgment were obtained in respect of the Causes of Action against Southern, and determined in the context of this Case that settlement rather than litigation of Causes of Action is in the best interests of the Debtor, its Estate and creditors.  In resolution of potential Causes of Action by the Estate against Southern, on the Effective Date, Southern will pay the Southern Contribution.  Resolution of the Southern appeal to the District Court of the AIG Settlement Order allows the AIG Settlement Proceeds of $3,180,490.87 to be paid into the Estate on the Effective Date for the benefit of creditors as provided for in the Plan.   In exchange for the Southern Contribution and the payment of additional release consideration to the plaintiffs in the Good Case in the amount of $350,000, Southern will be released of all Causes of Action by the Debtor and the Estate.  Also, in exchange for the Southern Contribution, and the additional release consideration of $350,000, the plaintiffs in the Bar 101 Case and the Good Case among others, will be bound by the releases provided for in Section 11.11 of the Plan.   Southern is also required to pay additional release consideration to the plaintiffs in the Good Case in the amount of $350,000 outside of the context of the Plan.  The Good Plaintiffs will contribute a portion of this settlement consideration to the Spill Claim Plan Administrator in accordance with  Section 4.5 of the Plan. Further, in connection with the Plan, Southern and the Former Ds and Os will execute a mutually satisfactory mutual release agreement on the Effective Date.  The Debtor has provided its evaluation and analysis to the Committee and Spill Claim Counsel.  The Committee and Spill Claim Counsel support the settlement with Southern if it is approved in conjunction with the Plan.

(b)        **The Former Ds and Os**.  The Estate owns potential Causes of Action against the Former Ds and Os.   These Causes of Action may include claims for breach of duty, fraudulent conveyance, unjust enrichment, preferential transfers, and veil piercing, among others.  The Debtor has evaluated these potential Causes of Action, potential defenses to the potential Causes of Action and collectability in the event that one or more hypothetical judgments were obtained in respect of the Causes of Action against the Former Ds and Os, and determined in the context of this Case that settlement rather than litigation of the Causes of Action is in the best interests of the Debtor, its Estate and creditors.  In resolution of potential Causes of Action by the Estate against the Former Ds and Os, on the Effective Date, the Former Ds and Os and Herzing in his capacity as Sellers' Representative will provide the

17

Former Ds and Os Contribution.  Each of CHI, as Buyer beneficiary under the Sale Escrow, and the Former Ds and Os, as Sellers through Herzing as the Sellers' Representative under the Sale Escrow, assert competing rights and claims in and to the Sale Escrow.  The Debtor has no property interest in the Sale Escrow, and but for the settlements and compromises embodied in the Plan, the Debtor would not be entitled to receive any portion of the Sale Escrow.  In accordance with the Chemstream Settlement, on the effective date of the Chemstream Settlement, Chemstream assigned its right, title and interests in and to the Sale Escrow to Freedom.  Freedom covenants and agrees with the Former Ds and Os and the Sellers' Representative that with respect to the Sale Escrow, Freedom is bound by the terms and conditions of the Sale Escrow Agreement dated as of December 6, 2013, including without limitation, provisions relating to draws on the Sale Escrow and venue for dispute resolution.  Freedom shall not seek to draw on the Sale Escrow until either (i) the date on which Chemstream, the Former Ds and Os and the Sellers' Representative execute a mutual release agreement, substantially similar to the mutual release exchanged among the parties on April 24, 2015, the execution of which is a condition to the Effective Date and the occurrence of the Effective Date, or (ii) the date on which the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code or a successor to the CRO is appointed by order of the Bankruptcy Court.   Any successor to the CRO shall be bound by this provision.   Proceeds of the Sale Escrow distributed on the Effective Date shall be deemed to have been distributed proportionally to the ERT Remediation Fund and the Spill Claim Plan administrator for the benefit of holders of Class 4 and Class 5 Claims. In exchange for the Former Ds and Os Contribution, the Former Ds and Os and Herzing in his capacity as Sellers' Representative will be released of all Causes of Action by the Debtor and the Estate.  The Debtor has provided its evaluation and analysis to the Committee and Spill Claim Counsel. The Committee and Spill Claim Counsel support the settlement with the Former Ds and Os and Herzing in his capacity as Sellers' Representative if it is approved in conjunction with the Plan.

