**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re | ) | **Chapter 11** |
| | ) | |
| **FREEDOM INDUSTRIES, INC.** | ) | |
| | ) | **Case No. 14-20017-RGP** |
| | ) | |
| Debtor. | ) | |
| | ) | |

~~FIRST~~SECOND **MODIFIED AMENDED PLAN OF LIQUIDATION UNDER CHAPTER 11 OF**
**THE BANKRUPTCY CODE PROPOSED BY FREEDOM INDUSTRIES, INC.**
**DATED ~~JULY 26,~~AUGUST 7, 2015**

**BARTH & THOMPSON**

Stephen L. Thompson (WV 3751)
J. Nicholas Barth (WV 255)
Barth & Thompson
P.O. Box 129
Charleston, West Virginia 25321
Telephone: (304) 342-7111
Facsimile: (304) 342-6215

and

**MCGUIREWOODS LLP**

Mark E. Freedlander (PA 70593)
625 Liberty Avenue, 23rd Floor
Pittsburgh, PA 15222
Telephone: (412) 667-6000
Facsimile: (412) 667-6050

Co-Counsel for the Debtor,
Freedom Industries, Inc.

# TABLE OF CONTENTS

**Page**

ARTICLE I.        DEFINITIONS AND INTERPRETATION.............................................................1

ARTICLE II.       ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS ..........9

2.1     Administrative Expense Claims .............................................................................9

2.2     Professional Fee Compensation and Reimbursement Claims.................................9

2.3     Fees Under 28 U.S.C. §1930 ...............................................................................10

ARTICLE III.      CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ............................11

ARTICLE IV.       TREATMENT OF CLAIMS AND EQUITY INTERESTS ...................................11

4.1     Class 1 – IRS Secured Claims .............................................................................11

4.2     Class 2 – Priority Tax Claims ..............................................................................11

4.3     Class 3 – General Unsecured Claims ...................................................................11

4.4     Class 4 – Convenience Spill Claims ....................................................................12

4.5     Class 5 – Spill Claims..........................................................................................12

4.6     Class 6 – Equity Interests.....................................................................................13

ARTICLE V.        MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN............13

5.1     Settlements and Compromises as the Foundation of the Plan ..........................13

5.2     Payment of Cash to the Plan Administrators and Issuance of Equity Interests in the Debtor to The Spill Claim Plan Administrator...............................................................................15

5.3     Distributions to Holders as of the Confirmation Date .......................................18

5.4     Closing of Case by Charitable Gift......................................................................18

5.5     Release of Liens....................................................................................................18

5.6     Cancellation of Existing Securities and Security Agreements.............................18

5.7     Plan Administrators' Post-Confirmation Role as of the Effective Date ...........19

5.8     Books and Records ...............................................................................................20

5.9     Effectuating Documents and Further Transactions..............................................20

ARTICLE VI.       PROVISIONS GOVERNING CLASS 5 SPILL CLAIMS AND THE SPILL CLAIM PLAN ADMINISTRATOR...........................................................................................20

6.1     Responsibility for Distributions to Holders of Allowed Spill Claims by the Spill Claim Plan Administrator; Transfer of Defenses to Spill Claim Plan Administrator........................20

6.2     Class 5 Spill Claims Allowance Procedures ........................................................20

6.3     Good Faith Resolution of Spill Claims by Debtor ...............................................21

6.4     Spill Claims Injunction ........................................................................................21

6.5     Method of Distributions by Spill Claim Plan Administrator Under the Plan .................22

6.6     Withholding and Reporting Requirements ...........................................................22

6.7     Time Bar to Cash Payments.................................................................................23

6.8     Minimum Distributions.........................................................................................23

TABLE OF CONTENTS
(continued)

| | | | |
|---|---|---|---|
| | 6.9 | Setoffs | 23 |
| | 6.10 | Transactions on Business Days | 23 |
| ARTICLE VII. | | PROVISIONS GOVERNING THE GC PLAN ADMINISTRATOR | 23 |
| | 7.1 | Distribution Record Date | 23 |
| | 7.2 | Method of Distributions by GC Plan Administrator Under the Plan | 23 |
| | 7.3 | Withholding and Reporting Requirements | 24 |
| | 7.4 | Time Bar to Cash Payments | 24 |
| | 7.5 | Minimum Distributions | 25 |
| | 7.6 | Setoffs | 25 |
| | 7.7 | Allocation of Plan Distribution Between Principal and Interest | 25 |
| ARTICLE VIII. | | PROCEDURES FOR DISPUTED CLAIMS | 25 |
| | 8.1 | Objections to Claims | 25 |
| | 8.2 | No Distribution Pending Allowance | 25 |
| | 8.3 | Reserves on Account of Disputed Claims | 25 |
| | 8.4 | Resolution of Disputed Claims | 26 |
| | 8.5 | Estimation | 26 |
| | 8.6 | Distributions to Holders of Allowed Claims Upon Disallowance of Disputed Claims | 26 |
| ARTICLE IX. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 27 |
| | 9.1 | Executory Contracts and Unexpired Leases | 27 |
| | 9.2 | Approval of Rejection of Executory Contracts and Unexpired Leases | 27 |
| | 9.3 | Rejection Claims | 27 |
| ARTICLE X. | | EFFECTIVENESS OF THE PLAN | 27 |
| | 10.1 | Conditions Precedent to Effective Date | 27 |
| | 10.2 | Satisfaction of Conditions | 28 |
| | 10.3 | Effect of Nonoccurrence of Conditions to Effective Date | 28 |
| ARTICLE XI. | | EFFECT OF CONFIRMATION | 28 |
| | 11.1 | Vesting of Assets | 28 |
| | 11.2 | Release of Assets | 28 |
| | 11.3 | Binding Effect | 29 |
| | 11.4 | Satisfaction of Claims and Termination of Interests | 29 |
| | 11.5 | Term of Injunctions or Stays | 29 |
| | 11.6 | Retention of Causes of Action | 29 |
| | 11.7 | Exculpation | 30 |
| | 11.8 | Debtor Release | 30 |

## TABLE OF CONTENTS
### (continued)

11.9     Release By Other Releasing Parties ................................................................31

11.10    Releases of Preference Actions Against Holders of General Unsecured Claims ............32

11.11    Limited Third Party Releases of Southern .......................................................32

11.12    Injunction ..................................................................................33

11.13    Injunction Against Interference with Plan .......................................................33

11.14    Apportionment of Fault in Tort Lawsuits ........................................................34

ARTICLE XII.     RETENTION OF JURISDICTION .................................................34

12.1     Jurisdiction of Bankruptcy Court ...............................................................34

ARTICLE XIII.    CRAMDOWN RESERVATION .....................................................35

13.1     Nonconsensual Confirmation ...................................................................35

ARTICLE XIV.     MISCELLANEOUS PROVISIONS .................................................35

14.1     Environmental Matters Following the Effective Date and the Sale of the Etowah River Terminal
         ........................................................................................................35

14.2     Disposition of Creditors Committee ............................................................36

14.3     Release of CRO ...............................................................................36

14.4     Substantial Consummation .....................................................................36

14.5     Exemption from Transfer Taxes ................................................................36

14.6     Post-Effective Date Fees and Expenses .........................................................36

14.7     Modification of Plan ..........................................................................36

14.8     Revocation or Withdrawal of Plan .............................................................37

14.9     Attribution of Proceeds to be Distributed Under the Plan .......................................37

14.10    Courts of Competent Jurisdiction ..............................................................37

14.11    Severability ..................................................................................37

14.12    Governing Law ...............................................................................37

14.13    Exhibits ......................................................................................37

14.14    Successors and Assigns ........................................................................38

14.15    Time .........................................................................................38

14.16    Notices .......................................................................................38

Exhibit A - Chemstream Settlement Agreement

**Exhibit B – Instructions for Form 1099 – Misc.**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| FREEDOM INDUSTRIES, INC. | ) | |
| | ) | Case No. 14-20017-RGP |
| | ) | |
| Debtor. | ) | |
| | ) | |

## ~~FIRST~~SECOND MODIFIED AMENDED PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY FREEDOM INDUSTRIES, INC. DATED ~~JULY 26,~~AUGUST 7, 2015

Freedom Industries, Inc. proposes the within amended chapter 11 plan of liquidation pursuant to section 1121(a) of title 11 of the United States Code:

### ARTICLE I.

### DEFINITIONS AND INTERPRETATION

The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

**1.1**    **AIG** means AIG Specialty Insurance Company.

**1.2**    **AIG Policies** means the Commercial General Liability and Pollution Legal Liability Policy No. EG 14196320 and Commercial Excess Follow Form Policy No. EGU 14197333 owned by Freedom and issued by AIG.

**1.3**    **AIG Settlement Agreement** means that certain settlement agreement by and among Freedom, AIG, the Former Ds and Os, plaintiff representatives of a proposed putative settlement class, and the Named Plaintiffs (as defined in the AIG Settlement Agreement) in the Good Litigation (as defined in the AIG Settlement Agreement) and in the Bar 101 Litigation (as defined in the AIG Settlement Agreement) as filed with the Bankruptcy Court on December 11, 2014 at Docket No. 642 and approved by the Bankruptcy Court on March 19, 2015 at Docket No. 725.

**1.4**    **AIG Settlement Order** means the order entered by the Bankruptcy Court on March 19, 2015 at Docket No. 725 approving the AIG Settlement Agreement and restricting the use of AIG Settlement Proceeds.

**1.5**    **AIG Settlement Proceeds** means the aggregate sum of $3,199,318 of which $90,827.26 was previously paid by AIG pursuant to prior order of the Bankruptcy Court and thus $3,108,490.87 is to be paid by AIG to Freedom in accordance with the terms and conditions of the AIG Settlement Agreement.

**1.6**    **Administrative Expense Claim** means any right to payment constituting a cost or expense of administration of the Case allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, any actual and necessary costs and expenses of preserving the Estate; any actual and necessary costs and expenses of operating the Debtor's business; any indebtedness or obligations incurred or assumed by the Debtor, as debtor-in-possession, during the Case, including, for the acquisition or lease of property or

1

an interest in property; or the rendition of services, any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under sections 328(a), 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estate under section 1930 of chapter 123 of title 28 of the United States Code.

**1.7**    **Allowed** means, (A) with reference to any Claim, (i) any Claim against the Debtor that has been listed by the Debtor in the Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (ii) any timely filed Claim as to which no objection to allowance has been interposed in accordance with Section 8.1 hereof or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, or (iii) any Claim expressly allowed by a Final Order or hereunder, or (B) with reference to any Incident Related Claim, any Incident Related Claim allowed pursuant to and in accordance with the Incident Related Claim Procedures.

**1.8**    **Avoidance Actions** means any actions commenced, or that may be commenced, before or after the Effective Date pursuant to sections 542, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code.

**1.9**    **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Case.

**1.10**    **Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of West Virginia, having jurisdiction over the Case and, to the extent of the withdrawal of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Case under section 151 of title 28 of the United States Code.

**1.11**    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Case, and any Local Rules of the Bankruptcy Court.

**1.12**    **Business Day** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in Charleston, West Virginia are required or authorized to close by law or executive order.

**1.13**    **Case** means the within captioned chapter 11 bankruptcy case filed on the Petition Date by the Debtor.

**1.14**    **Cash** means legal tender of the United States of America.

**1.15**    **Causes of Action** means, without limitation, any and all actions, proceedings, causes of action, controversies, liabilities, obligations, rights, rights of set-off, recoupment rights, suits, damages, accounts, defenses, offsets, powers, privileges, licenses, franchises, Claims, including, alter-ego, corporate or other veil-piercing, joint enterprise, or single business enterprise claims and claims under chapter 5 of the Bankruptcy Code as well as any claims or rights created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Petition Date, counterclaims, cross-claims, affirmative defenses and demands of any kind or character whatsoever, whether known or unknown, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereinafter arising, in contract or in tort, in law, in equity or otherwise, in any court, tribunal, forum or proceeding, under any

local, state, federal, foreign, statutory, regulatory, or other law or rule, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Case, including through the Effective Date.

**1.16    Chemstream** means Chemstream Holdings, Inc., the equity owner of Freedom, and Persons that are direct and indirect affiliates (including, without limitation, J. Clifford Forrest, Rosebud Mining Company, Chemstream, Inc. and Enviromine, Inc. ("Enviromine")).

**1.17    Chemstream Contribution** means (i) payment of the sum of $1,100,000 to Freedom to be used for designated remediation purposes (the "Chemstream Remediation Funding"), (ii) the assignment of Chemstream Holding, Inc.'s interests in and to the Sale Escrow to the Debtor and (iii) the release of any and all Claims by Chemstream against Freedom and its Estate, including, Claims of Enviromine and Chemstream, Inc. arising under section 503(b)(9) of the Bankruptcy Code in the respective amounts of $212,067.90 and $69,161.00, and general unsecured claims in the respective amounts of $1,217,240.30 and $111,086.95 all pursuant to a separate motion for approval of a settlement with Chemstream, DEP and certain other parties (the "Chemstream Settlement") filed by the Debtor with the Bankruptcy Court on June 16, 2015 (the "Chemstream Settlement Motion") and approved by order of the Bankruptcy Court dated July 8, 2015 [Docket No. 836].

**1.18    Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code.

**1.19    Claims Register** means the list maintained by the Clerk of the Bankruptcy Court listing all Claims filed in the Case in accordance with that certain order of the Bankruptcy Court dated June 29, 2014 [Docket # 422].

**1.20    Class** means any group of Claims, Incident Related Claims or Equity Interests classified by the Plan in accordance with section 1122(a)(1) of the Bankruptcy Code or pursuant to an order of the Bankruptcy Court or the District Court.

**1.21    Collateral** means any property or interest in property of the Debtor and the Estate subject to a valid and properly perfected Lien, charge or other encumbrance to secure the payment or performance of a Claim, which lien, charge or other encumbrance is not subject to avoidance under the Bankruptcy Code.

