**EXHIBIT A TO FREEDOM INDUSTRIES
THIRD MODIFIED AMENDED DISCLOSURE STATEMENT
DATED AUGUST 12, 2015**

**Pre-Bankruptcy Change of Ownership**

For years prior to December 6, 2013 (the "Transaction Date"), Freedom Industries, Inc. was owned by three (3) individuals, each of whom owned one-third of the outstanding shares in the Debtor: 1) Dennis P. Farrell ("Farrell"); 2) Charles E. Herzing ("Herzing"); and, 3) William E. Tis ("Tis" and, collectively with Farrell and Herzing, the "Former Ds and Os").

Freedom was the sole parent of two subsidiaries: Poca Blending, LLC ("Poca") and Crete Technologies, LLC ("Crete") (collectively with Poca, the "Former Subsidiaries"). Farrell, Herzing and Tis were Freedom's President, Vice President and Secretary, respectively, and Gary Southern ("Southern")[1] served on the board and acted as a consultant to Freedom. Freedom's pre-Transaction Date board of directors had five members: Farrell, Herzing, Tis, Southern and Kevin Skiles ("Skiles"). Southern resigned as a director of Freedom on or about October 10, 2013.

Etowah River Terminal, LLC ("Etowah"), the entity responsible for operating the Etowah River Terminal, after its purchase from Pennzoil-Quaker State Company, was likewise owned by Farrell, Herzing and Tis prior to the Transaction Date.

On December 6, 2013, the Former Ds and Os executed and closed on: (i) that certain Share Purchase Agreement (the "SPA") by and among Chemstream Holdings, Inc. ("CHI")[2] (as purchaser), Freedom, the Former Ds and Os and Charles E. Herzing, as Sellers' Representative dated December 6, 2013, (ii) a Membership Unit Purchase Agreement ("Membership Purchase Agreement") by and among CHI (as purchaser), Etowah River Terminal, LLC, Farrell, Tis, and Herzing, and (iii) associated documents (collectively, the "Sale Transaction"). Pursuant to the Sale Transaction, the Former Ds and Os of Freedom, *inter alia*, transferred all right, title, and interest in Freedom and the Former Subsidiaries and Etowah to CHI. On the Transaction Date, prior to closing, the directors of Freedom were: Farrell, Herzing, Tis and Kevin Skiles.

The Sale Transaction resulted in the Former Ds and Os selling shares of Freedom to CHI. The consideration paid by CHI pursuant to the SPA was $8,850,000.00 and was distributed at closing as follows: (1) $2,000,000.00 (the "Non-Tax Holdback Amount") was paid into escrow as a non-exhaustive source for the payment and discharge of any indemnification obligations of the Former Shareholders to CHI; (2) $1,000,000.00 (the "Tax Holdback Amount" and, together with the Non-Tax Holdback Amount, the "Holdback Amounts") was paid into escrow as a non-exclusive source for the payment and discharge of certain tax obligations of Freedom; (3) approximately $3,850,000.00 paid to satisfy indebtedness allegedly owed by Freedom, as follows: (i) $2,311,370.36 to First Bank of Charleston, Inc.; (ii) $132,865.04 to Farrell; (iii) $716,947.03 to Tis; (iv) $500,692.90 to Herzing; and, (v) $207,643.14 to Ford Motor Credit; (4) $230,203.60 to Kevin Skiles in exchange for cancellation of certain alleged equity rights; (5) $817,484.66 was paid to Freedom and then paid by Freedom to two employees

---

[1] The exact roles of Southern and the timeframes within which roles were served remains subject to dispute, as a federal grand jury indictment of Southern filed in the District Court on December 17, 2014 at Criminal No. 2:14-00264 accuses Southern, among other matters, of misrepresenting the roles Southern served at Freedom. More information regarding the allegations against Southern is available at http://www.justice.gov/usao-sdwv/chemical-spill.

[2] CHI is ultimately owned by J. Clifford Forrest.

for certain bonuses they were allegedly due (the "Bonus Payments") (discussed below); (6) transaction expenses in the amount of $38,500.00 paid to Bowles Rice, LLP (as counsel to the Former Ds and Os in the Sale Transaction); and (7) the remainder paid in equal amounts to the Former Ds and Os.[3] Since these amounts were paid by CHI, in its capacity as the purchaser, other than the Bonus Payments, the flow of funds relating to the Sale Transaction are not reflected on the Debtor's Statement of Financial Affairs.

