**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| In re ) | |
| ) | **Chapter 11** |
| **FREEDOM INDUSTRIES, INC.** ) | |
| ) | **Case No. 2:14-bk-20017** |
| **Debtor.** ) | |
| ) | |

**DECLARATION OF MARK WELCH, CHIEF RESTRUCTURING OFFICER**
**OF FREEDOM INDUSTRIES, INC., IN SUPPORT OF CONFIRMATION**
**OF THE DEBTOR'S THIRD MODIFIED AMENDED PLAN OF LIQUIDATION**
**DATED AUGUST 12, 2015**

MARK WELCH, being duly sworn, deposes and declares under the penalty of perjury as follows:

I am over the age of 18, am mentally competent, have personal knowledge of the facts of this matter, except where stated as based upon information and belief, and if called upon to testify, could and would do so, and would testify in the manner set forth in this declaration on my behalf.

I am the Chief Restructuring Officer (the "CRO") of Freedom Industries, Inc. ("Freedom" or the "Debtor"), debtor and debtor in possession in the above referenced chapter 11 bankruptcy case (the "Chapter 11 Case"). I have served as CRO of the Debtor for the majority of the Chapter 11 Case, since my appointment to the position on March 18, 2014 pursuant to order of the Bankruptcy Court. In my capacity as CRO, I am very familiar with the Debtor's Chapter 11 Case and the financial affairs of the Debtor.

I make this declaration in support of confirmation of the Debtor's Third Modified Amended Plan of Liquidation dated August 12, 2015 [Docket No. 872] (the "Plan")[1]. I make this declaration in support of the concurrently filed Memorandum of Law in Support of Confirmation of the Debtor's Third Modified Amended Plan of Liquidation dated August 12, 2015 (the "Memorandum"). I make the following statements based upon my personal knowledge and my knowledge of the business records of the Debtor.

The Plan represents the final phase of the Debtor's efforts to make the best of a complex and difficult set of circumstances that arose as a result of a chemical spill incident at the Debtor's Etowah River Terminal facility (the "ERT Site") located in Charleston, West Virginia. The Plan represents the culmination of significant negotiations with what I understand to be every major constituency in the Chapter 11 Case that was represented by counsel and participated in the Chapter 11 Case. At all times since my appointment as CRO, my dual goals have been (i) to remediate the ERT Site in a manner satisfactory to the West Virginia Department of

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the Third Modified Amended Plan of Liquidation Dated August 12, 2015.

Environmental Protection ("WVDEP") and (ii) the confirmation by the Bankruptcy Court of a chapter 11 plan that provides for a financial recovery by various creditor constituencies of Freedom and ties up as many loose ends in the Chapter 11 Case as possible.

It is my view that the Plan accomplishes these goals. The Plan results from and specifically reflects negotiations and discussions with parties in interest, including but not limited to (i) WVDEP, (ii) Chemstream, (iii) the Committee, (iv) Spill Claim Counsel, (v) the Former Ds and Os, (vi) Southern, (vii) Professionals, (viii) the Internal Revenue Service, and (ix) the Office of the U.S. Trustee. I either personally participated in negotiations or am generally aware through discussions with bankruptcy counsel to Freedom of negotiations and discussions with each of the aforementioned parties in interest.

Assuming confirmation of the Plan, on the Effective Date, Freedom's otherwise illiquid bankruptcy estate will receive aggregate funds with a value of approximately $6.10 million. Of this amount, in accordance with a previously approved settlement agreement among Freedom, Chemstream and WVDEP, $1,400,000 will be paid to the ERT Remediation Fund to supplement the $1,100,000 already paid into the ERT Remediation Fund by Chemstream, for the purpose of assuring full and final remediation of the ERT Site to the satisfaction of WVDEP. Remediation work will be overseen by CORE Environmental Services, Inc., an environmental firm selected by WVDEP. The balance of the proceeds received by Freedom on the Effective Date will be paid either directly to creditors or to third parties for the benefit of creditors of the Debtor. Importantly, the Plan allows for the holders of Spill Claims of $3,000 or less to receive a distribution of approximately 44% of each such claim in relatively short order following the Effective Date. Likewise, an initial payment will be made to the Spill Claim Plan Administrator for the benefit of the holders of Spill Claims larger than $3,000. The Plan further allows for an initial payment to the GC Plan Administrator for the benefit of the holders of unsecured claims that are not Spill Claims.

