**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| In re ) | |
| ) | **Chapter 11** |
| **FREEDOM INDUSTRIES, INC.** ) | |
| ) | **Case No. 2:14-bk-20017** |
| **Debtor.** ) | |
| ) | |

**DEBTOR'S MEMORANDUM IN SUPPORT OF CONFIRMATION OF THIRD**
**MODIFIED AMENDED PLAN OF LIQUIDATION DATED AUGUST 12, 2015**

The above-captioned debtor and debtor-in-possession (the "Debtor" or "Freedom") hereby files the within memorandum of law (the "Memorandum") in support of confirmation of the Third Modified Amended Plan of Liquidation dated August 12, 2015 [Docket No. 872]. In support of entry of the Confirmation Order,[1] the Debtor respectfully represents as follows:

### I.     BACKGROUND

1. On January 17, 2014 (the "Petition Date"), the above-captioned Debtor commenced a case in the United States Bankruptcy Court for the Southern District of West Virginia (the "Bankruptcy Court") by filing a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

2. Since entry of an order of approval dated March 18, 2014 [Docket No. 228], the Debtor's representative responsible for managing the affairs of the Debtor has been Mark Welch, in his capacity as Chief Restructuring Officer (the "CRO"). The Debtor has managed its property and affairs as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. On February 5, 2014, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee"). To date, no trustee or examiner has been requested or appointed in the Case.

4. Since the Petition Date, the Debtor has pursued two fundamental goals in the Case: (a) remediation of the Etowah River Terminal in a manner satisfactory to WVDEP and (b) development of a plan of liquidation that would not only fund environmental remediation of the

---

[1] Capitalized terms not defined in this Memorandum have the meanings ascribed to them in the Third Modified Amended Plan of Liquidation dated August 12, 2015.

Etowah River Terminal, but also provide a return to other creditors in the Case and wrap up as many matters in the Case as possible.

5. Given the substantial requirements associated with environmental remediation of the Etowah River Terminal, the Debtor ran out of cash in mid-2015. The Debtor's cash position, among other items, was the impetus for the Debtor to reach accommodations with WVDEP. These accommodations were accomplished, in large part, through the Chemstream Settlement Agreement which was approved by order of the Bankruptcy Court dated July 8, 2015 [Docket No. 836]. The Chemstream Settlement provided for continued funding of environmental remediation at the Etowah River Terminal and likewise provided (i) a financial cap on Estate funding of remediation relating to the Etowah River Terminal, (ii) a mechanism for fully funding the ERT Remediation Fund, (iii) a protocol for addressing environmental remediation matters at the Etowah River Terminal, and (iv) a requirement that WVDEP support confirmation of a plan of liquidation consistent with the terms and conditions of the Chemstream Settlement. Bankruptcy Court approval of the Chemstream Settlement and closing thereunder allowed the Case to progress to a point where confirmation of the Plan is supported by every significant constituency represented by counsel with which the Debtor, through the CRO, has had dealings in the Case.

6. On June 17, 2015, the Debtor filed its Modified Amended Plan of Liquidation dated June 17, 2015 [Docket No. 815] (the "Amended Plan") and accompanying Modified Amended Disclosure Statement dated June 17, 2015 [Docket No. 815] (the "Amended Disclosure Statement"). On July 28, 2015 the Bankruptcy Court conducted a hearing on the adequacy of the Amended Disclosure Statement (the "Disclosure Statement Hearing"). One objection (the "Arcadis DS Objection") was filed in opposition to approval of the Modified Amended Disclosure Statement by Arcadis US, Inc. ("Arcadis").

7. At the Disclosure Statement Hearing, the Bankruptcy Court expressed concerns about matters raised by Arcadis and likewise provided certain comments and suggestions with respect to the Amended Disclosure Statement and Amended Plan of Liquidation. Thereafter, on August 7, 2015, the Debtor filed its Second Modified Amended Plan of Liquidation dated August 7, 2015 [Docket No. 865] (the "Second Modified Amended Plan") and accompanying Second Modified Amended Disclosure Statement dated August 7, 2015 [Docket No. 865] (the "Second Modified Amended Disclosure Statement"). On August 10, 2015, the Bankruptcy Court

2

entered an order sustaining the Arcadis DS Objection [Docket No. 871] (the "Order Denying Approval")

8. On August 12, 2015, the Debtor filed (i) a Third Modified Amended Plan of Liquidation dated August 12, 2015 [Docket No. 874] (the "Plan"); (ii) an accompanying Third Modified Amended Disclosure Statement dated August 12, 2015 [Docket No. 872] (the "Disclosure Statement"); (iii) a CRO Time Report For The Period Of September 1, 2014 Through June 30, 2015; and (iv) a Stipulated Order Relating to Professional Fees and Expenses [Docket No. 876] (the "Initial Professional Fee Stipulated Order").