(c)      **Estate Waiver and Release of Preference Actions Against Holders of General Unsecured Claims**.  As part of the negotiation of terms and conditions of the Plan between the Debtor and the Committee, following an evaluation of potential Preference Actions and potential defenses to Preference Actions, it was agreed that on the Effective Date, the Debtor will waive and release all Preference Actions against holders of General Unsecured Claims.   The Debtor evaluated potential Preference Actions and potential defenses to such Preference Actions and determined in the context of this Case that a waiver and release of Preference Actions is in the best interests of the Debtor, its Estate and creditors.  In particular, the Debtor submits that until the date of the Incident, the Debtor was solvent, and thus any payments made by the Debtor prior to the date of the Incident that may be subject to a Preference Action would be subject to a solvency defense by defendants to such Preference Actions.  The Debtor has provided its evaluation and analysis to the Committee.  The Committee supports the waiver and release of Preference Actions against the holders of General Unsecured Claims if it is approved in conjunction with the Plan.

F.      **Means for Implementation and Execution of the Plan**

1.      **Settlements and Compromises as the Foundation of the Plan.**  The foundation of the Plan is a series of interdependent settlements and compromises involving numerous parties in interest in the Case.   These settlements provide the basis for funding of the Plan and allow for the negotiated distributions provided for under the Plan on the Effective Date.  Given the interdependence of the settlements and compromises embodied in the Plan, if any single settlement were not approved, the entirety of the Plan becomes non-feasible either as a result of the execution risks associated with the Plan or the inability of the Debtor to fund negotiated obligations under the Plan.

2.      **Federal Income Tax Treatment of Plan Administrators**.  The Plan provides for the appointment of the GC Plan Administrator and the Spill Claim Plan Administrator on the Effective Date to address claims and distributions.  For tax purposes, the following options are available to the Plan

18

Administrators on the Effective Date and are the most likely treatment for assets and claims in the circumstances of this Plan. The Plan Administrators, after consultation with their professionals, may determine in their discretion, to elect one of these approaches, or may alternatively determine in their discretion not to undertake such approaches. The goal of any such approach taken by the Plan Administrators is for purposes of simplicity of administration and minimizing tax consequences, if any, of administration. Upon making such determination after the Effective Date, the Plan Administrators shall file notice of the same with the Bankruptcy Court.

(a)    Qualified Settlement Fund (QSF). The assets of the Debtor required to be distributed to the Plan Administrators may be transferred to a QSF. The QSF is treated as a separate taxpayer. The transfer of assets to the QSF is not taxable to the QSF; that is, it receives the assets without such receipt being treated as income. Similarly, it pays no tax on the distribution of the assets to the creditors or claimants. The QSF does pay tax on any income it earns. In most cases, this is interest. The QSF treats its administrative costs as deductible expenses. Thus, only if its income exceeds its expenses does it pay tax. It files a Form 1120-SF, which it must file even if it has a loss. When the QSF makes distributions to the creditors or claimants, it may be required to issue Forms 1099-MISC.

(b)    Liquidating Trust. Subject to appropriate documentation, on the Effective Date, distributions payable to the Plan Administrator in accordance with the Plan may be paid to a liquidating trust. Although the assets are actually transferred to the Liquidating Trust, the liquidating trust approach treats the Debtor's assets as if the assets were first distributed to the holders of Allowed Claims and such holders of Allowed Claims then contributed the assets to the liquidating trust. This constitutes a completed transfer of the assets by the Debtor. At the time of the deemed distribution to the creditors, the creditors determine the tax consequence of the deemed distribution – usually a business bad debt deduction for the creditors. Because the creditors are treated as having contributed the assets to the liquidating trust, each of them is a grantor to the extent of the assets it contributed. The mechanics of the tax filings for the liquidating trust would likely require the filing of a Form 1041 and provide a statement to each grantor of its portion of the trust's income and expenses.

(c)    Plan Administrator Deemed as Holding Assets for Benefit of Applicable Claimants. Rather than treating the assets as transferred to a liquidating trust, the assets might be treated as transferred to the Plan Administrator in trust for the benefit of creditors and claimants. The Plan might be treated as a simple trust. The Plan Administrators would determine the items of income and expenses and distribute any distributable net income to the applicable holders of Allowed Claims. There would likely be no taxable income because the expenses would exceed the income. The Plan Administrators respectively, as trustees would file a Form 1041 for the trust and issue Schedules K-1 to the holders of Allowed Claims.

(d)    Plan Administrators Treated as Controlling Assets of the Debtor. The Plan Administrators could be treated as taking control of the Debtor's assets without the tax ownership of the assets ever leaving the Debtor. If there is any income earned, the Debtor would be responsible for any required taxes and the Spill Claim Plan Administrator, by virtue of the control exercised over the Debtor, would be responsible for filing tax returns on behalf of the Debtor.