**1.22    Committee** means the statutory committee of unsecured creditors appointed by the Office of the United States Trustee in the Case pursuant to section 1102 of the Bankruptcy Code, on February 5, 2014, as the composition of the same may be modified by the addition or removal of members from time to time.

**1.23    Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

**1.24    Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.25    Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**1.26    Consent Order** means that certain order issued by the DEP to Freedom identified by Number 8027 requiring specified remedial actions by the Debtor at the Etowah River Terminal and restricting certain other actions by the Debtor.

**1.27** **Contribution Claim** means any claim for contribution or similar Claim arising from or related to any one or more Spill Claims, whenever and wherever arising or asserted against the Debtor, including any claim asserted against the Debtor for the Debtor's actual or alleged share of any actual or alleged loss for which the Debtor may be jointly responsible to a third party.

**1.28** **Convenience Class Spill Claims** means (i) those Claims of Persons who have timely filed proofs of claim with the Bankruptcy Court for Claims arising from or relating to the Incident, each Claim of which is no greater than $3,000, and (ii) those Claims of Persons who have timely filed proofs of claim with the Bankruptcy Court for Claims arising from or relating to the Incident, each Claim of which is in excess of $3,000 but nevertheless elects to be treated as a Convenience Class Spill Claim. 3,000.

**1.29** **CRO** means Mark Welch, the duly appointed Chief Restructuring Officer of the Debtor pursuant to that certain order of the Bankruptcy Court dated March 18, 2014 [Docket No. 228].

**1.30** **December 2013 Transaction** means: (i) the purchase of the shares of Freedom Industries, Inc. pursuant to the Share Purchase Agreement by and among Chemstream Holdings, Inc., as Buyer and Dennis P. Farrell ("Farrell"), William E. Tis ("Tis") and Charles E. Herzing "Herzing," together with Farrell and Tis, the "Sellers") and Herzing in his capacity as Sellers' Representative; (ii) the purchase of the membership units of Etowah River Terminal, LLC pursuant to the Membership Unit Purchase Agreement by and among Chemstream Holdings, Inc. as Buyer and Farrell, Tis and Herzing as Sellers and Herzing as Sellers' Representative; (iii) the Escrow Agreement by and among Chemstream Holdings, Inc., Herzing as Seller's Representative and Somerset Trust Company as the Escrow Holder (the "Escrow Agreement"); (iv) individual Employment Agreements by and between Freedom Industries, Inc. and Farrell, Kevin B. Skiles ("Skiles") and Steven D. Simmons ("Simmons"); (v) separate Consulting Agreements by and between Freedom Industries, Inc. and Useful Solutions, Inc. and Tis, and (vi) various ancillary agreements relating to intellectual property owned by or transferred to Freedom Industries, Inc.

**1.31** **Debtor** means Freedom Industries, Inc.

**1.32** **DEP** means the West Virginia Department of Environmental Protection.

**1.33** **Disclosure Statement** means the disclosure statement accompanying the Plan, including, without limitation, all exhibits, schedules and attachments thereto, as may be amended or modified from time to time, and as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

**1.34** **Disclosure Statement Order** means that certain Order (A) Approving Proposed Disclosure Statement on an interim basis, (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Proposed Plan of Liquidation and Approval of the Disclosure Statement on a Final Basis and (C) Scheduling Certain Dates in Connection Therewith entered by the Bankruptcy Court in this case together with any exhibits or documents attached thereto.

**1.35** **Disputed** means, with respect to any Claim which has not been Allowed pursuant to the Plan or a Final Order:

(a) if no proof of claim has been filed by the applicable deadline: (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent or unliquidated; or (ii) a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent or unliquidated, but as to which the Debtor or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; or

(b)      if a proof of claim or request for payment of an Administrative Expense Claim has been filed by the applicable deadline: (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules; (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted in the proof of claim varies from the nature and amount of such Claim as listed on the Schedules; (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent or unliquidated; or (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtor which has not been withdrawn or determined by a Final Order.

**1.36**      **Disputed Claim Amount** means the amount set forth in the proof of claim or Schedules relating to a Claim that is Disputed or an amount estimated pursuant to an order of the Bankruptcy Court in respect of a Claim that is Disputed in accordance with section 502(a) of the Bankruptcy Code and Bankruptcy Rule 3018.

**1.37**      **Disputed Claim Reserve** has the meaning set forth in Section 8.3 hereof with respect to claims that are Class 3 General Unsecured Claims, and with respect to Class 5 Spill Claims, any reserve that may be established by the Spill Claim Plan Administrator.

**1.38**      **Distribution Record Date** means the Confirmation Date.

**1.39**      **District Court** means the United States District Court of the Southern District of West Virginia.

**1.40**      **Effective Date** means a Business Day after the Confirmation Date as mutually agreed by the Debtor and the Committee that is as soon as reasonably practicable after the conditions to the effectiveness of the Plan specified in Section 10.1 hereof have been satisfied or waived.

**1.41**      **Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.42**      **Equity Interest** means the interest of any holder of an equity security of the Debtor represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in the Debtor, whether or not transferable, or any option, warrant or right, contractual or otherwise, to acquire any such interest.

**1.43**      **ERT Remediation Fund** means the fund in an amount agreed upon by the Debtor and DEP, which will consist of (i) the Chemstream Remediation Funding, plus (ii) the sum of $1,400,000, deposited by the CRO into the account established pursuant to the Chemstream Settlement, which account shall be governed by the terms and conditions set forth in the Settlement Agreement documenting the Chemstream Settlement (the "Chemstream Settlement Agreement").

**1.44**      **Estate** means the bankruptcy estate of the Debtor in the Case pursuant to section 541 of the Bankruptcy Code.

**1.45**      **Etowah River Terminal** means the chemical blending and storage facility owned by the Debtor situate at 1015 Barlow Drive, Kanawha County, WV, and the site of the Incident.

**1.46**      **Final Order** means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court on the docket in the Case that has not been reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of

certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired.

**1.47    Former Ds and Os** means collectively, Farrell, Tis, Herzing, and any affiliated Person that any of the foregoing currently or formerly own or control.

**1.48    Former Ds and Os Contribution** means the assignment of the collective interests of the Former Ds and Os in and to the Sale Escrow on the Effective Date and the release by the Former Ds and Os of any and all Claims against Freedom and the Estate.

**1.49    GC Plan Administrator** means Robert Johns**.**

**1.50    General Unsecured Claim** means any Claim against the Debtor that is (i) not a Secured Claim, Administrative Expense Claim, Priority Tax Claim, or Spill Claim, or (ii) is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim and not a Spill Claim.

**1.51    Governmental Unit** has the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

**1.52    Impaired** has the meaning ascribed to it in section 1124 of the Bankruptcy Code.

**1.53    Incident** means the occurrence whereby on January 9, 2014, a substance primarily consisting of methylcyclohexanemethanol was released from Tank No. 396 at the Etowah River Terminal onto the facility and into the Elk River in Charleston, WV.

**1.54    Insider** has the meaning set forth in section 101(31) of the Bankruptcy Code and shall mean any Person qualifying as such at any time during the period beginning four years prior to the Petition Date through the Confirmation Date.

**1.55    Insurance Policy** means any policy of insurance covering the Debtor or that may be available to cover the Debtor for claims against the Debtor.

**1.56    Insurer** means any entity that has issued an Insurance Policy to the Debtor.

**1.57    IRC** means the Internal Revenue Code of 1986, as amended.

**1.58    IRS Claim** means the claim filed by the Internal Revenue Service in the Case at claim number 5 on the Claims Register, as amended from time to time.

**1.59    Law** means any law, rule, regulation, order, decree or other requirement having the force of law and, where applicable, any interpretation thereof by an authority having jurisdiction with respect thereto or charged with administration thereof.

**1.60    Lien** means a judicial lien as defined in section 101(36) of the Bankruptcy Code; a lien as defined in section 101(37) of the Bankruptcy Code; a security interest as defined in section 101(51) of the Bankruptcy Code; a statutory lien as defined in section 101(53) of the Bankruptcy Code; and any other lien, interest, charge or encumbrance on assets of the Debtor.

**1.61**   **Person** has the meaning set forth in section 101(41) of the Bankruptcy Code.

**1.62**   **Petition Date** means January 17, 2014.

**1.63**   **Plan** means this amended chapter 11 plan of liquidation, including exhibits, schedules and/or attachments annexed hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the terms hereof.

**1.64**   **Plan Administrators** means collectively, the GC Plan Administrator and the Spill Claim Plan Administrator.

**1.65**   **Preference Actions** mean any actions commenced or that may be commenced before or after the Effective Date pursuant to section 547 of the Bankruptcy Code.

**1.66**   **Priority Tax Claim** means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.67**   **Pro Rata Share** means a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class to the amount of all Allowed Claims in such Class.

**1.68**   **Professional** means any Bankruptcy Court approved professional Person employed by the Debtor or the Committee in the Case at any time before the Confirmation Date.

**1.69**   **Professional Fee Escrow Account** means the escrow account established on the Effective Date and controlled by the CRO from which the CRO on behalf of the Debtor shall pay funds to pay Professionals unpaid fees and expenses required or estimated to be requested by all Professionals for unpaid fees and expenses incurred through the Effective Date.

**1.70**   **Protected Party** means the Debtor, the Spill Claim Plan Administrator, the GC Plan Administrator and CORE Environmental Services, Inc. ("CORE") with respect to services provided on and after the Effective Date.

**1.71**   **Released Party** means collectively, in each case solely in their capacity as such: (a) the Debtor, (b) the CRO,  (c) Chemstream, but only to the extent not already released pursuant to the Chemstream Settlement, (d) the Former Ds and Os and Herzing in his capacity as Sellers' Representative, and (e) Southern; and with respect to the Entities identified in subsections (a) through (e) herein, each of such Entities' respective predecessors, successors and assigns and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors and consultants.

**1.72**   **Releasing Parties** means each of the following in its capacity as such (a) the Debtor, (b) the Estate, (c) Chemstream, but only to the extent it has not already granted releases pursuant to the Chemstream Settlement, (d) the Former Ds and Os and Herzing in his capacity as Sellers' Representative, and (e) Southern.

**1.73**   **Reserve Income** means the interest earned on all funds maintained in the Disputed Claim Reserve on account of a Claim that is Disputed prior to the distribution of such funds (based upon the average rate of interest earned on all accounts and investments in which the Disputed Claim Reserve are invested as estimated by the applicable Plan Administrator).

**1.74**   **Sale Escrow** means the escrowed funds deposited pursuant to the Escrow Agreement. Originally, $3,000,000 was deposited and approximately $2,720,000 currently remains, after taking into account the Sale Escrow Advance.

**1.75**   **Sale Escrow Advance** means an advance of $100,000 from the Sale Escrow to the Debtor on or about May 18, 2015 for the purpose of allowing the Debtor to continue compliance with the Consent Order.

**1.76**   **Schedules** means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms of the Bankruptcy Rules on February 17, 2014 [Docket Nos. 133 and 1334, respectively], as such schedules and statements have been or may be supplemented or amended from time to time through the Confirmation Date.

**1.77**   **Secured Claim** means a Claim (i) in accordance with section 506(a) of the Bankruptcy Code which is secured by Collateral, to the extent of the value of such Collateral (a) as set forth in the Plan, (b) as agreed to by the holder of such Claim and the Debtor, or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

**1.78**   **Secured Creditor** means the holder of an Allowed Secured Claim.

**1.79**   **Southern** means Gary Southern, his heirs and any Entities that Southern currently or formerly owns or controls (including, Blackwater, LLC and Enviromine).

**1.80**   **Southern Contribution** means the sum of $300,000 paid by Southern to the Debtor on the Effective Date, the release of any and all Claims of Southern against the Debtor and its Estate, and the resolution of Southern's appeal of the AIG Settlement Order to the District Court in a manner consistent with the Plan.

**1.81**   **Spill Claim** means a demand, right, right to payment, obligation, cause of action, or other similar claim of any nature whatsoever against the Debtor and the Estate for damages, whether liquidated, unliquidated, contingent, fixed, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured arising from or related to the Incident including, without limitation, for personal injury, business interruption and/or costs incurred in connection with the Incident.

**1.82**   **Spill Claim Counsel** means Mark Ferguson, Anthony Majestro, Jonathan Marshall and Marvin Masters, on behalf of the respective clients holding Spill Claims that they represent.

**1.83**   **Spill Claim Oversight Committee** means a committee established as of the Effective Date initially comprised of 5 individuals including Anthony Majestro, Marvin Masters, Jonathan Marshall, Mark Ferguson and Van Bunch, each of whom is an attorney licensed to practice law in the State of West Virginia, and which committee shall be responsible for oversight all matters contemplated by the Plan to be addressed by the Spill Claim Plan Administrator.

**1.84**   **Spill Claim Plan Administrator** means Robert Johns.

**1.85**   **Voting Class** means a Class designated as such in Article III of the Plan.

**1.86**   **VRP** means the DEP Voluntary Remediation Program.

**1.87    VRP Agreement** means that certain agreement between DEP and the Debtor dated March 30, 2015 establishing the work plan and other obligations of the Debtor under the VRP.

### INTERPRETATION; APPLICATION OF DEFINITIONS AND RULES OF CONSTRUCTION

The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  The words "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation."  A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code or Bankruptcy Rules.  Wherever from the context it appears appropriate, each term stated shall include both singular and plural, and pronouns shall include the masculine, feminine and neuter regardless of how stated.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  The exhibits attached to this Plan, if any, are incorporated into and are part of this Plan as if fully set forth in this Plan.