The Bonus Payments were paid by Freedom on December 11, 2013, as follows: (1) $544,281.25 was paid to Doug Simmons[4]; (2) $273,203.42 was paid to Skiles[5]. See, Statement of Financial Affairs, Question 3b.

The consideration paid by CHI pursuant to the Membership Purchase Agreement was $6,150,000.00, which was distributed at the December 6, 2013 closing to the Former Ds and Os according to their ownership interests in Etowah River Terminal, LLC. [6]

Total consideration paid by CHI in respect of the Sale Transaction, including working capital adjustments to the benefit of Former Ds and Os, was approximately $17.837 Million.

Pursuant to an escrow agreement (the "Escrow Agreement") executed by and among CHI, Herzing (as Seller Representative) and Somerset Trust Company as part of the Sale Transaction, Somerset Trust Company ("Escrow Agent") was appointed as escrow agent. The Holdback Amounts were paid to the Escrow Agent at closing pursuant to and in accordance with the terms of the Sale Transaction and the Escrow Agreement.  Given the nature of the Sale Transaction, where ownership interests rather than assets were sold, the entities subject to the sale of ownership interests were not parties to the Escrow Agreement.  The CRO has, therefore, determined that the Escrow Agreement and any rights in or to the proceeds held in accordance with the Escrow Agreement are not property of the Estate.

At the time of the Sale Transaction, the Former Ds and Os alleged that certain claims of the IRS were invalid and/or inaccurate. The Tax Holdback Amount was delivered to the Escrow Agent to be used to satisfy tax liens against Freedom or its Former Subsidiaries.  The Escrow Agreement establishes certain procedures by which CHI may request disbursement of all or a portion of the Tax Holdback Amount to satisfy applicable tax liens. Freedom is not a party to the Escrow Agreement and has no contractual right to demand that the Tax Holdback Amount be paid to the IRS in respect of the tax lien of the IRS.  Since the Petition Date, however, the Debtor has requested of CHI and CHI has, in fact, made requests to the Escrow Agent that certain portions of the Tax Holdback Amount be paid to the Debtor to reimburse it for installment payments made to the IRS.  Approximately $188,000 has been paid to the IRS from the Petition Date, and Freedom has been reimbursed in kind from the Tax Holdback under the Escrow Agreement.

---

[3] Subject to certain pre- and post-closing adjustments.
[4] At the time of the Sale Transaction, Doug Simmons was the senior vice president of sales and marketing of Freedom.
[5] At the time of the Sale Transaction, Kevin Skiles was the senior vice president of research and technology of Freedom.
[6] Subject to certain pre- and post-closing adjustments.

In connection with the Sale Transaction on December 6, 2013, the Former Ds and Os and Skiles resigned their positions as officers, directors and/or members of Freedom, Etowah and the Former Subsidiaries. Gary Southern became the President and Treasurer of Freedom. As of the Petition Date, Gary Southern was President of Freedom and Terry Cline was Chief Financial Officer of Freedom. Also, in connection with closing on the Sale Transaction: (i) Farrell executed an employment agreement with Freedom to provide primarily marketing services, (ii) Tis executed a consulting agreement with Freedom to provide general management services, (iii) Useful Solutions, Inc., a company owned and/or controlled by Herzing, executed a consulting agreement with Freedom to provide general management services, (iv) Kevin Skiles executed an employment agreement with Freedom to provide primarily strategic planning services and (v) Steven (Doug) Simmons executed an employment agreement with Freedom to provide primarily sales expertise. Neither Tis nor Useful Solutions, Inc. actually performed services nor received consideration under their respective consulting agreements. As of the date of this Disclosure Statement, none of the individuals or entities subject to employment agreements or consulting contracts are employed by or are consultants to the Debtor. In fact, the Debtor has no employees at this time.

On December 31, 2013, the Former Subsidiaries and Etowah were all merged into Freedom for simplicity of tax reporting purposes. Thus, as of the Petition Date, the Debtor was the sole surviving entity from those subject to the Sale Transaction. CHI is the parent of the Debtor, and J. Clifford Forrest is the sole director of the Debtor.

### A.    January 9, 2014 Chemical Spill and Response Thereto

**MCHM and Storage Tank Number 396**

As part of its business operations, Freedom stored a substance primarily consisting of methylcyclohexanemethanol ("MCHM") in tank number 396 ("Storage Tank Number 396") at the Etowah River Terminal. Storage Tank Number 396 was located adjacent to the Elk River, upstream from an intake operated by West Virginia American Water Company ("WVAWC"). Both the West Virginia Department of Environmental Protection ("WVDEP") and the United States Environmental Protection Agency ("EPA") have determined that MCHM is not a hazardous waste, stating as much in correspondence.