The Plan sets forth specific means for its implementation. The Plan provides for the collection of the Sale Escrow as a result of the Chemstream Settlement (previously approved by order of the Bankruptcy Court) and the settlement provided for in the Plan with the Former Ds and Os. By virtue of a settlement with Southern provided for under the Plan, the Plan provides for the collection of the AIG Settlement Proceeds and the Southern Contribution. Collectively, the proceeds of the Sale Escrow, the AIG Settlement Proceeds and the Southern Contribution form the basis for funding of the Plan. The Plan specifically provides for the appointment on the Effective Date of the Spill Claim Plan Administrator and the corresponding Spill Claim Oversight Committee for purposes of providing guidance to the Spill Claim Plan Administrator with respect to, among other items, distributions to the holders of Spill Claims, a process for determining the allowance of Spill Claims and matters relating to potential litigation arising from or relating to the Incident. The Plan further provides for the appointment of the GC Plan Administrator on the Effective Date for purposes of addressing claims allowance and distributions to holders of general unsecured claims that are not Spill Claims. The Plan also provides for the Spill Claim Plan Administrator to receive one hundred percent of the ownership interests in Freedom on the Effective Date.

The exculpation, release and injunctive provisions in Article XI of the Plan (i) are integral to the overall objectives of and settlements incorporated into the Plan, (ii) are essential to

the formulation and successful implementation of the Plan, (iii) are being provided for valuable consideration and have been negotiated in good faith and at arms' length, (iv) confer substantial and material benefit on the Estate, and (v) are in the best interests of the Debtor, the Estate and other parties in interest. The Plan contains limited third party releases of Southern, however, the third party releases of Southern are only from those represented parties specifically identified in the Plan that have negotiated and agreed to such releases. The Plan does not contain any involuntary third-party releases.

The Debtor is seeking confirmation of the Plan in good faith in order to equitably and efficiently distribute the Debtor's limited assets and to allow litigation rights not otherwise released under the Plan to proceed without impact of the automatic stay imposed on the Petition Date as a result of the Debtor having filed the Chapter 11 Case. I believe that the Debtor's good faith is demonstrated by the number of parties in interest with which the terms and conditions of the Plan have been negotiated and the overwhelming support of the Plan by each impaired Class of creditors that has voted on the Plan.

The Plan contains the disclosures required by applicable provisions of section 1129 of the Bankruptcy Code with respect to identification of parties involved on behalf of the Debtor on and after the Effective Date. My role as CRO will terminate on the Effective Date and the Spill Claim Plan Administrator will essentially succeed to my role on the Effective Date.

The Debtor is not subject to regulation of the type set forth in the applicable provision of section 1129 of the Bankruptcy Code and the Plan does not propose any rate changes.

I created the general liquidation analysis reflected in the Disclosure Statement. I absolutely believe that return to creditors under the Plan is substantially higher than the return that may occur if the Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code. The substantial risk, cost and delay associated with litigation that would occur in the event of a chapter 7 case rather than settling with parties in the manner proposed under the Plan justify confirmation of the Plan rather than conversion of the Case to a case under chapter 7. Likewise, the ability to fund the ERT Remediation Fund and equitably distribute the cash proceeds of Estate assets would be highly speculative if the Chapter 11 Case were converted to a case under chapter 7.

I substantially contributed to the Litigation Analysis developed with bankruptcy counsel to Freedom which was filed at Docket No. 817. I believe that the settlements effectuated through the Plan benefit the Debtor and its creditors by avoiding the time, expense, and uncertainty of years of protracted litigation, while at the same time providing the means necessary for the equitable treatment of claims. Absent settlements with the Former Ds and Os and Southern, I believe that there would be no pool of cash available anytime soon, if at all, to either satisfy the claims of creditors of Freedom or fund additional site work at the Etowah River Terminal.

I believe that as of the Effective Date, there will be adequate funds available to satisfy the obligations under the Plan for which the Debtor is responsible.

It is my understanding that the Debtor has no retiree benefits subject to the applicable provisions of section 1129 of the Bankruptcy Code.

The Plan provides for the payment of all fees due to the Office of the U.S. Trustee through the Effective Date of the Plan and thereafter. Draft versions of the Plan were shared with the Office of the U.S. Trustee prior to the filing of the Plan, and it is my understanding that the Office of the U.S. Trustee has no objections to the Plan.

Prior to the Confirmation Hearing, I will have engaged in detailed discussions with the Plan Administrators in order to assure a smooth transition of matters from me in my capacity as CRO to the Plan Administrators on the Effective Date.

I verify under the penalty of the laws of the United States of America that the foregoing statements in this declaration are true and correct to the best of my information, knowledge and belief.

Executed this 30th day of September 2015.

FREEDOM INDUSTRIES, INC.


By:  /s/ Mark Welch
     MARK WELCH, Chief Restructuring Officer