9. In response to the Order Denying Approval, on August 14, 2015, WVDEP filed a Motion To Amend Or Alter The Order Denying Approval [Docket No. 880] (the "WVDEP Reconsideration Motion"), and the Debtor filed a Response to the WVDEP Reconsideration Motion on August 19, 2015 [Docket No. 882]. On August 25, 2015, in an effort to resolve the Order Denying Approval and the WVDEP Reconsideration Motion, the Debtor filed a Stipulated Order Resolving the Fee and Expense Claim of Arcadis US, Inc. [Docket No. 883] (the "Arcadis Stipulated Order"). The Arcadis Stipulated Order had the effect of amending and modifying the Initial Professional Fee Stipulated Order, and as such, all Professionals that were parties to the Initial Professional Fee Stipulated Order also executed the Arcadis Stipulated Order.

10. On August 26, 2015, in recognition of the several thousand individuals and small business holding Class 3, Class 4 and Class 5 Claims who are not familiar with the bankruptcy process, the Debtor filed with the Bankruptcy Court a Summary Overview of the Plan and Disclosure Statement [Docket No. 884] (the "Summary Overview"). A proposed form of ballot for accepting or rejecting the Plan was filed on August 26, 2105 [Docket No. 885] (the "Ballot").

11. By order dated August 26, 2015 [Docket No. 886] (the "Disclosure Statement Order"), the Bankruptcy Court approved the Summary Overview as a form of Disclosure Statement and authorized and directed the Debtor to serve the Disclosure Statement Order, the Summary Overview and the Ballot among other items on all creditors and parties in interest. The Disclosure Statement Order also (i) established September 28, 2015 at 5:00 p.m. Prevailing Eastern Time as the deadline for voting on the Plan and/or asserting objections to the Plan (the "Voting/Objection Deadline"), and (ii) scheduling the Confirmation Hearing to commence on October 2, 2015 at 1:30 p.m. Prevailing Eastern Time.

12. The Debtor served the Disclosure Statement Order, the Summary Overview, the Ballot and other documentation in accordance with the Disclosure Statement Order and filed a Certificate of Service evidencing service of these pleadings and documents on September 3, 2015 [Docket No. 892].

13. Only one objection to confirmation of the Plan was filed by the Voting/Objection Deadline. That objection was filed by the Internal Revenue Service on August 28, 2015 [Docket No. 887] (the "IRS Plan Objection") and was premised on the fact that certain federal tax returns of the Debtor were delinquent. The Debtor promptly addressed this situation and filed delinquent federal tax returns. On September 18, 2015, a Notice of Withdrawal of the IRS Plan Objection was filed [Docket No. 898].

14. On September 1, 2015, the Bankruptcy Court approved local claims agent, James Lane, Jr., submitted an Application for Compensation for the Period of 09-01-14 to 03-30-15 in aggregate amount of $14,393.88 [Docket No. 889] (the "Additional Claims Agent Application"). Given the amounts paid to James Lane, Jr. during the course of the Case relative to other Professionals and the delay in filing of the Additional Claims Agent Application, it was agreed by the local claims agent and the Debtor (as well as the other Professionals in the Case) that the compensation subject to the Additional Claims Agent Application would be incorporated into a modification of the Arcadis Stipulated Order, with all amounts under the Additional Claims Agent Application to be paid in one or more subsequent distributions to Professionals from litigation recoveries, if any, rather than from cash allocated to Professionals under the Plan on the Effective Date. An amendment to the Arcadis Stipulated Order was filed with the Bankruptcy Court on September 30, 2015.

15. On September 30, 2015, the Debtor filed a Report of Balloting for the Third Modified Amended Plan of Liquidation (the "Report of Balloting"). Specifically, 100% of the holders and 100% in amount of Class 1—IRS Secured Claim; 100% of the holders and 100% in amount of Class 3—General Unsecured Claims; 98% of the holders and 98% in amount of Class 4--Spill Claim Convenience Class Claims; and 99% of the holders and 97% in amount of Class 5—Spill Claims all voted to accept the Plan. As evidenced by the Report of Balloting, the overwhelming majority of creditors eligible to vote to accept or reject the Plan, that timely submitted Ballots, voted to ACCEPT the Plan. Class 6—Equity Interests are statutorily deemed to reject the Plan and were not eligible to vote to accept or reject the Plan. No holders of Class

2—Priority Tax Claims submitted a Ballot. There are only estimated to be 3 holders of such Claims in an amount totaling less than approximately $5,000. Applicable case law, addressed below, provides that a non-voting class can be deemed to accept a plan.

## II. ARGUMENT

### a. The Plan Complies with the Applicable Provisions of the Bankruptcy Code and Should be Confirmed

#### i. The Plan Complies with Section 1129(a)(1) of the Bankruptcy Code

16. Pursuant to section 1129(a)(1) of the Bankruptcy Code, a plan of reorganization must comply with the applicable provisions of chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) indicates that a principal objective of this provision is to assure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization set forth in sections 1122 and 1123 of the Bankruptcy Code. See H.R. REP. No. 95-595, at 412 (1977); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 136, 158-60 (D. Del. 2006) (discussing compliance with sections 1129(a)(1), 1122 and 1123). The Plan complies with and satisfies all of these provisions.