3.    **Dissolution**. After the Effective Date, Freedom Industries, Inc. shall be dissolved and the Spill Claim Plan Administrator discharged at such time as (i) all Disputed Class 5 Claims have been resolved, (ii) all Causes of Action have been settled and resolved or judgments entered by Final Order and liquidated, and (iii) all distributions required to be made by the Spill Claim Plan Administrator under the Plan have been made. The GC Plan Administrator shall be discharged at such

time as all distributions required under the Plan to holders of Allowed Class 3 Claims have been made. Freedom Industries, Inc. shall only exist for a period as long as is necessary to facilitate or complete the recovery and liquidation of the Causes of Action and distribution of their proceeds.  The Spill Claim Plan Administrator shall not unduly prolong the duration of Freedom Industries, Inc.  and shall at all times endeavor to resolve, settle or otherwise dispose of all Causes of Action, and to effect the distribution of the proceeds of the Causes of Action in accordance with the terms hereof, and dissolve Freedom as soon as practicable.

4.      **Environmental Matters Following the Effective Date and the Sale of the Etowah River Terminal.**  The Debtor, as a Debtor in Possession, has an obligation to comply with all applicable non-bankruptcy law.  This includes an obligation to comply with applicable environmental laws and regulations.  Following the Effective Date, the Debtor shall remain obligated to comply with the VRP Agreement and the Consent Order to the extent that any such obligations remain unperformed on the Effective Date.   The financial means to satisfy these ongoing obligations will be assured by virtue of the ERT Remediation Fund, initially with cash from the Chemstream Settlement and then from the Debtor on the Effective Date.  Remediation of the Etowah River Terminal will continue in a manner consistent with the terms and conditions of the Chemstream Settlement.

It is contemplated that the Etowah River Terminal will be sold or otherwise transferred by the Debtor on or before the Effective Date to a party acceptable to DEP, following approval by the Bankruptcy Court.   In the event that the Bankruptcy Court has not, by Final Order approved a sale of the Etowah River Terminal prior to the Confirmation Date, the Confirmation Order shall, in accordance with sections 363 and 1123(a)(5)(D) of the Bankruptcy Code, authorize and approve the sale of the Etowah River Terminal free and clear of all liens, claims, encumbrances and interests, subject, however, to legal or contractual obligations of any such purchaser to perform obligations of the Debtor in accordance with the VRP Agreement and/or Consent Order.   A sale of the Etowah River Terminal in accordance with the Plan shall not relieve or discharge the obligations of the Debtor in accordance with the VRP Agreement and/or Consent Order.

## V.      EFFECTIVENESS OF THE PLAN

A.      <u>**Conditions Precedent to Effective Date.**</u>  The following are conditions precedent to the Effective Date of the Plan:

(a)      The Bankruptcy Court shall have entered a Confirmation Order in form and substance satisfactory to the Debtor, the Committee, Spill Claim Counsel, DEP, the Former Ds and Os, Herzing in his capacity as Sellers' Representative and Southern;

(b)      No stay of the Confirmation Order shall then be in effect;

(c)      The appeals of the AIG Settlement Order pending before the District Court have been resolved in a manner consistent with the Plan and satisfactory to the Debtor, Committee, Southern and Spill Claim Counsel;

(d)      The U.S. Attorney for the Southern District of West Virginia agrees to allow Southern to pay from funds currently subject to a seizure proceeding in the District Court (i) the Southern Contribution, and (ii) the additional release consideration to the plaintiffs in the Good Case;

(e)      The plaintiffs in the Good case (or their counsel) execute a release of Southern consistent with Section 11.11 of the Plan; and

(f)      A mutual release is executed among Chemstream, the Former Ds and Os and the Sellers' Representative.

**B.**      **Satisfaction of Conditions.**  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. If the Debtor determines that one of the conditions precedent set forth in Section 10.1 of the Plan cannot be satisfied and the occurrence of such condition is not waived by the Debtor or cannot be waived by the Debtor, then the Debtor shall file a notice of the failure of the Effective Date with the Bankruptcy Court.

**C.**      **Effect of Nonoccurrence of Conditions to Effective Date.**  If each of the conditions to consummation and the occurrence of the Effective Date has not been satisfied or duly waived on or before the Effective Date, the Confirmation Order may be vacated by the Bankruptcy Court. If the Confirmation Order is vacated pursuant to Section 10.3 of the Plan, the Plan shall be null and void in all respects, and nothing contained in the Plan shall constitute a waiver or release of any Claims and/or Spill Claims against the Debtor, and none of the parties subject to the Plan shall have any liability or obligation under the Plan.