### ARTICLE II.

### ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

**2.1    Administrative Expense Claims.**

(a)    **Administrative Expense Claims Bar Date**. All requests for the allowance and payment of an Administrative Expense Claim must be filed **as a motion** with the Bankruptcy Court and served upon the Debtor, the Committee prior to the Effective Date and the GC Plan Administrator and Spill Claim Plan Administrator on and after the Effective Date and other parties-in-interest, in accordance with the Bankruptcy Code and the Bankruptcy Rules, no later than the first Business Day that is 30 days after the Confirmation Date or such other date as approved by order of the Bankruptcy Court. Holders of alleged Administrative Expense Claims must satisfy the burden regarding allowance and payment of Administrative Expense Claims applicable in this district. **The failure to file and serve such a motion for allowance and payment of an Administrative Expense Claim timely and properly shall result in the Administrative Expense Claim being forever barred and discharged. For the avoidance of doubt, an Administrative Expense Claim asserted through a proof of claim filed in the Case is invalid unless a timely motion for allowance and payment of an Administrative Expense Claim is filed.**

(b)    **Payment to Holders of Allowed Administrative Expense Claims.** To the extent any non-Professional Administrative Expense Claims are Allowed pursuant to Section 2.1(a) of the Plan, the holder of such Claim will be paid by the Debtor in Cash the Allowed amount of such Claim on the Effective Date or paid by the Spill Claim Plan Administrator in Cash the Allowed amount of such Claim as soon thereafter as practicable unless the holder of such Claim agrees to alternative treatment with the Debtor prior to the Effective Date or the Spill Claim Plan Administrator thereafter.  An amount of $450,000 will be funded on the Effective Date to pay Allowed Administrative Expense Claims including section 503(b)(9) claims.

**2.2    Professional Fee Compensation and Reimbursement Claims.**

(a) ~~Within ten (10) days after the Confirmation Date, all Professionals, including without limitation, ARCADIS US, Inc., shall provide the CRO an accounting of any accrued and unpaid fees owed to the Professional through the Confirmation Date and shall provide an estimate of fees expected to be incurred through the Effective Date. The CRO shall hold an amount as provided in section 2.2(c) herein. The CRO shall maintain and control the Professional Fee Escrow Account, and distribute proceeds thereof in accordance with the Plan and Final Orders of the Bankruptcy Court or other court of competent jurisdiction.~~ **Professionals shall be paid in a manner approved by separate order of the Bankruptcy Court.**

(b) All Professionals or other Persons seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred no later than twenty (20) days after the Effective Date **unless the separate order of the Bankruptcy Court referred to in Section 2.2(a) provides for an alternative requirement**.

(c) On the Effective Date the Professional Fee Escrow Account shall be established for the benefit of Professionals and held by Mark Welch. On the Effective Date, the holder of the Professional Fee Escrow Account shall receive for the benefit of Professionals, 50% of the cash available on the Effective Date, after payment of (i) $1,400,000 to the ERT Remediation Fund, (ii) the allowed principal and accrued interest on the Class 1 Claim of the IRS, (iii) $450,000 for the benefit of allowed or allowable section 503(b)(9) claims, (iv) $2,000 for the benefit of allowed or allowable priority tax claims, (v) $350,000 to the GC Plan Administrator for the benefit of holders of allowed or allowable Class 3 general unsecured claims, (vi) $500,000 to the Spill Claim Plan Administrator for the benefit of Class 4 Convenience Spill Claims and (vii) an amount not to exceed ~~$100,000~~**50,000** to McGuireWoods for actual, necessary and documented costs incurred for service of the Plan, Disclosure Statement and related notices or documents (collectively, (i) through (vii) are the "Fixed Plan Payments") less $200,000 to account for the corresponding increase in item (iii) above. **It is estimated that the sum of approximately $1,195,983 will be paid into the Professional Escrow Account on the Effective Date.** The holder of the Professional Fee Escrow Account shall also receive for the benefit of Professionals, 50% of the residual amount, if any, of the ERT Remediation Fund remaining after taking into account post-Effective Date testing costs and costs of CORE, on such date as DEP issues a certificate of completion for the Etowah River Terminal. The holder of the Professional Fee Escrow Account shall receive for the benefit of Professionals, 25% of all net proceeds of retained Causes of Action until such time as all Allowed Professional fees and expenses are paid in full. In the event that there are not sufficient funds available to pay all Allowed fees and expenses of Professionals the full amount of fees and expenses allowed by Final Order of the Bankruptcy Court or other court of competent jurisdiction, all Professionals shall be paid in a manner such that each Professional receives the same percentage of allowed fees and expenses as all other Professionals, after taking into account interim payments made to each applicable professional on account of allowed fees and expenses since the Petition Date. In the event that the holder of the Professional Fee Escrow Account determines to make multiple distributions to holders of Professional Fee and Expense Claims, the holder of the Professional Fee Escrow Account shall cause to be reserved the full amount of any Professional fees and expenses subject to dispute or challenge in the Bankruptcy Court or other court of competent jurisdiction until such time as a Final Order has been entered with respect to any such disputed Professional Fees and Expenses.

**2.3    Fees Under 28 U.S.C. §1930.**  All fees payable in the Case under 28 U.S.C. §1930, as agreed by the CRO or as determined by the Bankruptcy Court, will, if not previously paid by the Debtor, be paid in Cash on the Effective Date or as soon thereafter as is practicable by the Spill Claim Plan Administrator, and will continue to be paid by the Spill Claim Plan Administrator as required under 28 U.S.C. §1930 until such time as an order is entered by the Bankruptcy Court closing the Case.

## ARTICLE III.

### CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table designates the Classes of Claims against and Equity Interests in the Debtor and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (iii) deemed to reject the Plan:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | IRS Secured Claims | Impaired | Yes |
| Class 2 | Priority Tax Claims | Impaired | Yes |
| Class 3 | General Unsecured Claims | Impaired | Yes |
| Class 4 | Spill Claim Convenience Class | Impaired | Yes |
| Class 5 | Spill Claims | Impaired | Yes |
| Class 6 | Equity Interests | Impaired | No (deemed to Reject) |

## ARTICLE IV.

### TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1    Class 1 – IRS Secured Claims**.  In full and complete satisfaction of the Class 1 Secured Claim of the IRS, on the Effective Date, the unpaid principal and interest components of the Class 1 Secured Claim of the IRS will be deemed an Allowed Claim and the IRS will be paid in Cash the unpaid principal and interest portions of this Claim estimated to total approximately $584,525.  In consideration of the allowance and payment of this Claim on the Effective Date, the IRS will waive all penalty amounts associated with this Claim upon receipt of payment in respect of the IRS Class 1 Secured Claim.

**Class 1 is impaired under the Plan.  Holders of Allowed Class 1 Claims are entitled to vote to accept or reject the Plan.**

**4.2    Class 2 – Priority Tax Claims**.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, holders of Allowed Priority Tax Claims, if any, shall be paid in Cash by the CRO on the Effective Date, or if any such Claim is Disputed, then the Spill Claim Plan Administrator will pay the full amount of any such Allowed Priority Tax Claim as soon as reasonably practicable following allowance of any or all such portion(s) of a Disputed Priority Tax Claim.  In the event that any Priority Tax Claim is Disputed as of the Effective Date the CRO and the Spill Claim Plan Administrator will agree to an amount to be held by the Spill Claim Plan Administrator in its Disputed Claim Reserve, and on the Effective Date the CRO will pay such amount to the Spill Claim Plan Administrator.

**Class 2 is impaired under the Plan.  Holders of Allowed Class 2 Claims are entitled to vote to accept or reject the Plan.**

**4.3    Class 3 – General Unsecured Claims.**  On the Effective Date, the GC Plan Administrator shall be paid $350,000 for the benefit of holders of Allowed Class 3 General Unsecured Claims.  After establishing reserves in an amount sufficient to address costs of administration and Disputed Class 3 General Unsecured Claims, the GC Plan Administrator will make a pro rata distribution to holders of

Allowed Class 3 Claims as soon as reasonably practicable after the Effective Date in accordance with the Plan.  In addition to receipt of $350,000 on the Effective Date, the GC Plan Administrator, for the benefit of the holders of Allowed Class 3 Claims, will participate with the Spill Claim Plan Administrator in receipt of twenty five (25%) percent of net recoveries from Causes of Action not otherwise released under the Plan, after reimbursement of all fees and expenses associated with such Causes of Action, until such time as all Allowed Professional Fee and Expense Claims are paid in full, then fifty (50%) percent of net recoveries from Causes of Action not otherwise released under the Plan, after reimbursement of all fees and expenses associated with such Causes of Action up to a maximum recovery by the GC Plan Administrator on behalf of holders of Class 3 Claims and the holder of the Professional Fee Escrow Account of $7,000,000.  The GC Plan Administrator will distribute proceeds of Causes of Action on a pro rata basis to holders of Allowed Class 3 Claims in accordance with the Plan as soon as reasonably practicable following receipt of such proceeds by the GC Plan Administrator.  Upon the Effective Date, the Debtor and the Estate will waive and release Preference Actions against holders of General Unsecured Claims.

**Class 3 is impaired under the Plan.  Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.**

**4.4   Class 4 – Convenience Spill Claims.**  In full and complete satisfaction of all Class 4 Convenience Class Spill Claims, on the Effective Date, the Spill Claim Plan Administrator shall be paid $500,000 for the benefit of the holders of Class 4 Convenience Class Spill Claims.  On or as soon as practicable following the Effective Date, the Spill Claim Plan Administrator will pay each holder of a Class 4 Convenience Class Spill Claim their pro rata share of $500,000.  **This payment is a one time only payment  and no further payments will be made to the holders of Class 4 Convenience Class Spill Claims.**  The Spill Claim Plan Administrator will use his or her best efforts to make distributions to the holders of Allowed Class 4 Convenience Class Spill Claims as soon as practical after the Effective Date in accordance with the Plan.  The Spill Claim Plan Administrator has the authority to compromise and settle Class 4 Convenience Class Spill Claims and to make distributions to holders of Allowed Class 4 Convenience Class 4 Spill Claims without Bankruptcy Court authority.   The Spill Claim Plan Administrator will file a notice with the Bankruptcy Court: (a) identifying the date of distribution to holders of Allowed Class 4 Convenience Class 4 Spill Claims; and (b) listing the claim number and amount of the distribution (the "Class 4 Convenience Spill Claim Distribution Notice").  The Spill Claim Plan Administrator will file the Class 4 Convenience Spill Claim Distribution Notice on or before fifteen (15) days after the distribution date**.  Fees and costs of the Spill Claim Plan Administrator in administering and distributing the $500,000 aggregate payment to the holders of Class 4 Convenience Class Spill Claims will be paid from the initial payment made to the Spill Claim Plan Administrator in respect of Class 5 Claims and capped at actual and necessary out-of-pocket costs plus [$20,000]**.

**Class 4 is impaired under the Plan.  Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.**

**4.5   Class 5 – Spill Claims.**  On the Effective Date, the Spill Claim Plan Administrator shall receive for the benefit of allowed or allowable Class 5 Spill Claims, $200,000 more than 50% of the cash available on the Effective Date, after payment of the Fixed Plan Payments.  **This amount is estimated to be approximately $1,595,983 on the Effective Date.**  The Spill Claim Plan Administrator shall also receive for the benefit of allowed or allowable Class 5 Claims, 50% of the residual amount, if any, of the ERT Remediation Fund remaining after taking into account post-Effective Date testing costs and costs of CORE, on such date as DEP issues a certificate of completion for the Etowah River Terminal.  The Spill Claim Plan Administrator shall receive for the benefit of holders of allowed or allowable Class 5 Spill Claims 50% of all net proceeds of retained Causes of Action until such time as the GC Plan Administrator

and the holder of the Professional Fee Escrow Account receive an aggregate amount of $7,000,000 from proceeds of Causes of Action, and then the Spill Claim Plan Administrator shall receive 100% of the net proceeds of retained Causes of Action. The Good Plaintiffs will, as promptly as reasonably practicable, take all reasonable steps to obtain approval from the District Court for authority to pay to the Spill Claim Plan Administrator the lesser of (x) $300,000 or (y) $2,199,318, less the amount of the distribution that the Spill Claim Plan Administrator receives on the Effective Date for the benefit of the holders of Class 5 Claims. The Good Plaintiffs will make this payment from proceeds of the settlement consideration paid to the Good Plaintiffs by Southern for purposes of reimbursing the holders of Class 5 Spill Claims the amount allocated from the holders of Class 5 Spill Claims to the ERT Remediation Fund, and shall pay such amount to the Spill Claim Plan Administrator as promptly as practicable upon approval by the District Court.

**Class 5 is impaired under the Plan. Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.**

**4.6   Class 6 – Equity Interests**. On the Effective Date, all Equity Interests in the Debtor shall be deemed cancelled without further action by the Debtor, and 100% of new equity interests in the Debtor shall be issued to the Spill Claim Plan Administrator or its designee for the benefit of the holders of Class 5 Spill Claims on the Effective Date. No holder of a Class 6 Equity Interest in the Debtor shall receive or retain any property or interest in property on account of such Equity Interest.

**Class 6 is impaired under the Plan, and the holders of Allowed Class 6 Equity Interests are deemed to reject the Plan.**

## ARTICLE V.

## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

**5.1   Settlements and Compromises as the Foundation of the Plan**. The foundation of the Plan is a series of interdependent settlements and compromises involving numerous parties in interest in the Case. These settlements and the Chemstream Settlement previously approved by the Bankruptcy Court, provide the basis for funding of the Plan and allow for the negotiated distributions provided for under the Plan on the Effective Date. Given the interdependence of the settlements and compromises embodied in the Plan, if any single settlement were not approved, the entirety of the Plan becomes non-feasible either as a result of the execution risks associated with the Plan or the inability of the Debtor to fund negotiated obligations under the Plan.