On February 12, 2014, the WVDEP issued a Minor Permit Modification for Disposal of Special Waste (the "Permit") to Disposal Service, Inc. ("Disposal Service"). The Permit was in response to the Debtor's and Disposal Service's request to dispose of water removed from the Debtor's containment tanks at Disposal Service's Hurricane, West Virginia facility. In the Permit, the WVDEP states as follows:

> The West Virginia Department of Environmental Protection, Office of Solid Waste, has reviewed information submitted by the Disposal Service, Inc. Based upon this information, the WVDEP believes that this waste is not hazardous waste under the Resource Conservation and Recovery Act. Consequently, a minor permit modification is granted for the disposal of this waste at the Disposal Service, Inc.

**January 9, 2014 Incident and Subsequent Environmental Remediation**

(a)      **January 9, 2014 Incident**

On January 9, 2014 it was discovered that Storage Tank Number 396 leaked MCHM and that a quantity of MCHM reached the Elk River (the "Incident"). Several days thereafter, it was determined and reported to regulatory authorities that the MCHM that leaked also contained polypropylene polystone ("PPH").[7] Facts surrounding the Incident, including the cause of the leak, are subject to pending investigations by various regulatory and other governmental authorities.[8] As a result of the Incident, the following federal and state authorities met with Freedom regarding the Incident, or investigated and/or are continuing to investigate the Debtor and/or the Incident:

i.       WVDEP;
ii.      EPA;
iii.     West Virginia National Guard;
iv.      United States Fish and Wildlife Service;
v.       Occupational Health Safety Administration;
vi.      Chemical Safety Board;
vii.     United States Attorney's Office;
viii.    West Virginia Attorney General's Office;
ix.      United States Coast Guard;
x.       Office of the Mayor of Charleston, West Virginia;
xi.      Office of the Governor of West Virginia;
xii.     Federal Bureau of Investigations; and
xiii.    Office of the United States Trustee.

(collectively, the "Governmental Agencies").

The MCHM that leaked into the Elk River flowed into WVAWC's downstream intake pipe. Subsequently, West Virginia Governor Earl Ray Tomblin issued a "do not use" order (the "Do Not Use Order") for the roughly 300,000 residents of Charleston, WV and the surrounding communities.

Freedom promptly commenced emergency response measures to contain the spill. Beginning on January 9, 2014, officials from the WVDEP and Diversified Services ("Diversified"), a pre-Petition Date environmental remediation contractor to Freedom, were on site addressing remediation matters. Work being performed by Diversified was supplemented with services provided by Clean Harbors, Inc. ("Clean Harbors"), which primarily handled emergency remediation of the Elk River.

---

[7] All references to MCHM below shall also include PPH.

[8] The facts and circumstances relating to the Incident as described herein are intended for explanatory purposes only and shall not prejudice the rights, claims, or defenses of any party in interest, including, without limitation, the rights of any purported holder of a claim arising from or related to the Incident, and correspondingly, all rights, claims, and defenses of the Debtor, its Estate and the Plan Administrators (on and after the Effective Date) of such rights, claims and defenses, and other parties in interest are preserved.

On January 10, 2014, WVDEP issued Order No. 8028 that required, *inter alia*, that Freedom, within twenty-four hours, begin removal of all material from all above ground storage tanks at Etowah River Terminal and store the material in an off-site area with secondary containment. Freedom immediately undertook efforts to commence compliance with Order No. 8028.

On January 14, 2014, WVDEP instructed the Debtor to focus its efforts on the ongoing containment and remediation of the spilled material and amended Order No. 8028 to provide that, *inter alia*, "[a]s soon as possible, but no later than fourteen (14) days from the effective date of the Order, Freedom Industries shall begin removal of all material from all above ground storage tanks and store the material in an off-site area which provides adequate secondary containment in accordance with 47 CSR 58, Section 4.8a.

On January 24, 2014, the WVDEP, following extensive negotiations with the Debtor and its environmental counsel, issued Consent Order No. 8034, that required, *inter alia*, on or before March 15, 2014, the Debtor must remove all material from all above ground storage tanks at the Etowah River Terminal by either selling the materials to customers, returning the materials to the original vendor, or storing the materials at an off-site area which provides adequate secondary containment in accordance with 47 CSR 58, Section 4.8a.