#### ii. The Plan Complies with Section 1122 of the Bankruptcy Code

17. Pursuant to section 1122(a) of the Bankruptcy Code, a plan proponent is afforded significant flexibility in classifying claims, provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar. *See In re Mason & Dixon Lines, Inc.*, 63 B.R. 176, 180 (Bankr. M.D.N.C. 1986) (plan proponents may rationally classify general unsecured claims, "subject only to the requirement of Section 1122(a) that all claims placed within the same class be substantially similar"); *see also CWCapital Asset Mgmt., LLC v. Burcam Capital II, LLC*, 2014 U.S. Dist. LEXIS 87900, *9-*10 (E.D.N.C. June 24, 2014) ("As a general rule, if a debtor can articulate a legitimate business justification for separate classification of unsecured claims, the courts will allow separate classification.").

18. Under the Plan, each class of Claims and Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within such class. *See* Plan, Art. III. In addition, valid business, legal and factual reasons exist for the separate classification of each of the classes of Claims and Equity Interests created under the

5

Plan, and such classes do not unfairly discriminate between or among holders of Claims and Equity Interests.

### iii. The Plan Complies with Section 1123 of the Bankruptcy Code

19. The Plan also complies with section 1123(a) of the Bankruptcy Code, which sets forth certain requirements with which every chapter 11 plan must comply. *See* 11 U.S.C. § 1123(a). The Plan fully complies with each such requirement. First, the Plan designates classes of Claims as required by section 1123(a)(1) of the Bankruptcy Code. *See* Plan, Art. III. Second, the Plan specifies which classes of Claims and Equity Interests are not impaired and sets forth the treatment for all impaired classes of Claims and Equity Interests as required by sections 1123(a)(2) and (3) of the Bankruptcy Code. See Plan, Art. III and IV. Indeed, the Plan specifies the treatment of all of the classes designated under the Plan, whether such classes are impaired or not. *Id.* Third, the Plan provides for the same treatment for each Claim or Equity Interest within a particular class as required by section 1123(a)(4) of the Bankruptcy Code. *See* Plan, Art. V. Fourth, the Plan provides for adequate means of implementation as required by section 1123(a)(5) of the Bankruptcy Code. See Plan, Art. VI. Fifth, as reflected in the Plan, there are no provisions allowing for the issuance of non-voting equity securities by the Debtor prior to the Effective Date, in order to comply with section 1123(a)(6) of the Bankruptcy Code.

20. In addition to the provisions required by section 1123(a) of the Bankruptcy Code, the Plan also contains numerous provisions permitted by section 1123(b) of the Bankruptcy Code. Among other things, the Plan provides for the rejection of executory contracts not assumed with approval of the Bankruptcy Code on or before the Confirmation Date, and provides for the retention of Causes of Action, except those expressly released under the Plan. *See* Plan, Art. X and § 11.6. All of the provisions of the Plan are consistent with section 1123(b) of the Bankruptcy Code and permissible under applicable law.

#### 1. Executory Contracts and Unexpired Leases

21. Consistent with section 1123(b)(2) of the Bankruptcy Code, the Plan provides for the rejection of all executory contracts not previously assumed, as permitted by section 365 of the Bankruptcy Code. See Plan, § 9.2. Under section 365 of the Bankruptcy Code, a debtor may reject executory contracts that are burdensome to the estate.

22. A debtor's motion to assume or reject an executory contract or unexpired lease is subject to judicial review under the business judgment standard. *See Lubrizol Enters. v.*

*Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985) (stating that courts must "start with the proposition that the bankrupt's decision upon it is to be accorded the deference mandated by the sound business judgment rule as generally applied by courts to discretionary actions or actions of corporate directors"); *see also Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989). Under this standard, the debtor's determination that assumption or rejection of an executory contract will benefit the bankruptcy estate should not be disturbed by the bankruptcy court unless such determination is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim, or caprice." *Lubrizol*, 756 F.2d at 1047.

23. In this liquidating case, the Debtor has exercised sound business judgment in its decision regarding the rejection of the executory contracts and unexpired leases under the Plan. Because the Debtor has ceased all business operations and is liquidating, it seeks to reject contracts that are burdensome or of inconsequential value to the Estate.

**2. Releases and Injunctions**

**a. The Plan's Release, Injunction, and Exculpation Provisions are Appropriate and Should be Approved.**

24. The Plan provides for a "Debtor Release" of certain Estate Causes of Action and a "Limited Third-Party Release of Southern," as well as customary exculpation and injunction provisions. (See generally, Plan §§ 11.7 – 11.13.) No creditor entitled to vote to accept or reject the Plan was obligated to provide a third-party release. Rather, the Limited Third-Party Release of Southern is entirely voluntary and was fully negotiated.

25. Significant matters otherwise requiring complex, time consuming, expensive and risky litigation (see, CRO Litigation Analysis filed in connection with the Third Modified Amended Plan of Liquidation dated August 12, 2015 [Docket No.865]) have been substantially resolved pursuant to the various settlements among the parties and incorporated in the Plan. The Debtor respectfully submits that the releases and corresponding injunctions provided by the Plan are an important step to bring this Case to a conclusion. Further, the releases contemplated by the Plan implement a fundamental aspect of the settlements that form the foundation for funding the Plan. Further, and as described more fully below, such releases fairly reflect the significant contributions of value to the Estate provided by the applicable parties.