## VI.      EFFECT OF CONFIRMATION

A.      **Vesting of Assets**.  As of the Effective Date, Cash will be paid by the Debtor to holders of Allowed Class 1 Claims, Allowed Class 2 Claims, and Allowed Administrative Expense Claims, to the CRO for the benefit of Professionals to be held in the Professional Fee Escrow Account, the CRO with respect to the ERT Remediation Fund unless funded prior to the Effective Date, the GC Plan Administrator and the Spill Claim Plan Administrator, all as provided in the Plan.  The equity interests in Freedom will vest in the Spill Claim Plan Administrator on the Effective Date, as will all Causes of Action not otherwise waived or released under the Plan. Only Causes of Action of the Debtor and the Estate will vest with the Spill Claim Plan Administrator on the Effective Date.

B.      **Release of Assets.**  Until the Effective Date, the Bankruptcy Court shall retain jurisdiction of the Debtor, the Estate and their assets and properties.  Thereafter, jurisdiction of the Bankruptcy Court shall be limited to the subject matter set forth in Article XII of the Plan.

C.      **Binding Effect.**  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and to the fullest extent permitted by section 1141 of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim including any holder of a Spill Claim against, or Equity Interest in, the Debtor and its respective successors and assigns, including, but not limited to, the Plan Administrators, whether or not the Claim, Spill Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

D.      **Satisfaction of Claims and Termination of Interests**.  To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, and release, effective as of the Effective Date, of Claims, Spill Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims, Spill Claims, or Equity Interests from and after the Petition Date, whether known or  unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Spill

21

Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims, Spill Claims, or Equity Interests relate to services performed by employees of the Debtor prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a proof of claim or proof of interest based upon such debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim, Spill Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim, Spill Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims, Spill Claims, and Equity Interests subject to the Effective Date occurring.

Neither the Plan nor the Confirmation Order shall be deemed a release of Allowed Contribution Claims, provided and for clarity, that no Person may seek satisfaction of any claim or Allowed Claim against a Protected Party except as specifically provided in this Plan.

E.    **Term of Injunctions or Stays.**   Unless otherwise expressly provided herein, all injunctions or stays arising under or entered during the Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, at which time such injunctions or stays shall be deemed lifted.

F.    **Retention of Causes of Action.**   Except as otherwise waived and released in accordance with the Plan, on and after the Effective Date, the Spill Claim Plan Administrator shall have the exclusive right to enforce and shall retain, all Causes of Action against any Persons including, without limitation, Claims and Causes of Action arising from or relating to the Incident. The Spill Claim Plan Administrator may prosecute, defend, enforce, abandon, settle or release any and all Claims and Causes of Action as it deems appropriate, subject to Bankruptcy Court approval as set forth in the Plan. The Spill Claim Plan Administrator may, in its sole discretion, offset any such claim held against a Person, against any payment due such person under the Plan; *provided, however,* that any Claims of the Debtor arising before the Petition Date shall first be offset against Claims against the Debtor arising before the Petition Date, subject in each instance, however, to the limitations of Section 8.4 of the Plan. All privileges, defenses and rights of avoidance of the Debtor not otherwise waived and released in accordance with the Plan, shall be retained and may be exercised by the Spill Claim Plan Administrator; provided, however, that all privileges, defenses, crossclaims, counterclaims, or Claims for setoff, recoupment, or which seek affirmative relief, in any form or manner whatsoever, related to or arising out of a Class 3 Claim  shall be retained and may be exercised by the GC Plan Administrator.

G.    **Exculpation**.  **The Plan, at page 29, provides for exculpation of J. Clifford Forrest for his post-Petition Date role as a director of Freedom, Mark Welch for his post-Petition Date roles as CRO and then as the sole director of Freedom, replacing J. Clifford Forrest in this role, professionals of the Debtor and Committee and members of the Committee.**

H.    **Debtor Release.**  **The Plan, at page 29, provides for the Debtor and the Estate to release Chemstream, the Former Ds and Os, the Sellers' Representatives and Southern as well as their representatives, affiliates and related parties.**

I.    **Release By Other Releasing Parties**.   **The Plan, at page 30, provides for Chemstream, the Former Ds and Os, the Sellers' Representative and Southern to release the Debtor and the Estate.**

22

J.    **Releases of Preference Actions Against Holders of General Unsecured Claims.** Pursuant to section 1123(b) of the Bankruptcy Code and for good and valuable consideration on and after the Effective Date, the Debtor and the Estate waive and release all Preference Actions against holders of General Unsecured Claims.