(a)    **Southern**. The Estate owns potential Causes of Action against Southern. These Causes of Action may include Claims for breach of duty, fraudulent conveyance, unjust enrichment, preferential transfers, among others. The Debtor has evaluated these potential Causes of Action, potential defenses to the potential Causes of Action and collectability in the event that a hypothetical judgment were obtained in respect of the Causes of Action against Southern, and determined in the context of this Case that settlement rather than litigation of Causes of Action is in the best interests of the Debtor, its Estate and creditors. A summary of the CRO's analysis of potential Causes of Action against Southern will be filed under separate cover in support of the Plan. In resolution of potential Causes of Action by the Estate against Southern, on the Effective Date, Southern will pay the Southern Contribution. Resolution of the Southern appeal to the District Court of the AIG Settlement Order allows the AIG Settlement Proceeds of $3,108,490.87 to be paid into the Estate on the Effective Date for the benefit of creditors as provided for in this Plan. Likewise, the AIG Settlement Proceeds will be received free and clear of any right of Southern to assert claims or interests in these proceeds. Southern has alleged that he is an additional insured party under the AIG Policies and that he has coverage rights with payment priority over certain parties in interest that

assert rights in and to the AIG Settlement Proceeds. In exchange for the Southern Contribution and the payment of additional release consideration to the plaintiffs in the Good Case in the amount of $350,000 outside of the Plan, Southern will be released of all Causes of Action by the Debtor and the Estate. Also, in exchange for the Southern Contribution, plaintiffs in the Good Case (and the additional release consideration of $350,000), and plaintiffs in the Bar 101 Case among others, will be bound by the releases provided for in Section 11.11 of the Plan. A portion of the $350,000 release consideration that Southern is to pay the plaintiffs in the Good Case will be paid over to the Spill Claim Plan Administrator in accordance with Section 4.5 of the Plan. The Debtor has provided its evaluation and analysis to the Committee and Spill Claim Counsel. The Committee and Spill Claim Counsel support the settlement with Southern if it is approved in conjunction with the Plan.

(b)     **The Former Ds and Os**. The Estate owns potential Causes of Action against the Former Ds and Os. These Causes of Action may include claims for breach of duty, fraudulent conveyance, unjust enrichment, preferential transfers and veil piercing, among others. The Debtor has evaluated these potential Causes of Action, potential defenses to the potential Causes of Action and collectability in the event that one or more hypothetical judgments were obtained in respect of the Causes of Action against the Former Ds and Os, and determined in the context of this Case that settlement rather than litigation of the Causes of Action is in the best interests of the Debtor, its Estate and creditors. A summary of the CRO's analysis of potential Causes of Action against the Former Ds and Os will be filed under separate cover in support of the Plan. In resolution of potential Causes of Action by the Estate against the Former Ds and Os, on the Effective Date, the Former Ds and Os and Herzing in his capacity as Sellers' Representative will provide the Former Ds and Os Contribution. Each of Chemstream, as Buyer beneficiary under the Sale Escrow, and the Former Ds and Os, as Sellers through Herzing as Sellers' Representative under the Sale Escrow, assert competing rights and claims in and to the Sale Escrow. As of the Petition Date, the Debtor had no property interest in the Sale Escrow, and thus the Debtor would not be entitled to receive any portion of the Sale Escrow. In accordance with the Chemstream Settlement, following the effective date of the Chemstream Settlement, Chemstream assigned its right, title and interest in and to the Sale Escrow to Freedom. Freedom covenants and agrees with the Former Ds and Os and the Sellers' Representative that with respect to the Sale Escrow, Freedom is bound by the terms and conditions of the Sale Escrow Agreement dated as of December 6, 2013, including without limitation, provisions relating to draws on the Sale Escrow and venue for dispute resolution. Freedom shall not seek to draw on the Sale Escrow until either (i) the date on which Chemstream, the Former Ds and Os and the Sellers' Representative execute a mutual release agreement substantially similar to the mutual release exchanged among those parties on April 24, 2015, the execution of which is a condition to the Effective Date and the occurrence of the Effective Date, or (ii) the date on which the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code or a successor to the CRO is appointed by order of the Bankruptcy Court. Any successor to the CRO shall be bound by this provision. Proceeds of the Sale Escrow distributed on the Effective Date shall be deemed to have been distributed proportionally to the ERT Remediation Fund and the Spill Claim Plan Administrator for the benefit of holders of Class 4 and Class 5 Claims. If the Court were not to confirm the Plan, the Debtor would be required to litigate with the Former Ds and Os regarding respective rights to the Sale Escrow. The Former Ds and Os also agree to waive and release any and all claims in and to the AIG Settlement Proceeds notwithstanding that they have alleged that they are additional insured parties under the AIG Policies. In exchange for the Former Ds and Os Contribution, the Former Ds and Os will be released of all Causes of Action by the Debtor and the Estate. The Debtor has provided its evaluation and analysis to the Committee and Spill Claim Counsel. The Committee and Spill Claim Counsel support the settlement with the Former Ds and Os and Herzing in his capacity as Sellers' Representative if it is approved in conjunction with the Plan.

(c)     **Proceeds Allocation**. As part of the Plan negotiation process, the Debtor, the Committee and Spill Claim Counsel agree to an allocation of amounts equal to the amount of the AIG Settlement Proceeds such that on the Effective Date $350,000 will be paid to the GC Plan Administrator for

the benefit of holders of Class 3 General Unsecured Claims, $500,000 will be paid to the Spill Claim Plan Administrator for the benefit of holders of Class 4 Convenience Class Spill Claims, and an amount as set forth in Section 4.5 will be paid to the Spill Claim Plan Administrator for the benefit of the holders of Class 5 Spill Claims.

(d)   **Estate Waiver and Release of Preference Actions**.  As part of the negotiation of terms and conditions of the Plan between the Debtor and the Committee, following an evaluation of potential Preference Actions and potential defenses to Preference Actions, it was agreed that on the Effective Date, the Debtor will waive and release all Preference Actions.  The Debtor evaluated potential Preference Actions and potential defenses to such Preference Actions and determined in the context of this Case that a waiver and release of Preference Actions is in the best interests of the Debtor, its Estate and creditors.  In particular, the Debtor submits that until the date of the Incident, the Debtor was solvent, and thus any payments made by the Debtor prior to the date of the Incident that may be subject to a Preference Action would be subject to a solvency defense by defendants to such Preference Actions.  The Debtor has provided its evaluation and analysis to the Committee.  The Committee supports the waiver and release of Preference Actions against the holders of General Unsecured Claims if it is approved in conjunction with the Plan.

**5.2   Payment of Cash to the Plan Administrators and Issuance of Equity Interests in the Debtor to The Spill Claim Plan Administrator.**

(a)   On the Effective Date, the Debtor shall pay Cash to the Plan Administrators as designated in the Plan and issue Equity Interests in the Debtor to the Spill Claim Plan Administrator.

(b)   On the Effective Date, as a result of the issuance of Equity Interests in the Debtor to the Spill Claim Plan Administrator, all of the Debtor's privileges, including, but not limited to, corporate privileges, confidential information, work product protections, attorney-client privileges, and other immunities or protections (the "Privileges") shall be transferred, assigned and delivered to the Spill Claim Plan Administrator, without waiver, limitation or release, and shall vest with the Spill Claim Plan Administrator for the benefit of the holders of Class 5 Claims.  The Spill Claim Plan Administrator shall hold and be the beneficiary of all Privileges and entitled to assert all Privileges.

(c)   The transfer of Cash to the Plan Administrators shall be made for the benefit of the holders of Class 3, Class 4 and Class 5 Claims, respectively, but only to the extent that holders of Class 3, Class 4 and Class 5 Claims are entitled to distributions under the Plan.

(d)   The Plan Administrators shall be subject to the terms and conditions of the Plan and the Confirmation Order.

(e)   The designation of the Plan Administrators shall be effective on the Effective Date without the need for a further order of the Bankruptcy Court. The Plan Administrators shall exercise reasonable business judgment in the exercise of their duties under the Plan.

(f)   The Plan Administrators may invest Cash paid to them in accordance with the Plan for the benefit of the holders of Class 3 Claims and Class 5 Claims, respectively in short term overnight investments or longer term investments as permitted by section 345 of the Bankruptcy Code.

(g)   The costs and expenses of the fulfillment of duties of the Plan Administrators under the Plan, including the fees and expenses of the Plan Administrators and their respective retained professionals, shall be paid by the Plan Administrators from the Cash received under the Plan. Such costs and expenses shall be treated with a first priority right of distribution, and without prior approval by the Bankruptcy Court. Each Plan Administrator shall retain such amounts as are reasonably necessary (at the

discretion of the Plan Administrators) to meet the future fees and expenses expected to be incurred in administering obligations of each Plan Administrator under the Plan.

(h)     **Compensation of the Plan Administrators**.  The Plan Administrators shall be entitled to reasonable compensation paid from the Cash distributions provided for under the Plan. Compensation to the Spill Claim Plan Administrator shall be approved by the Spill Claim Oversight Committee.  Compensation to the GC Plan Administrator shall be approved by the Committee prior to the Effective Date.

(i)     **Distributions.**  The Plan Administrators shall make distributions in accordance with the Plan, beginning as soon after the Effective Date as is deemed practicable by the Plan Administrators in their respective reasoned judgment, from Cash received under the Plan and proceeds of the Causes of Action, except with respect to such amounts (i) as would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed prior to the time of such distribution (but only until such Claim is resolved); (ii) as are reasonably necessary to meet contingent liabilities; (iii) to pay reasonable expenses; and (iv) to satisfy other liabilities incurred by the Plan Administrators in accordance with this Plan.

(j)     **Retention of Professionals by the Plan Administrators.**  The Plan Administrators shall be entitled to engage professionals to assist the Plan Administrators in fulfilling their duties under the Plan. Professionals engaged by a respective Plan Administrator shall be compensated in accordance with Section 5.2(h) of the Plan.  The Plan Administrators may, in their sole discretion, retain the services of counsel to the Committee.

(k)     **Authority to Settle and Grant Releases.**  Without limiting the generality of this Section, in connection with the compromise and settlement of any Causes of Action not otherwise waived and released under the Plan, the Spill Claim Plan Administrator is authorized to settle Causes of Action of the Debtor and the Estate, and release and discharge, to the fullest extent permitted by applicable Law, non-Debtor parties to Causes of Action of the Debtor and the Estate from all Causes of Action to which the Spill Claim Plan Administrator is a party in accordance with the Plan, subject to approval by the Bankruptcy Court. Any such settlement and/or release, however, shall be subject to prior written consent of the (i) GC Plan Administrator, and (ii) until Allowed Claims of Professionals are paid in full, the holder of the Professional Fee Escrow Account. Any settlement effectuated prior to the Confirmation Date, upon approval thereof by the Bankruptcy Court or other court of competent jurisdiction, shall be deemed incorporated into the Plan by reference, and entry of the Confirmation Order, including provisions of such settlement, shall be deemed a settlement pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019. The Spill Claim Plan Administrator shall have the authority to settle or otherwise dispose of any Disputed Class 5 Claim or Cause of Action of the Debtor and the Estate (with prior written approval by the GC Plan Administrator) subject to approval of the Bankruptcy Court. The GC Plan Administrator shall have the right to settle or otherwise dispose of any Disputed Class 3 Claim subject to approval by the Bankruptcy Court.

(l)     **Attorney-Client Privilege**.  Any attorney-client privilege, work-product privilege or other privilege or immunity that Debtor or the Estate are entitled to assert shall vest in the Spill Claim Plan Administrator on and after the Effective Date, and the Spill Claim Plan Administrator shall be entitled to assert such privilege and immunity to the same extent that the Debtor or the Estate were entitled to do so prior to the Effective Date.  For purposes of clarity, this Section 5.2(l) is not intended to expand or restrict the rights, if any, of third parties to their own privileges or any common interest or joint privileges.  Such privileges, if any, are not waived or transferred by this provision.

(m)     **Federal Income Tax Treatment of Plan ~~Administrator~~Administrators.**  The Plan provides for the appointment of the GC Plan Administrator and the Spill Claim Plan Administrator on the Effective Date to address claims and distributions.  For tax purposes, the following options are available

to the Plan Administrators on the Effective Date and are the most likely treatment for assets and claims in the circumstances of this Plan:.  **The Plan Administrators, after consultation with their professionals, may determine in their discretion, to elect one of these approaches, or may alternatively determine in their discretion not to undertake such approaches.  The goal of any such approach taken by the Plan Administrators is for purposes of simplicity of administration and minimizing tax consequences, if any, of administration.  Upon making such determination after the Effective Date, the Plan Administrators shall file notice of the same with the Bankruptcy Court.**

1.      <u>Qualified Settlement Fund (QSF)</u>.  The assets of the Debtor required to be distributed to the Plan Administrators may be transferred t to a QSF.  The QSF is treated as a separate taxpayer.  The transfer of assets to the QSF is not taxable to the QSF; that is, it receives the assets without such receipt being treated as income.  Similarly, it pays no tax on the distribution of the assets to the creditors or claimants.  The QSF does pay tax on any income it earns.  In most cases, this is interest.  The QSF treats its administrative costs as deductible expenses.  Thus, only if its income exceeds its expenses does it pay tax.  It files a Form 1120-SF, which it must file even if it has a loss.  When the QSF makes distributions to the creditors or claimants, it may be required to issue Forms 1099-MISC.

2.      <u>Liquidating Trust</u>.  Subject to appropriate documentation, on the Effective Date, distributions payable to the Plan Administrator in accordance with the Plan may be paid to a liquidating trust.  Although the assets are actually transferred to the Liquidating Trust, the liquidating trust approach treats the Debtor's assets as if the assets were first distributed to the holders of Allowed Claims and such holders of Allowed Claims then contributed the assets to the liquidating trust.  This constitutes a completed transfer of the assets by the Debtor.  At the time of the deemed distribution to the creditors, the creditors determine the tax consequence of the deemed distribution – usually a business bad debt deduction for the creditors.  Because the creditors are treated as having contributed the assets to the liquidating trust, each of them is a grantor to the extent of the assets it contributed.  The mechanics of the tax filings for the liquidating trust would likely require the filing of a Form 1041 and provide a statement to each grantor of its portion of the trust's income and expenses.