(b)        **Emergency Environmental Measures**

Immediately following the Incident, Freedom's representatives began meetings with representatives from the various Governmental Agencies. These meetings occurred daily for approximately the first month after the Incident.

Several groundwater monitoring wells were installed in areas affected by the Incident immediately after the Incident. Each of these wells were used to evaluate and sample the potential impact to deeper groundwater from the release of MCHM at the Etowah River Terminal. These wells continue in place as of the date of this Disclosure Statement.

In the weeks immediately following the Incident, subject to oversight by WVDEP, Diversified performed two primary duties. First, Diversified loaded and transported chemicals and other materials from the Etowah River Terminal in accordance with Order No. 8034 to off-site locations. Second, Diversified began digging several onsite containment trenches that were designed to capture any storm or ground water that ran through the Etowah River Terminal to ensure that such water did not flow into the Elk River.

On or about January 19, 2014, the Debtor engaged Civil & Environmental Consultants, Inc. ("CEC") to act as special environmental consultant. CEC's primary responsibility was management and oversight of the environmental remediation efforts including, without limitation, the undertakings by Diversified and liaison with the WVDEP.

CEC oversaw completion of three containment trenches at the Etowah River Terminal: a "lower trench," that is located adjacent to the Elk River, and two "upper trenches," that are located in a higher elevation than the lower trench, and were designed to capture storm and ground water prior to runoff into the lower trench.

CEC additionally oversaw the testing, sampling, and profiling of the water captured in the trenches. This testing occurred at least once, and often several times per week, in the weeks following the Incident. The testing of water captured in the trenches was (i) to determine whether the water being captured was potable, in accordance with applicable environmental regulations, and (ii) to determine whether chemicals were detectable in the water flowing through the Etowah River Terminal. The Debtor understands that generally, water is considered potable if there is less than one thousand (1,000) parts per billion of a given chemical in the water. A given chemical is not detectable in water if there is less than one hundred twenty (120) parts per billion of the chemical in a given sample. WVDEP has insisted since the Incident that the water captured in the trenches contain undetectable levels of MCHM.

The process of removing chemicals from the Etowah River Terminal began promptly following the Incident. The chemicals were removed in one of two ways: 1) they were sold in the ordinary course to customers in the early stages of the Debtor's bankruptcy proceeding; or, 2) they were moved by Diversified, at the direction of the Debtor and CEC, to the Debtor's Nitro Facility until they could be sold to customers in the ordinary course or otherwise disposed of in accordance with Order No. 8034. The entirety of these actions occurred with full knowledge and oversight by WVDEP.

By approximately March 15, 2014, emergency response activities were largely successful in removing all stored MCHM from the Etowah River Terminal. In addition, approximately six (6) to eight (8) inches of soil was removed from the former MCHM loading and handling area and replaced with clean gravel obtained from an offsite source.

(c)      **Environmental Remediation**

i.      Current Status

Since the completion of demolition work on the Etowah River Terminal site (as described below), it has been the goal of the CRO to finalize remediation efforts at the Etowah River Terminal under WVDEP's Voluntary Remediation Program (the "VRP"). Under the VRP, an applicant is entitled to negotiate a final remediation plan with WVDEP, the implementation of which is overseen by an agreed upon third party. The Debtor's VRP application was filed with WVDEP on or about January 6, 2015. Public notice was given of the Debtor's VRP application. The Debtor received notice dated February 28, 2015 that the application into the VRP was satisfactory subject to minor corrections. Thereafter, the Debtor and WVDEP executed a VRP Agreement dated March 30, 2015. The ultimate goal of a VRP participant is to receive a "certificate of completion" from WVDEP. As the CRO understands the VRP, it is typical for an applicant to be accepted into the VRP prior to the majority of testing and remediation work being undertaken. Traditionally, an applicant is subject to the VRP for an extended period of time because remediation work, testing, preparation of reports and corresponding review by WVDEP occur incrementally over time. Given the atypical circumstances of Freedom, however, the CRO undertook substantial water, soil and other testing in advance of the Debtor's acceptance into the VRP. The CRO likewise caused substantial soil and other remediation work to be completed prior to the Debtor's acceptance into the VRP. The CRO also caused substantial reporting that otherwise would be completed in the context of the VRP to be prepared prior to the Debtor's acceptance into the VRP. Accordingly, the CRO submits that the Debtor's path to

obtaining a certificate of completion from WVDEP is relatively short and well defined relative to a more traditional progression through the VRP.