### 1. The Debtor Release and Corresponding Release by Other Releasing Parties Are Appropriate and Should be Approved.

26. Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." Furthermore, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate. *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) ("The standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019 . . . ."). Courts in the Fourth Circuit and in other circuits will approve a settlement unless "the settlement falls below the lowest point in the range of reasonableness." *In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995); *see also In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be "within the reasonable range of litigation possibilities") (internal quotation marks omitted).

27. To determine the propriety of debtor releases of third parties in a chapter 11 plan, the Fourth Circuit Court of Appeals has endorsed 6 substantive factors to consider (the "*Dow Corning* factors"), which were first identified in *Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648 (6th Cir. 2002):

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; [and] (6) The Plan provides an opportunity for those claimants who choose not to settle to recover in full.

*Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 (4th Cir. 2014) (citing *Dow Corning*, 280 F.3d at 658).

28. "A debtor need not demonstrate that every *Dow Corning* factor weighs in its favor to obtain approval of a non-debtor release." *Id.* at 351-52. The Debtor submits that each of the first five factors supports the proposed Debtor Release in this Case. First, there is an identity of

interest between the Debtor and the parties to be released.  Each of the Released Parties, as stakeholders and critical participants in the Plan process, share a common goal with the Debtor in seeing the Plan succeed.  Like the Debtor, these parties seek to confirm the Plan and implement the transactions contemplated thereunder.  *See, In re Tribune Co.* 464 B.R. 126, 187 (Bankr. D. Del. 2011), modified, 464 B.R. 208 (Bankr. D. Del. 2011) (noting that an identity of interest between the debtors and the settling parties where such parties "share[d] the common goal of confirming the DCL Plan and implementing the DCL Plan Settlement"); *Zenith*, 241 B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize").  The Debtor Release is an essential component of the settlements that make the Plan possible and creates the entirety of the value to be distributed under the Plan.  Based on the foregoing, an identity of interests exists between the Debtor and stakeholders receiving releases from the Debtor.

29.     Second, each of the Released Parties have made or will make substantial contributions to the Debtor and its Estate and aided in the Plan process.  The Released Parties played an integral role in the negotiation of the Plan.  Importantly, the Plan reflects the settlement and resolution of complex disputes, and the Debtor Release and corresponding Release By Other Release Parties are integral components of the consideration – including the Former Ds and Os Contribution which will allow the Debtor to collect proceeds of the Sale Escrow and the Southern Contribution which will (i) allow the Debtor to recover the AIG Settlement Proceeds and (ii) provide a cash payment of $300,000 on the Effective Date - to be provided in exchange for the compromises and resolutions embodied in the Plan.

30.     Without the substantial contributions of the Released Parties, the Debtor's ability to confirm a Plan, which Plan is supported by the overwhelming majority of parties entitled to vote to accept or reject the Plan, would be severely impaired.  On this basis, the Debtor Release is warranted.

31.     Third, the Debtor Release is essential to the Plan itself.  As noted above, the Debtor Release was necessary to build the level of consensus with respect to the Plan and the settlements contemplated thereby.

32.     Fourth, as evidenced by the Voting Certification and as noted herein, the Debtor's stakeholders overwhelmingly support the Plan.  As noted in the Voting Certification, every

single Class entitled to vote on the Plan, voted to accept the Plan. This includes overwhelming support by holders of Class 4 Convenience Spill Claims and holders of Class 5 Spill Claims that voted on the Plan. Given the critical nature of the Debtor Release to the Plan, this degree of consensus evidences the Debtor's stakeholders' support for the Debtor Release and the Plan.

33. Fifth, the Plan provides for recoveries for all classes of creditors affected by the Debtor Release. As various pleadings filed by the CRO on behalf of the Debtor have described, the Estate is insolvent in reality and by a significant margin in a hypothetical chapter 7. Conversely, the Plan provides meaningful recoveries to stakeholders or their designed representatives on the Effective Date.

34. On this record, the Debtor Release is justified, in the best interests of the Debtor's creditors and Estate, and should be approved under section 1123(b)(3)(A) of the Bankruptcy Code.

## 2. The Limited Third-Party Releases of Southern Are Fully Consensual and Should Be Approved.

35. The Plan provides an appropriately tailored Limited Third-Party Releases of Southern—set forth in Section 11.11 of the Plan—that applies only to a specified group of consenting parties and, therefore, should be approved. Numerous courts have recognized that a chapter 11 plan may include a release of nondebtors by nondebtors when such release is consensual. *See, e.g., Indianapolis Downs*, 486 B.R. at 305 (collecting cases); *Spansion*, 426 B.R. at 144 (stating that "a third party release may be included in a plan if the release is consensual"). Specifically, the Plan provides for a discharge and release of specified claims against Southern in exchange for the Southern Contribution and a separate specified payment to one of the class action plaintiff groups that has agreed to participate in the Limited Third-Party Releases of Southern.

36. The Limited Third-Party Releases of Southern are consensual and should be approved. The Limited Third-Party Releases of Southern were a material inducement of the settlement with Southern and the corresponding Southern Contribution under the Plan.