K.    **Limited Third Party Releases of Southern.**  On the Effective Date, the plaintiffs in the following cases: (i) Scott Miller, Bar 101, LLC and Ichiban consolidated under <u>Desimone Hospitality Services, LLC, et al v. West Virginia American Water Company, et al.</u>, Civil Action No. 2:14-cv-14845 (the "Bar 101 Case"), (ii) <u>Crystal Good M.T.S, N.K.T, A.M.S., Melissa Johnson, Aladdin Restaurant, Inc., Georgia Hamra, Mary Lacy, Joan Green, Jamila Aisha Oliver, Wendy Renee Ruiz, Kimberly Ogier, Roy J. McNeal, Maddie Fields, R.G. Gunnoe Farms LLC and Dunbar Plaza, Inc.,</u> consolidated under <u>Good et al. v. American Water Company, Inc., et al.</u>, Civil Action No. 2:14-cv-01374, the "Good Plaintiffs") and (iii) certain putative class representatives that previously contemplated filing a class action lawsuit for settlement purposes with the Debtor, including Stephen N. Smith, Fuji LLC d/b/a Fuji's Sushi & Teriyaki, Fuji LLC d/b/a Fuji Reef Shop & Salt Water Pet Shop, and Hartman & Tyler, Inc. d/b/a Mardi Gras Casino & Resort (collectively, the plaintiffs in (i), (ii) and (iii) the "Class Action Plaintiffs") do agree and shall:

A.    release and forever discharge Southern from any and all claims, damages, costs and expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever, known and unknown, asserted and unasserted, arising from the events at issue in any and all of the above-referenced civil actions, specifically including, but not limited to, the Incident; and

B.    covenant not to sue Southern in any case related to or arising from the Incident and agree to release and forever discharge Southern from any and all claims, damages, costs, expenses (including attorney fees and costs) of any nature whatsoever arising from the Incident.

L.    **Injunction.** The Plan, at page 33, provides for injunctions in connection with the releases under the Plan.

M.    **Injunction Against Interference with Plan**.  Upon the entry of the Confirmation Order, all holders of Claims, Spill Claims, and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

N.    **Apportionment Of Fault In Tort Lawsuits.**  Subject to any order or orders of the Bankruptcy Court or any other court having jurisdiction over the Debtor, nothing in the Plan or the Confirmation Order shall either grant or diminish or stay the rights, if any, of a party to seek to allocate or apportion liability or fault of Debtor in any lawsuit or to claim a verdict credit for any sums paid by the Debtor to a holder of a Spill Claim.  No party shall be permitted to argue that the presence of this reservation in the Plan is a suggestion or implication that any such rights exist, as the intent of this reservation is to preserve the status quo with respect to the matters addressed in Section 11.14 of the Plan, and neither grant nor diminish rights that might or might not otherwise exist.

# VII.    ALTERNATIVES TO THE PLAN

The Debtor submits that the Plan is the best means of providing maximum recoveries to creditors. Alternatives to the Plan that have been considered and evaluated by the Debtor during the course of the Case and include (i) liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code, (ii) an

alternative chapter 11 plan that would provide for distributions to all Allowed holders of Incident Related Claims rather than the cy pres approach proposed for this class of claimants, and (iii) dismissal of the Case. The Debtor submits that the proposed Plan provides a greater recovery to creditors or a more equitable distribution of Estate assets on a more expeditious timetable than inherent risks in any other course of action available to the Debtor. The Debtor cannot predict potential recoveries in litigation at this time, but submits, given the analysis contained in this Disclosure Statement relating to potential Causes of Action against Southern and the Former Ds and Os that substantial defenses exist to potential Causes of Action against these parties as wells as collection issues. The Debtor further submits that although the Chemstream Settlement causes its interests in the Sale Escrow to be assigned to Freedom, the Former Ds and Os have arguments against Freedom's recovery of the Sale Escrow. Further, without resolution of the Southern appeal of the order approving the AIG Settlement, proceeds of this settlement would only become available to the Debtor in the event that the Debtor were to prevail in litigation relating to this matter by Final Order of court of competent jurisdiction.

### A.      Other Plans of Liquidation

If the Plan were not confirmed, the Debtor or any other party in interest could attempt to formulate an alternative chapter 11 plan. The Bankruptcy Court terminated the Debtor's exclusivity and thus, any party in interest could propose an alternative plan of liquidation.

The Plan, however, represents an intricate compromise that optimizes the limited resources available to the Debtor for the benefit of the Debtor's constituencies. The Plan includes a series of interdependent compromises between the Debtor and various parties in interest that make escrowed funds and insurance proceeds available for distribution to creditors. In addition, the Plan reserves adequate resources for the Debtor to address its remaining environmental cleanup operations at the Etowah River Terminal before that facility is sold. The Plan also embodies an agreement among the Debtor, the Committee and Spill Claim Counsel regarding the manner of distribution of funds to holders of Allowed Claims in Classes 3, 4 and 5 under the Plan.