3.      <u>Plan Administrator Deemed as Holding Assets for Benefit of Applicable Claimants</u>.  Rather than treating the assets as transferred to a liquidating trust, the assets might be treated as transferred to the Plan Administrator in trust for the benefit of creditors and claimants.  The Plan might be treated as a simple trust.  The Plan Administrators would determine the items of income and expenses and distribute any distributable net income to the applicable holders of Allowed Claims.  There would likely be no taxable income because the expenses would exceed the income.  The Plan Administrators respectively, as trustees would file a Form 1041 for the trust and issue Schedules K-1 to the holders of Allowed Claims.

4.      <u>Plan Administrators Treated as Controlling Assets of the Debtor</u>.  The Plan Administrators could be treated as taking control of the Debtor's assets without the tax ownership of the assets ever leaving the Debtor.  If there is any income earned, the Debtor would be responsible for any required taxes and the Spill Claim Plan Administrator, by virtue of the control exercised over the Debtor, would be responsible for filing tax returns on behalf of the Debtor.

(n)      **Dissolution.**  After the Effective Date, Freedom Industries, Inc. shall be dissolved and the Spill Claim Plan Administrator discharged at such time as (i) all Disputed Class 5 Claims have been resolved, (ii) all Causes of Action have been settled and resolved or judgments entered by Final Order and liquidated, and (iii) all distributions required to be made by the Spill Claim Plan Administrator under the Plan have been made.  The GC Plan Administrator shall be discharged at such time as all distributions

17

required under the Plan to holders of Allowed Class 3 Claims have been made.  Freedom Industries, Inc. shall only exist for a period as long as is necessary to facilitate or complete the recovery and liquidation of the Causes of Action and distribution of their proceeds.  The Spill Claim Plan Administrator shall not unduly prolong the duration of Freedom Industries, Inc.  and shall at all times endeavor to resolve, settle or otherwise dispose of all Causes of Action, and to effect the distribution of the proceeds of the Causes of Action in accordance with the terms hereof, and dissolve Freedom as soon as practicable.

(o)    **Indemnification of Plan Administrators.**  The Plan Administrators and their respective agents and professionals shall not be liable for actions taken or omitted in their capacity as, or on behalf of, the holders of Claims for whose benefit each respective Plan Administrator is appointed, except those acts, or omissions as determined by Final Order of a court of competent jurisdiction, arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Plan Administrators, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty; or *ultra vires* acts.

**5.3**    **Distributions to Holders as of the Confirmation Date.**  As of the close of business on the Confirmation Date, the Claims Register, the equity register and transfer and other registers as maintained by the Clerk of the Bankruptcy Court, will be closed and there will be no further changes in the record holder of any Claim or Equity Interest.  The Plan Administrators will have no obligation to recognize any transfer of any Claim or Equity Interest occurring after the Confirmation Date.  The Plan Administrators will instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Schedules and/or Claims Register, as the case may be, and other registers as of the close of business on the Confirmation Date.

**5.4**    **Closing of Case by Charitable Gift.**  If at any time either or both of the Plan Administrators determine (and in the instance of the Spill Claim Plan Administrator with consent of the Spill Claim Oversight Committee) that the expense of administering matters for which a Plan Administrator is responsible under the Plan is likely to exceed the value of the Cash remaining in the possession of a Plan Administrator, the respective Plan Administrator may apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to close the Case; (ii) donate any balance of the Cash to a charitable organization exempt from federal income tax under section 501(c)(3) of the Tax Code that is unrelated to the Debtor and any Insider of the Debtor; and (iii) close the Case in accordance with the Bankruptcy Code and Bankruptcy Rules.  Notice of such application shall be given electronically, to the extent practicable, to those parties who have filed requests for notices and whose electronic addresses remain current and operating.

**5.5**    **Release of Liens**.  Except as otherwise specifically provided in or contemplated by the Plan or in any contract, instrument or other agreement or document created in connection with the Plan, each holder of:  (a) any purported Secured Claim and/or (b) any judgment, personal property or *ad valorem* tax, molder, warehouse or artisan or similar Lien, in each case regardless of whether such Claim is an Allowed Claim, shall, on the Effective Date and regardless of whether such Claim has been scheduled or proof of such Claim has been filed:  execute such documents and instruments as the Spill Claim Plan Administrator requires to evidence the holder of a Claim's release of such property or Lien, and if such holder refuses to execute appropriate documents or instruments, the Spill Claim Plan Administrator, in its discretion, may file a copy of the Confirmation Order in the appropriate recording office, which shall serve to release any holder of a Claim's rights in such property.

**5.6**    **Cancellation of Existing Securities and Security Agreements**.  On the Effective Date, except as expressly provided in this Plan, the securities, promissory notes, trust indentures, share

certificates, security agreements, deeds of trust, collateral agency agreements and other instruments evidencing or securing a Claim shall be deemed cancelled without further act or action under any applicable agreement or Law, and the obligations of the Debtor and the Spill Claim Plan Administrator, as successor to the Debtor under the agreements, instruments, trust indentures and certificates governing and securing such Claims, as the case may be, shall be discharged.

     **5.7**    **Plan Administrators' Post-Confirmation Role as of the Effective Date**.  All rights and obligations of the Debtor under this Plan that exist or continue after the Effective Date other than the role of the CRO in administering the Professional Fee Escrow Account shall vest in the respective Plan Administrators pursuant to the terms of the Plan and shall be rights and obligations exercisable exclusively by each respective Plan Administrator after the Effective Date.  Other than administering the Professional Fee Escrow Account, the CRO shall be released of all duties and obligations to the Debtor, the Estate and creditors after the Effective Date.  Subject to Bankruptcy Court approval at a hearing scheduled on July 28, 2015, CORE Environmental Services, Inc. ("CORE"), shall serve as the licensed remediation specialist consistent with the terms and conditions of the Chemstream Settlement Agreement, and shall conduct remediation of the Etowah River Terminal site in accordance with a remediation plan approved by DEP. As of the Effective Date, control of the ERT Remediation Fund (as the term is defined in the Chemstream Settlement) shall vest in the Spill Claim Plan Administrator, who shall be subject to the terms and conditions of the Chemstream Settlement.

     (a)    **General Powers.**

     (i)    In furtherance of and consistent with the purpose of the Plan, the GC Plan Administrator shall exclusively (A) have the power and authority to hold, manage, sell and distribute the Cash to holders of Class 3 Claims in accordance with the Plan, (B) have the power and authority to object or consent to the proposed resolution of any Cause of Action by the Spill Claim Plan Administrator in accordance with the Plan, (C) have the power and authority to prosecute and resolve objections to Disputed Class 3 Claims subject to the Plan, and (D) have the power and authority to perform such other functions as are provided in the Plan. In all circumstances, the GC Plan Administrator shall act in the best interests of the holders of Class 3 Claims and in furtherance of the purpose of the Plan.

     (ii)    In furtherance of and consistent with the purpose of the Plan, the Spill Claim Plan Administrator shall act in the best interests of the holders of Class 4 and Class 5 Claims.  The Spill Claim Plan Administrator, in consultation with the Spill Claim Oversight Committee shall exclusively (A) have the power and authority to hold, manage and distribute Cash distributable to holders of Class 4 and Class 5 Claims  in accordance with the Plan, (B) have the power and authority to prosecute any Cause of Action in accordance with the Plan, provided, however, that any such Cause of Action is not waived or released under the Plan, (C) have the power and authority to prosecute and resolve objections to Disputed Class 5 Claims subject to the Plan, (D) have the power and authority to perform such other functions as are provided for in the Plan, and (E) have the power and authority to administer the dissolution of Freedom Industries, Inc. and closure of the Case.

     (b)    **Claims Administration, Prosecution of Objections to Claims, and Plan Distributions.**

     (i)    The GC Plan Administrator shall have the exclusive power and authority to prosecute and resolve objections to all Disputed Class 3 Claims in accordance with the Plan.  The GC Plan Administrator shall have the exclusive right, power and authority to retain and assert all defenses, rights of setoff, recoupment and counterclaims with respect to each of the foregoing.  The GC Plan Administrator shall also have the power and authority to hold, manage and distribute Plan distributions to the holders of Allowed Class 3 Claims consistent with applicable provisions of the Plan.

(ii)      The Spill Claim Plan Administrator shall have the exclusive power and authority to prosecute and resolve objections to Disputed Class 5 Claims in accordance with the Plan.  The Spill Claim Plan Administrator shall have the exclusive right, power and authority to retain and assert all privileges, defenses, rights of setoff, recoupment and counterclaims with respect to any Spill Claim.  The Spill Claim Plan Administrator shall also have the power and authority to hold, manage and distribute Plan distributions to the holders of all Class 4 Convenience Class Claims and Allowed Spill Claims consistent with applicable provisions of the Plan.

**5.8      Books and Records**.

(a)      Unless applicable non-bankruptcy Law permits the distribution or destruction of certain of the Debtor's business records at an earlier date, the Spill Claim Plan Administrator shall have the responsibility of storing and maintaining books and records until one year after the Effective Date, after which time such books and records may, at the sole discretion of the Spill Claim Plan Administrator, on no less than thirty (30) days' notice to the mailing matrix in the Case, Chemstream, Herzing in his capacity as Sellers' Representative, and to the GC Plan Administrator, be abandoned or destroyed without further Bankruptcy Court order, unless applicable non-bankruptcy law requires the retention and maintenance of any such books and records for a longer period, in which instance the Spill Claim Plan Administrator shall retain such books and records for at least the minimum period required by applicable non-bankruptcy law. For purposes of this section, books and records include computer generated or computer maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtor maintained by or in possession of third parties and all of the claims and rights of the Debtor and in and to their books and records, wherever located.

(b)      The Spill Claim Plan Administrator shall make the Debtor's books and records available for copying and/or inspection by: (i) the GC Plan Administrator upon reasonable written request; (ii) Chemstream and Herzing as the Sellers' Representative upon reasonable written request; and (iii) third parties by subpoena, which shall not be considered a violation of any bankruptcy stay or any injunction set forth in the Plan or the Confirmation Order or order of the Bankruptcy Court.

**5.9      Effectuating Documents and Further Transactions**.  The Debtor and each of the Plan Administrators, as the case may be, are authorized and directed to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## ARTICLE VI.

## PROVISIONS GOVERNING CLASS 5 SPILL CLAIMS AND
## THE SPILL CLAIM PLAN ADMINISTRATOR

**6.1      Responsibility for Distributions to Holders of Allowed Spill Claims by the Spill Claim Plan Administrator; Transfer of Defenses to Spill Claim Plan Administrator**.  On the Effective Date, in exchange for funding in accordance with Section 3.5 of the Plan, the Spill Claim Plan Administrator shall be deemed, without need for further action, to have assumed all responsibility for distributions to holders of Allowed Spill Claims in accordance with the Plan and the Confirmation Order. On and after the Effective Date, all privileges, defenses, rights, or claims of the Debtor and the Estate for purposes of pursuing litigation arising out of or related to the Incident shall be transferred to the Spill Claim Plan Administrator.

**6.2      Class 5 Spill Claims Allowance Procedures**.  The Spill Claim Plan Administrator in consultation with the Spill Claim Oversight Committee, shall, as promptly as practicable following the

Effective Date, develop a process and procedure for the estimation and/or allowance of unliquidated or Disputed Class 5 Spill Claims. The Spill Claim Plan Administrator shall have full power and authority to take any action to effectuate a procedure for the estimation and/or allowance of Class 5 Spill Claims subject to Bankruptcy Court approval.

**6.3     Good Faith Resolution of Spill Claims by Debtor**. The provisions of the Plan relating to the treatment of Class 4 and Class 5 Claims were negotiated at arms' length between the Debtor, the Committee and representatives of certain holders of Spill Claims, including, without limitation, Spill Claim Counsel. The provisions of the Plan represent a good faith resolution of the treatment of all Spill Claims by the Debtor.

**6.4     Spill Claims Injunction**. Except as otherwise expressly provided in the Plan and expressly subject to Section 11.15 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under sections 1123(b)(6) and 105(a) of the Bankruptcy Code or otherwise, in order to preserve and promote the actions contemplated by the Plan and in order to protect the Spill Claim Plan Administrator and to preserve the assets that the Spill Claim Plan Administrator will administer for the benefit of the holders of Spill Claims, the Confirmation Order will provide the following injunction to take effect as of the Effective Date:

Except as otherwise provided in Section 11.15, any Entity that holds or asserts, or which may in the future hold or assert a Spill Claim, or Contribution Claim that is otherwise subject to disallowance under the Bankruptcy Code or applicable state law, or allocation, subrogation, indemnity or similar claims arising from or relating to the Incident or any such Spill Claim against the Debtor shall be permanently stayed, restrained, and enjoined from taking any action against a Protected Party for the purpose of, directly or indirectly, collecting, recovering, or receiving payments, satisfaction, or recovery with respect to, relating to, arising out of, or in any way connected with a Spill Claim or for contribution, allocation, subrogation, indemnity or similar claim, either directly or derivatively through the Debtor, based on or relating to a Spill Claim, whenever and wherever arising or asserted, all of which will be channeled to the assets held by the Spill Claim Plan Administrator for resolution as set forth in the Plan and/or as provided in a Spill Claim liquidation procedure as established after the Effective Date by the Spill Claim Plan Administrator in consultation with the Spill Claim Oversight Committee, and subject to Bankruptcy Court approval. The actions so enjoined include, but are not limited to:

(i)     commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any Spill Claim against or affecting the Debtor, any property or interest of a Protected Party;

(ii)     enforcing, levying, attaching (including through any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order arising out or related to a Spill Claim against a Protected Party;

(iii)     creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien arising out or related to a Spill Claim against any property of any Protected Party;

(iv)     asserting or accomplishing any setoff, right of subrogation, right of contribution, right or reimbursement, indemnity, contribution or recoupment of any kind in any manner, directly or indirectly, and in any amount against any liability from any Protected Party arising out or related to a Spill Claim;

21

(v)      proceeding in any manner in any place with regard to any Spill Claim that is subject to and to be determined and paid by the Spill Claim Plan Administrator, except in conformity and compliance a Spill Claim liquidation procedure established after the Effective Date by the Spill Claim Plan Administrator in consultation with the Spill Claim Oversight Committee; and

(vi)      asserting any litigation right or Claim against the Insurers or their respective policies with respect to a Spill Claim.