The CRO has caused agents of the Debtor to remove approximately 600 cubic yards of soil from the Etowah River Terminal to date.   This soil has been removed from the areas where MCHM was either stored or handled (collectively, the "MCHM Footprint").   ARCADIS US, Inc. ("ARCADIS") is the Debtor's licensed remediation specialist under the VRP.   In this capacity, ARCADIS has developed and agreed upon a work plan under the VRP with WVDEP that provides for the further remediation steps to occur at the Etowah River Terminal.   These steps include, among others, the removal of a substantial additional volume of soil from areas including the MCHM Footprint, placing clean fill within the area where such soil is removed, covering the affected area with a liner of a form agreed to by WVDEP, and capping an area of the Etowah River Terminal in a manner and to an extent required by WVDEP.   This remediation work and attendant fees and costs of ARCADIS, among other costs, will be funded from the ERT Remediation Fund, which amount including a cash contribution by Chemstream of $1,100,000 upon Bankruptcy Court approval of the Chemstream Settlement plus funding of $1,400,000 by the Debtor on the Effective Date, will represent the final amount of funding by Freedom or other sources, for purposes of fulfilling the Debtor's obligations under the VRP and the Consent Order.   ARCADIS will oversee this remediation work in accordance with the terms and conditions of a Services Agreement between the Debtor and ARCADIS in conjunction with the Chemstream Settlement Agreement.   Remediation work in accordance with the VRP work plan will be paid for exclusively from the ERT Remediation Fund.

As of mid-May 2015, Freedom ran out of cash, and but for the Sale Escrow Advance, Freedom had no financial ability to continue to fulfill environmental obligations under the VRP and Consent Order.   Shortly after Freedom received the Sale Escrow Advance from the Sale Escrow, the Debtor, Chemstream and WVDEP explored ways to allow Freedom to continue to satisfy its environmental obligations at the Etowah River Terminal.   These discussions culminated in an agreement whereby Chemstream agreed to make the Chemstream Contribution upon entry of an order in a form and of substance acceptable to Chemstream, WVDEP and the Debtor approving a multi-party settlement agreement (the "Chemstream Settlement Agreement").   The Chemstream Settlement Agreement has been filed by the Debtor with the Bankruptcy Court on an expedited basis.   On the date the Chemstream Settlement was filed with the Bankruptcy Court, Chemstream paid the Debtor $250,000 to be funded into the ERT Remediation Fund  and in the event that the Bankruptcy Court were to approve the Chemstream Settlement Agreement and all other conditions precedent thereunder are satisfied or waived, Chemstream will provide the balance of the Chemstream Contribution, or $850,000 to the Debtor, for a total contribution of $1,100,000 to the ERT Remediation Fund.

Following completion of remediation efforts under the VRP or prior to such completion in the event of agreement by WVDEP, Freedom contemplates conveying title to the Etowah River Terminal, upon Bankruptcy Court approval, to a party and on terms and conditions acceptable to WVDEP.

     ii.    <u>Post-Incident Description of Events</u>

By March 15, 2014, in accordance with Order No. 8034: (i) all chemicals had been removed from the Etowah River Terminal; and (ii) all water being captured was well below the threshold of what is considered safe for consumption. The containment trenches were capturing all storm and ground water flowing through the Etowah Terminal site and nothing was flowing into the Elk River.

Beginning on or about March 30, 2014, environmental remediation measures shifted from stabilization of the site to cleanup of the site. Cleanup of the site is subject to a Tank Decommissioning Plan dated March 7, 2014 (the "<u>Decommissioning Plan</u>") and a Remediation Plan dated March 17, 2014 (the "<u>Remediation Plan</u>"). The Decommissioning Plan and the Remediation Plan were prepared by CEC and approved by the WVDEP.

The requirements of the Decommissioning Plan were required to be completed prior to undertaking the actions called for in the Remediation Plan. Generally, the Decommissioning Plan required the decommissioning, demolition, and removal of the tanks located at the Etowah River Terminal and established a process for the same. The Debtor was required to clean out the tanks and prepare them for demolition. All asbestos materials were then to be removed pursuant to applicable regulations. Following asbestos removal, the tanks were to be demolished and removed. The Decommissioning Plan required that the contractor performing the demolition provide and comply with a storm water management plan, as well as take certain dust control and safety measures. Asbestos abatement has occurred at the Etowah River Terminal, and the Debtor's Bankruptcy Court approved demolition contractor, Independence Excavating, Inc. has completed demolition and cleanup efforts for all tanks at the Etowah River Terminal on or about October 5, 2014.