37. Accordingly, the Debtor and submits the Limited Third-Party Releases of Southern are appropriately tailored under the circumstances of the Case, justified by the record of the Case and should be approved. *See, e.g., In re EBHI Holdings, Inc.*, No. 09-12099 (MFW) (Bankr. D. Del. Jan. 26, 2010) (granting a release of "the officers, directors, shareholders,

members and/or enrollees, employees, representatives, advisors, attorneys, financial advisors, investment bankers or agents of the Debtors" by "each present and former holder of a [c]laim or [i]nterest who votes in favor of the [p]lan"); *In re JHT Holdings, Inc.*, No. 08-11267 (BLS) (Bankr. D. Del. Oct. 6, 2008) (approving release of debtors, their officers and directors, advisors, and professionals); *In re Dura Auto Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008) (same); *In re Foamex Int'l Inc.*, No. 05-12685 (PJW) (Bankr. D. Del. Feb. 1, 2007) (same); *In re J.L. French Auto. Castings, Inc.*, No. 06-10119 (MFW) (Bankr. D. Del. Jun. 21, 2006) (same).

### 3. The Exculpation Should Be Approved.

38. Section 11.7 of the Plan provides for the exculpation of the Exculpated Parties. The Exculpation is appropriate and should be approved. The Plan's Exculpation is the product of arm's-length negotiations, was critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtor's major stakeholders. The Exculpation was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in the Case in reliance upon the protections afforded to the constituents involved by the Exculpation.[2]

39. Where a plan seeks to limit liability, such as through exculpation, such provisions must be assessed in light of the particular circumstances at issue. *See, In re PWS Holdings Corp.*, 288 F. 3d 224, 245 (3rd Cir. 2000). Exculpation provisions "generally are permissible, so long as they are properly limited and not overly broad." *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 233 (Bankr. E.D. Va. 2012).

40. At the outset, it is important to underscore that the Exculpation provision does not affect the liability of third parties <u>per se</u> but rather sets a standard of care applicable in future litigation against an Exculpated Party for acts arising in connection with the Case to the extent that litigation claims against Exculpated Parties are not otherwise released under the Plan. Indeed, practice recognizes that such provisions are essential inducements to cause parties (including estate fiduciaries and others) to participate collaboratively and constructively in a restructuring process. Exculpation is essential to ensure that capable individuals are willing to manage and assist a debtor in the chapter 11 context. *See In re Chemtura Corp.*, 439 B.R. 561,

---

[2] The Exculpated Parties are limited to the Debtor, J. Clifford Forrest in his post-Petition Date capacity as the director of Freedom, the CRO in his capacity as CRO or as the sole director of Freedom, bankruptcy counsel for the Debtor, the Committee and the Committee's members and attorneys.

610 (Bankr. S.D.N.Y. 2010) (recognizing that "exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case").

41. The participation in complex and challenging settlement discussions that gave rise to the Plan and the efforts required under extraordinary difficult and complicated circumstances that will allow for confirmation of the Plan warrant inclusion of the Exculpated Parties in the Exculpation and such Exculpation was a core consideration and inducement for their direct and substantial participation in the process. The Debtor therefore respectfully submits that the Exculpation provided by the Plan is amply warranted under the circumstances of this Case.

42. Accordingly, for the foregoing reasons, the Debtor respectfully submits that the Exculpation, set forth in Section 11.7 of the Plan should be approved.

### 4. The Injunction is Narrowly Tailored and Should be Approved.

43. Sections 11.12 and 11.13 of the Plan provide for an injunction that is necessary to implement the Plan's release and exculpation provisions. The Injunction is necessary to effectuate the releases contained in the Plan and to protect the Debtor from any potential litigation from prepetition creditors after the Effective Date. Any such litigation would hinder the efforts of the Debtor to fulfill its responsibilities effectively as contemplated in the Plan and thereby undermine the Debtor's efforts to maximize value for all holders of Claims. The Injunction is thus a key provision of the Plan because it enforces the release provisions that are centrally important to the Plan. As such, to the extent the Bankruptcy Court finds that the release provisions are appropriate, the Debtor respectfully requests that the Injunction be approved as well. Moreover, the Injunction is narrowly tailored to achieve its purpose, only extends to claims or causes of action that have been voluntarily released, and is similar to other injunctions approved by courts in other chapter 11 cases. *See, e.g., In re Sorenson Commc'ns, Inc.*, No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014) (finding that injunctions in the plan were necessary to preserve and enforce the releases and exculpations granted by the plan and were narrowly tailored to achieve that purpose); *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. Dec. 23, 2013) (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same). Accordingly, the Injunction should be approved.

### a.     The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code

44.     Section 1129(a)(2) of the Bankruptcy Code requires that a plan proponent "compl[y] with the applicable provisions of [title 11]." 11 U.S.C. § 1129(a)(2). The legislative history to section 1129(a)(2) explains that this provision incorporates the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. H.R. REP. No. 95-595, at 412 (1977) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure"); *see also In re Renegade Holdings, Inc.*, 2010 Bankr. LEXIS 2252, *6-*7 (Bankr. M.D.N.C. July 15, 2010) ("Congress and the courts have highlighted section 1125 as being one of 'the applicable provisions' of title 11 that must be complied with in order for a plan proponent to satisfy section 1129(a)(2)."); *In re Fed.-Mogul Global Inc.*, 2007 Bankr. LEXIS 3940, at *67-*68 (Bankr. D. Del. Nov. 8, 2007) (same).