In theory, an alternative plan of liquidation could be proposed that would address the concerns of the Debtor's constituencies as well as satisfy the plan confirmation requirements under the Bankruptcy Code. Such an alternative plan, however, would need to be developed through negotiations with the very same creditor constituencies and parties in interest that negotiated the terms of the Plan.

### B.      Liquidation Under Chapter 7 of the Bankruptcy Code

If the Plan is not confirmed under section 1129(a) of the Bankruptcy Code, the Case may be converted to a case under chapter 7 of the Bankruptcy Code, in which event a chapter 7 trustee would be appointed (or subsequently elected) to liquidate any remaining assets of the Debtor for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. For the reasons discussed below, the CRO does not believe that conversion to chapter 7 is in the best interests of the Debtor's estate and creditors.

- If the Case is converted to chapter 7, a trustee initially will be appointed on an interim basis, and a permanent trustee will be appointed or elected on a permanent basis, to manage the affairs of the Estate. The interim and/or permanent trustee will be required to undertake a thorough review of the facts and circumstances, in the performance of his or her fiduciary duties to the Estate, with respect to all issues presented, including among other things the continuing environmental remediation process, the potential sale of the Etowah River Terminal facility, the appeals that have been filed with respect to the AIG Settlement Proceeds, the viability of claims and causes of action held by the Estate and a Claims resolution process for the administrative expense, professional fee and prepetition

24

Claims against the Debtor and the Estate.  The trustee(s)' assessment of these matters will require substantial time, effort and expense, and possibly result in significant delay in resolution of these matters, at a time when progress toward completion of this bankruptcy case is critical.

- In particular, a chapter 7 trustee would face a steep learning curve with respect to the environmental remediation process that has been undertaken during the past 14 months. The chapter 7 trustee would need to determine, in his or her independent judgment, if the arrangements made by the CRO with WVDEP, as reflected in the VRP Agreement, are in the best interests of the Debtor, the Estate and creditors.  This decision-making would be made in the context of a chapter 7 estate that would have very limited financial means to complete the environmental obligations of the Debtor under the best of circumstances.

- In this regard, the chapter 7 trustee would need to evaluate whether the sale of the Etowah River Terminal proposed by the CRO is, in fact, in the best interests of the Debtor, its Estate and creditors.  The current sale transaction proposed by the CRO on behalf of the Debtor, which sale is the most readily available source of additional cash to the Estate, is dependent upon the successful resolution of remediation plans of the Debtor with respect to the Etowah River Terminal.  Accordingly, in order for a chapter 7 trustee to be able to sell the Etowah River Terminal, a chapter 7 trustee must be able to either implement the accommodations reached between the CRO and WVDEP or be able to reach successful resolution of the Debtor's environmental obligations in another manner acceptable to the chapter 7 trustee and WVDEP.

- The second major asset available to a chapter 7 trustee is proceeds of the Insurance Policies.  As noted herein, however, those proceeds would not be readily available to the chapter 7 trustee absent a settlement comparable to that reflected in the Plan.  The AIG Approval Order is subject to appeal by Gary Southern.  In order to be able to obtain proceeds of the Insurance Policies, a chapter 7 trustee must either prevail on appeal or otherwise resolve issues relating to both the Southern claims in and to these proceeds as well as the limitations imposed by the Bankruptcy Court on the use of the proceeds of the Insurance Policies as established in the AIG Approval Order and the Clarification Order.

A chapter 7 trustee would become the potential plaintiff in and to all Claims and Causes of Action of the Debtor.  Many of these potential Claims and Causes of Action have been settled by the CRO in the context of the Plan, with settlements to be implemented on the Effective Date.  A chapter 7 trustee would be required to investigate potential Claims and Causes of Action that may be asserted by the Debtor and determine whether the settlements proposed by the CRO on behalf of the Debtor are in the best interests of the Debtor, the Estate and creditor.  In the event that a chapter 7 trustee were to decide to litigate rather than settle certain Claims and Causes of Action owned by the Debtor, such a course of action would entail additional delay and expense, as well as risk in terms of defenses that might be asserted and collectability issues with respect to certain potential defendants.  The potential recoveries by a chapter 7 trustee from either negotiations to resolve or litigation of such Claims and Causes of Action would be highly uncertain.  The CRO submits that the settlements proposed in the Plan are in the best interests of the Debtor, the Estate and creditors.  If those settlements are approved in connection with Confirmation of the Plan, the Committee agrees with the assessment of the CRO.