### 6.5      Method of Distributions by Spill Claim Plan Administrator Under the Plan.

(a)      **Powers of Spill Claim Plan Administrator and Disbursement of Cash Held by the Spill Claim Plan Administrator.**  The Spill Claim Plan Administrator will not be required to post any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and in the event that the Spill Claim Plan Administrator is otherwise so ordered, all costs and expenses of procuring any such bond or surety will be paid from the Cash distributed to the Spill Claim Plan Administrator on the Effective Date.  Subject to input from the Spill Claim Oversight Committee and the terms of this Plan, the Spill Claim Plan Administrator shall be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated in the Plan, (iii) employ professionals to represent it with respect to its responsibilities under the Plan, (iv) make all determinations about expenditures made by the Spill Claim Plan Administrator, (v) make all determinations about liquidation and/or settlement strategies pursued by Spill Claim Plan Administrator, (vi) settle and compromise any and all Causes of Action of the Debtor and the Estate asserted by the Spill Claim Plan Administrator, (vii) make all determinations about the timing and amount of distributions to the holders of Class 5 Claims, and (viii) exercise such other powers as may be vested in the Spill Claim Plan Administrator by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Spill Claim Plan Administrator to be necessary and proper to implement the provisions of the Plan.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Spill Claim Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorneys' fees and other professional fees and expenses) made by the Spill Claim Plan Administrator shall be paid in Cash promptly upon approval by the Spill Claim Plan Oversight Committee.

(b)      **Distributions of Cash to Holders of Allowed Class 5 Claims.**  At the option of the Spill Claim Plan Administrator any Cash payment to be made to holders of Allowed Class 5 Claims and any Cash payment to be made by the Spill Claim Plan Administrator pursuant to the Plan will be made by check or wire transfer.

(c)      **Delivery of Distributions.**  Subject to Bankruptcy Rule 9010, unless otherwise provided in the Plan, all distributions to any holder of an Allowed Class 4 or Class 5 Claim by the Spill Claim Plan Administrator will be made to the holder of each Allowed Spill Claim at the address of such holder as listed in the proof of claim filed by each holder of a Spill Claim unless the Spill Claim Plan Administrator has been notified, in advance, in writing of a change of address.  In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder will be made unless and until the Spill Claim Plan Administrator has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter, such distribution will be made to such holder without interest; provided, however, that, such undeliverable distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days after the date of distribution in accordance with the section on unclaimed distributions below.  The Spill Claim Plan Administrator will have no obligation to attempt to locate any holder of a Class 4 or Class 5 Claim other than by reviewing the proof of claim giving rise to the Spill Claim.

**6.6** **Withholding and Reporting Requirements**. In connection with the Plan, the Spill Claim Plan Administrator shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. **The Spill Claim Plan Administrator shall use good faith best efforts to minimize all such reporting requirements, subject, however, to the guidelines for Federal Form 1099 which are attached hereto and incorporated herein by reference as Exhibit B.**

**6.7** **Time Bar to Cash Payments**. Checks issued by the Spill Claim Plan Administrator in accordance with the Plan in respect of Allowed Class 4 and Class 5 Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Spill Claim Plan Administrator by the holder of the Allowed Spill Claims to whom such check was originally issued. Any such request in respect of such a voided check shall be made on or before thirty (30) days after the expiration of the sixty (60) day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to the Spill Claim Plan Administrator and any Spill Claim in respect of such voided check shall be discharged and forever barred from assertion against the Debtor and its property or the assets held by the Spill Claim Plan Administrator, as the case may be.

**6.8** **Minimum Distributions**. No payment of Cash in an amount less than $100 shall be made by the Spill Claim Plan Administrator. Any Cash held by the Spill Claim Plan Administrator that is undistributable in accordance with this Section 6.8 shall vest with the Spill Claim Plan Administrator for the benefit of the holders of Class 5 Claims.

**6.9** **Setoffs**. The Spill Claim Plan Administrator may, but shall not be required, to set off against any Class 5 Claim (for purposes of determining the Allowed amount of such Class 5 Claim on which distribution shall be made), any claims of any nature whatsoever that the Debtor may have against the holder of such Class 5 Claim, but neither the failure to do so nor the allowance of any Class 5 Claim hereunder shall constitute a waiver or release by the Debtor or the Spill Claim Plan Administrator of any such claim the Debtor may have against the holder of such Class 5 Claim.

**6.10** **Transactions on Business Days**. If the Effective Date or any other date on which a transaction may occur under the Plan is required to occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next Business Day, but shall be deemed to have been completed as of the required date.

**ARTICLE VII.**

**PROVISIONS GOVERNING THE GC PLAN ADMINISTRATOR**

**7.1** **Distribution Record Date.** As of the close of business on the Confirmation Date, the various registers of Claims or Equity Interests of the Debtor maintained by the Clerk of the Bankruptcy Court shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Equity Interests unless otherwise specifically provided under the Plan or Final Order by the Bankruptcy Court or such other court of competent jurisdiction. Neither the Debtor nor the GC Plan Administrator shall have any obligation to recognize any transfer of the Claims or Equity Interests occurring after the Confirmation Date.

**7.2** **Method of Distributions by GC Plan Administrator Under the Plan.**

(a) **Effective Date Payments and Transfers by the Debtor.** On the Effective Date, the Debtor shall remit to the GC Plan Administrator the Cash payment required by the Plan. The GC Plan

23

Administrator shall pay a Pro Rata Share as soon as practicable to holders of Allowed Class 3 Claims pursuant to the Plan. The transfer by the GC Plan Administrator as described in the preceding sentence shall be made for the benefit of the holders of Class 3 Claims, but only to the extent that the holder of a Class 3 Claim is entitled to distributions under the Plan.

(b)    **Powers of GC Plan Administrator.**  All distributions under the Plan to holders of Class 3 Claims will be made by the GC Plan Administrator.  The GC Plan Administrator will not be required to post any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and in the event that the GC Plan Administrator is otherwise so ordered, all costs and expenses of procuring any such bond or surety will be funded from the Cash paid to the GC Plan Administrator for the benefit of Class 3 Claims on the Effective Date.  Subject to the terms of the Plan, the GC Plan Administrator shall be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated in the Plan, (iii) employ professionals to represent it with respect to its responsibilities under the Plan, (iv) make all determinations about expenditures, (v) make all determinations about strategies relating to the prosecution or settlement of Causes of Action pursued by the Spill Claim Plan Administrator, (vi) make all determinations about the timing and amount of distributions by the GC Plan Administrator to the holders of Class 3 Claims, (vii) object to and resolve Disputed Class 3 Claims; and (viii) exercise such other powers as may be vested in the GC Plan Administrator by order of the Bankruptcy Court and/or pursuant to the Plan, or as deemed by the GC Plan Administrator to be necessary and proper to implement the provisions of the Plan. Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the GC Plan Administrator on or after the Effective Date (including without limitation, taxes) and any reasonable compensation and expense reimbursement claims (including, without limitation, reasonable attorneys' fees and other professional fees and expenses) made by the GC Plan Administrator shall be paid in Cash.

(c)    **Distributions of Cash.**  At the option of the GC Plan Administrator, any Cash payment to be made by the GC Plan Administrator pursuant to the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

(d)    **Delivery of Distributions.**  Subject to Bankruptcy Rule 9010, unless otherwise provided in the Plan, all distributions to any holder of an Allowed Class 3 Claim by the GC Plan Administrator will be made to the holder of each Allowed Class 3 Claim at the address of such holder as listed in the Schedules, or on the books and records of the Debtor unless the Debtor or GC Plan Administrator, as the case may be, have been notified, in advance, in writing of a change of address, including, without limitation, by the timely filing of a proof of claim or interest by such holder that provides an address for such holder different from the address reflected in the Schedules or in the Debtor's books and records.  In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder will be made unless and until the GC Plan Administrator has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter, such distribution will be made to such holder without interest; provided, however, that, such undeliverable distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days after the date of distribution in accordance with Section 7.4 and 7.5 of the Plan.  The GC Plan Administrator will have no obligation to attempt to locate any holder of an Allowed Class 3 Claim other than by reviewing the Schedules and the books and records maintained by Debtor (including any proofs of claim filed against the Debtor).

**7.3    Withholding and Reporting Requirements.**  In connection with the Plan and all instruments issued in connection therewith and distributed thereunder, the GC Plan Administrator shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local

taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

**7.4     Time Bar to Cash Payments.**  Checks issued by the GC Plan Administrator in accordance with the Plan in respect of Allowed Class 3 Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be made to the GC Plan Administrator by the holder of the Allowed Class 3 Claim to whom such check was originally issued. Any such request in respect of such a voided check shall be made on or before thirty (30) days after the expiration of the sixty (60) day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to the GC Plan Administrator for the benefit of the holders of Class 3 Claims and any Class 3 Claim in respect of such voided check shall be discharged and forever barred from assertion against the Debtor and its property or the GC Plan Administrator, as the case may be.

**7.5     Minimum Distributions.**  No payment of Cash in an amount less than $100 shall be made by the GC Plan Administrator.  Any Cash paid to the GC Plan Administrator for the benefit of holders of Class 3 Claims that is undistributable in accordance with this Section 7.5 shall vest in the GC Plan Administrator for the benefit of the holders of Class 3 Claims.

**7.6     Setoffs.**  The GC Plan Administrator may, but shall not be required, to set off against any Class 3 Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Debtor may have against the holder of such Class 3 Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the GC Plan Administrator of any such claim the Debtor may have against the holder of such Claim.

**7.7     Allocation of Plan Distribution Between Principal and Interest.**  All distributions in respect of any Allowed Class 3 Claim made by the GC Plan Administrator shall be allocated first to the principal amount of such Allowed Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**ARTICLE VIII.**

**PROCEDURES FOR DISPUTED CLAIMS**

**8.1     Objections to Claims.**  Until the Effective Date, the Debtor and the Committee and from and after the Effective Date, the Spill Claim Plan Administrator exclusively, shall be entitled to object to Administrative Expense Claims, Secured or Priority Tax Claims, and Disputed Class 5 Claims.  Until the Effective Date, the Debtor and the Committee and from and after the Effective Date, the GC Plan Administrator exclusively shall be entitled to object to Disputed Class 3 Claims.

**8.2     No Distribution Pending Allowance.**  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**8.3     Reserves on Account of Disputed Claims**

(a)     **Establishment and Maintenance of Reserves for Disputed Claims**.  The GC Plan Administrator shall maintain the Disputed Claim Reserve at an amount equal to the aggregate of 100% of the distributable amounts to which holders of such Disputed Claims would be entitled under the Plan if

25

such Disputed Class 3 Claims were Allowed Claims in their Disputed Claim Amounts or such lesser amount as determined by the Bankruptcy Court or other court of competent jurisdiction pursuant to a Final Order. With respect to Disputed Secured Claims, Disputed Priority Tax Claims and/or Disputed Class 5 Claims, the Spill Claim Plan Administrator shall maintain one or more Disputed Claim Reserves in the same manner as set forth in the immediately prior sentence. For purposes of effectuating the provisions of this Section 8.3(a) and the distributions to holders of Allowed Claims, the Bankruptcy Court may fix or liquidate the amount of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed the amounts of the Disputed Claims for purposes of distribution under this Plan. In lieu of fixing or liquidating the amount of any Disputed Claim, the Bankruptcy Court may determine the amount to be reserved for any Disputed Claim as requested by the applicable Plan Administrator or such amount may be fixed by agreement in writing between the applicable Plan Administrator and the holder of a Disputed Claim.

(b) **Distributions Upon Allowance of Disputed Claims**. The holder of a Disputed Claim that becomes an Allowed Claim shall receive a distribution in Cash from the Disputed Claim Reserve of the applicable Plan Administrator as soon as practicable following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. Such distribution shall be made in accordance with the Plan based upon the distribution that would have been made to such holder under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date. No holder of a Disputed Claim shall have any Claim against the Disputed Claim Reserve or the applicable Plan Administrator with respect to such Claim until such Disputed Claim becomes an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest on such Disputed Claim unless otherwise agreed by the applicable Plan Administrator and the holder of such Disputed Claim or determined by the Bankruptcy Court pursuant to a Final Order.

**8.4** **Resolution of Disputed Claims.** Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, following the Effective Date, the GC Plan Administrator shall have the exclusive right to make and file objections to Class 3 Claims and shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than one hundred eighty (180) days after the Effective Date (subject, however, to the right of the GC Plan Administrator to seek an extension of time to file such objections from the Bankruptcy Court). The Spill Claim Plan Administrator shall have the exclusive right to make and file objections to Class 5 Claims in accordance with a process to be established by the Spill Claim Plan Administrator in consultation with the Spill Claim Oversight Committee and subject to Bankruptcy Court approval.

**8.5** **Estimation.** The Debtor or Committee prior to the Effective Date or the Plan Administrators following the Effective Date may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for purposes of the applicable Disputed Claims Reserve of the applicable Plan Administrator, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor, Committee or the GC Plan Administrator (as the case may be) may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. On and after the Confirmation Date, Claims that have been estimated may be compromised, settled, withdrawn or otherwise resolved subsequently by the GC Plan Administrator, without further order of the Bankruptcy Court.