The CRO instructed CEC and Diversified to reduce staff to better reflect the then-current state of the remediation (i.e., cleanup versus emergency stabilization). This significantly reduced the costs incurred by the Debtor relating to remediation.

The CRO proposed and negotiated a water management program acceptable to WVDEP. The water management program essentially called for the continued capture of water flowing through the Etowah River Terminal site in the containment trenches. The water is then pumped into one of several water storage tankers currently on site. All collected water is tested, documented with manifests, and then shipped to a commercial facility willing to accept the water. Since the appointment of the CRO, in excess of 2.5 million gallons of water have been captured and shipped from the Etowah River Terminal site. With oversight by WVDEP on or about November 21, 2014, the CRO caused a diversion trench to be finalized and implemented such that water previously flowing from the adjacent Yeager Airport property and through the Etowah River Terminal site was diverted in a manner whereby this water never actually comes into contact with soil at the Etowah River Terminal site. This action has reduced the costs of water collection and disposition by approximately 60% to date, and it is projected that the diversion trench has saved the Debtor no less than $250,000 in water collection and transportation costs.

On June 12 and June 13, 2014, a series of rain storms involving drenching rain occurred in Charleston, WV.  At the time, CEC, with the consent of the WVDEP, was testing the maximum capacity of the lower trench at the Etowah River Terminal. WVDEP asserts that some storm water ultimately escaped the lower trench and flowed into the Elk River. It is unclear whether this water originated at the Etowah River Terminal, or instead, flowed from the adjacent Yeager Airport. Despite protocols being in place for 24-hour monitoring of the site as between Diversified and a nighttime security detail, a representative of WVDEP detected the June 12 overflow, arriving at the site in the late afternoon. Although an orderly transition of the site from Diversified to the security detail had occurred daily, on the afternoon of June 12, while the CRO was attending to a family matter, employees of the Debtor, representatives of CEC, and Diversified all left the site, and no agents or employees of Freedom were monitoring the site when the WVDEP representative arrived. Given the heavy rainfall, a second overflow incident occurred on June 13. On June 17, 2014, the CRO filed an environmental status report with the Court [Docket No. 413] explaining these occurrences and certain corrective actions that were subsequently taken at the direction of the CRO. By memo dated June 20, 2014, the Court directed the U.S. Trustee to investigate matters occurring on June 12 and 13. The CRO actively cooperated with the U.S. Trustee in its investigation.

As a result of the events of June 12 and 13, the CRO, with consent of WVDEP, modified water retention trenches, water pumping approach and site monitoring staffing and protocol.

WVAWC was immediately notified of the potential that runoff water had escaped the lower trench and flowed into the Elk River.  WVAWC tested samples of the water that had come from the downstream intake pipe.  Those samples revealed no presence of MCHM (i.e., "undetectable" levels).

In response to the mid-June, 2014 incidents, the WVDEP strongly urged the Debtor to terminate CEC as environmental consultant.  The Debtor did so and on July 2, 2014, the Debtor filed an application to employ ARCADIS US, Inc. ("ARCADIS") as replacement environmental consultant, which the Court approved on July 2, 2014.  ARCADIS has since been overseeing remediation efforts at the Etowah River Terminal.  On July 10, 2014, the CRO also released the Debtor's facilities manager.  In late July, 2014, the CRO terminated the services of Diversified and a new remediation company, SPSI West, Inc. ("SPSI"), has been transitioned into the process at the direction and under the oversight of ARCADIS.

In mid-June 2014 the Debtor, through Diversified, began the process of cleaning all of the tanks so that they could be demolished.  The CRO met with approximately sixteen (16) demolition firms to discuss their interest in submitting a proposal to perform the demolition operations set forth in the Decommissioning Plan.  Ultimately, the CRO received four (4) proposals, two of which required the Debtor to pay several hundred thousand dollars for the demolition operations.  The CRO negotiated with the remaining two demolition firms and, ultimately, executed an agreement (the "Demolition Agreement") with Independence Contracting, Inc. ("Independence"), pursuant to which Independence agreed to demolish the tanks at the Etowah River Terminal.  Pursuant to the Demolition Agreement, Independence has paid the Debtor Twenty-Five Thousand ($25,000.00) Dollars in exchange for title to all scrap metals removed from the site as part of the demolition.