45.     The Debtor has complied with all solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order governing notice, disclosure and solicitation in connection with the Plan and the Disclosure Statement.

### b.     The Plan Complies with Section 1129(a)(3) of the Bankruptcy Code

46.     Pursuant to section 1129(a)(3) of the Bankruptcy Code, a chapter 11 plan may be confirmed only if it "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The United States Court of Appeals for the Seventh Circuit has stated that "the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir. 1984); *see also In re Osborne*, 2013 Bankr. LEXIS 2203, *11-*12 (Bankr. E.D.N.C. May 30, 2013); *In re Sherwood Square Assocs.*, 107 B.R. 872, 875-76 (Bankr. D. Md. 1989). Good faith must be "viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind [that] the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship* (*In re T-H New Orleans Ltd. P'ship*), 116 F.3d 790, 802 (5th Cir. 1997) (citing *In re Sun Country Dev. Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)). There is no question that the Plan has been proposed by the Debtor in good faith. The Plan is the result of extensive, arms'-length and good faith negotiations among the Debtor and key

stakeholders, the Plan is fundamentally fair to all stakeholders. In the Debtor's view, the Plan also provides the Debtor's creditors with the best possible recovery under the circumstances. Accordingly, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

### c.     The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code.

47.     Section 1129(a)(4) of the Bankruptcy Code requires that a payment "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). This section has been construed to require all payments of professional fees from estate assets to be subject to bankruptcy court review and approval as to their reasonableness. *See, e.g., In re Mason & Dixon Lines, Inc.*, 63 B.R. 176, 183 (Bankr. M.D.N.C. 1986); *In re Stations Holding Co.*, No. 02-10882 (MFW), 2002 WL 31947022, at *3 (Bankr. D. Del. Sept. 30, 2002); *Listanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005).

48.     Pursuant to Section 2.2 of the Plan, on the Effective Date, the amount remaining after the Fixed Plan Payments will be shared as between Professionals and holders of Class 5 Claims by virtue of payments to the Professional Fee Escrow Account and the Spill Claim Plan Administrator, respectively. Furthermore, all Professionals have agreed to pursuant to the Initial Fee Stipulated Order as modified by the Arcadis Stipulated Order which itself has been modified in accordance with the modification thereto filed on September 30, 2015, defer certain portions of their fees pending potential litigation recoveries. The provision is sufficient to comply with section 1129(a)(4) of the Bankruptcy Code.

### d.     The Plan Complies with Section 1129(a)(5) of the Bankruptcy Code

49.     Section 1129(a)(5)(A) of the Bankruptcy Code provides that a court may confirm a plan only if the plan proponent discloses "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan." 11 U.S.C. § 1129(a)(5)(A).

50.     Under Section 5.2 of the Plan, on the Effective Date, the Spill Claim Plan Administrator will become the sole shareholder of Freedom for the benefit of holders of Class 5 Claims.

### e. The Plan Complies with Section 1129(a)(6) of the Bankruptcy Code

51. Other than the Etowah River Terminal, the Debtor's business operations have been sold or liquidated. Thus, no rates are being changed that require approval of a governmental regulatory commission, and accordingly, section 1129(a)(6) of the Bankruptcy Code is not applicable with respect to the Plan.

### f. The Plan Complies with Section 1129(a)(7) of the Bankruptcy Code

52. Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest of such class must either (a) accept the plan or (b) receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated in a hypothetical liquidation under chapter 7 of the Bankruptcy Code. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441-42, n.13 (1999); *Toibb v. Radloff*, 501 U.S. 157, 164-65 (1991); *Hobson v. Travelstead* (*In re Travelstead*), 227 B.R. 638, 654 (D. Md. 1998); *In re Smith*, 357 B.R. 60, 67 (Bankr. M.D.N.C. 2006).

53. As explained in Section VII B at pages 24-25 of the Disclosure Statement, recoveries to impaired classes under the Plan greatly exceed the amounts such parties would receive in a liquidation under chapter 7 of the Bankruptcy Code. In short, a liquidation under chapter 7 as set forth in the liquidation analysis would profoundly and adversely affect the ultimate proceeds available for distribution to all holders of Allowed Claims in the Case due to the delay, cost and uncertainty of liquidation that would be required rather than the settlements proposed under the Plan. Accordingly, section 1129(a)(7) of the Bankruptcy Code is satisfied.

### g. Section 1129(a)(8) of the Bankruptcy Is Not Satisfied

54. Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either has accepted the plan or is not impaired under the plan. See 11 U.S.C. § 1129(a)(8). In determining whether an impaired class of claims has accepted the plan, section 1126(c) of the Bankruptcy Code requires that creditors accepting the plan hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class voting to accept or reject the plan. Moreover, in determining whether an impaired class of interests has accepted a plan, section 1126(d) of the Bankruptcy Code requires that interest holders accepting the plan hold at least two-thirds in amount of the allowed interests of such class voting to accept or reject the plan.