## VIII.    CONFIRMATION REQUIREMENTS

### A.        The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing before a plan of reorganization or liquidation may be confirmed.  The Confirmation Hearing to confirm the Plan has been scheduled for the date set forth in the attached notice of confirmation hearing before the Honorable Ronald G. Pearson, United States Bankruptcy Judge in the United States Bankruptcy Court, Robert C.  Byrd U.S. Courthouse, 300 Virginia Street, Room 3200, Charleston, West Virginia 25301. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the claim or number and type of shares of equity security interests held by the objector.  Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and certain other parties when and as set forth in the attached notice of confirmation hearing.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  At the hearing on the confirmation of the Plan, the Bankruptcy Court will confirm the Plan only if the requirements of the Bankruptcy Code, particularly those set forth in section 1129 of the Bankruptcy Code, have been satisfied.  Objections to final approval of the Disclosure Statement are governed by Bankruptcy Rules 3017 and 9014.  At the final hearing on approval of the Disclosure Statement, the Bankruptcy Court will approve the Disclosure Statement on a final basis if the requirements of Bankruptcy Code section 1125 are satisfied.

### B.        Acceptances Necessary to Confirm the Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by the requisite amount and number of Allowed Claims and Allowed Interests in each impaired class.  Under the Bankruptcy Code, a class of creditors or equity security holders is impaired if its legal, equitable or contractual rights are altered by a proposed plan of reorganization or liquidation.  If a class is not impaired, each creditor or equity security holder in such unimpaired class is conclusively presumed to have accepted the plan pursuant to section 1126(f) of the Bankruptcy Code.

An impaired class of creditors and each holder of a claim in such class will be deemed to have accepted the Plan if the holders of at least two-thirds in amount and more than one-half of those in number of the Allowed Claims in such impaired class for which complete and timely ballots have been received have voted for acceptance of the Plan.  An impaired class of equity securities and each holder of an interest in such class will be deemed to have accepted a plan if the Plan has been accepted by at least two-thirds in amount of the interests in such class who actually vote on the Plan.

Because the equity interests held by the members of Class 6 are not receiving anything under the Plan, Class 6 is deemed to have rejected the Plan, and the Debtor cannot satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code.  Accordingly, the Debtor intends to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Under section 1129(b), the Bankruptcy Court must determine, among other things, that the Plan does not discriminate unfairly and that it is fair and equitable with respect to each class of impaired Allowed Claims and Allowed Interests that have not voted to accept the Plan.

C.       Best Interests of Creditors

        The Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

        The first step in determining whether this test has been satisfied is to determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case.  The gross amount of cash that would be available for satisfaction of claims and equity interests would be the sum consisting of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor, augmented by the unencumbered cash hold by the Debtor at the time of the commencement of the liquidation cases.

        The next step is to reduce that gross amount by the costs and expenses of liquidation and by such additional administrative and priority claims that might result from the use of chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code.  Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

        The costs of liquidation of the Debtor under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.  Other liquidation costs include the expenses incurred during the Cases and subsequently allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals for the Debtor, and the Committee, and costs and expenses of members of the Committee, as well as other compensation claims.

        The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured Claims.

        The Debtor, through the CRO, submits that each impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code, and almost certainly more due to (i) the statutory fees to which a chapter 7 trustee is entitled for administering assets and (ii) the other matters discussed in Section IX.B above.

        After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Case – including the chapter 7 trustee's investment of substantial time and resources to address the continuing environmental remediation process, the potential sale of the Etowah River Terminal facility, the appeals that have been filed with respect to the AIG Settlement Proceeds, the viability of claims and causes of action held by the Estate and a Claims resolution process for the administrative expense, professional fee and prepetition Claims against the Debtor and the Estate – the Debtor has determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtor under chapter 7.

        The Debtor also submits that the present value of any distributions to each Class of Allowed Claims in a chapter 7 case, would be less than the value of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time.  In the event litigation

27

was necessary to resolve claims asserted in a chapter 7 case, the delay could be prolonged and administrative expenses increased, such that ultimate creditor recoveries will be decreased.

### D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Court finds that such plan is feasible.  A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor.  Because the Plan provides for the complete liquidation of the Debtor, the Bankruptcy Court will find that the Plan is feasible if it determines that there will exist conditions precedent to the Effective Date can be satisfied and sufficient funds to meet its post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Cases.  Provided that all settlements and compromises encompassed in the Plan are approved by the Bankruptcy Court, and given the funding of the ERT Remediation Fund pursuant to the Chemstream Settlement and the provisions of the Plan, the Debtor submits that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

### E.    Confirmation of the Plan

In the event the Bankruptcy Court determines that all of the requirements for the confirmation of the Plan are satisfied, the Bankruptcy Court will issue the Confirmation Order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

## IX.    CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF IMPAIRED CLAIMS AGAINST OR INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THOSE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    Parties-In-Interest May Object to the Classification of Claims

Section 1122 of the Bankruptcy Code provides that a plan of reorganization or liquidation may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtor submits that the classification of claims and interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, the Debtor cannot give assurances that the Bankruptcy Court will reach the same conclusion.