**8.6**    **Distributions to Holders of Allowed Claims Upon Disallowance of Disputed Claims.** Subject to Section 8.4 hereof, upon disallowance of any Disputed Claim, each holder of an Allowed Claim in the same Class as the disallowed Disputed Claim will be entitled to its Pro Rata Share of Cash by the applicable Plan Administrator equal to the distribution that would have been made in accordance with the Plan to the holder of such Disputed Claim had such Disputed Claim been an Allowed Claim on or prior to the Effective Date. Such distributions on account of Disputed Claims will be made at such times as determined by the applicable Plan Administrator.  Upon allowance or disallowance of all or a portion of such Disputed Claims, the applicable Plan Administrator will make appropriate distributions in accordance with the Plan.

### ARTICLE IX.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**9.1**    **Executory Contracts and Unexpired Leases.**  On the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party shall be deemed rejected as of the Effective Date, except for an executory contract or unexpired lease that (i) has been assumed or rejected pursuant to Final Order of the Bankruptcy Court prior to the Effective Date, (ii) is subject to separate motion to assume or reject (or terminate or modify, as the case may be) filed under sections 365, 1113 and/or 1114 of the Bankruptcy Code prior to the Effective Date; or (iii) on the Effective Date, the Spill Claim Plan Administrator files with the Bankruptcy Court a motion to assume an executory contract or unexpired lease or a motion to extend the time within which to assume or reject an executory contract or unexpired lease.

Except as provided in Section 11.7 of the Plan, nothing contained in the Plan shall constitute or be deemed to be a waiver of any Cause of Action that the Debtor or Committee may hold against any Person, including, without limitation, any Insurer under any of the Debtor's Insurance Policies.

**9.2**    **Approval of Rejection of Executory Contracts and Unexpired Leases.**  Entry of the Confirmation Order shall constitute the approval, pursuant to sections 365(a), 1113 and/or 1114 of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected as of the Effective Date pursuant to the Plan.

**9.3**    **Rejection Claims.**  In the event that the rejection of an executory contract or unexpired lease pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor, the GC Plan Administrator or any property to be distributed under the Plan unless a proof of claim is filed with the Bankruptcy Court and served upon the GC Plan Administrator on or before the date that is twenty (20) days after the Effective Date.  The foregoing sentence shall not, however, be applicable to any separate pre-Confirmation Date order of the Bankruptcy Court authorizing rejection of an executory contract or unexpired lease wherein a separate deadline by which rejection damages claims must be filed with the Bankruptcy Court was established.

### ARTICLE X.

### EFFECTIVENESS OF THE PLAN

**10.1**    **Conditions Precedent to Effective Date.**  The following are conditions precedent to the Effective Date of the Plan:

(a)     The Bankruptcy Court shall have entered a Confirmation Order in form and substance satisfactory to the Debtor, the Committee, Spill Claim Counsel, DEP, the Former Ds and Os, Herzing in his capacity as Sellers' Representative and Southern;

(b)     No stay of the Confirmation Order shall then be in effect;

(c)     The appeals of the AIG Settlement Order pending before the District Court have been resolved in a manner consistent with the Plan and satisfactory to the Debtor, Committee, Southern and Spill Claim Counsel;

(d)     The U.S. Attorney for the Southern District of West Virginia agrees to allow Southern to pay (i) the Southern Contribution, and (ii) additional release consideration to the plaintiffs in the Good Case from funds currently subject to a seizure proceeding in the District Court;

(e)     The plaintiffs in the Good Case (or their counsel) execute a release of Southern consistent with Section 11.11 of the Plan; and

(f)     A mutual release is executed among Chemstream, the Former Ds and Os and the Sellers' Representative.

**10.2     Satisfaction of Conditions.**  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. If the Debtor determines that one of the conditions precedent set forth in Section 10.2 hereof cannot be satisfied and the occurrence of such condition is not waived by the Debtor or cannot be waived by the Debtor, then the Debtor shall file a notice of the failure of the Effective Date with the Bankruptcy Court.

**10.3     Effect of Nonoccurrence of Conditions to Effective Date.**  If each of the conditions to consummation and the occurrence of the Effective Date has not been satisfied or duly waived on or before the Effective Date, the Confirmation Order may be vacated by the Bankruptcy Court. If the Confirmation Order is vacated pursuant to this Section 10.3, the Plan shall be null and void in all respects, and nothing contained in the Plan shall constitute a waiver or release of any Claims and/or Spill Claims against the Debtor, and none of the parties subject to the Plan shall be obligated under the Plan.

## ARTICLE XI.

## EFFECT OF CONFIRMATION

**11.1     Vesting of Assets.**  As of the Effective Date, Cash will be paid by the Debtor to holders of Allowed Class 1 Secured Claims, Allowed Class 2 Claims, and Allowed Administrative Expense Claims, to the CRO for the benefit of Professionals to be held in the Professional Fee Escrow Account, the CRO with respect to the ERT Remediation Fund unless funded prior to the Effective Date, the GC Plan Administrator and the Spill Claim Plan Administrator, all as provided in the Plan.  The equity interests in Freedom will vest in the Spill Claim Plan Administrator on the Effective Date, as will all Causes of Action not otherwise waived or released under the Plan.  Only Causes of Action of the Debtor and the Estate will vest with the Spill Claim Plan Administrator on the Effective Date.

**11.2     Release of Assets.**  Until the Effective Date, the Bankruptcy Court shall retain jurisdiction of the Debtor, the Estate and their assets and properties.  Thereafter, jurisdiction of the Bankruptcy Court shall be limited to the subject matter set forth in Article XII hereof.

**11.3    Binding Effect.**  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and to the fullest extent permitted by section 1141 of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim including any holder of a Spill Claim against, or Equity Interest in, the Debtor and its respective successors and assigns, including, but not limited to, the Plan Administrators, whether or not the Claim, Spill Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

**11.4    Satisfaction of Claims and Termination of Interests**.  To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, and release, effective as of the Effective Date, of Claims, Spill Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims, Spill Claims, or Equity Interests from and after the Petition Date, whether known or  unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Spill Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims, Spill Claims, or Equity Interests relate to services performed by employees of the Debtor prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a proof of claim or proof of interest based upon such debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim, Spill Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim, Spill Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims, Spill Claims, and Equity Interests subject to the Effective Date occurring.

Neither this Plan nor the Confirmation Order shall be deemed a release of Allowed Contribution Claims, provided and for clarity, that no Person may seek satisfaction of any claim or Allowed Claim against a Protected Party except as specifically provided in this Plan.

**11.5    Term of Injunctions or Stays.**  Unless otherwise expressly provided herein, all injunctions or stays arising under or entered during the Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, at which time such injunctions or stays shall be deemed lifted.

**11.6    Retention of Causes of Action.**  Except as otherwise waived and released in accordance with the Plan, on and after the Effective Date, the Spill Claim Plan Administrator shall have the exclusive right to enforce and shall retain, all Causes of Action of the Debtor and the Estate against any Persons **including, without limitation, Claims or Causes of Action** arising from or relating **the Incident**. The Spill Claim Plan Administrator may prosecute, defend, enforce, abandon, settle or release any and all Claims and Causes of Action of the Debtor and the Estate as it deems appropriate, subject to Bankruptcy Court approval as set forth in the Plan.  The Spill Claim Plan Administrator may, in its sole discretion, offset any such claim held against a Person, against any payment due such person under the Plan; *provided, however,* that any Claims of the Debtor arising before the Petition Date shall first be offset against Claims against the Debtor arising before the Petition Date, subject in each instance, however, to the limitations of Section 8.4 hereof.  All privileges, defenses and rights of avoidance of the Debtor not otherwise waived and released in accordance with the Plan, shall be retained and may be exercised by the Spill Claim Plan Administrator; provided, however, that all privileges, defenses, crossclaims, counterclaims, or Claims for setoff, recoupment, or which seek affirmative relief, in any form or manner

29

whatsoever, related to or arising out of a Class 3 Claim  shall be retained and may be exercised by the GC Plan Administrator.

**11.7**    <u>Exculpation</u>.  Except as otherwise specifically provided in the Plan, **neither the  Debtor, J. Clifford Forrest in his post-Petition Date capacity as director of Freedom, the CRO in his capacity as CRO or as the sole director of Freedom, bankruptcy counsel for the Debtor, the Committee, nor any of the Committee's members, or attorneys, in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, or arising out of, the Case, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan (the "Exculpated Claims"), provided, however, that any such liability does not arise from willful misconduct or gross negligence by an Exculpated Party as determined by Final Order of a court of competent jurisdiction.**  The Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, *suit,* judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Exculpated Parties in respect of the Exculpated Claims, except as otherwise provided in the Plan.  Each of the Exculpated Parties shall have the right to independently seek enforcement of this release provision.  All such Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities hereunder and under the Bankruptcy Code.   Notwithstanding anything herein to the contrary, the exculpation and limitation of liability provided for herein shall not apply to any acts of omissions that occurred prior to the Petition Date.  The rights granted hereunder are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law.  This exculpation from liability provision is an integral part of the Plan and is essential to its implementation

**11.8    DEBTOR RELEASE.    PURSUANT TO SECTION 1123(b) OF THE BANKRUPTCY CODE, ON AND AFTER THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THEIR COOPERATION AND CONTRIBUTIONS TO THE CASE, THE RELEASED PARTIES SHALL BE DEEMED RELEASED AND DISCHARGED BY THE DEBTOR, THE ESTATE, THE CRO, THE GC PLAN ADMINISTRATOR, AND THE SPILL CLAIM PLAN ADMINISTRATOR FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING WITHOUT LIMITATION ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTOR, THE ESTATE AND/OR PLAN ADMINISTRATORS AS SUCCESSORS TO THE DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR UNASSERTED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE LAWS, OR OTHERWISE, AND INCLUDING, WITHOUT LIMITATION ANY CLAIMS OR CAUSES OF ACTION BASED ON AVOIDANCE LIABILITY UNDER FEDERAL OR STATE LAWS, VEIL PIERCING, ALTER-EGO, JOINT OR SINGLE BUSINESS ENTERPRISE THEORIES OF LIABILITY, CONTRIBUTION, INDEMNIFICATION, JOINT LIABILITY OR OTHERWISE THAT THE DEBTOR OR THE ESTATE WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT THE COMMITTEE OR ANY HOLDER OF A CLAIM OR INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF THE DEBTOR OR THE ESTATE, AND INCLUDING, WITHOUT LIMITATION, ANY CLAIMS OR CAUSES OF ACTION BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM , IN WHOLE OR IN PART, THE DEBTOR, THE DEBTOR'S LIQUIDATION, THE DECEMBER 2013 TRANSACTION, THE INCIDENT AND THE RESPONSE THERETO, THE CASE, THE SUBJECT MATTER OF, OR**

**THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, OR THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY RELEASED PARTY.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019 OF THE RELEASES PROVIDED FOR IN SECTION 11.8, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE RELEASES PROVIDED FOR IN THIS SECTION 11.8 ARE: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE DEBTOR, AND THE ESTATE; (3) IN THE BEST INTERESTS OF THE DEBTOR, ITS ESTATE AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR AGAINST THE DEBTOR, ITS ESTATE, THE COMMITTEE, THE GC PLAN ADMINISTRATOR OR THE SPILL CLAIM PLAN ADMINISTRATOR FROM ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE RELEASE CONTAINED IN THIS SECTION 11.8.**

**WITHOUT LIMITING THE SCOPE OF THE RELEASE BY THE DEBTOR, THE ESTATE, THE CRO, THE GC PLAN ADMINISTRATOR, AND THE SPILL CLAIM PLAN ADMINISTRATOR OF CLAIMS AND CAUSES OF ACTION PROVIDED IN THIS SECTION 11.8, NOTHING IN THIS SECTION SHALL BE INTERPRETED TO GRANT A RELEASE OF CLAIMS OR CAUSES OF ACTION, IF ANY, OF ANY OTHER PERSON OR ENTITY AGAINST, CHEMSTREAM, THE FORMER DS AND OS, SOUTHERN, OR HERZING IN HIS CAPACITY AS SELLERS' REPRESENTATIVE.**

**11.9  RELEASE BY OTHER RELEASING PARTIES. AS OF THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, CHEMSTREAM, THE FORMER Ds AND Os, HERZING AS SELLERS' REPRESENTATIVE AND SOUTHERN SHALL RELEASE, EACH OF THE DEBTOR, ITS ESTATE THE CRO, THE GC PLAN ADMINISTRATOR, THE SPILL CLAIM PLAN ADMINISTRATOR AS SUCCESSORS OF THE DEBTOR AND CORE FOR ANY POST-EFFECTIVE DATE MATTERS RELATING TO FREEDOM FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTOR OR ITS ESTATE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT BASED ON, OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, THE DEBTOR'S LIQUIDATION, THE DECEMBER 2013 TRANSACTION, THE INCIDENT AND THE RESPONSE THERETO, THE MERGER OF THE ENTITIES NOW COMPROMISING THE DEBTOR, THE CASE, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY PARTY RELEASED PURSUANT TO THIS SECTION 11.9, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CASE, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN OR OTHER RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES PROVIDED FOR HEREUNDER**

31

**SHALL NOT RELEASE ANY OBLIGATION OF ANY PARTY UNDER THE PLAN OR ANY RELATED DOCUMENT, INSTRUMENT OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019 OF THE RELEASES PROVIDED FOR IN THIS SECTION 11.9, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE RELEASES PROVIDED FOR IN THIS SECTION 11.9 ARE: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE PARTIES RECEIVING RELEASES UNDER THE PLAN; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION RELEASED BY THE DEBTOR, ITS ESTATE AND THE COMMITTEE; (3) IN THE BEST INTERESTS OF THE DEBTOR, ITS ESTATE AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY TO FOR HEARING; AND (6) A BAR AGAINST THE DEBTOR, RELEASING PARTIES FROM ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE RELEASE CONTAINED IN THIS SECTION 11.9.**

**WITHOUT LIMITING THE SCOPE OF THE RELEASE BY CHEMSTREAM, THE FORMER DS AND OS, SOUTHERN OR HERZING IN HIS CAPACITY AS SELLERS' REPRESENTATIVE IN THIS SECTION 11.9 OF THE PLAN, NOTHING IN SECTION 11.9 OF THE PLAN SHALL BE INTERPRETED TO GRANT A RELEASE OF CLAIMS OR CAUSES OF ACTION, IF ANY, AGAINST ANY PERSON OR ENTITY OTHER THAN THE DEBTOR, ITS ESTATE, THE CRO, THE GC PLAN ADMINISTRATOR AND THE SPILL CLAIM PLAN ADMINISTRATOR AS SUCCESSOR OF THE DEBTOR BY CHEMSTREAM, THE FORMER DS AND OS, SOUTHERN, OR HERZING IN HIS CAPACITY AS SELLERS' REPRESENTATIVE.**

**11.10** <u>**Releases of Preference Actions Against Holders of General Unsecured Claims.**</u> Pursuant to section 1123(b) of the Bankruptcy Code and for good and valuable consideration on and after the Effective Date, the Debtor and the Estate waive and release all Preference Actions against holders of General Unsecured Claims.