On May 30, 2014, the Debtor filed a motion for order authorizing an agreement for demolition operations in furtherance of WVDEP Consent Order No. 8034 [Docket No. 366 (the "Demolition Motion"). The Demolition Motion was approved by an order of the Bankruptcy Court entered on June 6, 2014 [Docket No. 385]. Prior to the commencement of actual demolition work, an expansive asbestos abatement process was undertaken with the consent of WVDEP. Although the Etowah River Terminal did not have significant asbestos containing materials, there were a variety of gaskets and other items that did contain asbestos. A thorough and precautionary inspection and abatement program were undertaken in an abundance of caution. Actual demolition work on the Etowah River Terminal began on July 15, 2014 and was completed in two phases. Phase 1 removed all tanks north of tank 402. Phase 1 was complete by the first week of July 2014. Phase 2 was delayed until the CRO was able to negotiate an acceptable and cost effective manner in which to continue to capture and store water on site. WVDEP required and the CRO on behalf of the Debtor located double lined baker tanks that the Debtor brought onto the site for water containment purposes. Prior to the commencement of the second phase of demolition, which primarily related to four storage tanks that contained water collected on the site, the Debtor was required to remove approximately 130,000 gallons of water from tanks 402, 403, 404 and 405. By September 15, 2014, the Debtor removed all remaining water from the tanks, and over the next 10 days completed cleaning these tanks. Phase 2 demolition was thereafter completed by the first week of October 2014 in a manner that ensured subsequent remediation costs are minimized. As part of this process, strict adherence to the Evidence Preservation Order occurred, thus requiring significant cooperation and coordination by the CRO and Independence with various regulatory authorities and other parties in interest.

(d)     **Costs of Environmental Remediation**

In the weeks following the Incident, the Debtor's representatives were required to meet with various officials from no less than 12 regulatory agencies on a daily basis. These meetings involved dozens of tours of the Etowah River Terminal site to discuss a variety of concerns raised by WVDEP and the appropriate methods to address those concerns. Over time, the frequency and length of the meetings was reduced. By March 30, 2014, the Debtor engaged in two or three "official" meetings per week with the WVDEP to discuss the ongoing remediation, however, since the Incident, representatives of WVDEP visit the Etowah River Terminal site on a daily basis including weekends.

The Debtor's special environmental counsel, Babst, Calland, Clements & Zomnir, P.C. ("Babst") has served as a liaison among WVDEP, the Debtor, and CEC (and now ARCADIS). Throughout the case, Babst has primarily overseen meetings with WVDEP, assisted with tours of the site, and negotiated with WVDEP regarding the appropriate ways to address WVDEP's concerns relating to remediation.

Through the end of March, 2015, the Debtor has disposed of in excess of 2.5 million gallons of water and continues to capture and dispose of an additional average of approximately 90,000 gallons of water each week. The water is shipped pursuant to several long-term contracts with commercial facilities to ensure that there is ample coverage to dispose of the water. Of late, in many instances, the Debtor is able to ship water to the Charleston Sanitary Board at a cost of $0.07 per gallon compared to $.50 per gallon with other alternatives.

The Debtor has committed substantial resources to the aforementioned emergency response and then remediation measures.  The Debtor incurred approximately Three Million Four Hundred Thousand ($3,400,000.00) Dollars relating to the emergency measures taken from the Petition Date through March 30, 2014.  Since appointment, the CRO has prepared budgets for all costs expected to be incurred by the Estate, including, primarily, costs associated with remediation, testing, water collection and disposition.  Many costs associated with environmental clean-up are not easily projected by the CRO.  This is true for two primary reasons.  First, a large component of environmental-related expenditures is water collection and disposition.  The CRO, however, has no reasonable means to predict water flow through the site largely generated as a result of precipitation in the greater Charleston area.  The second element of environmental-related expenditures that is out of the control of the CRO is requests by WVDEP.  The CRO has gone to great lengths in the environmental clean-up process to comply with as many requests or demands of regulatory authorities relating to the clean-up process as is practicable given the limited resources of the Debtor.  Costs associated with such compliance have not proven to be predictable.  Since appointment of the CRO approximately $1,700,000 has been expended on water collection and disposition, and approximately $5,374,000 has been expended on site remediation related matters.  Accordingly, since the Petition Date, no less than approximately $10,470,000 has been expended on matters relating directly to cleanup resulting from the Incident.

Through the end of February 2015, approximately $600,000 has been incurred by the Debtor for fees and expenses of special environmental counsel.  This amount does not include the additional counsel costs incurred in responding to coordinating with and otherwise addressing requests and inquiries from regulatory authorities other than the WVDEP, or counsel fees in connection with matters implicating the intersection between bankruptcy law and environmental and other regulatory matters.