55. Class 1 – IRS Secured Claims; Class 3 – General Unsecured Claims; Class 4 – Spill Claim Convenience Class and Class 5 – Spill Claims have all voted to accept the Plan. No Class 2 votes were submitted to accept or reject the Plan. Case law suggests that Class 2 may be deemed to accept the Plan[3]. Class 6 Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g). Accordingly, section 1129(a)(8) of the Bankruptcy Code has not and cannot be satisfied. The Plan, however, is still confirmable because it satisfied the nonconsensual confirmation provisions of section 1129 of the Bankruptcy Code, as set forth below.

### h. The Plan Complies with Section 1129(a)(9) of the Bankruptcy Code

56. Section 1129(a)(9) of the Bankruptcy Code generally requires that persons holding claims entitled to priority under section 507(a) receive payment in full in cash unless the holder of a particular claim agrees to a different treatment with respect to such claim. Section 4.2 of the Plan provides for payment in full of all Claims entitled to priority under section 507(a) of the Bankruptcy Code either on (a) the Effective Date or (b) the first Business Day after the date that is 10 Business Days after the date such Claim becomes an Allowed Priority Claim. Accordingly, section 1129(a)(9) is satisfied. No holder of a Class 2 Claim has submitted a Ballot, but the treatment of such Claims fully complies with Section 1129(a)(9) of the Bankruptcy Code.

### i. The Plan Complies with Section 1129(a)(10) of the Bankruptcy Code

57. Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of a plan by at least one class of impaired claims, which is "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). At least one impaired class of impaired creditors accepted the Plan. Specifically, as provided in the Voting Certification, Class

---

[3] In the case of *Heins v. Ruti-Sweetwater, Inc.* (*In re Ruti-Sweetwater, Inc.*), 836 F.2d 1263, 1266-67 (10th Cir. 1988), the Court of Appeals affirmed a ruling that a creditor's failure to vote or to object to a Chapter 11 plan constitutes acceptance of the plan. In that case, the creditor was the only member of the class in question. The court said that "[t]o hold otherwise would be to endorse the proposition that a creditor may sit idly by, not participate in any manner in the formulation and adoption of a plan of reorganization and thereafter, subsequent to the adoption of the plan, raise a challenge to the plan for the first time. Adoption of the [opposite] approach would effectively place all reorganization plans at risk in terms of reliance and finality." The holding was followed in the Adelphia bankruptcy case, where the court held that "[r]egarding non-voters as rejecters runs contrary to the Code's fundamental principle, and the language of section 1126(c), that only those actually voting be counted in determining whether a class has met the requirements, in number and amount, for acceptance or rejection of a plan, and subjects those who care about the case to burdens (or worse) based on the inaction and disinterest of others." *In re Adelphia Comm. Corp.*, 368 B.R. 140, 261-62 (Bankr. S.D.N.Y. 2007).

16

1 – IRS Secured Claims; Class 3 General Unsecured Claims; Class 4 – Spill Claim Convenience Class and Class 5 – Spill Claims have overwhelmingly voted to accept the Plan.

### j. The Plan Complies with Section 1129(a)(11) of the Bankruptcy Code

58. The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The Case is a liquidating case. The sources of funding for the Plan all relate to settlements provided for under the Plan. Other than confirmation of the Plan, there are no contingencies to obtaining the Former Ds and Os Contribution or the Southern Contribution.

### k. The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code

59. Section 1129(a)(12) of the Bankruptcy Code requires that either all fees payable pursuant to section 1930 of Title 28 of the United States Code have been paid or that the plan provides for the payment of all such fees on the effective date of the plan. See 11 U.S.C. § 1129(a)(12); *see also Armstrong World*, 348 B.R. at 167. Section 2.3 of the Plan provides for the payment of all statutory fees on the Effective Date or as soon thereafter as is practicable by the Spill Claim Plan Administrator. The Plan accordingly satisfies section 1129(a)(12) of the Bankruptcy Code.

### l. Section 1129(a)(13) of the Bankruptcy Code Is Inapplicable

60. Section 1129(a)(13) of the Bankruptcy Code provides that a plan must provide for continued, post-confirmation payments of all retiree benefits at the levels established in accordance with section 1114 of the Bankruptcy Code. No retiree benefits existed in the Case. As such, the Debtor is not obligated to pay any such benefits, and section 1129(a)(13) is inapplicable.

### l. Section 1129(a)(14) of the Bankruptcy Code Is Inapplicable

61. Section 1129(a)(14) of the Bankruptcy Code provides that a debtor must pay all domestic support obligations as required under judicial or administrative order or by statute. *See* 11 U.S.C. § 1129(a)(14). The Debtor has no domestic support obligations, and therefore section 1129(a)(14) of the Bankruptcy Code is inapplicable.

### m. Section 1129(a)(15) of the Bankruptcy Code is Inapplicable

62. Section 1129(a)(15) of the Bankruptcy Code only applies to cases in which the debtor is an individual, and therefore, is inapplicable to the Debtors. See 11 U.S.C. § 1129(a)(15).

### n. Section 1129(a)(16) of the Bankruptcy Code is Inapplicable

63. Section 1129(a)(16) of the Bankruptcy Code requires that all transfers of property in the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business or commercial corporation of trust. See 11 U.S.C. § 1129(a)(16). The Debtor is a for-profit business corporation, and therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable.