### B.    The Debtor May Not Be Able to Secure Confirmation of the Plan

The Debtor cannot assure you that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, the Debtor cannot assure you that the Bankruptcy Court will confirm the Plan.  A non-accepting creditor or equity security holder of the Debtor might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a

need for further financial reorganization and that the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.  While the Debtor cannot give assurances that the Bankruptcy Court will conclude that these requirements have been met, the Debtor submits that the Plan will not be followed by a need for further financial reorganization and that non-accepting holders within each class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

The confirmation and consummation of the Plan are also subject to certain conditions.

### C.      The Debtor, Committee and/or a Plan Administrator May Object to the Amount or Classification of Your Claim

The Debtor reserves the right to object to the amount or classification of any claim or interest.  The estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose claim or interest is subject to an objection.  Any such claim or interest holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.  Such an objection to claim may be prosecuted by the applicable Plan Administrator.

### D.      Remediation Requirements

The Debtor has an obligation not to violate any applicable non-bankruptcy law in order to confirm a plan of liquidation or plan of reorganization under the Bankruptcy Code.  The Debtor's environmental remediation obligations and the manner in which the Debtor intends to approach satisfaction of these obligations are addressed in the Chemstream Settlement which is attached to the Plan as Exhibit A.

### E.      The Proposed Settlements May Not Be Approved

Funding for the Plan comes from various sources contingent upon approval by the Bankruptcy Court in the context of confirmation of the Plan, of settlements between the Debtor, Chemstream, the Former Ds and Os and Southern, as well as the Chemstream Settlement.  Likewise, certain provisions of the Plan result from settlements and compromises among the Debtor, the Committee and Spill Claim Counsel.  Also, distributions under the Plan are based upon the understanding of the finite nature of the Debtor's environmental obligations with respect to the Etowah River Terminal.  If any of these settlements were not approved by the Bankruptcy Court, the Plan will not be feasible, and thus, not confirmable.

### F.      Payment of the Southern Contribution is Subject to Approval by the Office of the U.S. Attorney

A condition precedent to the Effective Date is approval by the Office of the U.S. Attorney of Southern's payment of the Southern Contribution.  In connection with the criminal proceedings pending against Southern, the Office of the US Attorney sought and obtained seizure of many if not all of the assets of Southern.  In order for Southern to make the Southern Contribution, (and also pay additional release consideration to the plaintiffs in the Good Case) Southern will be required to obtain approval for the release of funds sufficient to cover the Southern Contribution and the payment of the additional

release consideration to the plaintiffs in the Good Case from the Office of the US Attorney and the District Court.  Although the CRO understands that such approval is more likely than not, there cannot be assurances at this time that requisite approvals will actually be obtained.  Without funding of the Southern Contribution, the settlement and compromise between the Debtor and Southern cannot occur.

## X.     WHERE YOU CAN OBTAIN MORE INFORMATION

Pursuant to the requirements of the Office of the U.S.  Trustee, the Debtor is required to and has filed monthly operating reports for the postpetition period with the Bankruptcy Court. These monthly operating reports may be obtained at prescribed per page copy rates by writing to the <u>Office of the Clerk of the United States Bankruptcy Court for the Southern District of West Virginia, U.S.  Bankruptcy Court Robert C.  Byrd U.S.  Courthouse 300 Virginia Street, Room 3200, Charleston, West Virginia 25301</u>, or on-line at the Bankruptcy Court's website: <u>http://www.wvsb.uscourts.gov</u>.

## XI.     CONCLUSION AND RECOMMENDATION

The Debtor submits that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims.  The Debtor urges holders of Claims entitled to vote on the Plan to vote to ACCEPT the Plan.

The Committee and certain Spill Claim Counsel have filed a letter of recommendation with the Bankruptcy Court indicating the Committee's support of the Plan and encouraging holders of Class 3, Class 4 and Class 5 Claims to vote to ACCEPT the Plan.  WVDEP has also filed a letter in support of the confirmation of the Plan.

Dated: August 7, 2015

FREEDOM INDUSTRIES, INC.

By: <u>/s/ Mark Welch</u>
Its: Chief Restructuring Officer

69653918_2

30