**11.11** <u>**Limited Third Party Releases of Southern.**</u> On the Effective Date, the plaintiffs in the following cases: (i) Scott Miller, Bar 101, LLC and Ichiban consolidated under <u>Desimone Hospitality Services, LLC, et al v. West Virginia American Water Company, et al.</u>, Civil Action No. 2:14-cv-14845 (the "Bar 101 Case"), (ii) <u>Crystal Good M.T.S, N.K.T, A.M.S., Melissa Johnson, Aladdin Restaurant, Inc., Georgia Hamra, Mary Lacy, Joan Green, Jamila Aisha Oliver, Wendy Renee Ruiz, Kimberly Ogier, Roy J. McNeal, Maddie Fields, R.G. Gunnoe Farms LLC and Dunbar Plaza, Inc., consolidated under Good et al. v. American Water Company, Inc., et al.</u>, Civil Action No. 2:14-cv-01374 (the "Good Plaintiffs") and (iii) certain putative class representatives that previously contemplated filing a class action lawsuit for settlement purposes with the Debtor, including Stephen N. Smith, Fuji LLC d/b/a Fuji's Sushi & Teriyaki, Fuji LLC d/b/a Fuji Reef Shop & Salt Water Pet Shop, and Hartman & Tyler, Inc. d/b/a Mardi Gras Casino & Resort (collectively, the plaintiffs in (i), (ii) and (iii) the "Class Action Plaintiffs") do agree and shall:

(A)      release and forever discharge Southern from any and all claims, damages, costs and expenses (including   attorneys' fees and costs actually incurred) of any nature whatsoever, known and unknown, asserted and unasserted, arising from the events at issue in any and all of the above-referenced civil actions, specifically including, but not limited to, the Incident; and

(B)     covenant not to sue Southern in any case related to or arising from the Incident and agree to release and forever discharge Southern from any and all claims, damages, costs, expenses (including attorney fees and costs) of any nature whatsoever arising from the Incident.

Additionally, on the Effective Date, Southern and the Former Ds and Os shall execute a mutually satisfactory mutual release agreement.

**11.12  <u>INJUNCTION</u>.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, SPILL CLAIMS, INTERESTS, OR LIENS THAT ARE RELEASED OR DISCHARGED BY THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTOR, THE ESTATE, PLAN ADMINISTRATOR OR THE RELEASED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR THE ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH PERSON HAS TIMELY ASSERTED SUCH SETOFF RIGHT PRIOR TO THE EFFECTIVE DATE IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH PERSON ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.  FOR PURPOSES OF CLARITY, THE INJUNCTION PROVIDED IN THIS SECTION 11.12 <u>SHALL</u> <u>NOT</u> APPLY TO CLAIMS AND CAUSES OF ACTION BY THIRD PARTIES THAT ARE NOT SPECIFICALLY WAIVED AND RELEASED CLAIMS AND CAUSES OF ACTION IN ACCORDANCE WITH THE PLAN.**

**11.13  <u>Injunction Against Interference with Plan</u>**.  Upon the entry of the Confirmation Order, all holders of Claims, Spill Claims, and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

**11.14  <u>Apportionment of Fault in Tort Lawsuits</u>.**     Subject to any order or orders of the Bankruptcy Court or any other court having jurisdiction over the Debtor, nothing in this Plan or the Confirmation Order shall either grant or diminish or stay the rights, if any, of a party to seek to allocate or apportion liability or fault of Debtor in any lawsuit or to claim a verdict credit for any sums paid by the Debtor to a holder of a Spill Claim.  No party shall be permitted to argue that the presence of this reservation in this Plan is a suggestion or implication that any such rights exist, as the intent of this

reservation is to preserve the status quo with respect to the matters addressed in this Section 11.14, and neither grant nor diminish rights that might or might not otherwise exist.

## ARTICLE XII.

## RETENTION OF JURISDICTION

**12.1** **Jurisdiction of Bankruptcy Court.**  The Bankruptcy Court, following the Confirmation Date, shall retain jurisdiction of all matters arising under, arising out of, or related to the Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date, including, without limitation, any proceeding to recover a Cause of Action not otherwise waived and released under the Plan;

(c)    To ensure that distributions to holders of Allowed Spill Claims are accomplished as provided in the Plan;

(d)    To consider Spill Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim or Spill  Claims;

(e)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(g)    To hear and determine any application to modify the Plan or Confirmation Order in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    To hear and determine all applications under sections 328, 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred by Professionals prior to the Effective Date;

(i)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    To take any action and issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation;

(k)      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust or reserve established in furtherance of the Plan);

(m)      To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

(n)      To enter a final decree closing the Case.

## ARTICLE XIII.

## CRAMDOWN RESERVATION

**13.1    Nonconsensual Confirmation.**  If any Impaired Class fails to vote to accept the Plan by the requisite statutory majorities provided in sections 1126(c) and 1126(d) of the Bankruptcy Code, as applicable, or if any Impaired Class is deemed to have rejected the Plan, the Debtor reserves the right to undertake to have the Bankruptcy Court confirm the Plan under the "cram down" provisions of section 1129(c) of the Bankruptcy Code and/or amend or modify the Plan in accordance with Section 14.9 hereof to the extent necessary to obtain entry of the Confirmation Order.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

**14.1    Environmental Matters Following the Effective Date and the Sale of the Etowah River Terminal**.  The Debtor, as a Debtor in Possession, has an obligation to comply with all applicable non-bankruptcy law.  This includes an obligation to comply with applicable environmental laws and regulations.  Following the Effective Date, the Debtor shall remain obligated to comply with the VRP Agreement and the Consent Order to the extent that any such obligations remain unperformed on the Effective Date.   The financial means to satisfy these ongoing obligations will be assured by virtue of the ERT Remediation Fund, initially with cash from the Chemstream Settlement and then from the Debtor on the Effective Date.  Remediation of the Etowah River Terminal will continue in a manner consistent with the terms and conditions of the Chemstream Settlement.   A copy of the Chemstream Settlement Agreement is attached to the Plan and incorporated herein by reference as Exhibit "A".

It is contemplated that the Etowah River Terminal will be sold by the Debtor, subject to approval by the Bankruptcy Court, on or before the Effective Date to a party and on terms and conditions acceptable to DEP.   In the event that the Bankruptcy Court has not, by Final Order approved a sale of the Etowah River Terminal prior to the Confirmation Date, the Confirmation Order shall, in accordance with sections 363 and 1123(a)(5)(D) of the Bankruptcy Code, authorize and approve the sale of the Etowah River Terminal free and clear of all liens, claims encumbrances and interests, subject, however, to legal or contractual obligations of any such purchaser to perform obligations of the Debtor in accordance with the VRP Agreement and/or Consent Order.   A sale of the Etowah River Terminal in accordance with the Plan shall not relieve or discharge the obligations of the Debtor in accordance with the VRP Agreement and/or Consent Order.

Nothing in this Plan shall be deemed to modify or amend the services agreement between Freedom and CORE filed with the Bankruptcy Court at Docket No. 846 in connection with the Chemstream Settlement and subject to approval by the Bankruptcy Court at a hearing scheduled for July 28, 2015.

**14.2    Disposition of Creditors Committee.**  The Committee shall disband and be released of its duties and obligations on the Effective Date.  The Committee and its members, acting in such capacity, shall be entitled to the protections of the exculpation provisions provided for under the Plan.

**14.3    Release of CRO**.  Other than administration of the Professional Fee Escrow Account, on the Effective Date, the CRO shall be released of his duties and obligations and shall be entitled to the protections of the release and exculpation provisions provided for under the Plan.

**14.4    Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be "substantially consummated" as contemplated under sections 1101 and 1127(b) of the Bankruptcy Code.

**14.5    Exemption from Transfer Taxes.**  Pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by the Plan (i.e., the sale of the Etowah River Terminal) shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use, or other similar tax.

**14.6    Post-Effective Date Fees and Expenses**.

(a)    **Fees and Expenses of Professionals.**  The respective Plan Administrators shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses, incurred after the Effective Date, of the professional persons employed by the respective Plan Administrators in connection with the implementation and consummation of the Plan, the claims reconciliation process and any other matters for which such professionals may be engaged.  The fees and expenses of such professionals shall be paid within ten (10) Business Days after submission of a detailed invoice therefor. If a Plan Administrator disputes the reasonableness of any such invoice, the respective Plan Administrator shall timely pay the undisputed portion of such invoice, and the respective Plan Administrator or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of such invoice.

**14.7    Modification of Plan.**  The Plan may be amended, modified, or supplemented by the Debtor with prior written consent by the Committee and any Released Party or Releasing Party affected by such amendment, modification or supplement, if any, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. After the Confirmation Date, but prior to the Effective Date, the Debtor with prior written consent by the Committee may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, *provided* that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Spill Claims.  In addition, after the Effective Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Spill Claims under the Plan, the Spill Claim Plan Administrator may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

**14.8    Revocation or Withdrawal of Plan.**  The Debtor, with prior written consent of the Committee, reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date,

notwithstanding any objection thereto by any other party-in-interest.  If the Debtor takes such action, the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim or Spill Claim by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

**14.9**   **Attribution of Proceeds to be Distributed Under the Plan.**  The Plan treats all funds in the possession of the Debtor or to be received by the Debtor on the Effective Date that are required under the Plan to be (i) distributed to the holders of Claims, (ii) paid into the ERT Remediation Fund, if not sooner to occur, and (iii) paid into the Professional Fee Escrow Account, in accordance with the Plan to be fungible, and without attribution to any particular source of payment.   In the event that an attribution of funds to be distributed under the Plan is otherwise required, no AIG Settlement Proceeds shall be attributed to the payment of fees and expenses of Professionals including the funding of the Professional Fee Escrow Account, and proceeds of the Former Ds and Os Contribution and Southern Contribution shall be attributable to the payment of Claims for which restitution may have otherwise been sought.

**14.10**   **Courts of Competent Jurisdiction.**  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or lack of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**14.11**   **Severability.**  If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**14.12**   **Governing Law.**  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of West Virginia, without giving effect to the principles of conflicts of law thereof.

**14.13**   **Exhibits.**  All exhibits, schedules, addenda or other documents, annexed to or filed in connection with the Plan are deemed incorporated into and are a part of the Plan as if set forth in full herein.

**14.14**   **Successors and Assigns.**  All the rights, benefits and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person.

**14.15**   **Time.**  In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**14.16** **Notices.** All notices, requests and demands, to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to Debtor:                          Freedom Industries, Inc.
                                       c/o Mark Welch, Chief Restructuring Officer
                                       MorrisAnderson
                                       55 West Monroe  Street, Suite 2500
                                       Chicago,  Illinois 60603
                                       (412) 498-8258
                                       mwelch@morrisanderson.com

                                       -and-

                                       Mark E. Freedlander, Esq.
                                       McGuireWoods LLP
                                       625 Liberty Avenue, 23rd Floor
                                       Pittsburgh, PA 15222
                                       (412) 667-6000
                                       (412) 667-7967 (fax)
                                       mfreedlander@mcguirewoods.com

If to Committee:                       Ronald E. Gold
                                       Douglas Lutz
                                       3300 Great American Tower
                                       301 East 4th Street
                                       Cincinnati, OH 45202-4182
                                       Telephone: (513) 651-6800
                                       Fax : (513) 651-6981
                                       RGold@fbtlaw.com
                                       DLutz@fbtlaw.com

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

THE FOREGOING ~~FIRST~~**SECOND** MODIFIED AMENDED PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR DATED AS OF ~~JULY 26,~~**AUGUST 7,** 2015 IS RESPECTFULLY SUBMITTED BY:

Dated: ~~July 26,~~**August 7,** 2015        FREEDOM INDUSTRIES, INC.,
                                       Debtor and Debtor-in-Possession

                                       By: /s/ Mark Welch_____
                                       Name: Mark Welch
                                       Its: Chief Restructuring Officer

69499231_3

Document comparison by Workshare Compare on Friday, August 07, 2015
3:31:25 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DMSPROXY/Active/69499231/1 |
| Description | #69499231v1<Active> - Second Modified Amended Chapter 11 Plan of Freedom Industries |
| Document 2 ID | interwovenSite://DMSPROXY/Active/69499231/4 |
| Description | #69499231v4<Active> - Second Modified Amended Chapter 11 Plan of Freedom Industries |
| Rendering set | MW Standard |

| Legend: | |
|---|---|
| **Insertion** | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 22 |
| Deletions | 14 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 38 |