### C.    Chemical Spill Lawsuits

On the Petition Date, approximately twenty-eight (28) lawsuits naming Freedom as a defendant were pending in state and federal district court (the "Chemical Spill Lawsuits").  The Debtor believed that promptly determining a strategy to address the Chemical Spill Lawsuits was critical to assuring its vendors and customers that the Debtor had a realistic path to reorganization.

The Debtor determined that litigating dozens of lawsuits in different forums was untenable.  The Debtor, with advice of counsel, determined, in its business judgment, that it was necessary for strategic and efficiency purposes to consolidate the Chemical Spill Lawsuits in one forum.

On February 21, 2014 and February 22, 2014, the Debtor filed notices ("Freedom's Notices of Removal") in the Bankruptcy Court pursuant to Rule 9027 of the Bankruptcy Rules removing each of the Chemical Spill Lawsuits in which Freedom was a named defendant.  On or about February 24, 2014, WVAWC filed notices ("WVAWC's Notices of Removal" and, collectively with Freedom's Notices of Removal, the "Notices of Removal") in the Bankruptcy Court pursuant to Rule 9027 of the Bankruptcy Rules removing each of the Chemical Spill Lawsuits in which the Debtor was not a named defendant.

Subsequent to the filing of the Notices of Removal, on March 3, 2014, the Debtor and WVAWC filed a motion to withdraw the reference of the Chemical Spill Lawsuits to the District Court.  On April 16, 2014, the District Court entered a Memorandum Opinion and Order withdrawing the reference of the Chemical Spill Lawsuits and consolidating those lawsuits into one case for purposes of remand arguments, at case No. 14-14845 (the "Consolidated Action").

On June 3, 2014, plaintiffs in the Consolidated Action filed a joint motion to remand ("Remand Motion") and brief in support thereof.  The purpose of the Remand Motion was to have the Chemical Spill Lawsuits heard by a state court judge in Kanawha County, West Virginia. On June 27, the defendants, including the Debtor, filed a joint brief (the "Response Brief") in opposition to the Remand Motion.  On July 18, 2014, plaintiffs filed a reply to the Response Brief.  Substantial additional argument and briefing has occurred before the District Court in the Consolidated Action.  Since the time of execution of a term sheet for a proposed class action settlement involving the Debtor (which settlement, as described below, is no longer moving forward) the Debtor has taken a neutral position with respect to the venue in which the class action litigation should properly occur.  The Plan is neutral with respect to the venue for the class action litigation as well.  The District Court has not made a ruling with respect to the Remand Motion, and the Debtor has no indication at this time when such ruling may occur.

Almost immediately following the filing of the Notices of Removal, certain plaintiffs' representatives contacted counsel to the Debtor in an effort to discuss a global resolution.  Those discussions ultimately resulted in the outline of a global settlement.  This settlement in principle was memorialized in a comprehensive term sheet previously filed by the Debtor as Exhibit "B" to the Debtor's Disclosure Statement (the "Prior Disclosure Statement") dated as of August 18, 2014 [Docket No. 532].  Within approximately one month following the Debtor having filed a Plan of Liquidation (the "Prior Plan") dated as of August 18, 2014 [Docket No. 531], the Bankruptcy Court issued certain rulings [Docket No. 557] critical of the Prior Plan and the Prior Disclosure Statement.  Subsequently, after notice and hearing [Docket No. 587], and upon recommendation by the Committee, the Bankruptcy Court made an oral ruling requiring the Debtor to focus its efforts primarily, if not exclusively, on environmental remediation matters.

The class action settlement term sheet was premised on certain assumed levels of cash available to the Debtor and certain other financial projections.  With the passage of time and the substantial cash dedicated to environmental remediation efforts, the financial assumptions on which the class action settlement term sheet was premised are no longer applicable in the current context of this Case.  Likewise, certain pleadings filed by WVAWC made clear that WVAWC intended to vigorously oppose the proposed class action settlement and the Prior Plan, which was premised on the class action settlement term sheet.  For these reasons, the Debtor and counsel to the then-proposed putative settlement class action plaintiffs determined not to further pursue approval of the proposed class action settlement.

Notwithstanding the fact that approval of the proposed class action settlement is no longer being pursued, negotiations relating to the Plan have involved Spill Claim Counsel, whom the CRO understands to support the Plan.  The CRO further understands that WVAWC does not object to the Plan.