### o. The Plan Complies with Section 1129(b) of the Bankruptcy Code

64. Class 6 – Equity Interests are receiving no distributions under the Plan, and thus, are deemed to reject the Plan. *See* § 4.6. Here, cramdown of the holders of Class 6 interests (the "Deemed Rejecting Class") is appropriate under the Bankruptcy Code.

65. Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may "cramdown" a plan over a dissenting impaired class or classes of claims or interests so long as the plan does not "unfairly discriminate" and is "fair and equitable" with respect to the dissenting class or classes. *See In re Legacy at Jordan Lake,* LLC, 448 B.R. 719, 723 (Bankr. E.D.N.C. 2011); *see also In re Dura Auto. Sys., Inc.*, 379 B.R. 257, 270 (Bankr. D. Del. 2007) (discussing unfair discrimination); *Kurak v. Dura Auto. Sys., Inc.* (*In re Lernout & Hauspie Speech Prods.*, N.V.), 301 B.R. 651, 660 (Bankr. D. Del. 2003). The Plan does not "discriminate unfairly" and is "fair and equitable" with respect to the Deemed Rejecting Class.

66. "Section 1129(b)(1) permits discriminatory treatment as long as the discrimination is not unfair." *In re Sea Trail Corp.*, 2012 Bankr. LEXIS 4985, *25-*26 (Bankr. E.D.N.C. Oct. 23, 2012); *In re Renegade Holdings, Inc.*, 429 B.R. 502, 521 (Bankr. M.D.N.C. 2010) ("The prohibition under section 1129(b)(1) is against 'unfair discrimination' and not simply discrimination of any kind."). The test for determining whether discrimination under a plan is unfair "can be distilled down to two basic elements: (1) there must be a reasonable basis for the discrimination; and (2) the extent of the discrimination must be necessary in light of the basis for the discrimination." *In re Renegade Holdings*, 429 B.R. at 521. In other words, a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similar claims are treated differently without a reasonable basis for the disparate treatment, or a class of claims receives consideration of a value that is greater than the amount of its allowed claims. *See In re Kennedy*, 158 B.R. 589, 599 (Bankr. D.N.J. 1993); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); In re Future Energy Corp., 83 B.R. 470, 492-93 (Bankr.

S.D. Ohio 1988); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part*, 78 B.R. 407 (S.D.N.Y. 1987). Accordingly, as between two classes of claims or two classes of interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.*, *Johns-Manville*, 68 B.R. at 636, or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.  *See, e.g., Buttonwood Partners*, 111 B.R. at 63.  As the foregoing standards demonstrate, the Plan does not "discriminate unfairly."

67. Under the Plan, the "fair and equitable" standard, known as the "absolute priority rule," is satisfied as to each holder of an Equity Interest in the Deemed Rejecting Class. Although holders of Equity Interests in the Deemed Rejecting Class shall neither receive nor retain any property under the Plan, since no holder, if any, that is junior to their Equity Interests will receive or retain property under the Plan on account of their Equity Interests, the Plan is "fair and equitable" with respect to holders of Equity Interests in the Deemed Rejecting Class. Based on the foregoing, the Plan satisfies the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Class 6 - Equity Interests.

### p. The Plan Complies with Section 1129(c) of the Bankruptcy Code

68. The Plan (including previous versions thereof) is the only plan that has been filed in the Case and satisfies the requirements of subsections (a) and (b) of section 1129 of the Bankruptcy Code.  Section 13.1 of the Plan specifically reserves the right of the Debtor to cause confirmation of the Plan pursuant to the "cram down" provisions of Section 1129(c) of the Bankruptcy Code.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

### q. The Plan Complies with Section 1129(d) of the Bankruptcy Code

69. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.  Therefore, the Plan complies with section 1129(d) of the Bankruptcy Code.

### r. The Plan Satisfies All Confirmation Requirements

70. Based on the foregoing, the Debtor submits that the Plan satisfies all of the requirements of the Bankruptcy Code and should be confirmed.

### s. The Plan Complies with Section 1125(e) of the Bankruptcy Code

71. The Debtor submits that the Debtor and its CRO, who is also the sole member of the Debtor's board of directors has acted in "good faith" and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of his activities relating to the solicitation of acceptances of the Plan, and the same is true with respect to the Debtor's attorneys.

### III. CONCLUSION

72. For the reasons set forth herein, and as provided in the accompanying Declaration of Mark Welch, Chief Restructuring Officer of Freedom Industries, Inc., In Support Of Confirmation of the Debtor's Third Modified Amended Plan of Liquidation Dated August 12, 2015, the Debtor, Freedom Industries, Inc. respectfully submits that the Plan should be confirmed.

Dated: September 30, 2015
       Charleston, WV

**BARTH & THOMPSON**

Stephen L. Thompson (WV 3751)
J. Nicholas Barth (WV 255)
Barth & Thompson
P.O. Box 129
Charleston, West Virginia 25321
Telephone: (304) 342-7111
Facsimile: (304) 342-6215

and

**MCGUIREWOODS LLP**

/s/ Mark E. Freedlander
Mark E. Freedlander (PA 70593)
625 Liberty Avenue, 23rd Floor
Pittsburgh, PA 15222
Telephone: (412) 667-6000
Facsimile: (412) 667-6050

Co-Counsel for the Debtor,
Freedom Industries, Inc.